1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
2    Including Professional Corporations
   ORI KATZ, Cal. Bar No. 209561
3  GIANNA SEGRETTI, Cal. Bar No. 323645
   Four Embarcadero Center, 17th Floor
4  San Francisco, California 94111-4109
   Telephone:    415.434.9100
5  Facsimile:    415.434.3947
   Email         okatz@sheppardmullin.com
6                gsegretti@sheppardmullin.com

7  *Attorneys for HASelect-Medical Receivables
   Litigation Finance Fund International SP*

8

9              **UNITED STATES DISTRICT COURT**

10            **NORTHERN DISTRICT OF CALIFORNIA**

11                   **SAN JOSE DIVISION**

12  In re:   Three Bell Capital, LLC Document
             Subpoena                              Case No. 5:22-mc-80338-NC
13

14  Served in Related Cases:

15  *In re Infinity Capital Management, Inc., U.S.*   **OPPOSITION TO NON-PARTY**
    *Bankruptcy Court, District of Nevada Case*      **THREE BELL CAPITAL, LLC'S**
16  *No. 21-14486-abl*                               **MOTION TO QUASH HASELECT-**
                                                     **MEDICAL RECEIVABLES**
17  *and adversary proceeding*                       **LITIGATION FINANCE FUND**
                                                     **INTERNATIONAL SP'S**
18  *HASelect-Medical Receivables Litigation*        **SUBPOENA TO PRODUCE**
    *Finance Fund International SP v.*                **DOCUMENTS**
19  *Tecumseh-Infinity Medical Receivables*
    *Fund, LP, Adv. Proc. No. 21-01167-abl*          Date of Hearing: January 11, 2023
20                                                   Time of Hearing: 11:30 a.m.

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ...................................................................................................1

II.     SUMMARY OF THE ADVERSARY PROCEEDING ......................................1

III.    LEGAL ARGUMENTS.........................................................................................5

        A.      HASelect's Subpoena Is Not Overly Broad..............................................7

        B.      HASelect's Subpoena Seeks Relevant Information...................................8

        C.      HASelect's Subpoena Was Issued in Good Faith and Does Not Impose any Undue Burden on Three Bell. ................................................................10

        D.      There Is No Basis to Impose Sanctions on HASelect or Its Counsel. ....16

IV.     CONCLUSION......................................................................................................18

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

<u>Cases</u>

4

*Antman v. Uber Techs., Inc.*
    2015 U.S. Dist. LEXIS 162531 (N.D. Cal. Dec. 2, 2015) ........................................................6

5

6

*In re Bank United F.S.B.*
    2012 U.S. Dist. LEXIS 58145 (N.D. Cal. Apr. 11, 2012) ........................................................8

7

*Chevron Corp. v. Donziger*
    2013 U.S. Dist. LEXIS 119622 (N.D. Cal. Aug. 22, 2013)....................................................6, 8

8

9

*Echostar Satellite LLC v. Freetech, Inc.*
    2009 U.S. Dist. LEXIS 131409 (N.D. Cal. May 18, 2009) ......................................................8

10

*Eureka Fin. Corp. v. Hartford Acc. & Indem. Co.*
    136 F.R.D. 179 (E.D. Cal. 1991) ..........................................................................................15

11

12

*Exxon Shipping Co. v. U.S. Dep't of Interior*
    34 F.3d 774 (9th Cir. 1994) ....................................................................................................6

13

14

*Goldberg v. Amgen, Inc.*
    123 F. Supp. 3d 9 (D.D.C. 2015) .....................................................................................16, 17

15

*Goodyear Tire & Rubber Co. v. Kirk's Tire & Auto Servicenter of Haverstraw, Inc.*
    211 F.R.D. 658 (D. Kan. 2003)................................................................................................6

16

17

*Hickman v. Taylor*
    329 U.S. 495 (1947)................................................................................................................5

18

19

*Legal Voice v. Stormans Inc.*
    738 F.3d 1178 (9th Cir. 2013) ...........................................................................................16, 17

20

*Mattel, Inc. v. Walking Mountain Prods.*
    353 F.3d 792 (9th Cir. 2003) ...................................................................................................6

21

22

*In re Modern Plastics Corp.*
    890 F.3d 244 (6th Cir. 2018) .................................................................................................16

23

24

*Moon v. SCP Pool Corp.*
    232 F.R.D. 633 (C.D. Cal. 2005) .......................................................................................6, 14

25

*Sanchez v. Cty. Of Sacramento Sheriff's Dep't*
    2020 U.S. Dist. LEXIS 114327 (E.D. Cal. June 29, 2020)....................................................15

26

27

*Shasta Linen Supply, Inc. v. Applied Underwriters, Inc.*
    2018 U.S. Dist. LEXIS 100158 (E.D. Cal. June 13, 2018)....................................................14

28

*Shoen v. Shoen*
  5. F. 3d 1289, 1292 (9th Cir. 1993) ............................................................................5

*Soto v. Castlerock Farming & Transp., Inc.*
  282 F.R.D. 492 (E.D. Cal. 2012) .............................................................................14

*UnitedHealthcare of Fla., Inc. v. Am. Renal Assocs. Holdings, Inc.*
  2019 U.S. Dist. LEXIS 72090 (D. Md. April 29, 2019).........................................16

*Winet v. Arthur J. Gallagher & Co.*
  2020 U.S. Dist. LEXIS 205416, *2-3 (S.D. Cal. Nov. 3, 2020)..............................9

<u>Statutes</u>

11 U.S.C. § 544.............................................................................................................4, 5

11 U.S.C. § 551.............................................................................................................4, 5

<u>Other Authorities</u>

FRCP 26............................................................................................1, 8, 9, 10, 11

FRCP 26(b)...............................................................................................................5, 6

FRCP 34......................................................................................................................6

FRCP 45..........................................................................................1, 6, 8, 10, 13, 16

FRCP 45(c)...............................................................................................................5

FRCP 45(d)(1)......................................................................................................6, 16

FRCP 45(d)(3)..........................................................................................................5

1    HASelect-Medical Receivables Litigation Finance Fund International SP ("HASelect") by

2    and through its undersigned counsel, submits this Opposition Three Bell Capital, LLC's ("Three

3    Bell") *Motion to Quash HASelect-Medical Receivables Litigation Finance Fund International*

4    *SP's Subpoena to Produce Documents* [ECF No. 1] (the "Motion") and respectfully requests that

5    the Court enter an order denying the Motion in its entirety and compelling Three Bell to respond

6    to HASelect's subpoena for the production of documents (the "Subpoena")[1] as set forth herein.

7    This Opposition is made and based on Federal Rules of Civil Procedure 26 and 45, the

8    attached memorandum of points and authorities, the exhibits attached hereto, including the

9    declaration of Bart K. Larsen, Esq. (the "Larsen Declaration") attached hereto as Exhibit 1, and

10   any further evidence or argument the Court may consider in connection with the hearing of the

11   Motion.

12                              **POINTS AND AUTHORITIES**

13   **I.      INTRODUCTION**

14   Three Bell's Motion is not well taken.  As set forth below, HASelect has established the

15   relevancy of the information requested from Three Bell through the Subpoena.  In contrast, Three

16   Bell has failed to meet its burden of establishing that the Subpoena is in any way overly broad,

17   imposes any undue burden, seeks the production of any confidential information, or was otherwise

18   issued in bad faith or for any improper purpose.  Consequently, the Motion must be denied, and

19   Three Bell should be compelled to respond to the Subpoena.

20   **II.     SUMMARY OF THE ADVERSARY PROCEEDING[2]**

21   HASelect's Subpoena was issued in an adversary proceeding pending in the U.S.

22   Bankruptcy Court for the District of Nevada (the "Bankruptcy Court"), Case No. 21-01167-abl,

23   (the "Adversary Proceeding") in connection with the chapter 7 bankruptcy case of Infinity Capital

24   ───────────────

[1] A copy of the Subpoena is attached hereto as Exhibit 2.

25   [2] This section provides only a relatively bare summary of the issues before the Bankruptcy Court in the Adversary

26   Proceeding.  A more complete discussion of these issues as well as citations to supporting evidence on file on the
     Bankruptcy Court's docket, which are incorporated herein by reference, can be found in HASelect's opposition to

27   Tecumseh's motion for partial summary judgment filed in the Adversary Proceeding on September 30, 2022 at ECF
     No. 122 and the supporting declaration of Michael Griffin filed at ECF No. 123, copies of which are attached hereto

28   as Exhibit 19 and Exhibit 20, respectively.

1   Management, Inc. ("Infinity").  The facts underlying the Adversary Proceeding and the need for

2   the information requested in the Subpoena are as follows.

3          In February 2019, HASelect entered into a secured lending relationship with Infinity

4   through which HASelect received a perfected first-priority security interest in all personal property

5   owned by Infinity.  From February 2019 through April 2020, HASelect advanced approximately

6   $16 million in loan proceeds to Infinity.  Such loan proceeds were intended for use by Infinity to

7   purchase accounts receivable from various medical providers arising from treatment provided to

8   personal injury claimants.  HASelect's perfected security interest encompassed all such accounts

9   purchased by Infinity prior to Infinity's chapter 7 bankruptcy filing.  HASelect engaged the

10  services of FTM Limited to act as a subadvisor and fiduciary to assist in the administration of the

11  loan to Infinity.  Griffin Asset Management, LLC ("GAM") serves as an asset manager to

12  HASelect.  Through its relationship with GAM, Three Bell and/or its clients invested funds with

13  HASelect that were used, along with funds from other sources, to fund HASelect's loan to

14  Infinity.[3]

15         In early 2020, two former employees of GAM, Simon Clark and Chad Meyer, formed

16  Tecumseh-Infinity Medical Receivables Fund, LP ("Tecumseh") and, together with the principals

17  of FTM Limited, William Dalzell and Endre Debozy, began soliciting Infinity to terminate its

18  relationship with HASelect and to enter into an alternative financing arrangement with Tecumseh.

19  As a result of these solicitations, Infinity's borrowing relationship with HASelect was terminated,

20  and Infinity entered into a Sub-Advisory Agreement with Tecumseh on June 18, 2020 under which

21  it was contemplated that Infinity would assist Tecumseh in locating and purchasing accounts from

22  medical providers.   Additionally, Tecumseh engaged the principals of FTM Limited, Dalzell and

23  Debozy (ostensibly acting through a new entity) (collectively, "FTM") to provide administrative

24  services in connection with this new funding arrangement.

25

26

27

28  [3] See December 30, 2019 email attached hereto as Exhibit 11.

1    In filing its chapter 7 case on September 14, 2021, Infinity claimed to own accounts worth

2  less than $6 million despite admittedly owing more than $14 million to HASelect.[4]  In investigating

3  the basis for this significant shortfall in the collateral for its loan to Infinity, HASelect discovered

4  that Infinity had not merely assisted Tecumseh in locating and purchasing accounts from third

5  party medical providers as described in the Sub-Advisory Agreement.  Rather, immediately upon

6  entering into the Sub-Advisory Agreement, Infinity sold millions of dollars in accounts included

7  within HASelect's collateral directly to Tecumseh.[5]  Further, HASelect discovered that, after

8  entering into the Sub-Advisory Agreement, Infinity continued to purchase accounts in its own

9  name using funds provided by Tecumseh that were commingled with proceeds Infinity continued

10 to collect from accounts included within HASelect's collateral.

11    Based on these discoveries, HASelect commenced the Adversary Proceeding against

12 Tecumseh on October 19, 2021 in which it has asserted claims for declaratory relief, conversion,

13 and unjust enrichment against Tecumseh and seeks a determination that all accounts purchased by

14 Infinity, including those funded by Tecumseh under the Sub-Advisory Agreement, are subject to

15 HASelect's perfected, first-priority security interest and remain collateral for HASelect's loan to

16 Infinity.[6]  In response, Tecumseh asserted counterclaims against HASelect and Infinity's chapter

17 7 trustee, alleging that Tecumseh is the equitable owner of the disputed accounts at issue despite

18 the fact they were purchased by Infinity in its own name and claiming that Infinity held those

19 accounts in an equitable trust for Tecumseh's benefit.[7]  In response, HASelect has asserted

20 equitable defenses, including, but not limited to, the fact that Tecumseh cannot seek equity as a

21 result of its unclean hands.

22

23

24  [4] A copy of Infinity's bankruptcy schedules is attached hereto as <u>Exhibit 3</u>.

25  [5] These transfers are described in detail in HASelect's motion for partial summary judgment filed in the Adversary

26  Proceeding on March 22, 2022 at ECF No. 53, which was granted, in part, by the Bankruptcy Court through its order entered on July 25, 2022 at ECF No. 88.

27  [6] A copy of HASelect's First Amended Complaint is attached hereto as <u>Exhibit 4</u>.

28  [7] A copy of Tecumseh's Answer and Counterclaim is attached hereto as <u>Exhibit 5</u>.

1    In response to Tecumseh's counterclaim, the chapter 7 trustee asserted his own

2  counterclaim against Tecumseh seeking to avoid any unperfected interest[8] claimed by Tecumseh

3  in the disputed accounts pursuant to 11 U.S.C. §§ 544 and 551.[9]  Subsequent to the filing of the

4  chapter 7 trustee's counterclaim, HASelect purchased the Infinity chapter 7 estate's interests in the

5  disputed accounts from the chapter 7 trustee through a 363 sale approved by the bankruptcy

6  court.[10]  Thereafter, HASelect substituted into the chapter 7 trustee's position in the Adversary

7  Proceeding.[11]  Consequently, HASelect now sits in the position of the chapter 7 trustee in terms of

8  defending Tecumseh's counterclaims against the chapter 7 trustee and in pursuing the chapter 7

9  trustee's counterclaim against Tecumseh.

10    Discovery in the Adversary Proceeding is set to close on January 31, 2023.  Trial in the

11  Adversary Proceeding is scheduled to begin on April 4, 2023.  The major issues remaining to be

12  resolved in the Adversary Proceeding, among others, are as follows:

13
14    1. What was the nature of the transactions between Tecumseh and Infinity under the
       June 18, 2020 Sub-Advisory Agreement?

15    2. What was the nature of the transactions between Infinity and the various medical
16       providers from whom Infinity acquired the disputed accounts claimed by Tecumseh
         under the Sub-Advisory Agreement?

17    3. Did Infinity sell or otherwise transfer additional accounts subject to HASelect's
18       perfected security interest to Tecumseh beyond those on which the Bankruptcy Court
         has already granted partial summary judgment in HASelect's favor?

19    4. Did Infinity purchase disputed accounts claimed by Tecumseh under the Sub-
20       Advisory Agreement using HASelect's loan proceeds or proceeds of HASelect's
         collateral commingled with funds received from Tecumseh?

21    5. Did Infinity purchase disputed accounts claimed by Tecumseh under the Sub-
22       Advisory Agreement pursuant to preexisting, non-assignable contracts with medical
         providers, which contracts also served as collateral for HASelect's loan to Infinity?

23
_____

24  [8] Tecumseh failed to file any UCC financing statement to perfect any interest it claims to have purchased in the
    disputed accounts prior to Infinity's chapter 7 bankruptcy filing.

25  [9] A copy of the chapter 7 trustee's Answer and Counterclaim is attached hereto as Exhibit 6.

26  [10] A copy of the order approving that sale was filed in Infinity's chapter 7 case on February 11, 2022 at ECF No. 184
    and is attached hereto as Exhibit 7.

27  [11] A copy of the order approving this substitution was filed in the Adversary Proceeding at ECF No. 81 and is attached
28  hereto as Exhibit 8.

6. Did Tecumseh and Infinity act with the requisite intent to create a resulting trust relationship in entering into the Sub-Advisory Agreement?

7. Is Tecumseh barred from the equitable relief it seeks through its counterclaims as a result of its own inequitable conduct towards HASelect under the doctrine of unclean hands?

8. Why do Infinity's bankruptcy schedules make no mention of any accounts held in trust for Tecumseh's benefit or any trust relationship with Tecumseh?

9. Are the disputed accounts claimed by Tecumseh subject to HASelect's perfected security interest to Tecumseh?

10. Did Tecumseh improperly collude with Infinity in planning to continue doing business with Infinity's principals through their new company, IHS, after Infinity's chapter 7 filing?

11. Is any unperfected interest claimed by Tecumseh in the disputed accounts avoidable pursuant to 11 U.S.C. §§ 544 and 551?[12]

## III.   LEGAL ARGUMENTS

As this Court is aware, under Rule 26(b), the scope of discovery is broad. Pre-trial discovery is "accorded a broad and liberal treatment." *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). A party "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." FRCP 26(b). Moreover, "information within this scope of discovery need not be admissible in evidence to be discoverable." *Id*. "A non-party can be compelled to produce evidence regarding any matter relevant to the subject matter involved in the pending action or reasonably calculated to lead to the discovery of admissible evidence." *Shoen v. Shoen*, 5. F. 3d 1289, 1292 (9th Cir. 1993). "This broad right of discovery is based on the general principle that litigants have a right to every man's evidence, and that wide access to relevant facts serves the integrity and fairness of the judicial process by promoting the search for truth." *Id*., *quoting U.S. v. Bryan*, 339 U.S. 323 (1950).

Rule 45(d)(3) [Quashing or Modifying a Subpoena] provides the following:

(A) When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

---

[12] Larsen Declaration, ¶ 10.

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

Irrelevance is not contained within the list of enumerated reasons for quashing a subpoena found in Rule 45.  "It is well settled, however, that the scope of discovery under a subpoena is the same as the scope of discovery under Rules 26(b) and 34." *Goodyear Tire & Rubber Co. v. Kirk's Tire & Auto Servicenter of Haverstraw, Inc.*, 211 F.R.D. 658, 662 (D. Kan. 2003); FRCP 45(d)(1) (advisory committee's note to the 1970 Amendment).  Thus, the court must examine whether a request contained in a subpoena is overly broad or seeks irrelevant information under the same standards as set forth in Rule 26(b) and as applied to Rule 34 requests for production.  *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 637 (C.D. Cal. 2005)("courts have incorporated relevance as a factor when determining motions to quash a subpoena.").

The party asserting the objections (i.e., the moving party on a motion to quash) has the burden of persuasion under FRCP 45.  *See, e.g.*, *Chevron Corp. v. Donziger*, 2013 U.S. Dist. LEXIS 119622, *13 (N.D. Cal. Aug. 22, 2013). This includes proving that the information sought is overly broad and unduly burdensome.  *See, e.g.*, *Antman v. Uber Techs., Inc.*, 2015 U.S. Dist. LEXIS 162531 (N.D. Cal. Dec. 2, 2015) ("[T]he non-party seeking to modify a subpoena…has the burden of persuading the court that the subpoena presents an undue burden.").  All that is required of the moving party is to show that the discovery sought is relevant.  *Id.* (denying a motion to quash).

District courts have broad discretion to determine whether a subpoena is unduly burdensome. *See Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 779 (9th Cir. 1994). A subpoena is unduly burdensome where it seeks to compel production of documents regarding topics unrelated to or beyond the scope of litigation. *See Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 813-14 (9th Cir. 2003).  "[A]n evaluation of undue burden requires the court to weigh the burden to the subpoenaed party against the value of the information to the serving party," and requires the court's consideration of "such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity

1    with which the documents are described and the burden imposed." *Moon v. SCP Pool Corp.*, 232

2    F.R.D. 633, 637 (C.D. Cal. 2005) (internal citation and quotation marks omitted).

3        **A.    HASelect's Subpoena Is Not Overly Broad.**

4        Three Bell falsely complains that the Subpoena requests "19 separate categories of

5    documents" that are "untied to time" and fail to "describe the documents sought with any

6    reasonable particularity."[13]   Yet, the Motion makes virtually no reference to the documents

7    actually requested under the Subpoena and fails to explain how any particular request is in any

8    way overly broad or improper.  In fact, even a cursory review of the actual document requests set

9    forth in the Subpoena disproves Three Bell's contention that the Subpoena is overly broad.

10       The 19 separate document requests included in the Subpoena fall into six (6) discrete

11   categories:  Three Bell's communications with Infinity (requests 1 – 5), Three Bell's

12   communications with Tecumseh (requests 6 – 9), Three Bell's communications with FTM

13   (requests 10 – 14), Three Bell's communications with third parties regarding HASelect's

14   relationships with Infinity or FTM (request 15), Three Bell's communications with third parties

15   regarding Tecumseh's relationships with Infinity or FTM (request 16), and documents relating to

16   any agreement between Three Bell and either Infinity, Tecumseh, or FTM relating to the sale,

17   purchase, sourcing, servicing, collection, or valuation of accounts receivable (requests 17 – 19).

18       Requests 1 – 14 seek communications with specific parties (Tecumseh, Infinity, and FTM)

19   regarding specific topics over a specific period of time.  Requests 15 and 16 are broader in the

20   sense that they seek communications exchanged with a wider range of third parties but still each

21   relate to a specific topic and specific period of time.  Requests 17 – 19 seek documents relating to

22   agreements between Three Bell and specific parties (again, Tecumseh, Infinity, and FTM) relating

23   to a specific topic over a specific period of time.    These requests were separated in this fashion

24   in an attempt to clearly identify the specific nature of the requested communications.  Moreover,

25   these requests are accompanied by detailed definitions (pages 1 – 3 of Exhibit A to the Subpoena)

26   and instructions (pages 3 – 5 of Exhibit A to the Subpoena) intended to minimize any possible

27   
─────────────────
28   [13] *See* Motion, p. 9, ll. 5-8.

1    ambiguity as to the documents requested.  Finally, contrary to Three Bell's complaint that the

2    requests are "untied to time", instruction 10 (page 5 of Exhibit A to the Subpoena) expressly states

3    that, unless otherwise indicated, the document requests relate to the time period of January 1, 2019

4    through the date of Three Bell's response.  Further, after wrongly complaining that the Subpoena

5    is not specific as to time, Three Bell acknowledges that HASelect's counsel offered to further limit

6    the applicable time period to January 1, 2020 through December 31, 2021.[14]  Still, however, Three

7    Bell offers no explanation as to why it believes this two-year period is overly broad.[15]

8            Three Bell has failed to establish that any request for documents included within the

9    Subpoena is overly broad, which it is required to do as a nonparty resisting discovery and seeking

10   to quash the Subpoena. *See, e.g.*, *Chevron Corp.*, 2013 U.S. Dist. LEXIS 119622 at *13.  As such,

11   Three Bell's objection to the Subpoena on the basis that it is overly broad should be overruled.

12           **B.    HASelect's Subpoena Seeks Relevant Information.**

13           In light of the significant issues remaining to be resolved in the Adversary Proceeding as

14   recounted above, the documents requested from Three Bell under the Subpoena are plainly

15   relevant and well within the scope of permissible third-party discovery under FRCP 26 and 45.

16           In spite of Three Bell's claim that it has no connection to the Adversary Proceeding or

17   Infinity's chapter 7 case, HASelect has learned through discovery in the Adversary Proceeding

18   and Infinity's chapter 7 case that, in July 2020 – at roughly the same time that Infinity wrongfully

19   sold Tecumseh millions of dollars in accounts included in HASelect's collateral – Tecumseh,

20   FTM, and Infinity discussed a scheme to solicit Three Bell to seek a redemption of its investment

21   in HASelect to force a liquidation of HASelect that they hoped would allow Infinity to transfer

22   most, if not all, of the remaining collateral for HASelect's loan to Tecumseh.[16]  HASelect has also

23   confirmed that Tecumseh thereafter successfully solicited Three Bell to invest in Tecumseh's

24
25   [14] *See* Motion, p. 9, ll. 13-16.

26   [15] Nor could it. *See Echostar Satellite LLC v. Freetech, Inc.*, 2009 U.S. Dist. LEXIS 131409, *4-5 (N.D. Cal. May 18, 2009) (requiring a nonparty to produce documents "going back…two years" which were responsive to a subpoena); *see also In re Bank United F.S.B.*, 2012 U.S. Dist. LEXIS 58145 (N.D. Cal. Apr. 11, 2012) (refusing to quash a subpoena seeking documents over a two-year period).

27
28   [16] *See* July 11, 2020 email chain attached hereto as <u>Exhibit 9</u>.

funding of Infinity's ongoing purchases of accounts in connection with the June 18, 2020 Sub-Advisory Agreement.[17]  HASelect has similarly learned that in the months leading up to Infinity's bankruptcy filing in September 2021, Three Bell representatives, Jon Porter, Eric Patterson, and Will Martin, communicated extensively with Infinity's principals, Oliver Hemmers and Anne Pantelas, and others regarding options for securing the transfer to Tecumseh of the remaining collateral for HASelect's loan and for resolving HASelect's claims against Tecumseh, Infinity, and FTM as set forth below.

In the course of their communications with Three Bell, it is highly plausible, if not likely, that Tecumseh, Infinity, and FTM made representations to Three Bell regarding the nature of their business relationships and the transactions occurring under the June 18, 2020 Sub-Advisory Agreement, the facts surrounding the funding and purchase of the disputed accounts by Infinity, the transfer of accounts included within HASelect's collateral to Tecumseh, and the status, value, and disposition of accounts in which HASelect held a perfected, first-position security interest – all of which would be relevant to the claims and defenses at issue in the Adversary Proceeding. *See* FRCP 26; *see also* Winet v. Arthur J. Gallagher & Co., 2020 U.S. Dist. LEXIS 205416, *2-3 (S.D. Cal. Nov. 3, 2020) (citing to cases and recognizing that "information having 'any tendency' to make a fact in dispute 'more or less probable' is relevant" and that "relevancy for purposes of discovery is broader than relevancy for purposes of trial").

For example, in emails dated June 16, 2021, Three Bell confirmed to Infinity that it had been in communication with Tecumseh regarding a potential deal to transfer the remaining collateral for HASelect's loan to Tecumseh.[18]  In another email dated June 27, 2021 – less than 90 days before Infinity's chapter 7 bankruptcy filing – Infinity's principles provided to Three Bell an analysis of the remaining accounts that served as collateral for HASelect's loan and opined that such accounts were worth $10.5 to $15 million.[19]  Just three months later, Infinity represented to

---

[17] *See* September 4, 2020 email chain attached hereto as Exhibit 10.

[18] *See* June 16, 2021 email chain attached hereto as Exhibit 14.

[19] *See* June 27, 2021 email chain attached hereto as Exhibit 12.

the Bankruptcy Court in filing its schedules that these same accounts were worth just $5.8 million.[20]   Similarly, in emails dated July 15 and 16, 2021, Three Bell and Infinity discussed a request by Three Bell that Infinity provide copies of emails it purportedly exchanged with HASelect to be used by Three Bell as leverage against HASelect.[21]   Finally, emails dated September 1, 2012 confirm that Three Bell representative Jon Porter spoke with Infinity's principals just two weeks before Infinity's chapter 7 case was filed.[22]

These communications along with other communications Three Bell may have exchanged with Tecumseh, Infinity, or FTM are plainly relevant to the issues pending before the Bankruptcy Court in the Adversary Proceeding and are well within the scope of permissible third-party discovery under FRCP 26 and 45.  As such, HASelect has met its burden of establishing that the information sought is relevant in accordance with discovery principals, and any objection raised by Three Bell based on the relevancy of the Subpoena should be overruled.

### C.    HASelect's Subpoena Was Issued in Good Faith and Does Not Impose any Undue Burden on Three Bell.

HASelect first sought to subpoena documents from Three Bell and Jon Porter through subpoenas issued in the Adversary Proceeding on January 12, 2022.[23]   In response, Three Bell's attorneys objected to these subpoenas, claiming, among other things, that the subpoenas' document requests were overly broad and imposed an undue burden on Three Bell and that HASelect had not made adequate efforts to obtain the requested documents through other means.[24]   After some additional discussion of these subpoenas with Three Bell's counsel during February and March 2022, HASelect chose not to seek to enforce these subpoenas at that time.  Instead, HASelect did as Three Bell requested and sought to obtain the requested documents through other means,

---

[20] *See* Exhibit 3 attached hereto at pages 4 and 9.

[21] *See* July 15 and 16, 2021 email chain attached hereto as Exhibit 13.

[22] *See* September 1, 2021 email chain attached hereto as Exhibit 15.

[23] Copies of these subpoenas were filed on this Court's docket by Three Bell at ECF No. 1-18.

[24] A copy of counsel's January 20, 2022 letter objecting to these subpoenas was filed on this Court's docket by Three Bell at ECF No. 1-11.

1   including discovery requests directed to Tecumseh, subpoenas directed to FTM and its principal

2   Bill Dalzell, and subpoenas issued to various third parties believed to be in possession of Infinity's

3   email records.[25]

4       HASelect, however, has had only limited success in its efforts to obtain the requested

5   documents from alternative sources.  HASelect issued requests for production of documents on

6   March 10, 2022 in which HASelect requested that Tecumseh produce its communications with

7   third parties regarding Three Bell as well as its communications with Three Bell and its principals

8   regarding Infinity.[26]  Tecumseh, however, refused to produce any such communications.[27]

9       HASelect's attempts to obtain discovery from FTM and its principal Bill Dalzell have been

10  similarly frustrated.  FTM is believed to be based out of Vanuatu with no formal presence in the

11  United States.  FTM's principals are not U.S. citizens and are not known to have any regular

12  presence in the United States.  As such, HASelect has had few feasible options for seeking

13  discovery from FTM.  In November 2022, HASelect's counsel learned that Dalzell, who is

14  believed to be a Canadian citizen, was likely visiting Las Vegas and attempted to serve document

15  subpoenas on FTM and Dalzell at a local address provided through Tecumseh's FRCP 26 witness

16  disclosures.[28]  That address proved to be incorrect.  By the time HASelect was able to able to

17  obtain the correct address for the residence where Dalzell was believed to be staying while in Las

18  Vegas, Dalzell had already left.  HASelect is informed and believes that Dalzell does not intend to

19  return to Las Vegas for several months and has no knowledge of any alternative local where it

20  might serve discovery requests on FTM or Dalzell prior to the close of discovery in the Adversary

21  Proceeding.[29]

22

[25] Larsen Declaration, ¶¶ 17-19.

23

24  [26] A copy of Tecumseh's responses HASelect's requests for production to Tecumseh in the Adversary Proceeding was filed on this Court's Docket by Three Bell at ECF No. 1-2.  The relevant requests are requests nos. 36 – 38 and 55 – 58.

25  [27] *Id*.  Larsen Declaration, ¶ 20.  Counsel for HASelect is in the process of meeting and conferring with counsel for Tecumseh regarding several deficiencies in Tecumseh's discovery responses, including its refusal to produce its

26  communications with Three Bell.

27  [28] Copies of the subpoenas issued to FTM and Dalzell are attached hereto as <u>Exhibit 16</u>.

28  [29] Larsen Declaration, ¶¶ 21-22.

1   HASelect has been partially successful in its efforts to obtain Infinity's communications

2   with Three Bell, but those efforts have been continually frustrated by the improper actions of

3   Infinity's principals, Hemmers and Pantelas, who have gone to great lengths to conceal from

4   HASelect certain aspects of their dealings with Tecumseh, FTM, and Three Bell.  For example,

5   during the October 27, 2021 meeting of creditors in Infinity's chapter 7 case, Hemmers and

6   Pantelas made several materially false statements intended to conceal the fact that they had

7   transferred Infinity business records and assets (i.e., HASelect's collateral) to a new company,

8   Infinity Health Solutions, LLC ("<u>IHS</u>") through which they continued to do business with

9   Tecumseh and FTM after Infinity's chapter 7 filing.[30]  Similarly, prior to surrendering Infinity's

10  computer equipment and business records to HASelect, Hemmers deleted from such records

11  several emails he exchanged with an IT consultant named Robert Land that assisted Hemmers in

12  establishing new servers for IHS and in wrongfully copying Infinity's business records to those

13  new servers around the time of Infinity's chapter 7 filing.[31]  HASelect was able to recover these

14  emails only by issuing a document subpoena directly to Land.

15          Further, HASelect has issued subpoenas to several third parties believed to be in possession

16  of Infinity's email records, including GoDaddy.com, LLC (unable to provide any email records),

17  Tailor Made Servers (provided only limited and mostly older email records), and GPMicro, Inc.

18  ("<u>GPMicro</u>"), which is an affiliate of Infinity operated by Hemmers that is believed to have

19  provided data backup services to Infinity.  After several months of negotiations with GPMicro,

20  HASelect finally received a copy of Infinity's email archives from GPMicro in March 2022. While

21  the email records produced by GPMicro are more complete that those turned over to HASelect by

22  Infinity following its chapter 7 filing, it has become obvious that Hemmers deleted pertinent

23  portions of his own emails from his Infinity email account before allowing GPMicro to produce

24  those records to HASelect.       For example, Hemmers' email inbox for his

25

---

26  [30] The details of these false statements are recounted at paragraphs 72 – 82 on the separate adversary complaint HASelect filed against IHS, Hemmers, and Pantelas, a copy of which is attached hereto as <u>Exhibit 17</u>.

27  [31] A more detailed description of Hemmers' deletion of the emails exchanged with Land is provided at paragraphs 40 – 48 of the adversary complaint attached hereto as <u>Exhibit 17</u>.

28

oliver@infinitycapital.com email address did not contain a single email received from Three Bell representatives, Porter, Patterson, or Martin.[32]  However, Hemmers' sent items folder included more than a dozen emails from Porter, Patterson, and Martin to which Hemmers had responded.[33] The absence of these emails from Hemmers' inbox is an obvious sign that Hemmers attempted to delete his communications with Three Bell prior to producing Infinity's email archives to HASelect.  HASelect has no way of knowing the full extent to which Hemmers deleted his communications with Three Bell and has exhausted its options for obtaining a complete record of such communications from alternative sources.  It is appropriate and necessary that HASelect obtain these communications from Three Bell pursuant to the Subpoena, and HASelect has acted in good faith in attempting to do so.

Aside from complaining that it would have to take action to locate and produce the communications in question[34], Three Bell's Motion fails to identify any undue burden it would face in responding to the Subpoena.  Instead, Three Bell complains *ad nauseum* that the documents requested are not relevant to the Adversary Proceeding while ignoring the multiple explanations from HASelect's counsel as to how such documents are, in fact, relevant for the reasons set forth above.[35]  Three Bell further complains that HASelect has not fully exhausted its options for obtaining the requested documents from Tecumseh.  First, there is no reason to believe that Tecumseh would be in possession of Three Bell's communications with either Infinity or FTM. As such this argument relates to only a subset of the documents requested under the Subpoena. Second, Three Bell has cited no case law in support of its argument that HASelect must litigate a motion to compel against Tecumseh before attempting to subpoena records from Three Bell.  In fact, no such requirement exists under FRCP 45 or applicable case law.  Of course, HASelect acknowledges that discovery should generally be obtained from a party before burdening a non-

---

[32] Further, the deleted items folders for Hemmers' email account as well as virtually all of the approximately 20 other email accounts produced by GPMicro were complete empty – a clear indication that emails had recently been permanently deleted from those accounts.

[33] Larsen Declaration, ¶¶ 23-24.

[34] *See* Motion, p. 9, ll. 13-15.

[35] *See* Emails attached hereto as Exhibit 18.

party with discovery requests. *See, e.g., Moon*, 232 F.R.D. at 638. But this obligation does not require that discovery between parties be final before a subpoena can be issued to a third party.

This very issue was addressed in *Shasta Linen Supply, Inc. v. Applied Underwriters, Inc.*, 2018 U.S. Dist. LEXIS 100158, (E.D. Cal. June 13, 2018) in which the court held as follows:

> Relation is correct that when documents are in the possession of both the opposing party and a non-party, the first request should be to the opposing party. However, Relation cites no bright-line rule that party discovery must be complete before a third-party subpoena would be appropriate, and the court is aware of no such rule. Relation's citation to *Soto v. Castlerock Farming & Transp., Inc.* is on point, but ultimately does not support its argument. 282 F.R.D. 492, 505 (E.D. Cal. 2012). In Soto, the court noted that "[i]n general, there is a preference for parties to obtain discovery from one another before burdening non-parties with discovery requests." *Id*. There, the subpoenaing party first sought documents from the opposing party, who largely refused to produce responsive documents. *Id*. The Soto court found that this attempt established the subpoenaing party's need to obtain the documents from the third party. *Id*.

> Here, Applied Underwriters sought discovery from plaintiffs in this case, and found that their productions had gaps which Applied Underwriters believes would be filled by the production from Relation. ECF No. 88 at 8. Relation cites no law that indicates Applied Underwriters' attempts were insufficient, or that party discovery must be somehow final before it can be required to produce documents. Applied Underwriters also argued at hearing that metadata associated with Relation's copy of documents may be important to its arguments; the court finds this reasoning persuasive. Because Applied Underwriters has attempted to get responsive documents from plaintiffs and retains a belief that Relation has additional responsive documents in its possession, and because Relation's copy of documents may include discoverable metadata unique to their version of the document, Applied Underwrites has demonstrated a need to obtain the documents from Relation and the third-party subpoenas are not premature.

*Id.* at *14-16.

Again, many of the documents requested under the Subpoena would not be in Tecumseh's possession. As to those that would likely be in Tecumseh's possession (i.e., Three Bell's communications with Tecumseh), HASelect has requested those documents from Tecumseh, who has refused to produce those document along with many other categories of documents that remain the subject of HASelect's meet and confer efforts with Tecumseh. Moreover, in light of such refusal, and given Infinity's close working relationship with Tecumseh and obvious efforts to destroy its own records of communications with Three Bell as evidenced by the deletion of such

1    communications from Hemmers' email account inbox, there is good reason for HASelect to seek

2    a complete record of Tecumseh's communications directly from Three Bell.

3        Finally, Three Bell broadly claims that its communications with its clients are highly

4    confidential and propriety.  However, beyond the self-serving statements included in the Porter

5    Declaration[36], Three Bell offers no evidence and cites to no legal authority in support of this

6    claimed confidentiality.  Further, Three Bell fails to explain how its communications with

7    Tecumseh, FTM, and Infinity could be considered confidential as none of these parties are known

8    or claimed to be clients of Three Bell.[37]  This falls woefully short of Three Bell's burden in

9    objecting based on privilege, and the Motion should be denied for this reason alone.  *See, e.g.*,

10   *Sanchez v. Cty. Of Sacramento Sheriff's Dep't*, 2020 U.S. Dist. LEXIS 114327 (E.D. Cal. June 29,

11   2020) ("It is a fundamental principal of discovery that the party asserting privilege bears the burden

12   of proving the applicability of the privilege or protection to a given document.").[38]  In any event,

13   any privilege asserted by Three Bell must be strictly construed because they impede the full and

14   fair discovery of the truth. *See, e.g.*, *Eureka Fin. Corp. v. Hartford Acc. & Indem. Co.*, 136 F.R.D.

15   179, 183 (E.D. Cal. 1991).  To be clear, the Subpoena does not seek production of Three Bell's

16   communications with its clients or internal communications regarding investment strategies.

17   Rather, the Subpoena seeks communications Three Bell exchanged with independent third parties

18   regarding issues that are directly related to the Adversary Proceeding for the reasons explained

19   above.

20       Three Bell has plainly failed to carry its burden of establishing that it would be subjected

21   to any undue burden in responding to the Subpoena.  As such, Three Bell's objection that any such

22

23

24   [36] *See* ECF No. 1-16, ¶¶ 7 and 9.

25   [37] In fact, this supposed issue of confidentiality was not raised in any of the meet-and-confer discussions between
     counsel prior to the filing of Three Bell's Motion.  To the extent that responding to the Subpoena would require the
26   disclosure of any confidential or sensitive information, HASelect is willing to work with Three Bell to fashion
     appropriate safeguards to protect any such information.

27   [38] HASelect is hamstrung in responding to the Motion based on Three Bell's failure to satisfy its burden and refusal
     to clarify its nebulous assertion of privilege.  To the extent Three Bell attempts to clarify on Reply, HASelect must be
28   provided a chance to respond.

1   undue burden exists should be overruled, and Three Bell should be ordered to produce its

2   communications with Tecumseh, Infinity, and FTM in response to the Subpoena.

3       **D.      There Is No Basis to Impose Sanctions on HASelect or Its Counsel.**

4          Three Bell requests that the Court impose sanctions on HASelect and its counsel for having

5   issued the Subpoena pursuant to Rule 45(d)(1).  Yet, Three Bell cites to no case law that would

6   support an award of sanctions in this situation and fails to offer any coherent argument in support

7   of such sanctions.[39]  Moreover, Three Bell ignores HASelect's multiple attempts to address Three

8   Bell's objections, including HASelect's offer to reimburse Three Bell's reasonable costs incurred

9   in responding to the Subpoena.[40]

10         Undoubtedly, Rule 45(d)(1) requires parties who issue subpoenas to "take reasonable steps

11  to avoid imposing undue burden or expense on a person subject to the subpoena."  What constitutes

12  an "undue burden" is assessed on a case-by-case basis.  Factors considered include "relevance, the

13  need of the party for the documents, the breadth of the document request, the time period covered

14  by it, the particularity with which the documents are described and the burden imposed."  *In re*

15  *Modern Plastics Corp.*, 890 F.3d 244, 251 (6th Cir. 2018); *See also Legal Voice*, 738 F.3d at 1185

16  ("A court may, however, impose sanctions when a party issues a subpoena in bad faith, for an

17  improper purpose, or in a manner inconsistent with existing law.").  However, "[t]he fact that the

18  parties disagree over the demands of a subpoena does not automatically mean it imposes an "undue

19  burden.'"  *UnitedHealthcare of Fla., Inc. v. Am. Renal Assocs. Holdings, Inc. (In re Subpoenas*

20  *Served on the Am. Kidney Fund, Inc.)*, 2019 U.S. Dist. LEXIS 72090 (D. Md. April 29, 2019).

21         Where the party serving the subpoena engages in good faith negotiations to resolve a

22  conflict as to the scope of the subpoena and to avoid imposing an undue burden on the responding

23  party, courts generally declined to impose Rule 45 sanctions. *See, e.g., Goldberg v. Amgen, Inc.*,

24

---

25  [39] Three Bell complains that HASelect served the Subpoena at the personal residence of Three Bell's principal, Jon
26  Porter.  However, Three Bell fails to advise the court that its counsel refused to accept service of the Subpoena and
    that HASelect first attempted to serve Three Bell at its corporate office, which is also the address designed with the
    California Secretary of State for Porter as Three Bell's resident agent, several times but found the office locked and
27  no one present on each occasion.  *See* Emails attached hereto as <u>Exhibit 18</u>; Larsen Declaration, ¶ 26.

28  [40] *See* Emails attached hereto as <u>Exhibit 18</u>.

1    123 F. Supp. 3d 9, 23 (D.D.C. 2015) (*citing Mount Hope Church v. Bash Back!*, 705 F.3d 418,

2    428 (9th Cir.2012) (concluding a party had complied with its duty to avoid undue burden where it

3    attempted to address the responding party's objections in good faith and narrow the issues, and

4    "nothing on the record to suggest that the subpoena was issued in bad faith or for an improper

5    purpose")); *see also Legal Voice v. Stormans Inc.*, 738 F.3d 1178, 1184 (9th Cir. 2013) (("[W]hile

6    failure narrowly to tailor a subpoena may be a ground for sanctions, the district court need not

7    impose sanctions every time it finds a subpoena overbroad; such overbreadth may sometimes result

8    from normal advocacy, which [the court has] said should not give rise to sanctions."").

9    Furthermore, courts generally interpret "undue burden" to be "'limited to harms inflicted by

10   complying with the subpoena' and 'not to the adjudication of related follow-on issues, such as

11   whether the subpoenaed information is potentially protected by a privilege.'" *Goldberg v. Amgen,*

12   *Inc.*, 123 F.Supp.3d 9 (D. D.C. 2015) (*citing Legal Voice*, 738 F.3d at 1185).

13           For the reasons set forth above, the communications sought through the Subpoena are

14   plainly relevant to the issues pending before the Bankruptcy Court in the Adversary Proceeding.

15   HASelect made reasonable efforts to obtain such communications from alternative sources before

16   issuing the Subpoena to Three Bell.  To the extent that any request for documents included in the

17   Subpoena could be reasonably construed to impose any undue burden on Three Bell, the meet-

18   and-confer communications exchanged between the parties' counsel clearly show that HASelect

19   attempted in good faith to address Three Bell's objections and reasonably offered to narrow the

20   scope of the Subpoena to avoid any undue burden to Three Bell.[41]

21           Instead of reciprocating and attempting to resolve this matter in good faith, Three Bell has

22   steadfastly refused to respond to the Subpoena in any form and has continually attempted to cast

23   HASelect's efforts to address Three Bell's purported concerns as somehow admitting that the

24   Subpoena is improper.  Three Bell's obtuse insistence that it is above the law and owes no

25   obligation whatsoever to respond to the Subpoena is unreasonable and entirely inconsistent with

26

27

---

[41] *See* Emails attached hereto as <u>Exhibit 18</u>.

1    even basic notions of good faith.   Sanctions against HASelect or its counsel are clearly not

2    appropriate under these circumstances.

3    **IV.    CONCLUSION**

4    Based on the forgoing, HASelect respectfully requests that the Court enter an order denying

5    Three Bell's Motion in its entirety and requiring that Three Bell respond to the Subpoena through

6    the production of responsive documents pertaining to its communications with Tecumseh, Infinity,

7    and FTM.

8    Dated:  January 4, 2023

9                                    SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

10

11                    By    _____
                                       */s/ Ori Katz*
12                                        ORI KATZ
                                     GIANNA SEGRETTI
13
                              Attorneys for HASelect-Medical Receivables
14                            Litigation Finance Fund International SP

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
ORI KATZ, Cal. Bar No. 209561
GIANNA SEGRETTI, Cal. Bar No. 323645
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
Telephone:    415.434.9100
Facsimile:    415.434.3947
E mail          okatz@sheppardmullin.com
                    gsegretti@sheppardmullin.com

*Attorneys for HASelect-Medical Receivables
Litigation Finance Fund International SP*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| In re:   Three Bell Capital, LLC Document<br>            Subpoena<br><br>Served in Related Cases:<br><br>*In re Infinity Capital Management, Inc., U.S.<br>Bankruptcy Court, District of Nevada Case<br>No. 21-14486-abl*<br><br>*and adversary proceeding*<br><br>*HASelect-Medical Receivables Litigation<br>Finance Fund International SP v.<br>Tecumseh-Infinity Medical Receivables<br>Fund, LP, Adv. Proc. No. 21-01167-abl* | Case No. 5:22-mc-80338-NC<br><br>**DECLARATION OF BART K.<br>LARSEN IN SUPPORT OF<br>OPPOSITION TO NON-PARTY<br>THREE BELL CAPITAL, LLC'S<br>MOTION TO QUASH HASELECT-<br>MEDICAL RECEIVABLES<br>LITIGATION FINANCE FUND<br>INTERNATIONAL SP'S<br>SUBPOENA TO PRODUCE<br>DOCUMENTS**<br><br>Date of Hearing: January 11, 2023<br>Time of Hearing: 11:30 a.m. |

I, Bart K. Larsen, hereby declare as follows:

1.       I am over the age of twenty-one (21) years old and am mentally competent.  I have personal knowledge of the matters set forth herein except as to those matters stated on information and belief, which I believe to be true, and if called upon as a witness to testify to these facts, I could and would competently and truthfully do so.

2.       I have been licensed to practice law before all courts in the state of Nevada since 2003 and have been admitted to practice before the Ninth Circuit Court of Appeals since at least

2011.  I am partner in the law firm of Shea Larsen PC, which has served as counsel for HASelect-Medical Receivables Litigation Finance Fund International SP ("HASelect") in the chapter 7 case of Infinity Capital Management, Inc. ("Infinity") since approximately September 20, 2021 and in the related adversary proceedings filed by HASelect, including the adversary proceeding commenced against Tecumseh-Infinity Medical Receivables Fund, LP's ("Tecumseh"), Adversary Case No. 21-01167-abl (the "Adversary Proceeding") on October 19, 2021 in which the subpoena at issue in this matter (the "Subpoena") was issued.

3.      I make this Declaration in support of HASelect's Opposition (the "Opposition") to Three Bell Capital, LLC's ("Three Bell") *Motion to Quash HASelect-Medical Receivables Litigation Finance Fund Internation SP's Subpoena to Produce Documents* (the "Motion").

4.      Except as to matters stated on information and belief, I make this declaration based upon my own personal knowledge of the facts stated herein.

5.      The document attached to the Opposition as Exhibit 2 is a true and correct copy of the Subpoena.

6.      The documents attached to the Opposition as Exhibit 3, Exhibit 4, Exhibit 5, Exhibit 6, Exhibit 7, Exhibit 8, Exhibit 17, Exhibit 19, and Exhibit 20 are true and correct copies of documents filed on the docket of the U.S. Bankruptcy Court for the District of Nevada (the "Bankruptcy Court") in the chapter 7 bankruptcy case of Infinity Capital Management, Inc. ("Infinity"), Case No. 21-14486-abl, or in the Adversary Proceeding.

7.      The documents attached to the Opposition as Exhibit 9, Exhibit 10, Exhibit 11, Exhibit 12, Exhibit 13, Exhibit 14, and Exhibit 15 are true and correct copies of emails produced to my office as counsel for HASelect in response to a subpoena issued in Infinity's chapter 7 bankruptcy case to GPMicro, Inc. ("GPMicro"), which is an affiliate of Infinity operated by Hemmers that is believed to have provided data backup services to Infinity prior to Infinity's.

8.      The documents attached to the Opposition as Exhibit 16 are true and correct copies of subpoenas issued in the Adversary Proceeding seeking the production of documents from FTM Investments, LLC and William Dalzell (collectively, and together with related entities, "FTM").

9.      The documents attached to the Opposition as <u>Exhibit 18</u> are true and correct copies of emails I exchanged with counsel for Three Bell in connection with our efforts to meet and confer regarding Three Bell's objections to the Subpoena.

10.     Discovery in the Adversary Proceeding is set to close on January 31, 2023.  Trial in the Adversary Proceeding is scheduled to begin on April 4, 2023.  The major issues remaining to be resolved in the Adversary Proceeding, among others, are as follows:

a. What was the nature of the transactions between Tecumseh and Infinity under the June 18, 2020 Sub-Advisory Agreement?

b. What was the nature of the transactions between Infinity and the various medical providers from whom Infinity acquired the disputed accounts claimed by Tecumseh under the Sub-Advisory Agreement?

c. Did Infinity sell or otherwise transfer additional accounts subject to HASelect's perfected security interest to Tecumseh beyond those on which the Bankruptcy Court has already granted partial summary judgment in HASelect's favor?

d. Did Infinity purchase disputed accounts claimed by Tecumseh under the Sub-Advisory Agreement using HASelect's loan proceeds or proceeds of HASelect's collateral commingled with funds received from Tecumseh?

e. Did Infinity purchase disputed accounts claimed by Tecumseh under the Sub-Advisory Agreement pursuant to preexisting, non-assignable contracts with medical providers, which contracts also served as collateral for HASelect's loan to Infinity?

f. Did Tecumseh and Infinity act with the requisite intent to create a resulting trust relationship in entering into the Sub-Advisory Agreement?

g. In Tecumseh barred from the equitable relief it seeks through its counterclaims as a result of its own inequitable conduct towards HASelect under the doctrine of unclean hands?

h. Why do Infinity's bankruptcy schedules make no mention of any accounts held in trust for Tecumseh's benefit or any trust relationship with Tecumseh?

i.  Are the disputed accounts claimed by Tecumseh subject to HASelect's perfected security interest to Tecumseh?

j.  Did Tecumseh improperly collude with Infinity in planning to continue doing business with Infinity's principals through their new company, IHS, after Infinity's chapter 7 filing?

k.  Is any unperfected interest claimed by Tecumseh in the disputed accounts avoidable pursuant to 11 U.S.C. §§ 544 and 551?

11.  Infinity's chapter 7 bankruptcy case was filed on September 14, 2021.  I am informed and believe that, at that time, Infinity owed in excess of $16 million to HASelect under a series of secured loans for which HASelect held a perfected security interest in substantially all of Infinity's personal property, including its books and records.  Such collateral consisted primarily of accounts receivable that Infinity had purchased or funded through transactions with over 100 different medical providers.

12.  Immediately upon learning of Infinity's bankruptcy filing, HASelect acted diligently to obtain relief from the automatic stay and to obtain control over its collateral and possession of Infinity's books and records.

13.  On or about October 24, 2021, HASelect gained access to Infinity's physical office in Henderson, Nevada and to what was left of Infinity's computer systems and physical files.  I have personally reviewed many of the records remaining on Infinity's computer systems, including the email records of Infinity's principals, Oliver Hemmers and Anne Pantelas, and many of Infinity's physical files.

14.  Upon gaining access to Infinity's computer systems and physical files, HASelect discovered that a substantial number of records relating to Infinity's business operations and HASelect's collateral were missing or incomplete.  For example, the vast majority of recent business-related emails had been permanently deleted from Hemmers' oliver@infinitycapital.com email account.  Moreover, those records that remained were poorly organized and difficult to access without the use of the proprietary Case Manager software developed by Infinity, which had been

rendered unusable prior to Infinity's abandonment of its office.

15.     As is thoroughly documents in filings on the Bankrutpcy Court's docket in a separate adversary proceeding HASelect filed against Infinity's principals, Oliver Hemmers and Anne Pantelas, and their new company, Infinity Health Solutions, LLC ("IHS") on June 8, 2022, Adversary Case No. 22-01109, HASelect's efforts to obtain control over its collateral and possession of Infinity's books and records have continually been frustrated by Hemmers and Pantelas's attempts to secretly misappropriate and transfer Infinity's business records and intangible property to IHS as well as countless false representations by Hemmers and Pantelas concerning Infinity's dealings with Tecumseh and FTM Limited and their business activities through IHS.

16.     In an attempt to circumvent Hemmers and Pantelas efforts to conceal information, HASelect has issued subpoenas for the production of documents to more than 20 different parties through Infinity's chapter 7 case.  HASelect has also been diligent in conducting discovery in the Adversary Proceeding through issuing discovery requests to Tecumseh and subpoenas for the production of documents to various additional third parties.

17.     In connection with these efforts to reconstruct Infinity's business records and to obtain discovery related to the claims and defenses at issue in the Adversary Proceeding, HASelect issued subpoenas to Three Bell and its principal, Jon Porter, on January 12, 2022.

18.     In response, Three Bell's attorneys objected to these subpoenas, claiming, among other things, that the subpoenas' document requests were overly broad and imposed an undue burden on Three Bell and that HASelect had not made adequate efforts to obtain the requested documents through other means.

19.     After some additional discussion of these subpoenas with Three Bell's counsel during February and March 2022, HASelect chose not to seek to enforce these subpoenas at that time. Instead, HASelect did as Three Bell requested and sought to obtain the requested documents through other means, including discovery requests directed to Tecumseh and subpoenas issued to various third parties believed to be in possession of Infinity's email records and subpoenas directed to FTM and its principal Bill Dalzell.

20.     HASelect, however, has had only limited success in its efforts to obtain the requested documents from alternative sources.  HASelect issued requests for production of documents on March 10, 2022 in which HASelect requested that Tecumseh produce its communications with third parties regarding Three Bell as well as its communications with Three Bell and its principals regarding Infinity.  Tecumseh, however, refused to produce any such communications.

21.     HASelect's attempts to obtain discovery from FTM have been similarly frustrated.  I am informed and believe that FTM is based out of Vanuatu and has no formal presence in the United States.  I am further informed and believe that FTM's principals are not U.S. citizens and are not known to have any regular presence in the United States.

22.     In November 2022, I learned that Dalzell, who is believed to be a Canadian citizen, was likely visiting Las Vegas and attempted to serve document subpoenas on FTM and Dalzell at a local address provided through Tecumseh's FRCP 26 witness disclosures.  That address proved to be incorrect.  By the time I was able to able to obtain the correct address for the residence where Dalzell was believed to be staying while in Las Vegas, Dalzell had already left.  Based on recent discussions with Hemmers, I am informed and believe that Dalzell does not intend to return to Las Vegas for several months and have no knowledge of any alternative local where HASelect might serve discovery requests on FTM or Dalzell prior to the close of discovery in the Adversary Proceeding.

23.     HASelect has issued subpoenas to several third parties believed to be in possession of Infinity's email records, including GoDaddy.com, LLC (unable to provide any email records), Tailor Made Servers (provided only limited and mostly older email records), and GPMicro, which provided copies of what were represented to be Infinity's email archives in or around March 2022 after more than five (5) months of negotiations for the production of such records.

24.     While the email records produced by GPMicro are more complete that those turned over to HASelect by Infinity following its chapter 7 filing, it has become obvious that Hemmers deleted pertinent portions of his own emails from his Infinity email account before allowing GPMicro to produce those records to HASelect.  For example, Hemmers' email inbox for his

oliver@infinitycapital.com email address did not contain a single email received from Three Bell representatives, Porter, Patterson, or Martin.  However, Hemmers' sent items folder included more than a dozen emails from Porter, Patterson, and Martin to which Hemmers had responded.  Additionally, the deleted items folders for Hemmers' email account as well as virtually all of the approximately 20 other email accounts produced by GPMicro were complete empty, indicating that emails had recently been permanently deleted from those accounts.

25.     As a result of these difficulties encountered by HASelect in seeking to obtain discovery from Tecumseh, Infinity, and FTM, HASelect issued a second subpoena seeking the production of documents to Three Bell in October 2022 (the "Subpoena").  The scope of the document requests included in the Subpoena were substantially narrower than the requests included in the initial subpoenas issued to Three Bell and Porter in January 2022.

26.     HASelect's process server initially attempted to serve the Subpoena on Three Bell at its corporate office located at 4 Main Street, Suite 230, Los Altos, California 90422, which is also the address designed with the California Secretary of State for Porter as Three Bell's resident agent, six (6) separate times between November 4 and 15, 2022 but found the office locked and no one present on each occasion.  It was only after I learned that service could not be completed at Three Bell's corporate office that I instructed its process server to serve the Subpoena at Porter's residence, which I am informed and believe was completed on December 1, 2022.

27.     Based on Three Bell's combative response to the prior subpoenas issued in January 2022, I did not expect that Three Bell's counsel would cooperate in accepting service of the Subpoena and was concerned that providing advance notice of HASelect's intent to serve the subpoena would result in Three Bell attempting to avoid service.  As such, I did not contact Three Bell's counsel prior to attempting to serve the Subpoena.

28.     On December 7, 2022, I received a letter from Three Bell's counsel, Melissa Zonne, objecting to the Subpoena and claiming that service of the Subpoena had been ineffective.  Between December 7 and 13, 2022, I exchanged several emails with Ms. Zonne.  Copies of those emails are included in Exhibit 18.

29.     On December 14, 2022, I spoke with Ms. Zonne by telephone.  During this call I explained the relevancy of the documents requests under the Subpoena as set forth in the Opposition and advised Ms. Zonne that I was willing to discuss reasonably narrowing the scope of the document requests to avoid inconveniencing her client.  In response, Ms. Zonne maintained that service of the Subpoena was ineffective and that Three Bell was unwilling to produce any documents in response to the Subpoena.  I asked whether Ms. Zonne could accept service of the Subpoena to avoid having to attempt service at Porter's residence a second time, but she declined.  During the call, Ms. Zonne complained that HASelect had not filed a motion to compel against Tecumseh and suggested that it do so before seeking to enforce the Subpoena.  In response, I advised Ms. Zonne that discovery in the Adversary Case is set to close on January 31, 2023 and that trial is set to begin in early April 2023.  Any motion to compel Tecumseh to produce records would likely take at least four to six weeks to resolve.  As a result, there would be insufficient time to revisit the Subpoena to Three Bell after litigating a motion to compel.

30.     Following this call, I sent Ms. Zonne an email confirming that I intended to attempt service at Porter's residence a second time if Three Bell continued to dispute the December 1, 2022 service of the Subpoena and refused to allow Ms. Zonne's firm to accept service.  This email is included in Exhibit 18.

31.     I am informed and believe that an updated version of the Subpoena with extended compliance dates was served at Porter's residence on December 15, 2022.

32.     Following my December 14, 2022 call with Ms. Zonne, I exchanged several emails with Ms. Zonne and with another attorney at her firm, Mark Boennighausen, in which I again explained the relevancy of the Subpoena to the Adversary Proceeding, offered to narrow the scope of the Subpoena to address Three Bell's objections, and offered to discuss the matter further by telephone.  I also confirmed in my final email sent to Mr. Boennighausen on December 21, 2022 that HASelect was willing to reimburse reasonable expenses incurred by Three Bell in responding to the Subpoena.  These emails are included in Exhibit 18.

33.     I declare under penalty of perjury of the laws of the United States that the foregoing

is true and correct.

DATED this 4th day of January 2023.

_____
BART K. LARSEN, ESQ

2011. I am partner in the law firm of Shea Larsen PC, which has served as counsel for HASelect-Medical Receivables Litigation Finance Fund International SP ("HASelect") in the chapter 7 case of Infinity Capital Management, Inc. ("Infinity") since approximately September 20, 2021 and in the related adversary proceedings filed by HASelect, including the adversary proceeding commenced against Tecumseh-Infinity Medical Receivables Fund, LP's ("Tecumseh"), Adversary Case No. 21-01167-abl (the "Adversary Proceeding") on October 19, 2021 in which the subpoena at issue in this matter (the "Subpoena") was issued.

3.       I make this Declaration in support of HASelect's Opposition (the "Opposition") to Three Bell Capital, LLC's ("Three Bell") *Motion to Quash HASelect-Medical Receivables Litigation Finance Fund Internation SP's Subpoena to Produce Documents* (the "Motion").

4.       Except as to matters stated on information and belief, I make this declaration based upon my own personal knowledge of the facts stated herein.

5.       The document attached to the Opposition as Exhibit 2 is a true and correct copy of the Subpoena.

6.       The documents attached to the Opposition as Exhibit 3, Exhibit 4, Exhibit 5, Exhibit 6, Exhibit 7, Exhibit 8, Exhibit 17, Exhibit 19, and Exhibit 20 are true and correct copies of documents filed on the docket of the U.S. Bankruptcy Court for the District of Nevada (the "Bankruptcy Court") in the chapter 7 bankruptcy case of Infinity Capital Management, Inc. ("Infinity"), Case No. 21-14486-abl, or in the Adversary Proceeding.

7.       The documents attached to the Opposition as Exhibit 9, Exhibit 10, Exhibit 11, Exhibit 12, Exhibit 13, Exhibit 14, and Exhibit 15 are true and correct copies of emails produced to my office as counsel for HASelect in response to a subpoena issued in Infinity's chapter 7 bankruptcy case to GPMicro, Inc. ("GPMicro"), which is an affiliate of Infinity operated by Hemmers that is believed to have provided data backup services to Infinity prior to Infinity's.

8.       The documents attached to the Opposition as Exhibit 16 are true and correct copies of subpoenas issued in the Adversary Proceeding seeking the production of documents from FTM Investments, LLC and William Dalzell (collectively, and together with related entities, "FTM").

9.      The documents attached to the Opposition as <u>Exhibit 18</u> are true and correct copies of emails I exchanged with counsel for Three Bell in connection with our efforts to meet and confer regarding Three Bell's objections to the Subpoena.

10.     Discovery in the Adversary Proceeding is set to close on January 31, 2023.  Trial in the Adversary Proceeding is scheduled to begin on April 4, 2023.  The major issues remaining to be resolved in the Adversary Proceeding, among others, are as follows:

a.   What was the nature of the transactions between Tecumseh and Infinity under the June 18, 2020 Sub-Advisory Agreement?

b.   What was the nature of the transactions between Infinity and the various medical providers from whom Infinity acquired the disputed accounts claimed by Tecumseh under the Sub-Advisory Agreement?

c.   Did Infinity sell or otherwise transfer additional accounts subject to HASelect's perfected security interest to Tecumseh beyond those on which the Bankruptcy Court has already granted partial summary judgment in HASelect's favor?

d.   Did Infinity purchase disputed accounts claimed by Tecumseh under the Sub-Advisory Agreement using HASelect's loan proceeds or proceeds of HASelect's collateral commingled with funds received from Tecumseh?

e.   Did Infinity purchase disputed accounts claimed by Tecumseh under the Sub-Advisory Agreement pursuant to preexisting, non-assignable contracts with medical providers, which contracts also served as collateral for HASelect's loan to Infinity?

f.   Did Tecumseh and Infinity act with the requisite intent to create a resulting trust relationship in entering into the Sub-Advisory Agreement?

g.   In Tecumseh barred from the equitable relief it seeks through its counterclaims as a result of its own inequitable conduct towards HASelect under the doctrine of unclean hands?

h.   Why do Infinity's bankruptcy schedules make no mention of any accounts held in trust for Tecumseh's benefit or any trust relationship with Tecumseh?

    i.   Are the disputed accounts claimed by Tecumseh subject to HASelect's perfected security interest to Tecumseh?

    j.   Did Tecumseh improperly collude with Infinity in planning to continue doing business with Infinity's principals through their new company, IHS, after Infinity's chapter 7 filing?

    k.   Is any unperfected interest claimed by Tecumseh in the disputed accounts avoidable pursuant to 11 U.S.C. §§ 544 and 551?

11.    Infinity's chapter 7 bankruptcy case was filed on September 14, 2021.  I am informed and believe that, at that time, Infinity owed in excess of $16 million to HASelect under a series of secured loans for which HASelect held a perfected security interest in substantially all of Infinity's personal property, including its books and records.  Such collateral consisted primarily of accounts receivable that Infinity had purchased or funded through transactions with over 100 different medical providers.

12.    Immediately upon learning of Infinity's bankruptcy filing, HASelect acted diligently to obtain relief from the automatic stay and to obtain control over its collateral and possession of Infinity's books and records.

13.    On or about October 24, 2021, HASelect gained access to Infinity's physical office in Henderson, Nevada and to what was left of Infinity's computer systems and physical files.  I have personally reviewed many of the records remaining on Infinity's computer systems, including the email records of Infinity's principals, Oliver Hemmers and Anne Pantelas, and many of Infinity's physical files.

14.    Upon gaining access to Infinity's computer systems and physical files, HASelect discovered that a substantial number of records relating to Infinity's business operations and HASelect's collateral were missing or incomplete.  For example, the vast majority of recent business-related emails had been permanently deleted from Hemmers' oliver@infinitycapital.com email account.  Moreover, those records that remained were poorly organized and difficult to access without the use of the proprietary Case Manager software developed by Infinity, which had been

rendered unusable prior to Infinity's abandonment of its office.

15.     As is thoroughly documents in filings on the Bankrutpcy Court's docket in a separate adversary proceeding HASelect filed against Infinity's principals, Oliver Hemmers and Anne Pantelas, and their new company, Infinity Health Solutions, LLC ("IHS") on June 8, 2022, Adversary Case No. 22-01109, HASelect's efforts to obtain control over its collateral and possession of Infinity's books and records have continually been frustrated by Hemmers and Pantelas's attempts to secretly misappropriate and transfer Infinity's business records and intangible property to IHS as well as countless false representations by Hemmers and Pantelas concerning Infinity's dealings with Tecumseh and FTM Limited and their business activities through IHS.

16.     In an attempt to circumvent Hemmers and Pantelas efforts to conceal information, HASelect has issued subpoenas for the production of documents to more than 20 different parties through Infinity's chapter 7 case.  HASelect has also been diligent in conducting discovery in the Adversary Proceeding through issuing discovery requests to Tecumseh and subpoenas for the production of documents to various additional third parties.

17.     In connection with these efforts to reconstruct Infinity's business records and to obtain discovery related to the claims and defenses at issue in the Adversary Proceeding, HASelect issued subpoenas to Three Bell and its principal, Jon Porter, on January 12, 2022.

18.     In response, Three Bell's attorneys objected to these subpoenas, claiming, among other things, that the subpoenas' document requests were overly broad and imposed an undue burden on Three Bell and that HASelect had not made adequate efforts to obtain the requested documents through other means.

19.     After some additional discussion of these subpoenas with Three Bell's counsel during February and March 2022, HASelect chose not to seek to enforce these subpoenas at that time. Instead, HASelect did as Three Bell requested and sought to obtain the requested documents through other means, including discovery requests directed to Tecumseh and subpoenas issued to various third parties believed to be in possession of Infinity's email records and subpoenas directed to FTM and its principal Bill Dalzell.

20.    HASelect, however, has had only limited success in its efforts to obtain the requested documents from alternative sources.  HASelect issued requests for production of documents on March 10, 2022 in which HASelect requested that Tecumseh produce its communications with third parties regarding Three Bell as well as its communications with Three Bell and its principals regarding Infinity.  Tecumseh, however, refused to produce any such communications.

21.    HASelect's attempts to obtain discovery from FTM have been similarly frustrated.  I am informed and believe that FTM is based out of Vanuatu and has no formal presence in the United States.  I am further informed and believe that FTM's principals are not U.S. citizens and are not known to have any regular presence in the United States.

22.    In November 2022, I learned that Dalzell, who is believed to be a Canadian citizen, was likely visiting Las Vegas and attempted to serve document subpoenas on FTM and Dalzell at a local address provided through Tecumseh's FRCP 26 witness disclosures.  That address proved to be incorrect.  By the time I was able to able to obtain the correct address for the residence where Dalzell was believed to be staying while in Las Vegas, Dalzell had already left.  Based on recent discussions with Hemmers, I am informed and believe that Dalzell does not intend to return to Las Vegas for several months and have no knowledge of any alternative local where HASelect might serve discovery requests on FTM or Dalzell prior to the close of discovery in the Adversary Proceeding.

23.    HASelect has issued subpoenas to several third parties believed to be in possession of Infinity's email records, including GoDaddy.com, LLC (unable to provide any email records), Tailor Made Servers (provided only limited and mostly older email records), and GPMicro, which provided copies of what were represented to be Infinity's email archives in or around March 2022 after more than five (5) months of negotiations for the production of such records.

24.    While the email records produced by GPMicro are more complete that those turned over to HASelect by Infinity following its chapter 7 filing, it has become obvious that Hemmers deleted pertinent portions of his own emails from his Infinity email account before allowing GPMicro to produce those records to HASelect.  For example, Hemmers' email inbox for his

oliver@infinitycapital.com email address did not contain a single email received from Three Bell representatives, Porter, Patterson, or Martin.  However, Hemmers' sent items folder included more than a dozen emails from Porter, Patterson, and Martin to which Hemmers had responded.  Additionally, the deleted items folders for Hemmers' email account as well as virtually all of the approximately 20 other email accounts produced by GPMicro were complete empty, indicating that emails had recently been permanently deleted from those accounts.

25.     As a result of these difficulties encountered by HASelect in seeking to obtain discovery from Tecumseh, Infinity, and FTM, HASelect issued a second subpoena seeking the production of documents to Three Bell in October 2022 (the "Subpoena").  The scope of the document requests included in the Subpoena were substantially narrower than the requests included in the initial subpoenas issued to Three Bell and Porter in January 2022.

26.     HASelect's process server initially attempted to serve the Subpoena on Three Bell at its corporate office located at 4 Main Street, Suite 230, Los Altos, California 90422, which is also the address designed with the California Secretary of State for Porter as Three Bell's resident agent, six (6) separate times between November 4 and 15, 2022 but found the office locked and no one present on each occasion.  It was only after I learned that service could not be completed at Three Bell's corporate office that I instructed its process server to serve the Subpoena at Porter's residence, which I am informed and believe was completed on December 1, 2022.

27.     Based on Three Bell's combative response to the prior subpoenas issued in January 2022, I did not expect that Three Bell's counsel would cooperate in accepting service of the Subpoena and was concerned that providing advance notice of HASelect's intent to serve the subpoena would result in Three Bell attempting to avoid service.  As such, I did not contact Three Bell's counsel prior to attempting to serve the Subpoena.

28.     On December 7, 2022, I received a letter from Three Bell's counsel, Melissa Zonne, objecting to the Subpoena and claiming that service of the Subpoena had been ineffective.  Between December 7 and 13, 2022, I exchanged several emails with Ms. Zonne.  Copies of those emails are included in Exhibit 18.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

29.     On December 14, 2022, I spoke with Ms. Zonne by telephone.  During this call I explained the relevancy of the documents requests under the Subpoena as set forth in the Opposition and advised Ms. Zonne that I was willing to discuss reasonably narrowing the scope of the document requests to avoid inconveniencing her client.  In response, Ms. Zonne maintained that service of the Subpoena was ineffective and that Three Bell was unwilling to produce any documents in response to the Subpoena.  I asked whether Ms. Zonne could accept service of the Subpoena to avoid having to attempt service at Porter's residence a second time, but she declined.  During the call, Ms. Zonne complained that HASelect had not filed a motion to compel against Tecumseh and suggested that it do so before seeking to enforce the Subpoena.  In response, I advised Ms. Zonne that discovery in the Adversary Case is set to close on January 31, 2023 and that trial is set to begin in early April 2023.  Any motion to compel Tecumseh to produce records would likely take at least four to six weeks to resolve.  As a result, there would be insufficient time to revisit the Subpoena to Three Bell after litigating a motion to compel.

30.     Following this call, I sent Ms. Zonne an email confirming that I intended to attempt service at Porter's residence a second time if Three Bell continued to dispute the December 1, 2022 service of the Subpoena and refused to allow Ms. Zonne's firm to accept service.  This email is included in Exhibit 18.

31.     I am informed and believe that an updated version of the Subpoena with extended compliance dates was served at Porter's residence on December 15, 2022.

32.     Following my December 14, 2022 call with Ms. Zonne, I exchanged several emails with Ms. Zonne and with another attorney at her firm, Mark Boennighausen, in which I again explained the relevancy of the Subpoena to the Adversary Proceeding, offered to narrow the scope of the Subpoena to address Three Bell's objections, and offered to discuss the matter further by telephone.  I also confirmed in my final email sent to Mr. Boennighausen on December 21, 2022 that HASelect was willing to reimburse reasonable expenses incurred by Three Bell in responding to the Subpoena.  These emails are included in Exhibit 18.

33.     I declare under penalty of perjury of the laws of the United States that the foregoing

is true and correct.

DATED this 4th day of January 2023.

_____
BART K. LARSEN, ESQ

**<u>EXHIBIT 2</u>**

B2570 (Form 2570 – Subpoena for Production of Documents, Information, Objects or to Permit Inspection in a Bankruptcy Case or Adversary Case) (12/15)

# UNITED STATES BANKRUPTCY COURT

## District of Nevada

| | |
|---|---|
| In re: INFINITY CAPITAL MANAGEMENT, INC. <br><br> Debtor. | Case No. 21-14486-abl <br> Chapter 7 |
| HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP, <br><br> Plaintiff <br><br> v. <br><br> TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP, <br><br> Defendant | Adversary Case No. 21-01167-abl |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

**To:  Three Bell Capital, LLC, 4 Main Street, Suite 230, Los Altos, California 94022**

☒ *Production:* YOU ARE COMMANDED to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:  **See Exhibit A attached hereto**.

| Location: | **Talty Court Reporters, Inc.** <br> **2131 The Alameda, Suite D** <br> **San Jose, CA 95126** | Date and Time: | **January 4, 2023** <br> **5:00 p.m.** |
|---|---|---|---|

**\*\*\*Production of electronic records by email to blarsen@shea.law is also acceptable.\*\*\***

☐ *Inspection of Premises:* YOU ARE COMMANDED to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Location: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: December 14, 2022.

CLERK OF COURT                              OR

_____          /s/ *Bart K. Larsen, Esq.*
*Signature of Clerk or Deputy Clerk*        Attorney's signature

The name, address, email address, and telephone number of the attorney representing HASelect-Medical Receivables Litigation Finance Fund International SP, who issues or requests this subpoena, is: Bart K. Larsen, Esq., SHEA LARSEN PC, 1731 Village Center Circle, Suite 150, Las Vegas, Nevada 89134, (702) 471-7432, blarsen@shea.law.

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (Page 2)

## PROOF OF SERVICE
**(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)**

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)*_____.

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)*_____; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $_____.

My fees are $_____for travel and $_____for services, for a total of $_____.

I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information concerning attempted service, etc.:

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (Page 3)

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

# EXHIBIT A

## DEFINITIONS

1.      "**506 Investor Group**" refers to 506 Investor Group, LLC, including its employees, directors, officers, agents, servants, subsidiaries, parent company, affiliated companies, and other persons acting or purporting to act on its behalf, including its Representatives, as well as anyone known or believed to be a member of or affiliated with 506 Investor Group.

2.      "**Bankruptcy Case**" shall mean the following case: *In re Infinity Capital Management, Inc.*, United States Bankruptcy Court for the District of Nevada, Case No. 21-14486-abl, including all related adversary proceedings.

3.      "**Communication**" means any oral or written statement, dialogue, colloquy, discussion, or conversation, and includes any transfer of thoughts or ideas or data or information, between persons or locations by means of any Documents or by any other means, including but not limited to electronic or similar means.

4.      "**Control**" means in your possession, custody, or control or under your direction, and includes in the possession, custody, or control of those under the direction of you or your employees, subordinates, counsel, accountant, consultant, expert, parent or affiliated corporation, and any person purporting to act on your behalf.

5.      "**Document**" means any written or graphic matter and other means of preserving thought or expression and all tangible things from which information can be processed or transcribed, including the originals and all non-identical copies, whether different from the original by reason of any notation made on such copy or otherwise, including, but not limited to, correspondence, emails, memoranda, notes, messages, letters, telegrams, teletype, telefax, bulletins, meetings or other communications, inter-office and intra-office telephone calls, diaries, chronological data, minutes, books, reports, studies, summaries, pamphlets, bulletins, printed matter, charts, ledgers, invoices, worksheets, receipts, returns, computer printouts, prospectuses, financial statements, schedules, affidavits, contracts, canceled checks, statements, transcripts,

statistics, surveys, magazine or newspaper articles, releases (and any and all drafts, alterations or modifications, changes and amendments of any of the foregoing), graphic or aural records or representations of any kind (including without limitation, photographs, microfiche, microfilm, videotape, records and motion pictures) and electronic, mechanical or electric records or representations of any kind (including without limitation, tapes, cassettes, discs and records) as well as all Electronically Stored Information ("**ESI**"), which refers to any type of information that is created, used, or stored in digital form and accessible by digital means, including but not limited to, all data, digital documents, email, electronic documents, and metadata of the same (and is further defined below).  For the avoidance of doubt, Document includes but is not limited to all Communications.

6.     "**FTM**" shall refer to FTM Investments, LLC and any affiliated entities known to be owned or controlled by Endre Debozy and William Dalzell, including all employees, directors, officers, agents, servants, subsidiaries, parent company, affiliated company, and other persons acting or purporting to act on behalf of such entities, including Representatives.  For the avoidance of doubt, any request for Communications between You and FTM includes Communications between You and Endre Debozy or William Dalzell (or any combination thereof).

7.     "**HASelect**" shall refer to HASelect-Medical Receivables Litigation Finance Fund International SP, including its employees, directors, officers, agents, servants, subsidiaries, parent company, affiliated company, and other persons acting or purporting to act on its behalf, including its Representatives.

8.     "**Infinity**" or "**Debtor**" shall refer to Debtor Infinity Capital Management, Inc., including its employees, directors, officers, agents, servants, subsidiaries, parent company, affiliated company, and other persons acting or purporting to act on its behalf, including its Representatives.  For the avoidance of doubt, any request for Communications between You and Infinity includes Communications between You and Oliver Hemmers or Anne Pantelas (or any combination thereof).

9.     "**Person**" refers to any natural individual, governmental entity, or business entity,

including a corporation, partnership, association, limited liability company, or other entity or combination thereof, and all corporations, divisions, or entities affiliated with, owned, or controlled directly or indirectly or owning or controlling directly or indirectly any such entities as well as directors, officers, managers, employees, agents, attorneys, affiliates, or other representatives thereof, or third parties retained by any of the above.

10.    "**PFD**" refers to PFD Management, LLC, including its employees, directors, officers, agents, servants, subsidiaries, parent company, affiliated companies, and other persons acting or purporting to act on its behalf, including its Representatives.

11.    "**Representative**" means any and all agents, employees, servants, officers, directors, attorneys, or other persons acting or purporting to act on behalf of the person in question.

12.    "**Tecumseh**" shall refer to Tecumseh-Infinity Medical Receivables Fund, LP, including its employees, directors, officers, members, agents, servants, subsidiaries, parent company, affiliated company, and other persons acting or purporting to act on its behalf, including its Representatives.  For the avoidance of doubt, any request for Communications between You and Tecumseh includes Communications between You and Chadwick Meyer, Mike Belotz, or Simon Clark (or any combination thereof).

13.    "**You**" or "**Three Bell**" shall refer to Three Bell Capital, LLC, including its employees, directors, officers, members, agents, servants, subsidiaries, parent company, affiliated company, and other persons acting or purporting to act on its behalf, including its Representatives.

14.    The terms "**related to**", "**relate to**", or "**relating to**" shall mean directly or indirectly, refer to, reflect, describe, pertain to, arise out of or in connection with, or in any way legally, logically, or factually be connected with the matter discussed.

## **INSTRUCTIONS**

1.    When producing the Documents, please keep all Documents segregated by the file in which the Documents are contained and indicate the name of the file in which the Documents are contained, and the name of the Documents being produced.

2.      When producing the required Documents, please produce all other Documents that are clipped, stapled, or otherwise attached to any requested Document.

3.      In the event such file(s) or Document(s) has (have) been removed, either for the purpose of this action or for some other purpose, please state the name and address of the person who removed the file, the title of the file and each subfile, if any, maintained within the file, and the present location of the file.

4.      Each draft, final Document, original, reproduction, and each signed and unsigned Document and every additional copy of such Document where such copy contains any commentary, note, notation or other change whatsoever that does not appear on the original or on the copy of the one Document produced shall be deemed and considered to constitute a separate Document.

5.      If any Document encompassed by the attached requests for production of Documents is deemed by you to be privileged, furnish all non-privileged Documents and provide a log outlining all Documents claimed as privileged which includes: (a) the type of privilege claimed for each Document; (b) a brief description of the Document; (c) the author of the Document sufficient to identify it; (d) the recipient (if any); (e) the date of the Document.

6.      When appropriate, the singular form of a word should be interpreted in the plural as may be necessary to bring within the scope hereof any Documents which might otherwise be construed to be outside the scope hereof.

7.      In addition to Documents currently in your possession, custody, or control, you are to produce all Documents within the scope of these requests that are not currently in your possession, custody, or control but can be obtained through reasonable effort.

8.      This request calls for the production of all electronic Documents and electronically stored information (ESI) responsive to the requests below, including but not limited to e-mails and any related attachments, electronic files, or other data compilations that relate to the categories of Documents requested below.  Your search for these electronically stored Documents shall include all of your computer hard drives, floppy discs, compact discs, backup and archival tapes,

4

removable media such as zip drives, password protected and encrypted files, databases, electronic calendars, personal digital assistants, iPhones, smart phones, tablets, iPads, proprietary software, and inactive or unused computer disc storage areas.

9.      The words "and" and "or" as used herein shall be construed either disjunctively or conjunctively as required by the context to bring within the scope of these Requested Documents any answer that might be deemed outside their scope by another construction.

10.     Unless otherwise stated, the following Document requests relate to the time period of January 1, 2019 through the date of your response.

## DOCUMENT PRODUCTION REQUESTS

1.      All Documents relating to any Communication between You and Infinity relating to HASelect.

2.      All Documents relating to any Communication between You and Infinity relating to Tecumseh.

3.      All Documents relating to any Communication between You and relating to the Bankruptcy Case.

4.      All Documents relating to any Communication between You and Infinity relating to the sale, purchase, sourcing, servicing, collection, or valuation of accounts receivable.

5.      All Documents relating to any Communication between You and Infinity relating to FTM Investments.

6.      All Documents relating to any Communication between You and Tecumseh relating to HASelect.

7.       All Documents relating to any Communication between You and Tecumseh relating to Infinity.

8.      All Documents relating to any Communication between You and Tecumseh relating to the Bankruptcy Case.

9.      All Documents relating to any Communication between You and Tecumseh

relating to the sale, purchase, sourcing, servicing, collection, or valuation of accounts receivable.

10.     All Documents relating to any Communication between You and FTM relating to HASelect.

11.     All Documents relating to any Communication between You and FTM relating to Infinity.

12.     All Documents relating to any Communication between You and FTM relating to Tecumseh.

13.     All Documents relating to any Communication between You and FTM relating to the Bankruptcy Case.

14.     All Documents relating to any Communication between You and FTM relating to the sale, purchase, sourcing, servicing, collection, or valuation of accounts receivable.

15.     All Documents relating to any Communication between You and any Person, including but not limited to 506 Investor Group and PFD, regarding HASelect's relationship to Infinity or FTM.

16.     All Documents relating to any Communication between You and any Person, including but not limited to 506 Investor Group and PFD, regarding Tecumseh's relationship to Infinity or FTM.

17.     All Documents relating to any agreement between You and Infinity relating to the sale, purchase, sourcing, servicing, collection, or valuation of accounts receivable.

18.     All Documents relating to any agreement between You and Tecumseh relating to the sale, purchase, sourcing, servicing, collection, or valuation of accounts receivable.

19.     All Documents relating to any agreement between You and FTM relating to the sale, purchase, sourcing, servicing, collection, or valuation of accounts receivable.

# EXHIBIT 3

Fill in this information to identify the case:

Debtor name    Infinity Capital Management, Inc.

United States Bankruptcy Court for the:    DISTRICT OF NEVADA

Case number (if known)    21-14486-abl

☐ Check if this is an amended filing

## Official Form 202
# Declaration Under Penalty of Perjury for Non-Individual Debtors    12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

- ☑ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)
- ☑ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
- ☑ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)
- ☑ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)
- ☑ *Schedule H: Codebtors* (Official Form 206H)
- ☑ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)
- ☐ *Amended Schedule* _____
- ☐ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)
- ☐ *Other document that requires a declaration* _____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   9 - 28 - 2021    x _____
                                            Signature of individual signing on behalf of debtor

                                     Oliver Hemmers
                                     Printed name

                                     Treasurer & Secretary
                                     Position or relationship to debtor

Software Copyright (c) 1996-2021 Best Case, LLC - www.bestcase.com            Best Case Bankruptcy

**Fill in this information to identify the case:**

Debtor name    Infinity Capital Management, Inc.

United States Bankruptcy Court for the:    DISTRICT OF NEVADA

Case number (if known)    21-14486-abl

☐ Check if this is an amended filing

## Official Form 206Sum
## Summary of Assets and Liabilities for Non-Individuals     12/15

### Part 1:   Summary of Assets

1. **Schedule A/B: Assets-Real and Personal Property** (Official Form 206A/B)

   1a. **Real property:**
   Copy line 88 from *Schedule A/B*.................................................................... $    0.00

   1b. **Total personal property:**
   Copy line 91A from *Schedule A/B*................................................................ $    5,872,767.98

   1c. **Total of all property:**
   Copy line 92 from *Schedule A/B*................................................................. $    5,872,767.98

### Part 2:   Summary of Liabilities

2. **Schedule D: Creditors Who Have Claims Secured by Property** (Official Form 206D)
   Copy the total dollar amount listed in Column A, *Amount of claim,* from line 3 of *Schedule D*................... $    14,126,860.00

3. **Schedule E/F: Creditors Who Have Unsecured Claims** (Official Form 206E/F)

   3a. **Total claim amounts of priority unsecured claims:**
   Copy the total claims from Part 1 from line 5a of *Schedule E/F*............................. $    0.00

   3b. **Total amount of claims of nonpriority amount of unsecured claims:**
   Copy the total of the amount of claims from Part 2 from line 5b of *Schedule E/F*................ +$    1,791,007.85

4. **Total liabilities** ...............................................................................
   Lines 2 + 3a + 3b    $    15,917,867.85

Software Copyright (c) 1996-2021 Best Case, LLC - www.bestcase.com     Best Case Bankruptcy

**Fill in this information to identify the case:**

Debtor name **Infinity Capital Management, Inc.**

United States Bankruptcy Court for the: **DISTRICT OF NEVADA**

Case number (if known) **21-14486-abl**

☐ Check if this is an amended filing

# Official Form 206A/B
## Schedule A/B: Assets - Real and Personal Property
12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

| Part 1: | Cash and cash equivalents |
| --- | --- |

**1. Does the debtor have any cash or cash equivalents?**

☐ No. Go to Part 2.
■ Yes Fill in the information below.

**All cash or cash equivalents owned or controlled by the debtor**

Current value of debtor's interest

3. **Checking, savings, money market, or financial brokerage accounts** *(Identify all)*

| | Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number | Current value of debtor's interest |
| --- | --- | --- | --- | --- |
| 3.1. | First Savings Bank | Checking | 2420 | $25,371.92 |
| 3.2. | Nevada State Bank | Checking | 1315 | $294.46 |
| 3.3. | Nevada State Bank | Checking | 6375 | $42,547.48 |
| 3.4. | Nevada State Bank | Checking | 8480 | $375.44 |

4. **Other cash equivalents** *(Identify all)*

5. **Total of Part 1.**
   Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80.

   $68,589.30

| Part 2: | Deposits and Prepayments |
| --- | --- |

**6. Does the debtor have any deposits or prepayments?**

■ No. Go to Part 3.
☐ Yes Fill in the information below.

---

| Debtor | Infinity Capital Management, Inc. | Case number *(If known)* 21-14486-abl |
|--------|-----------------------------------|----------------------------------------|
|        | Name                              |                                        |

**Part 3:     Accounts receivable**

**10. Does the debtor have any accounts receivable?**

☐ No.  Go to Part 4.
■ Yes Fill in the information below.

**11.      Accounts receivable**

11b. Over 90 days old:          5,781,238.68          -          0.00      =....          $5,781,238.68
                              face amount                   doubtful or uncollectible accounts

**12.     Total of Part 3.**                                                           | $5,781,238.68 |
Current value on lines 11a + 11b = line 12.  Copy the total to line 82.

**Part 4:     Investments**

**13. Does the debtor own any investments?**

■ No.  Go to Part 5.
☐ Yes Fill in the information below.

**Part 5:     Inventory, excluding agriculture assets**

**18. Does the debtor own any inventory (excluding agriculture assets)?**

■ No.  Go to Part 6.
☐ Yes Fill in the information below.

**Part 6:     Farming and fishing-related assets (other than titled motor vehicles and land)**

**27. Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?**

■ No.  Go to Part 7.
☐ Yes Fill in the information below.

**Part 7:     Office furniture, fixtures, and equipment; and collectibles**

**38. Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

☐ No.  Go to Part 8.
■ Yes Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---------------------|------|------|------|
| **39.     Office furniture**<br>Misc. office furnishings.  See Exhibit A/B. | $0.00 | Liquidation | $6,155.00 |
| **40.     Office fixtures** | | | |
| **41.     Office equipment, including all computer equipment and communication systems equipment and software**<br>Misc. desk top computers; printers, scanners, and fax machine.  See Exhibit A/B. | $0.00 | Liquidation | $3,450.00 |

**42.     Collectibles** *Examples*: Antiques and figurines; paintings, prints, or other artwork;
books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card

Official Form 206A/B                    Schedule A/B Assets - Real and Personal Property                    page 2

| Debtor | Infinity Capital Management, Inc. | Case number *(if known)* 21-14486-abl |
|---|---|---|
| | Name | |

collections; other collections, memorabilia, or collectibles

**43.** **Total of Part 7.**
Add lines 39 through 42. Copy the total to line 86.

$9,605.00

**44.** **Is a depreciation schedule available for any of the property listed in Part 7?**
■ No
☐ Yes

**45.** **Has any of the property listed in Part 7 been appraised by a professional within the last year?**
☐ No
■ Yes

---

**Part 8:**   **Machinery, equipment, and vehicles**

**46. Does the debtor own or lease any machinery, equipment, or vehicles?**

☐ No. Go to Part 9.
■ Yes Fill in the information below.

| | General description<br>Include year, make, model, and identification numbers<br>(i.e., VIN, HIN, or N-number) | Net book value of<br>debtor's interest<br>(Where available) | Valuation method used<br>for current value | Current value of<br>debtor's interest |
|---|---|---|---|---|
| **47.** | **Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles** | | | |
| 47.1. | 2016 Honda Odyssey; 72,233 miles; Kelley Blue Book $19,570.00 (Debtor only owns 50% interest) | $0.00 | | $9,785.00 |
| 47.2. | 2011 Honda Pilot; 131,636 miles, Kelley Blue Book $7,100 (Debtor only owns 50% interest) | $0.00 | | $3,550.00 |

**48.** **Watercraft, trailers, motors, and related accessories** *Examples:* Boats, trailers, motors, floating homes, personal watercraft, and fishing vessels

**49.** **Aircraft and accessories**

**50.** **Other machinery, fixtures, and equipment (excluding farm machinery and equipment)**

**51.** **Total of Part 8.**
Add lines 47 through 50. Copy the total to line 87.

$13,335.00

**52.** **Is a depreciation schedule available for any of the property listed in Part 8?**
■ No
☐ Yes

**53.** **Has any of the property listed in Part 8 been appraised by a professional within the last year?**
■ No
☐ Yes

---

**Part 9:**   **Real property**

**54. Does the debtor own or lease any real property?**

■ No. Go to Part 10.
☐ Yes Fill in the information below.

---

Official Form 206A/B                    Schedule A/B Assets - Real and Personal Property                    page 3

| Debtor | Infinity Capital Management, Inc. | Case number *(If known)* 21-14486-abl |
|---|---|---|
| | Name | |

## Part 10: Intangibles and intellectual property

**59. Does the debtor have any interests in intangibles or intellectual property?**

☐ No. Go to Part 11.
■ Yes Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 60. **Patents, copyrights, trademarks, and trade secrets** | | | |
| 61. **Internet domain names and websites** www.infinityhealth.com | $0.00 | | $0.00 |
| 62. **Licenses, franchises, and royalties** | | | |
| 63. **Customer lists, mailing lists, or other compilations** | | | |
| 64. **Other intangibles, or intellectual property** | | | |
| 65. **Goodwill** | | | |
| 66. **Total of Part 10.** Add lines 60 through 65. Copy the total to line 89. | | | $0.00 |

**67. Do your lists or records include personally identifiable information of customers** (as defined in 11 U.S.C.§§ 101(41A) and 107)?
☐ No
■ Yes

**68. Is there an amortization or other similar schedule available for any of the property listed in Part 10?**
■ No
☐ Yes

**69. Has any of the property listed in Part 10 been appraised by a professional within the last year?**
■ No
☐ Yes

## Part 11: All other assets

**70. Does the debtor own any other assets that have not yet been reported on this form?**
Include all interests in executory contracts and unexpired leases not previously reported on this form.

☐ No. Go to Part 12.
■ Yes Fill in the information below.

| | Current value of debtor's interest |
|---|---|
| 71. **Notes receivable** Description (include name of obligor) | |
| 72. **Tax refunds and unused net operating losses (NOLs)** Description (for example, federal, state, local) | |
| 73. **Interests in insurance policies or annuities** State Farm Fire & Caualty Co. Insurance policy for personal property | $0.00 |
| 74. **Causes of action against third parties (whether or not a lawsuit** | |

| Debtor | Infinity Capital Management, Inc. | Case number *(If known)* 21-14486-abl |
|---|---|---|
| | Name | |

**has been filed)**

75.   **Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims**

76.   **Trusts, equitable or future interests in property**

77.   **Other property of any kind not already listed** *Examples:* Season tickets, country club membership

78.   **Total of Part 11.**

$0.00

Add lines 71 through 77. Copy the total to line 90.

79.   **Has any of the property listed in Part 11 been appraised by a professional within the last year?**
   ■ No
   ☐ Yes

Software Copyright (c) 1996-2021 Best Case, LLC - www.bestcase.com      Best Case Bankruptcy

| Debtor | Infinity Capital Management, Inc. | Case number (If known) | 21-14486-abl |
|---|---|---|---|
| | Name | | |

| Part 12: | Summary |
|---|---|

**In Part 12 copy all of the totals from the earlier parts of the form**

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| 80. **Cash, cash equivalents, and financial assets.** Copy line 5, Part 1 | $68,589.30 | |
| 81. **Deposits and prepayments.** Copy line 9, Part 2. | $0.00 | |
| 82. **Accounts receivable.** Copy line 12, Part 3. | $5,781,238.68 | |
| 83. **Investments.** Copy line 17, Part 4. | $0.00 | |
| 84. **Inventory.** Copy line 23, Part 5. | $0.00 | |
| 85. **Farming and fishing-related assets.** Copy line 33, Part 6. | $0.00 | |
| 86. **Office furniture, fixtures, and equipment; and collectibles.** Copy line 43, Part 7. | $9,605.00 | |
| 87. **Machinery, equipment, and vehicles.** Copy line 51, Part 8. | $13,335.00 | |
| 88. **Real property.** Copy line 56, Part 9.........................................................................> | | $0.00 |
| 89. **Intangibles and intellectual property.** Copy line 66, Part 10. | $0.00 | |
| 90. **All other assets.** Copy line 78, Part 11. | + $0.00 | |
| 91. **Total.** Add lines 80 through 90 for each column | $5,872,767.98 | + 91b. $0.00 |
| 92. **Total of all property on Schedule A/B.** Add lines 91a+91b=92 | | $5,872,767.98 |

Schedule A/B Assets - Real and Personal Property

**Fill in this information to identify the case:**

Debtor name    Infinity Capital Management, Inc.

United States Bankruptcy Court for the:    DISTRICT OF NEVADA

Case number (if known)    21-14486-abl

☐ Check if this is an
amended filing

Official Form 206D

## Schedule D: Creditors Who Have Claims Secured by Property     12/15

Be as complete and accurate as possible.

**1. Do any creditors have claims secured by debtor's property?**

   ☐ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.

   ■ Yes. Fill in all of the information below.

**Part 1:   List Creditors Who Have Secured Claims**

**2. List in alphabetical order all creditors** who have secured claims. If a creditor has more than one secured claim, list the creditor separately for each claim.

| | | Column A<br>Amount of claim<br><br>Do not deduct the value of collateral. | Column B<br>Value of collateral that supports this claim |
|---|---|---|---|
| **2.1** HASelect-FTM Medical Receivables<br>Creditor's Name<br><br>Litigation Finance Fund SP<br>c/o HedgeACT Int'l SPC, Ltd.<br>403 South La Grange Rd.<br>La Grange, IL 60525<br>Creditor's mailing address | **Describe debtor's property that is subject to a lien**<br>All assets.<br><br><br><br>**Describe the lien**<br>BUSINESS LOAN | $14,126,860.00 | Unknown |

**Is the creditor an insider or related party?**

■ No

☐ Yes

**Is anyone else liable on this claim?**

■ No

☐ Yes. Fill out Schedule H: Codebtors (Official Form 206H)

Creditor's email address, if known

**Date debt was incurred**

12/18/2019

**Last 4 digits of account number**

**Do multiple creditors have an interest in the same property?**

■ No

☐ Yes. Specify each creditor, including this creditor and its relative priority.

**As of the petition filing date, the claim is:**
Check all that apply

☐ Contingent

☐ Unliquidated

■ Disputed

**3. Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any.**    $14,126,860.00

**Part 2:   List Others to Be Notified for a Debt Already Listed in Part 1**

List in alphabetical order any others who must be notified for a debt already listed in Part 1. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for secured creditors.

If no others need to notified for the debts listed in Part 1, do not fill out or submit this page. If additional pages are needed, copy this page.

| Name and address | On which line in Part 1 did you enter the related creditor? | Last 4 digits of account number for this entity |
|---|---|---|
| Griffin Asset Management LLC<br>Attn: Michael E. Griffin<br>230 Park Ave.<br>10th Floor, Suite 61<br>New York, NY 10169 | Line 2.1 | |

| Debtor | Infinity Capital Management, Inc. | Case number (if known) | 21-14486-abl |
|---|---|---|---|
| | Name | | |

| | | |
|---|---|---|
| HASelect-FTM Medical Receivables<br>Litigation Finance Fund SP<br>c/o Thomas C. Cronin<br>120 N. LaSalle St., 20th Floor<br>Chicago, IL 60602 | Line 2.1 | |
| HASelect-FTM Medical Receivables<br>Litigation Finance Fund, SP<br>c/o John N. Hourihane, Jr.<br>120 N. LaSalle St., 20th Floor<br>Chicago, IL 60602 | Line 2.1 | |

Software Copyright (c) 1996-2021 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy

| Fill in this information to identify the case: |
| --- |
| Debtor name   Infinity Capital Management, Inc. |
| United States Bankruptcy Court for the:  DISTRICT OF NEVADA |
| Case number (if known)  21-14486-abl |

☐ Check if this is an amended filing

## Official Form 206E/F
## Schedule E/F: Creditors Who Have Unsecured Claims     12/15

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims.
List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on *Schedule A/B: Assets - Real and
Personal Property* (Official Form 206A/B) and on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G). Number the entries in Parts 1 and
2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.

**Part 1:**   List All Creditors with PRIORITY Unsecured Claims

   **1.**   **Do any creditors have priority unsecured claims?** (See 11 U.S.C. § 507).

      ■ No. Go to Part 2.

      ☐ Yes. Go to line 2.

**Part 2:**   List All Creditors with NONPRIORITY Unsecured Claims

   **3.**   **List in alphabetical order all of the creditors with nonpriority unsecured claims.** If the debtor has more than 6 creditors with nonpriority unsecured claims, fill
out and attach the Additional Page of Part 2.

                                               **Amount of claim**

| 3.1 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $1,326.85 |
| --- | --- | --- | --- |
| | Artiano Shinoff<br>Attn: Bankruptcy Dept/Managing Agent<br>3636 4th Avenue<br>San Diego, CA 92103 | ☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| | Date(s) debt was incurred  8/2021<br>Last 4 digits of account number  4791 | Basis for the claim:  Services<br>Is the claim subject to offset? ■ No ☐ Yes | |

| 3.2 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | Unknown |
| --- | --- | --- | --- |
| | Century Link<br>Attn: Managing Member<br>100 CenturyLink Drive<br>P.O. Box 4065, Monroe, LA | ☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| | Date(s) debt was incurred <br>Last 4 digits of account number  __ | Basis for the claim:  Services<br>Is the claim subject to offset? ■ No ☐ Yes | |

| 3.3 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | Unknown |
| --- | --- | --- | --- |
| | Claus Nissen<br>Hugo-Distler Strasse 64<br>D-90411 Nuernberg, Germany | ☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| | Date(s) debt was incurred  __<br>Last 4 digits of account number  __ | Basis for the claim:  Individual Investor<br>Is the claim subject to offset? ■ No ☐ Yes | |

| 3.4 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | Unknown |
| --- | --- | --- | --- |
| | Coastal Investments PLC<br>Attn: Managing Member<br>P.O. Box 11, ANZ House<br>Avarua, Rarotonga, Cook Islands | ☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| | Date(s) debt was incurred  __<br>Last 4 digits of account number  __ | Basis for the claim:  Promissory Note<br>Is the claim subject to offset? ■ No ☐ Yes | |

| Debtor | Infinity Capital Management, Inc. | | Case number (if known) | 21-14486-abl |
|---|---|---|---|---|
| | Name | | | |

**3.5** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | Unknown
Cox Internet
Attn: Managing Member
1700 Vegas Drive
Las Vegas, NV 89106

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred __
Last 4 digits of account number __

Basis for the claim:  Services

Is the claim subject to offset? ■ No ☐ Yes

---

**3.6** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | Unknown
Daniel P. Nicholas
3842 N. Southport Ave. Apt. M
Chicago, IL 60613-6226

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred __
Last 4 digits of account number __

Basis for the claim:  Individual Investor

Is the claim subject to offset? ■ No ☐ Yes

---

**3.7** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | Unknown
Dynamic Legal Recovery
Attn: Managing Member
25600 Rye Canyon Road #209
Valencia, CA 91355

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred __
Last 4 digits of account number __

Basis for the claim:  Collection account

Is the claim subject to offset? ■ No ☐ Yes

---

**3.8** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | Unknown
FTM Ltd
Attn: Managing Member
PO Box 316, Port Vila
First Floor, Law Partners House-Lini Hig
Efate, Vanuatu

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred __
Last 4 digits of account number __

Basis for the claim:  Promissory Note

Is the claim subject to offset? ■ No ☐ Yes

---

**3.9** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | Unknown
Gregory M Cash
Tyringa Road
Port Kenney, SA 5671, Australia

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred __
Last 4 digits of account number __

Basis for the claim:  Individual Investor

Is the claim subject to offset? ■ No ☐ Yes

---

**3.10** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $919,000.00
HealthPlus Imaging of Texas, LLC
Attn: Managing Member
9000 Southwest Freeway, Suite 250
Houston, TX 77074

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred __
Last 4 digits of account number __

Basis for the claim:  Pending litigation

Is the claim subject to offset? ■ No ☐ Yes

---

**3.11** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $200,000.00
Imtisal Khuri
1148 Broken Hills Dr.
Henderson, NV 89011

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred __
Last 4 digits of account number __

Basis for the claim:  Promissory Note

Is the claim subject to offset? ■ No ☐ Yes

| Debtor | Infinity Capital Management, Inc. | Case number (if known) | 21-14486-abl |
|---|---|---|---|
| | Name | | |

| 3.12 | **Nonpriority creditor's name and mailing address** | **As of the petition filing date, the claim is:** Check all that apply. | Unknown |
|---|---|---|---|

Infinity Centers United
Attn: Managing Member
3310 Edloe Street
Houston, TX 77027

☐ Contingent
☐ Unliquidated
☐ Disputed

**Date(s) debt was incurred** _

**Basis for the claim:** Provider

**Last 4 digits of account number** _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.13 | **Nonpriority creditor's name and mailing address** | **As of the petition filing date, the claim is:** Check all that apply. | Unknown |
|---|---|---|---|

Infinity Diagnostics, LLC dba Prestige M
Attn: Managing Member
3310 Edloe Street
Houston, TX 77027

☐ Contingent
☐ Unliquidated
☐ Disputed

**Date(s) debt was incurred** _

**Basis for the claim:** Individual investor

**Last 4 digits of account number** _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.14 | **Nonpriority creditor's name and mailing address** | **As of the petition filing date, the claim is:** Check all that apply. | $350,000.00 |
|---|---|---|---|

Jennifer de Bono
89 Southfork Drive
Glenning Valley, NSW 2261, Australia

☐ Contingent
☐ Unliquidated
☐ Disputed

**Date(s) debt was incurred** _

**Basis for the claim:** Individual Investor

**Last 4 digits of account number** _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.15 | **Nonpriority creditor's name and mailing address** | **As of the petition filing date, the claim is:** Check all that apply. | $100,000.00 |
|---|---|---|---|

John & Karen Laub
9501 Royal Windsor Avenue
Las Vegas, NV 89149

☐ Contingent
☐ Unliquidated
☐ Disputed

**Date(s) debt was incurred** _

**Basis for the claim:** Individual Investor

**Last 4 digits of account number** _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.16 | **Nonpriority creditor's name and mailing address** | **As of the petition filing date, the claim is:** Check all that apply. | $20,000.00 |
|---|---|---|---|

Judy L. Trent
9724 Camden Hills Ave
Las Vegas, NV 89145

☐ Contingent
☐ Unliquidated
☐ Disputed

**Date(s) debt was incurred** _

**Basis for the claim:** Individual Investor

**Last 4 digits of account number** _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.17 | **Nonpriority creditor's name and mailing address** | **As of the petition filing date, the claim is:** Check all that apply. | $60,000.00 |
|---|---|---|---|

Kabbage
Attn: Managing Member
730 Peachtree Street NE, Suite 1100
Atlanta, GA 30308

☐ Contingent
☐ Unliquidated
☐ Disputed

**Date(s) debt was incurred** _

**Basis for the claim:** Loan

**Last 4 digits of account number** _

Is the claim subject to offset? ■ No ☐ Yes

---

| 3.18 | **Nonpriority creditor's name and mailing address** | **As of the petition filing date, the claim is:** Check all that apply. | $140,681.00 |
|---|---|---|---|

Luke de Bono
89 Southfork Drive
Glenning Valley, NSW 2261, Australia

☐ Contingent
☐ Unliquidated
☐ Disputed

**Date(s) debt was incurred** _

**Basis for the claim:** Individual Investor

**Last 4 digits of account number** _

Is the claim subject to offset? ■ No ☐ Yes

---

| Debtor | Infinity Capital Management, Inc. | | Case number (if known) | 21-14486-abl |
|---|---|---|---|---|
| | Name | | | |

| 3.19 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | Unknown |
|---|---|---|---|

Matt Valenti
1651 S. Victoria Ave.
Los Angeles, CA 90019

☐ Contingent
☐ Unliquidated
☐ Disputed

**Date(s) debt was incurred** __

**Last 4 digits of account number** __

**Basis for the claim:** Individual Investor

Is the claim subject to offset? ■ No ☐ Yes

| 3.20 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | Unknown |
|---|---|---|---|

Max Oram
1840 Ulan Road
Mudgee, NSM 2850, Australia

☐ Contingent
☐ Unliquidated
☐ Disputed

**Date(s) debt was incurred** __

**Last 4 digits of account number** __

**Basis for the claim:** Individual Investor

Is the claim subject to offset? ■ No ☐ Yes

| 3.21 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | Unknown |
|---|---|---|---|

NV Energy
Attn: Managing Member
P.O. Box 98910
Las Vegas, NV 89151-0001

☐ Contingent
☐ Unliquidated
☐ Disputed

**Date(s) debt was incurred** __

**Last 4 digits of account number** __

**Basis for the claim:** Services

Is the claim subject to offset? ■ No ☐ Yes

| 3.22 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | Unknown |
|---|---|---|---|

Rent-MDL Group
Attn: Managing Member
5960 South Jones Boulevard
Las Vegas, NV 89118

☐ Contingent
☐ Unliquidated
☐ Disputed

**Date(s) debt was incurred** __

**Last 4 digits of account number** __

**Basis for the claim:** Commercial Lease

Is the claim subject to offset? ■ No ☐ Yes

| 3.23 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | Unknown |
|---|---|---|---|

Robin W. Smith
12 Estuary Court
Twin Waters, QLD 4564, Australia

☐ Contingent
☐ Unliquidated
☐ Disputed

**Date(s) debt was incurred** __

**Last 4 digits of account number** __

**Basis for the claim:** Individual Investor

Is the claim subject to offset? ■ No ☐ Yes

| 3.24 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | Unknown |
|---|---|---|---|

Tecumseh Alternatives, LLC
Attn: Managing Member
5668 Morris Hunt Drive
Fort Mill, SC 29708

☐ Contingent
☐ Unliquidated
☐ Disputed

**Date(s) debt was incurred** __

**Last 4 digits of account number** __

**Basis for the claim:** Services

Is the claim subject to offset? ■ No ☐ Yes

| 3.25 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | Unknown |
|---|---|---|---|

The Injury Specialists, LLC
Attn: Managing Member
270 Carpenter Drive, Suite 300
Sandy Springs, GA 30328

☐ Contingent
☐ Unliquidated
☐ Disputed

**Date(s) debt was incurred** __

**Last 4 digits of account number** __

**Basis for the claim:** Former business partner

Is the claim subject to offset? ■ No ☐ Yes

**Part 3:    List Others to Be Notified About Unsecured Claims**

**4. List in alphabetical order any others who must be notified for claims listed in Parts 1 and 2.** Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for unsecured creditors.

| Debtor | Infinity Capital Management, Inc. | | Case number (if known) | 21-14486-abl |
|---|---|---|---|---|
| | Name | | | |

If no others need to be notified for the debts listed in Parts 1 and 2, do not fill out or submit this page. If additional pages are needed, copy the next page.

| Name and mailing address | On which line in Part1 or Part 2 is the related creditor (if any) listed? | Last 4 digits of account number, if any |
|---|---|---|

---

| **Part 4:** | **Total Amounts of the Priority and Nonpriority Unsecured Claims** |
|---|---|

5. Add the amounts of priority and nonpriority unsecured claims.

| | | Total of claim amounts |
|---|---|---|
| 5a. Total claims from Part 1 | 5a. $ | 0.00 |
| 5b. Total claims from Part 2 | 5b. + $ | 1,791,007.85 |
| 5c. Total of Parts 1 and 2<br>Lines 5a + 5b = 5c. | 5c. $ | 1,791,007.85 |

**Fill in this information to identify the case:**

Debtor name   Infinity Capital Management, Inc.

United States Bankruptcy Court for the:   DISTRICT OF NEVADA

Case number (if known)   21-14486-abl

☐ Check if this is an
amended filing

## Official Form 206G
## Schedule G: Executory Contracts and Unexpired Leases                      12/15

Be as complete and accurate as possible. If more space is needed, copy and attach the additional page, number the entries consecutively.

1. **Does the debtor have any executory contracts or unexpired leases?**
   ☐ No. Check this box and file this form with the debtor's other schedules. There is nothing else to report on this form.
   ■ Yes. Fill in all of the information below even if the contacts of leases are listed on *Schedule A/B: Assets - Real and Personal    Property* (Official Form 206A/B).

**2. List all contracts and unexpired leases**

State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease

| 2.1. | State what the contract or lease is for and the nature of the debtor's interest | Commercial Lease for premises located at 1700 West Horizon Ridge, Henderson, Nevada | |
|---|---|---|---|
| | State the term remaining | | First Savings Bank |
| | List the contract number of any government contract | | Attn: Managing Member 5960 S. Jones Blvd. Las Vegas, NV 89118 |

| 2.2. | State what the contract or lease is for and the nature of the debtor's interest | Item to be supplemented, as there are hundreds of these ageements. | |
|---|---|---|---|
| | State the term remaining | | |
| | List the contract number of any government contract | | Micellaneous Provider Agreements |

| 2.3. | State what the contract or lease is for and the nature of the debtor's interest | Insurance policy for business personal property effective 1/28/2021-1/28/2022 | |
|---|---|---|---|
| | State the term remaining | | State Farm Fire & Casualty Co. |
| | List the contract number of any government contract | | Attn: Bankruptcy Dept/Managing Agent 3 Ravinia Drive Atlanta, GA 30346-2117 |

| 2.4. | State what the contract or lease is for and the nature of the debtor's interest | Sub-Advisory Agreement dated June 18, 2020, and Addendum Modification thereto | |
|---|---|---|---|
| | State the term remaining | | Tecumseh-Infinity Med. Receiv. Fund LP |
| | List the contract number of any government contract | | Attn: Tecumseh Alternatives, LLC 5668 Morris Hunt Dr. Fort Mill, SC 29708 |

**Fill in this information to identify the case:**

Debtor name __Infinity Capital Management, Inc.__

United States Bankruptcy Court for the: __DISTRICT OF NEVADA__

Case number (if known) __21-14486-abl__

☐ Check if this is an amended filing

## Official Form 206H
## Schedule H: Your Codebtors

12/15

Be as complete and accurate as possible. If more space is needed, copy the Additional Page, numbering the entries consecutively. Attach the Additional Page to this page.

**1. Do you have any codebtors?**

■ No. Check this box and submit this form to the court with the debtor's other schedules. Nothing else needs to be reported on this form.
☐ Yes

**2. In Column 1, list as codebtors all of the people or entities who are also liable for any debts listed by the debtor in the schedules of creditors, Schedules D-G.** Include all guarantors and co-obligors. In Column 2, identify the creditor to whom the debt is owed and each schedule on which the creditor is listed. If the codebtor is liable on a debt to more than one creditor, list each creditor separately in Column 2.

*Column 1:* **Codebtor**

*Column 2:* **Creditor**

| | Name / Mailing Address | Name | Check all schedules that apply: |
|---|---|---|---|
| 2.1 | | | ☐ D ☐ E/F ☐ G |
| | Street | | |
| | City   State   Zip Code | | |
| 2.2 | | | ☐ D ☐ E/F ☐ G |
| | Street | | |
| | City   State   Zip Code | | |
| 2.3 | | | ☐ D ☐ E/F ☐ G |
| | Street | | |
| | City   State   Zip Code | | |
| 2.4 | | | ☐ D ☐ E/F ☐ G |
| | Street | | |
| | City   State   Zip Code | | |

**Fill in this information to identify the case:**

Debtor name    Infinity Capital Management, Inc.

United States Bankruptcy Court for the:    DISTRICT OF NEVADA

Case number (if known)    21-14486-abl

☐ Check if this is an amended filing

# Official Form 207
## Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy    04/19

The debtor must answer every question. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and case number (if known).

## Part 1:   Income

1. **Gross revenue from business**

   ☐ None.

   | Identify the beginning and ending dates of the debtor's fiscal year, which may be a calendar year | Sources of revenue<br>Check all that apply | Gross revenue<br>(before deductions and exclusions) |
   |---|---|---|
   | From the beginning of the fiscal year to filing date:<br>From 1/01/2021 to Filing Date | ■ Operating a business<br>☐ Other | $1,662,108.49 |
   | For prior year:<br>From 1/01/2020 to 12/31/2020 | ■ Operating a business<br>☐ Other | $5,758,336.00 |
   | For year before that:<br>From 1/01/2019 to 12/31/2019 | ■ Operating a business<br>☐ Other | $2,663,825.00 |

2. **Non-business revenue**
   Include revenue regardless of whether that revenue is taxable. *Non-business income* may include interest, dividends, money collected from lawsuits, and royalties. List each source and the gross revenue for each separately. Do not include revenue listed in line 1.

   ■ None.

   | | Description of sources of revenue | Gross revenue from each source<br>(before deductions and exclusions) |
   |---|---|---|

## Part 2:   List Certain Transfers Made Before Filing for Bankruptcy

3. **Certain payments or transfers to creditors within 90 days before filing this case**
   List payments or transfers--including expense reimbursements--to any creditor, other than regular employee compensation, within 90 days before filing this case unless the aggregate value of all property transferred to that creditor is less than $6,825. (This amount may be adjusted on 4/01/22 and every 3 years after that with respect to cases filed on or after the date of adjustment.)

   ☐ None.

   | Creditor's Name and Address | Dates | Total amount of value | Reasons for payment or transfer<br>*Check all that apply* |
   |---|---|---|---|

Software Copyright (c) 1996-2021 Best Case, LLC - www.bestcase.com     Best Case Bankruptcy

Debtor    Infinity Capital Management, Inc.                          Case number (if known)  21-14486-abl

| Creditor's Name and Address | Dates | Total amount of value | Reasons for payment or transfer<br>*Check all that apply* |
|---|---|---|---|
| 3.1.   See Exhibit SOFA -3 | | $0.00 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>☐ Services<br>☐ Other___ |

4. **Payments or other transfers of property made within 1 year before filing this case that benefited any insider**
   List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $6,825. (This amount may be adjusted on 4/01/22 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. *Insiders* include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

   ☐ None.

   | Insider's name and address<br>Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
   |---|---|---|---|
   | 4.1.   GPMicro, Inc.<br>1700 W. Horizon Ridge Pkwy., #206<br>Henderson, NV 89012<br>Member's affiliate | See Exhibit<br>SOFA-4 | $26,334.00 | Services |

5. **Repossessions, foreclosures, and returns**
   List all property of the debtor that was obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller. Do not include property listed in line 6.

   ■ None

   | Creditor's name and address | Describe of the Property | Date | Value of property |
   |---|---|---|---|

6. **Setoffs**
   List any creditor, including a bank or financial institution, that within 90 days before filing this case set off or otherwise took anything from an account of the debtor without permission or refused to make a payment at the debtor's direction from an account of the debtor because the debtor owed a debt.

   ■ None

   | Creditor's name and address | Description of the action creditor took | Date action was taken | Amount |
   |---|---|---|---|

| **Part 3:** | **Legal Actions or Assignments** |
|---|---|

7. **Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits**
   List the legal actions, proceedings, investigations, arbitrations, mediations, and audits by federal or state agencies in which the debtor was involved in any capacity—within 1 year before filing this case.

   ☐ None.

   | Case title<br>Case number | Nature of case | Court or agency's name and address | Status of case |
   |---|---|---|---|
   | 7.1.   HASELECT-FTM MEDICAL RECEIVABLES LITIGATION FINANCE FUND SP v. INFINITY CAPITAL MANAGEMENET, INC.<br>1:21-cv-03906 | Breach of Contract | U.S. District Court N.D. Illinois<br>Dirksen U.S. Courthouse<br>219 S. Dearborn St.<br>Chicago, IL 60604 | ■ Pending<br>☐ On appeal<br>☐ Concluded |

8. **Assignments and receivership**
   List any property in the hands of an assignee for the benefit of creditors during the 120 days before filing this case and any property in the hands of a receiver, custodian, or other court-appointed officer within 1 year before filing this case.

| Debtor | Infinity Capital Management, Inc. | Case number *(if known)* | 21-14486-abl |
|---|---|---|---|

■ None

## Part 4: Certain Gifts and Charitable Contributions

9. **List all gifts or charitable contributions the debtor gave to a recipient within 2 years before filing this case unless the aggregate value of the gifts to that recipient is less than $1,000**

■ None

| Recipient's name and address | Description of the gifts or contributions | Dates given | Value |
|---|---|---|---|

## Part 5: Certain Losses

10. **All losses from fire, theft, or other casualty within 1 year before filing this case.**

■ None

| Description of the property lost and how the loss occurred | Amount of payments received for the loss<br><br>If you have received payments to cover the loss, for example, from insurance, government compensation, or tort liability, list the total received.<br><br>List unpaid claims on Official Form 106A/B *(Schedule A/B: Assets – Real and Personal Property).* | Dates of loss | Value of property lost |
|---|---|---|---|

## Part 6: Certain Payments or Transfers

11. **Payments related to bankruptcy**
    List any payments of money or other transfers of property made by the debtor or person acting on behalf of the debtor within 1 year before the filing of this case to another person or entity, including attorneys, that the debtor consulted about debt consolidation or restructuring, seeking bankruptcy relief, or filing a bankruptcy case.

☐ None.

| | Who was paid or who received the transfer?<br>Address | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|---|
| 11.1. | | | Original retainer paid on 8/4/21, and then remainder converted to bankrupcy retainer paid day prior to the petition date. | |
| | Larson & Zirzow, LLC<br>850 E. Bonneville Ave.<br>Las Vegas, NV 89101 | Total of $10,000 paid, including pre-petition atteempted negotiations with HAS as secured lender, which was billed hourly, with the remainder of $3,505 for the bankruptcy filing. | | $3,505.00 |
| | **Email or website address**<br>mzirzow@lzlawnv.com | | | |
| | **Who made the payment, if not debtor?** | | | |

12. **Self-settled trusts of which the debtor is a beneficiary**
    List any payments or transfers of property made by the debtor or a person acting on behalf of the debtor within 10 years before the filing of this case to a self-settled trust or similar device.
    Do not include transfers already listed on this statement.

■ None.

Debtor  Infinity Capital Management, Inc. _____     Case number (if known) 21-14486-abl

| Name of trust or device | Describe any property transferred | Dates transfers were made | Total amount or value |
|---|---|---|---|

**13. Transfers not already listed on this statement**

List any transfers of money or other property by sale, trade, or any other means made by the debtor or a person acting on behalf of the debtor within 2 years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security. Do not include gifts or transfers previously listed on this statement.

■ None.

| Who received transfer? Address | Description of property transferred or payments received or debts paid in exchange | Date transfer was made | Total amount or value |
|---|---|---|---|

## Part 7:  Previous Locations

**14. Previous addresses**

List all previous addresses used by the debtor within 3 years before filing this case and the dates the addresses were used.

■ Does not apply

| Address | Dates of occupancy From-To |
|---|---|

## Part 8:  Health Care Bankruptcies

**15. Health Care bankruptcies**

Is the debtor primarily engaged in offering services and facilities for:
- diagnosing or treating injury, deformity, or disease, or
- providing any surgical, psychiatric, drug treatment, or obstetric care?

■ No. Go to Part 9.
☐ Yes. Fill in the information below.

| Facility name and address | Nature of the business operation, including type of services the debtor provides | If debtor provides meals and housing, number of patients in debtor's care |
|---|---|---|

## Part 9:  Personally Identifiable Information

**16. Does the debtor collect and retain personally identifiable information of customers?**

■ No.
☐ Yes. State the nature of the information collected and retained.

**17. Within 6 years before filing this case, have any employees of the debtor been participants in any ERISA, 401(k), 403(b), or other pension or profit-sharing plan made available by the debtor as an employee benefit?**

■ No. Go to Part 10.
☐ Yes. Does the debtor serve as plan administrator?

## Part 10:  Certain Financial Accounts, Safe Deposit Boxes, and Storage Units

**18. Closed financial accounts**

Within 1 year before filing this case, were any financial accounts or instruments held in the debtor's name, or for the debtor's benefit, closed, sold, moved, or transferred?

Include checking, savings, money market, or other financial accounts; certificates of deposit; and shares in banks, credit unions, brokerage houses, cooperatives, associations, and other financial institutions.

☐ None

| Financial Institution name and Address | Last 4 digits of account number | Type of account or instrument | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|

Debtor  Infinity Capital Management, Inc.                    Case number (if known)  21-14486-abl

| | Financial Institution name and Address | Last 4 digits of account number | Type of account or instrument | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|---|
| 18.1. | First Savings Bank<br>5800 S. Western Ave.<br>Sioux Falls, SD 57108 | XXXX-1531 | ■ Checking<br>☐ Savings<br>☐ Money Market<br>☐ Brokerage<br>☐ Other___ | 3/11/2021 | $1,553.13 |

**19. Safe deposit boxes**
List any safe deposit box or other depository for securities, cash, or other valuables the debtor now has or did have within 1 year before filing this case.

■ None

| Depository institution name and address | Names of anyone with access to it<br>Address | Description of the contents | Do you still have it? |
|---|---|---|---|

**20. Off-premises storage**
List any property kept in storage units or warehouses within 1 year before filing this case. Do not include facilities that are in a part of a building in which the debtor does business.

■ None

| Facility name and address | Names of anyone with access to it | Description of the contents | Do you still have it? |
|---|---|---|---|

**Part 11:  Property the Debtor Holds or Controls That the Debtor Does Not Own**

**21. Property held for another**
List any property that the debtor holds or controls that another entity owns. Include any property borrowed from, being stored for, or held in trust. Do not list leased or rented property.

■ None

**Part 12:  Details About Environment Information**

For the purpose of Part 12, the following definitions apply:
*Environmental law* means any statute or governmental regulation that concerns pollution, contamination, or hazardous material, regardless of the medium affected (air, land, water, or any other medium).

*Site* means any location, facility, or property, including disposal sites, that the debtor now owns, operates, or utilizes or that the debtor formerly owned, operated, or utilized.

*Hazardous material* means anything that an environmental law defines as hazardous or toxic, or describes as a pollutant, contaminant, or a similarly harmful substance.

**Report all notices, releases, and proceedings known, regardless of when they occurred.**

22. **Has the debtor been a party in any judicial or administrative proceeding under any environmental law? Include settlements and orders.**

   ■  No.
   ☐  Yes. Provide details below.

| Case title<br>Case number | Court or agency name and address | Nature of the case | Status of case |
|---|---|---|---|

23. **Has any governmental unit otherwise notified the debtor that the debtor may be liable or potentially liable under or in violation of an environmental law?**

| Debtor | Infinity Capital Management, Inc. | Case number (if known) | 21-14486-abl |
|---|---|---|---|

■ No.
☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|

24. **Has the debtor notified any governmental unit of any release of hazardous material?**

■ No.
☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|

**Part 13:  Details About the Debtor's Business or Connections to Any Business**

25. **Other businesses in which the debtor has or has had an interest**
List any business for which the debtor was an owner, partner, member, or otherwise a person in control within 6 years before filing this case.
Include this information even if already listed in the Schedules.

■ None

| Business name address | Describe the nature of the business | Employer Identification number<br>Do not include Social Security number or ITIN.<br><br>Dates business existed |
|---|---|---|

26. **Books, records, and financial statements**
26a. List all accountants and bookkeepers who maintained the debtor's books and records within 2 years before filing this case.
☐ None

| Name and address | Date of service<br>From-To |
|---|---|
| 26a.1.    Blue Chip Accounting<br>Att: Raymond G. Chan CPA<br>8475 S. Eastern Ave., Ste. 200<br>Las Vegas, NV 89123 | 2020 to current |

26b. List all firms or individuals who have audited, compiled, or reviewed debtor's books of account and records or prepared a financial statement within 2 years before filing this case.

☐ None

| Name and address | Date of service<br>From-To |
|---|---|
| 26b.1.    Philip Zhang, CPA, Ltd.<br>The Accounting Experts<br>8275 S. Eastern Ave., Ste. 200-49<br>Las Vegas, NV 89123 | 2019 |

26c. List all firms or individuals who were in possession of the debtor's books of account and records when this case is filed.

■ None

| Name and address | If any books of account and records are unavailable, explain why |
|---|---|

26d. List all financial institutions, creditors, and other parties, including mercantile and trade agencies, to whom the debtor issued a financial statement within 2 years before filing this case.

☐ None

---

| Debtor | Infinity Capital Management, Inc. | Case number *(if known)* 21-14486-abl |
|--------|-----------------------------------|----------------------------------------|

**Name and address**

26d.1. Debra Griffin
HedgeAct Client Services

26d.2. HASelect Auditors
Michael Bennett
750 Third Ave.
New York, NY 10017

**27. Inventories**
Have any inventories of the debtor's property been taken within 2 years before filing this case?

☒ No
☐ Yes. Give the details about the two most recent inventories.

| Name of the person who supervised the taking of the inventory | Date of inventory | The dollar amount and basis (cost, market, or other basis) of each inventory |
|---|---|---|

**28.** List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| Oliver Hemmers | 1700 Horizon Ridge Parkway, Ste. 206 Henderson, NV 89012 | Secretary/Treasurer | 50% |

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| Anne Pantelas | 1700 Horizon Ridge Parkway, Ste. 206 Henderson, NV 89012 | President | 50% |

**29.** Within 1 year before the filing of this case, did the debtor have officers, directors, managing members, general partners, members in control of the debtor, or shareholders in control of the debtor who no longer hold these positions?

☒ No
☐ Yes. Identify below.

**30. Payments, distributions, or withdrawals credited or given to insiders**
Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised?

☐ No
☒ Yes. Identify below.

| | Name and address of recipient | Amount of money or description and value of property | Dates | Reason for providing the value |
|---|---|---|---|---|
| 30.1 | Oliver Hemmers 1700 Horizon Ridge Parkway, Ste. 206 Henderson, NV 89012 | $144,230.74 | Period of 9/14/2020 thru 9/14/2021 See Exhibit SOFA 30. | Salary |

**Relationship to debtor**
Member

| Debtor | Infinity Capital Management, Inc. | Case number *(if known)* 21-14486-abl |
| --- | --- | --- |

| | Name and address of recipient | Amount of money or description and value of property | Dates | Reason for providing the value |
| --- | --- | --- | --- | --- |
| 30.2. | Anne Pantelas<br>1700 Horizon Ridge Parkway,<br>Ste. 206<br>Henderson, NV 89012 | $156,485.74 | Period of<br>9/14/2020 thru<br>9/14/2021.<br>See Exhibit<br>SOFA 30. | Salary |
| | **Relationship to debtor**<br>Member | | | |
| 30.3. | Jonathan N. Pantelas-Hemmers<br>1700 Horizon Ridge Parkway,<br>Ste. 206<br>Henderson, NV 89012 | $2,342.45 | Periodically<br>from 2/2021<br>thru 9/10/2021.<br>See Exhibit<br>SOFA 30. | Wages |
| | **Relationship to debtor**<br>Nephew of Member | | | |

**31. Within 6 years before filing this case, has the debtor been a member of any consolidated group for tax purposes?**

☑ No
☐ Yes. Identify below.

**Name of the parent corporation**

**Employer Identification number of the parent corporation**

**32. Within 6 years before filing this case, has the debtor as an employer been responsible for contributing to a pension fund?**

☑ No
☐ Yes. Identify below.

**Name of the pension fund**

**Employer Identification number of the parent corporation**

Software Copyright (c) 1996-2021 Best Case, LLC - www.bestcase.com     Best Case Bankruptcy

Fill in this information to identify the case:

Debtor name __Infinity Capital Management, Inc.__

United States Bankruptcy Court for the: __DISTRICT OF NEVADA__

Case number (if known) __21-14486-abl__

☐ Check if this is an amended filing

# Official Form 207
## Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy           04/19

The debtor must answer every question. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and case number (if known).

**Part 14:   Signature and Declaration**

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.
18 U.S.C. §§ 152, 1341, 1519, and 3571.

I have examined the information in this *Statement of Financial Affairs* and any attachments and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   __09 - 28 - 2021__

_____          Oliver Hemmers
Signature of individual signing on behalf of the debtor      Printed name

Position or relationship to debtor   __Treasurer & Secretary__

**Are additional pages to *Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy* (Official Form 207) attached?**
■ No
☐ Yes

B2030 (Form 2030) (12/15)

# United States Bankruptcy Court
## District of Nevada

In re    Infinity Capital Management, Inc.      Case No.   21-14486-abl

                     Debtor(s)            Chapter   7

## DISCLOSURE OF COMPENSATION OF ATTORNEY FOR DEBTOR(S)

1.   Pursuant to 11 U .S.C. § 329(a) and Fed. Bankr. P. 2016(b), I certify that I am the attorney for the above named debtor(s) and that compensation paid to me within one year before the filing of the petition in bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:

| | | |
|---|---|---|
| For legal services, I have agreed to accept | $ | 3,505.00 |
| Prior to the filing of this statement I have received | $ | 3,505.00 |
| Balance Due | $ | 0.00 |

2.   The source of the compensation paid to me was:

     ■ Debtor      ☐ Other (specify):

3.   The source of compensation to be paid to me is:

     ■ Debtor      ☐ Other (specify):

4.   ■ I have not agreed to share the above-disclosed compensation with any other person unless they are members and associates of my law firm.

     ☐ I have agreed to share the above-disclosed compensation with a person or persons who are not members or associates of my law firm. A copy of the agreement, together with a list of the names of the people sharing in the compensation is attached.

5.   In return for the above-disclosed fee, I have agreed to render legal service for all aspects of the bankruptcy case, including:

     a.   Analysis of the debtor's financial situation, and rendering advice to the debtor in determining whether to file a petition in bankruptcy;
     b.   Preparation and filing of any petition, schedules, statement of affairs and plan which may be required;
     c.   Representation of the debtor at the meeting of creditors and confirmation hearing, and any adjourned hearings thereof;
     d.   [Other provisions as needed]

6.   By agreement with the debtor(s), the above-disclosed fee does not include the following service:
       Representation of Debtor(s) in any adversary proceeding, including without limitation, any nondischargeability actions pursuant to 11 U.S.C. 523 and 727; and any appeals.

---

### CERTIFICATION

I certify that the foregoing is a complete statement of any agreement or arrangement for payment to me for representation of the debtor(s) in this bankruptcy proceeding.

September 28, 2021
*Date*

Matthew C. Zirzow 7222
*Signature of Attorney*
Larson & Zirzow, LLC
850 E. Bonneville Ave.
Las Vegas, NV 89101
702-382-1170   Fax: 702-382-1169
mzirzow@lzlawnv.com
*Name of law firm*

---

## United States Bankruptcy Court
### District of Nevada

In re   Infinity Capital Management, Inc.

Debtor(s)

Case No.   21-14486-abl

Chapter   7

# VERIFICATION OF CREDITOR MATRIX

I, the Treasurer & Secretary of the corporation named as the debtor in this case, hereby verify that the attached list of creditors is true and correct to the best of my knowledge.

Date:   September 28, 2021

/s/ Oliver Hemmers

Oliver Hemmers/Treasurer & Secretary
Signer/Title

Infinity Capital Management, Inc.
1700 W Horizon Ridge Pkwy #206
Henderson, NV 89012

Internal Revenue Service
Attn: Bankruptcy Dept/Managing Agent
P.O. Box 7346
Philadelphia, PA 19101

Clark County Treasurer
c/o Bankruptcy Clerk
500 S. Grand Central Pkwy
P.O. Box 551220
Las Vegas, NV 89155

Clark County Assessor
c/o Bankruptcy Clerk
500 S. Grand Central Pkwy
Box 551401
Las Vegas, NV 89155

Dept. of Empl, Training & Rehab
Employment Security Division
500 East Third Street
Carson City, NV 89713

Nevada Dept. of Taxation
Bankruptcy Section
555 E. Washington Avenue #1300
Las Vegas, NV 89101

Social Security Administration
Attn: Bankruptcy Desk/Managing Agent
PO Box 33021
Baltimore, MD 21290-3021

Artiano Shinoff
Attn: Bankruptcy Dept/Managing Agent
3636 4th Avenue
San Diego, CA 92103

Century Link
Attn: Managing Member
100 CenturyLink Drive
P.O. Box 4065, Monroe, LA

Claus Nissen
Hugo-Distler Strasse 64
D-90411 Nuernberg, Germany

Coastal Investments PLC
Attn: Managing Member
P.O. Box 11, ANZ House
Avarua, Rarotonga, Cook Islands

Cox Internet
Attn: Managing Member
1700 Vegas Drive
Las Vegas, NV 89106

Daniel P. Nicholas
3842 N. Southport Ave. Apt. M
Chicago, IL 60613-6226

Dynamic Legal Recovery
Attn: Managing Member
25600 Rye Canyon Road #209
Valencia, CA 91355

First Savings Bank
Attn: Managing Member
5960 S. Jones Blvd.
Las Vegas, NV 89118

FTM Ltd
Attn: Managing Member
PO Box 316, Port Vila
First Floor, Law Partners House-Lini Hig
Efate, Vanuatu

Gregory M Cash
Tyringa Road
Port Kenney, SA 5671, Australia

HASelect-FTM Medical Receivables
Litigation Finance Fund SP
c/o HedgeACT Int'l SPC, Ltd.
403 South La Grange Rd.
La Grange, IL 60525

HealthPlus Imaging of Texas, LLC
Attn: Managing Member
9000 Southwest Freeway, Suite 250
Houston, TX 77074

Imtisal Khuri
1148 Broken Hills Dr.
Henderson, NV 89011

Infinity Centers United
Attn: Managing Member
3310 Edloe Street
Houston, TX 77027

Infinity Diagnostics, LLC dba Prestige M
Attn: Managing Member
3310 Edloe Street
Houston, TX 77027

Jennifer de Bono
89 Southfork Drive
Glenning Valley, NSW 2261, Australia

John & Karen Laub
9501 Royal Windsor Avenue
Las Vegas, NV 89149

Judy L. Trent
9724 Camden Hills Ave
Las Vegas, NV 89145

Kabbage
Attn: Managing Member
730 Peachtree Street NE, Suite 1100
Atlanta, GA 30308

Luke de Bono
89 Southfork Drive
Glenning Valley, NSW 2261, Australia

Matt Valenti
1651 S. Victoria Ave.
Los Angeles, CA 90019

Max Oram
1840 Ulan Road
Mudgee, NSM 2850, Australia

Micellaneous Provider Agreements

NV Energy
Attn: Managing Member
P.O. Box 98910
Las Vegas, NV 89151-0001

Rent-MDL Group
Attn: Managing Member
5960 South Jones Boulevard
Las Vegas, NV 89118

Robin W. Smith
12 Estuary Court
Twin Waters, QLD 4564, Australia

State Farm Fire & Casualty Co.
Attn: Bankruptcy Dept/Managing Agent
3 Ravinia Drive
Atlanta, GA 30346-2117

Tecumseh Alternatives, LLC
Attn: Managing Member
5668 Morris Hunt Drive
Fort Mill, SC 29708

Tecumseh-Infinity Med. Receiv.  Fu L
Attn:  Tecumseh Alternatives, LLC
5668 Morris Hunt Dr.
Fort Mill, SC 29708

The Injury Specialists, LLC
Attn: Managing Member
270 Carpenter Drive, Suite 300
Sandy Springs, GA 30328

Griffin Asset Management LLC
Attn:  Michael E. Griffin
230 Park Ave.
10th Floor, Suite 61
New York, NY 10169

HASelect-FTM Medical Receivables
Litigation Finance Fund SP
c/o Thomas C. Cronin
120 N. LaSalle St., 20th Floor
Chicago, IL 60602

HASelect-FTM Medical Receivables
Litigation Finance Fund, SP
c/o John N. Hourihane, Jr.
120 N. LaSalle St., 20th Floor
Chicago, IL 60602

# United States Bankruptcy Court
## District of Nevada

In re    Infinity Capital Management, Inc.                      Case No.    21-14486-abl

                                 Debtor(s)           Chapter    7

## CORPORATE OWNERSHIP STATEMENT (RULE 7007.1)

Pursuant to Federal Rule of Bankruptcy Procedure 7007.1 and to enable the Judges to evaluate possible disqualification or recusal, the undersigned counsel for   Infinity Capital Management, Inc.   in the above captioned action, certifies that the following is a (are) corporation(s), other than the debtor or a governmental unit, that directly or indirectly own(s) 10% or more of any class of the corporation's(s') equity interests, or states that there are no entities to report under FRBP 7007.1:

■ None [*Check if applicable*]

September 28, 2021

Date

Matthew C. Zirzow 7222
Signature of Attorney or Litigant
Counsel for   Infinity Capital Management, Inc.
Larson & Zirzow, LLC
850 E. Bonneville Ave.
Las Vegas, NV 89101
702-382-1170 Fax:702-382-1169
mzirzow@lzlawnv.com

# EXHIBIT A/B

**SCHEDULE A/B 39-OFFICE FURNITURE**

| | |
|---|---|
| 1. (2) SINGLE PEDESTAL DESKS | $120.00 |
| 2. (2) EXECUTIVE CHAIRS | $80.00 |
| 3, (2) DESK TO P COMPUTERS | $220.00 |
| 4. 5-DRAWER LATERAL FILE CABINET | $100.00 |
| 5. (2) SINGLE PEDESTAL DESKS | $120.00 |
| 6. (2) EXECUTIVE CHAIRS | $80.00 |
| 7. BLACK SIDE CHAIRS | $30.00 |
| 10. BLUE SOFA | $120.00 |
| 11. END TABLE | $25.00 |
| 12. (3) 2-DOOR CABINETS | $120.00 |
| 15. (5) BLACK SIDE CHAIRS | $150.00 |
| 16. (2) SINGLE PEDESTAL DESKS | $120.00 |
| 18. (2) EXECUTIVE CHAIRS | $80.00 |
| 19. (2) 5-DRAWERLATERALFILE CABINETS | $200.00 |
| 20. 3-DRAWER LATERAL FILE CABINET | $50.00 |
| 21. SINGLE PEDESTAL DESK | $60.00 |
| 22. DESK TOP COMPUTER | $100.00 |
| 23. EXECUTIVE CHAIR | $40.00 |
| 24. 2-DRAWER LATERAL FILE CABINET | $35.00 |
| 25. FRAMED PRINT | $10.00 |
| 26. (2) 8' FOLDING TABLES | $600.00 |
| 27. UTILITY CART | $25.00 |
| 28. (3) WIRE SHELF UNITS | $135.00 |
| 29. 3-DRAWE R LATERAL FILE CABINET | $50.00 |
| 30. (4) BAR STOOLS | $120.00 |
| 31. TABLE | $35.00 |
| 32. KENMORE REFRIGERATOR | $90.00 |
| 33. MICROWAVE OVEN | $20.00 |
| 34. COFFEEMAKER | $25.00 |
| 35. WATER DISPENSER | $50.00 |
| 36. TOASTER OVEN | $10.00 |
| 37. STAINLESS STEEL TRASH CAN | $20.00 |
| 39. (2) SINGLE PEDESTAL DESKS | $120.00 |
| 40. (2) EXECUTIVE CHAIRS | $80.00 |
| 42. SYSRACKS COMPUTER SERVER CABINET | $175.00 |
| 46. ROUND TABLE | $40.00 |
| 47. (4) BLACK SIDE CHAIRS | $120.00 |
| 49. (2) SINGLE PEDESTAL DESKS | $120.00 |
| 50. 2-DRAWER FILE CABINET | $10.00 |
| 51. UTILITY CART | $25.00 |
| 52. (2) EXECUTIVE CHAIRS | $80.00 |
| 53. (2) SINGLE PEDESTAL DESKS | $120.00 |
| 54. (2) EXECUTIVE CHAIRS | $80.00 |
| 55. (2) BLACK SIDE CHAIRS | $60.00 |
| 56. (2) DESK TOP COMPUTERS | $220.00 |
| 57. (3) 48" BOOKCASES | $105.00 |
| 58. RECEPTION DESK | $75.00 |

| | |
|---|---|
| 61. OAK CREDENZA | $50.00 |
| 62. END TABLE | $5.00 |
| 63. EXECUTIVE  CHAIR | $40.00 |
| 64. SECRETARY  CHAIR | $30.00 |
| 65. BLUE SIDE CHAIR | $35.00 |
| 66. FRAMED MIRROR | $20.00 |
| 67. 2-DRAWER FILE CABINET | $10.00 |
| 68. (2) 4-DRAWER FILE CABINETS | $60.00 |
| 69. (2) EXECUTIVE  CHAIRS | $80.00 |
| 70. CONFERENCE TABLE | $75.00 |
| 73. SINGLE PEDESTAL DESK | $35.00 |
| 74. (2) 4-DRAWER LATERAL FILE CABINETS | $150.00 |
| 75. 4-DRAWER LATERAL FILE CABINET | $70.00 |
| 76. 2-DOORMETAL  STORAGE CABINET | $50.00 |
| 77. 2-DOOR WOOD STORAGE  CABINET | $35.00 |
| 78. ROUND TABLE | $35.00 |
| 79. STAINLESS STEEL TRASH CAN | $20.00 |
| 80. STEP STOOL | $10.00 |
| 81. MAGIC CHEF REFRIGERATOR | $75.00 |
| 82. MICROWAVE  OVEN | $15.00 |
| 83. COFFEEMAKER | $15.00 |
| 88. OAK DESK | $65.00 |
| 89. (3) BLUE SIDE CHAIRS | $90.00 |
| 91. DOUBLE PEDESTAL DESK | $70.00 |
| 92. MUSIC CABINET | $25.00 |
| 93. 3-DRAWER LATERAL  FILE CABINET | $50.00 |
| 94. ROUND END TABLE | $10.00 |
| 95. UTILITY STAND | $10.00 |
| 96. PAPER SHREDDER | $25.00 |
| 97. SECRETARY CHAIR | $30.00 |
| 98. OAK DESK  W/ RETURN | $90.00 |
| 99. COMPUTER DESK | $20.00 |
| 100. SINGLE PEDESTAL DESK | $60.00 |
| 101. (3) EXECUTIVE  CHAIRS | $120.00 |
| 103. (2) 2-DRAWER FILE CABINET | $20.00 |
| 104. 4-DRAWERLATERAL FILE CABINET | $75.00 |
| 105. TYPEWRITER  STAND | $10.00 |
| | **$6,155.00** |

**SCHEDULE A/B 41-OFFICE EQUIPMENT AND COMPUTERS**

| | |
|---|---|
| 8. (2) DESK  TOP COMPUTERS | $220.00 |
| 9. HP LASER PRINTER M553 | $275.00 |
| 13. BROTHER SCANNER | $75.00 |
| 14. HP 281FDW LASER ALL IN ONE PRINTER | $75.00 |
| 17. (2) DESK TOP COMPUTERS | $200.00 |
| 38. EPSON PRECISION CORE PRINTER | $90.00 |
| 41. (2) DESK TOP COMPUTERS | $220.00 |
| 43. UPS BATTERY BACKUP | $75.00 |
| 45. COMPUTER SERVER | $475.00 |
| 48. (2) DESK TOP COMPUTERS | $220.00 |
| 59. DESK TOP COMPUTER | $110.00 |
| 60. CANON ALL IN ONE PRINTER | $65.00 |
| 71. (2) DESK TOP COMPUTERS | $170.00 |
| 72. FUJITSU FT7160 SCANNER | $200.00 |
| 84. HP LASER M553 PRINTER | $275.00 |
| 85. BROTHER IMAGE CENTER ADS 2900W SCANNER | $125.00 |
| 86. BROTHER BUSINESS  CLASS FAX | $25.00 |
| 87. OLD COMPUTER  SERVER | $125.00 |
| 90. (2) DESK TOP COMPUTERS | $130.00 |
| 102. (3) DESK TOP COMPUTERS | $300.00 |
| | **$3,450.00** |

# EXHIBIT SOFA - 3

# Expenses by Contact

Infinity Capital Management, Inc.

For the period June 14, 2021 to September 14, 2021

| Contact | Type | Jun 14-Sep 14, 2021 |
|---|---|---|
| A B McCallum Superanuation | Expense | (7,132.71) |
| BLUECHIP ACCOUNTING LLC | Expense | (12,897.42) |
| FIRST SAVINGS BANK | Expense | (21,105.28) |
| GP MICRO | Expense | (12,984.00) |
| HASelect-FTM | Expense | (130,309.70) |
| Jas Bains | Expense | (10,000.00) |
| JENNIFER DEBONO | Expense | (10,994.79) |
| KABBAGE | Expense | (27,168.27) |
| Knox Group Australia | Expense | (22,280.00) |
| Larson & Zirzow, LLC | Expense | (10,000.00) |
| MCNUTT LAW FIRM, PC | Expense | (17,278.55) |
| National Payment Corp | Expense | (307,991.38) |
| Neal H Howard & Associates | Expense | (25,506.55) |
| RMWBH | Expense | (10,000.00) |
| Tecumseh-Infinity Medical Receivables Fund LP | Expense | (17,644.83) |
| THE INJURY SPECIALISTS | Expense | (60,046.42) |

**Expenses by Contact**

**AB McCallum Supernaution**

| Date | Details | Reference | Total |
|------|---------|-----------|-------|
| 13 Jul 2021 | Cash Paid | | 7,132.71 |
| **Total** | | | **7,132.71** |

**Blue Chip Accounting, LLC**

| Date | Details | Reference | Total |
|------|---------|-----------|-------|
| 22 Jun 2021 | Cash Paid | | 3,000.00 |
| 01 Jul 2021 | Invoice | Inv 7214 | 297.42 |
| 22 Jul 2021 | Cash Paid | | 3,000.00 |
| 23 Aug 2021 | Cash Paid | | 3,000.00 |
| 14 Sep 2021 | Cash Paid | | 3,000.00 |
| 14 Sep 2021 | Cash Paid | | 600.00 |
| **Total** | | | **12,897.42** |

**First Savings Bank**

| Date | Details | Reference | Total |
|------|---------|-----------|-------|
| 25 Jun 2021 | Cash Paid | | 25.00 |
| 25 Jun 2021 | Cash Paid | | 25.00 |
| 29 Jun 2021 | Invoice | First sav 206-infincap | 7,001.76 |
| 15 Jul 2021 | Cash Paid | | 25.00 |
| 15 Jul 2021 | Cash Paid | | 25.00 |
| 23 Jul 2021 | Invoice | Rent for August | 7,001.76 |
| 25 Aug 2021 | Invoice | August rent | 7,001.76 |
| **Total** | | | **21,105.28** |

**GP Micro**

| Date | Details | Reference | Total |
|------|---------|-----------|-------|
| 15 Jul 2021 | Invoice | Services fees - backup etc | 10,287.00 |
| 27 Aug 2021 | Invoice | Web and Data Portal Hosting | 2,697.00 |
| **Total** | | | **12,984.00** |

**HASelect-FTM**

| Date | Details | Reference | Total |
|------|---------|-----------|-------|
| 25 Jun 2021 | Cash Paid | | 67,746.79 |
| 25 Jun 2021 | Cash Paid | | 58,162.91 |
| 15 Jul 2021 | Cash Paid | | 3,821.29 |
| 15 Jul 2021 | Cash Paid | | 578.71 |
| **Total** | | | **130,309.70** |

**Jas Bains**

| Date | Details | Reference | Total |
|------|---------|-----------|-------|
| 22 Jul 2021 | Cash Paid | | 10,000.00 |
| **Total** | | | 10,000.00 |

**Jennifer Debono**

| Date | Details | Reference | Total |
|------|---------|-----------|-------|
| 30 Jun 2021 | Cash Paid | | 10,994.79 |

| | | | |
|---|---|---|---|
| **Total** | | | **10,994.79** |

**Kabbage**

| Date | Details | Reference | Total |
|---|---|---|---|
| 17 Jun 2021 | Cash Paid | | 9,056.09 |
| 19 Jul 2021 | Cash Paid | | 9,056.09 |
| 17 Aug 2021 | Cash Paid | | 9,056.09 |
| **Total** | | | **27,168.27** |

**Knox Group Austrailia**

| Date | Details | Reference | Total |
|---|---|---|---|
| 13 Jul 2021 | Cash Paid | | 22,280.00 |
| **Total** | | | **22,280.00** |

**Larson & Zirzow, LLC**

| Date | Details | Reference | Total |
|---|---|---|---|
| 04 Aug 2021 | Cash Paid | | 10,000.00 |
| **Total** | | | **10,000.00** |

**McNutt Law Firm**

| Date | Details | Reference | Total |
|---|---|---|---|
| 15 Jul 2021 | Invoice | Healthplus legal fees | 14,861.42 |
| 08 Sep 2021 | Invoice | | 2,417.13 |
| **Total** | | | **17,278.55** |

**Neal H. Howard & Associates**

| Date | Details | Reference | Total |
|---|---|---|---|
| 25 Jun 2021 | Invoice | Wiley Stinson | 25,506.55 |
| **Total** | | | **25,506.55** |

National Payment Corp

| Date | Details | Reference | Total |
|---|---|---|---|
| 17 Jun 2021 | Cash Paid | | 33,349.74 |
| 01 Jul 2021 | Cash Paid | | 34,480.25 |
| 12 Jul 2021 | Cash Paid | | 712.04 |
| 15 Jul 2021 | Cash Paid | | 32,607.52 |
| 19 Jul 2021 | Cash Paid | | 1,587.57 |
| 29 Jul 2021 | Cash Paid | | 28,521.50 |
| 12 Aug 2021 | Cash Paid | | 33,973.08 |
| 26 Aug 2021 | Cash Paid | | 32,495.73 |
| 09 Sep 2021 | Cash Paid | | 33,074.92 |
| 13 Sep 2021 | Cash Paid | | 1,400.00 |
| 14 Sep 2021 | Cash Paid | | 75,789.03 |
| **Total** | | | **307,991.38** |

**RMWBH**

| Date | Details | Reference | Total |
|---|---|---|---|
| 13 Jul 2021 | Invoice | Retainer | 5,000.00 |
| 21 Jul 2021 | Cash Paid | | 5,000.00 |
| **Total** | | | **10,000.00** |

**Tecumseh-Infinity Medial Receiveables**

| Date | Details | Reference | Total |
|------|---------|-----------|-------|
| 25 Jun 2021 | Cash Paid | | 2,295.59 |
| 29 Jun 2021 | Cash Paid | | 14,138.16 |
| 30 Jul 2021 | Cash Paid | | 1,211.08 |
| **Total** | | | **17,644.83** |

The Injury Specialist

| Date | Details | Reference | Total |
|------|---------|-----------|-------|
| 15 Jun 2021 | Cash Paid | | 7,033.47 |
| 29 Jun 2021 | Invoice | May 2021 Commissions | 8,265.68 |
| 06 Sep 2021 | Invoice | | 17,357.88 |
| 14 Sep 2021 | Cash Paid | | 27,389.39 |
| **Total** | | | **60,046.42** |

# EXHIBIT SOFA - 4

## Expenses by Contact

**GPMicro**

| Date | Details | Reference | Total |
|---|---|---|---|
| 06 Oct 2020 | Invoice | INV# 202010INF | 5.850.00 |
| 16 Dec 2020 | Invoice | INV# 202010INF-1 | 7.500.00 |
| 15 Jul 2021 | Invoice | Services fees - backup etc | 10.287.00 |
| 27 Aug 2021 | Invoice | Web and Data Portal Hosting | 2.697.00 |
| **Total** | | | **26.334.00** |

# EXHIBIT SOFA - 30



ZZ INFINITY CAPITAL MANAGEMENT

Pay Code Summary By Employee By Pay Code Report

For Date Range 09/14/2020 to 09/14/2021

| Employee ID | Employee Name | Pay Code | Pay Description | Amount Paid | Pay Rate | Hours |
|---|---|---|---|---|---|---|
| P31721 | HEMMERS OLIVER A | REG | REGULAR PAY | 144,230.74 | 69.34 | 2,080.00 |
| | Totals for Employee:   P31721 | | | 144,230.74 | | 2,080.00 |
| L02196 | PANTELAS ANNE | OTHER | OTHER EARN | 62,585.74 | 2,607.74 | 24.00 |
| | | REG | REGULAR PAY | 93,750.00 | 45.07 | 2,080.00 |
| | | SCORP | PRINCIPAL MED | 150.00 | 0.00 | 0.00 |
| | Totals for Employee:   L02196 | | | 156,485.74 | | 2,104.00 |
| J68172 | PANTELAS–HEMMERS JONATHAN N | REG | REGULAR PAY | 2,190.00 | 11.38 | 192.50 |
| | | REIM | REIMBURSEMENT | 152.45 | 0.00 | 0.00 |
| | Totals for Employee:   J68172 | | | 2,342.45 | | 192.50 |
| | Report Totals: | | | 303,058.93 | | 4,376.50 |

27 Sep 2021 – 17:11



## ZZ INFINITY CAPITAL MANAGEMENT
### Pay Code Detail Report

Pay Dates from 09/14/2020 to 09/14/2021 | All Pay Codes | Employee L02196

| Pay Code | Pay Description | Employee ID | Employee Name | Pay Date | Check# | Voucher# | Amount Paid | Hours |
|----------|-----------------|-------------|---------------|----------|--------|----------|-------------|-------|
| OTHER | OTHER EARNINGS | L02196 | ANNE PANTELAS | 09/25/2020 | 1344448 | 006381 | 2,503.43 | 1.00 |
| OTHER | OTHER EARNINGS | L02196 | ANNE PANTELAS | 10/09/2020 | 1350423 | 006402 | 2,503.43 | 1.00 |
| OTHER | OTHER EARNINGS | L02196 | ANNE PANTELAS | 10/23/2020 | 1356453 | 006422 | 2,503.43 | 1.00 |
| OTHER | OTHER EARNINGS | L02196 | ANNE PANTELAS | 11/06/2020 | 1362942 | 006442 | 2,503.43 | 1.00 |
| OTHER | OTHER EARNINGS | L02196 | ANNE PANTELAS | 11/20/2020 | 1368356 | 006482 | 2,503.43 | 1.00 |
| OTHER | OTHER EARNINGS | L02196 | ANNE PANTELAS | 12/04/2020 | 1375023 | 006502 | 2,503.43 | 1.00 |
| OTHER | OTHER EARNINGS | L02196 | ANNE PANTELAS | 12/18/2020 | 1381859 | 006521 | 2,503.43 | 1.00 |
| OTHER | OTHER EARNINGS | L02196 | ANNE PANTELAS | 12/31/2020 | 1389486 | 006555 | 2,503.43 | 1.00 |
| OTHER | OTHER EARNINGS | L02196 | ANNE PANTELAS | 01/15/2021 | 1394927 | 006574 | 2,503.43 | 1.00 |
| OTHER | OTHER EARNINGS | L02196 | ANNE PANTELAS | 01/29/2021 | 1401819 | 006594 | 2,503.43 | 1.00 |
| OTHER | OTHER EARNINGS | L02196 | ANNE PANTELAS | 02/12/2021 | 1407842 | 006613 | 2,503.43 | 1.00 |
| OTHER | OTHER EARNINGS | L02196 | ANNE PANTELAS | 02/26/2021 | 1414533 | 006632 | 2,503.43 | 1.00 |
| OTHER | OTHER EARNINGS | L02196 | ANNE PANTELAS | 03/12/2021 | 1418472 | 006653 | 2,503.43 | 1.00 |
| OTHER | OTHER EARNINGS | L02196 | ANNE PANTELAS | 03/26/2021 | 1425298 | 006680 | 2,503.43 | 1.00 |
| OTHER | OTHER EARNINGS | L02196 | ANNE PANTELAS | 04/09/2021 | 1432211 | 006697 | 1,251.71 | 0.00 |
| OTHER | OTHER EARNINGS | L02196 | ANNE PANTELAS | 04/23/2021 | 1440260 | 006714 | 2,503.43 | 1.00 |
| OTHER | OTHER EARNINGS | L02196 | ANNE PANTELAS | 05/07/2021 | 1446720 | 006728 | 1,251.71 | 0.00 |
| OTHER | OTHER EARNINGS | L02196 | ANNE PANTELAS | 05/21/2021 | 1454077 | 006774 | 2,503.43 | 1.00 |
| OTHER | OTHER EARNINGS | L02196 | ANNE PANTELAS | 06/04/2021 | 1460245 | 006804 | 2,503.43 | 1.00 |
| OTHER | OTHER EARNINGS | L02196 | ANNE PANTELAS | 06/18/2021 | 1467393 | 006821 | 2,503.43 | 1.00 |
| OTHER | OTHER EARNINGS | L02196 | ANNE PANTELAS | 07/02/2021 | 1474705 | 006836 | 2,503.43 | 1.00 |
| OTHER | OTHER EARNINGS | L02196 | ANNE PANTELAS | 07/16/2021 | 1484131 | 006853 | 2,503.43 | 1.00 |
| OTHER | OTHER EARNINGS | L02196 | ANNE PANTELAS | 07/30/2021 | 1489538 | 006868 | 2,503.43 | 1.00 |
| OTHER | OTHER EARNINGS | L02196 | ANNE PANTELAS | 08/13/2021 | 1497527 | 006880 | 2,503.43 | 1.00 |
| OTHER | OTHER EARNINGS | L02196 | ANNE PANTELAS | 08/27/2021 | 1504985 | 006892 | 2,503.43 | 1.00 |
| OTHER | OTHER EARNINGS | L02196 | ANNE PANTELAS | 09/10/2021 | 1512502 | 006916 | 2,503.43 | 1.00 |
| | Totals For:   ANNE PANTELAS | | | | | | 62,585.74 | 24.00 |
| | Totals For Pay Code:   OTHER | | | | | | 62,585.74 | 24.00 |
| REG | REGULAR | L02196 | ANNE PANTELAS | 09/25/2020 | 1344448 | 006381 | 3,750.00 | 80.00 |
| REG | REGULAR | L02196 | ANNE PANTELAS | 10/09/2020 | 1350423 | 006402 | 3,750.00 | 80.00 |

28 Sep 2021 – 10:49

Case 21-14486-abl   Doc 47   Entered 09/29/21 16:23:54   Page 45 of 49



## ZZ INFINITY CAPITAL MANAGEMENT
### Pay Code Detail Report
Pay Dates from 09/14/2020 to 09/14/2021 | All Pay Codes | Employee L02196

| Pay Code | Pay Description | Employee ID | Employee Name | Pay Date | Check# | Voucher# | Amount Paid | Hours |
|----------|-----------------|-------------|---------------|----------|--------|----------|-------------|-------|
| REG | REGULAR | L02196 | ANNE PANTELAS | 10/23/2020 | 1356453 | 006422 | 3,750.00 | 80.00 |
| REG | REGULAR | L02196 | ANNE PANTELAS | 11/06/2020 | 1362942 | 006442 | 3,750.00 | 80.00 |
| REG | REGULAR | L02196 | ANNE PANTELAS | 11/20/2020 | 1368356 | 006482 | 3,750.00 | 80.00 |
| REG | REGULAR | L02196 | ANNE PANTELAS | 12/04/2020 | 1375023 | 006502 | 3,750.00 | 80.00 |
| REG | REGULAR | L02196 | ANNE PANTELAS | 12/18/2020 | 1381859 | 006521 | 3,750.00 | 80.00 |
| REG | REGULAR | L02196 | ANNE PANTELAS | 12/31/2020 | 1389486 | 006555 | 3,750.00 | 80.00 |
| REG | REGULAR | L02196 | ANNE PANTELAS | 01/15/2021 | 1394927 | 006574 | 3,750.00 | 80.00 |
| REG | REGULAR | L02196 | ANNE PANTELAS | 01/29/2021 | 1401819 | 006594 | 3,750.00 | 80.00 |
| REG | REGULAR | L02196 | ANNE PANTELAS | 02/12/2021 | 1407842 | 006613 | 3,750.00 | 80.00 |
| REG | REGULAR | L02196 | ANNE PANTELAS | 02/26/2021 | 1414533 | 006632 | 3,750.00 | 80.00 |
| REG | REGULAR | L02196 | ANNE PANTELAS | 03/12/2021 | 1418472 | 006653 | 3,750.00 | 80.00 |
| REG | REGULAR | L02196 | ANNE PANTELAS | 03/26/2021 | 1425298 | 006680 | 3,750.00 | 80.00 |
| REG | REGULAR | L02196 | ANNE PANTELAS | 04/09/2021 | 1432211 | 006697 | 1,875.00 | 80.00 |
| REG | REGULAR | L02196 | ANNE PANTELAS | 04/23/2021 | 1440260 | 006714 | 3,750.00 | 80.00 |
| REG | REGULAR | L02196 | ANNE PANTELAS | 05/07/2021 | 1446720 | 006728 | 1,875.00 | 80.00 |
| REG | REGULAR | L02196 | ANNE PANTELAS | 05/21/2021 | 1454077 | 006774 | 3,750.00 | 80.00 |
| REG | REGULAR | L02196 | ANNE PANTELAS | 06/04/2021 | 1460245 | 006804 | 3,750.00 | 80.00 |
| REG | REGULAR | L02196 | ANNE PANTELAS | 06/18/2021 | 1467393 | 006821 | 3,750.00 | 80.00 |
| REG | REGULAR | L02196 | ANNE PANTELAS | 07/02/2021 | 1474705 | 006836 | 3,750.00 | 80.00 |
| REG | REGULAR | L02196 | ANNE PANTELAS | 07/16/2021 | 1484131 | 006853 | 3,750.00 | 80.00 |
| REG | REGULAR | L02196 | ANNE PANTELAS | 07/30/2021 | 1489538 | 006868 | 3,750.00 | 80.00 |
| REG | REGULAR | L02196 | ANNE PANTELAS | 08/13/2021 | 1497527 | 006880 | 3,750.00 | 80.00 |
| REG | REGULAR | L02196 | ANNE PANTELAS | 08/27/2021 | 1504985 | 006892 | 3,750.00 | 80.00 |
| REG | REGULAR | L02196 | ANNE PANTELAS | 09/10/2021 | 1512502 | 006916 | 3,750.00 | 80.00 |
| | Totals For:   ANNE PANTELAS | | | | | | 93,750.00 | 2,080.00 |
| | Totals For Pay Code:   REG | | | | | | 93,750.00 | 2,080.00 |
| SCORP | SCORP PRINCIPAL MEDICAL | L02196 | ANNE PANTELAS | 12/31/2020 | | 006589 | 150.00 | 0.00 |
| | Totals For:   ANNE PANTELAS | | | | | | 150.00 | 0.00 |



**ZZ INFINITY CAPITAL MANAGEMENT**
Pay Code Detail Report

Pay Dates from 09/14/2020 to 09/14/2021 | All Pay Codes | Employee L02196

| Pay Code | Pay Description | Employee ID | Employee Name | Pay Date | Check# | Voucher# | Amount Paid | Hours |
|----------|-----------------|-------------|---------------|----------|--------|----------|-------------|-------|
| Totals For Pay Code: | SCORP | | | | | | 150.00 | 0.00 |
| Report Totals: | | | | | | | 156,485.74 | 2,104.00 |

Total Number of Employees: 1

Case 21-14486-abl   Doc 47   Entered 09/29/21 16:23:54   Page 47 of 49



**ZZ INFINITY CAPITAL MANAGEMENT**
Employee Voucher Report
From 09/14/2020 To 09/14/2021 | Employee J68172

Sorted by Employee Name

| Pay Date | Period Start Date | Period End Date | Reg Hours | Premium Hours | Gross Pay | Reimburse Amt | Gross Earned | Federal Tax | FICA | State Tax | Other Taxes | Payroll Deductions | Net Pay |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 02/26/2021 | 02/07/2021 | 02/20/2021 | 0.00 | 0.00 | 0.00 | 0.00 | $0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 03/12/2021 | 02/21/2021 | 03/06/2021 | 18.25 | 0.00 | 182.50 | 0.00 | $182.50 | 0.00 | 13.97 | 0.00 | 0.00 | 0.00 | 168.53 |
| 03/26/2021 | 03/07/2021 | 03/20/2021 | 15.75 | 0.00 | 157.50 | 0.00 | $157.50 | 0.00 | 12.04 | 0.00 | 0.00 | 0.00 | 145.46 |
| 04/09/2021 | 03/21/2021 | 04/03/2021 | 11.25 | 0.00 | 112.50 | 0.00 | $112.50 | 0.00 | 8.61 | 0.00 | 0.00 | 0.00 | 103.89 |
| 04/23/2021 | 04/04/2021 | 04/17/2021 | 5.00 | 0.00 | 50.00 | 0.00 | $50.00 | 0.00 | 3.83 | 0.00 | 0.00 | 0.00 | 46.17 |
| 05/07/2021 | 04/18/2021 | 05/01/2021 | 0.00 | 0.00 | 0.00 | 0.00 | $0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 05/21/2021 | 05/02/2021 | 05/15/2021 | 0.00 | 0.00 | 0.00 | 0.00 | $0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 06/04/2021 | 05/16/2021 | 05/29/2021 | 0.00 | 0.00 | 0.00 | 0.00 | $0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 06/18/2021 | 05/30/2021 | 06/12/2021 | 30.25 | 0.00 | 302.50 | 0.00 | $302.50 | 0.00 | 23.13 | 0.00 | 0.00 | 0.00 | 279.37 |
| 07/02/2021 | 06/13/2021 | 06/26/2021 | 39.50 | 0.00 | 395.00 | 0.00 | $395.00 | 0.00 | 30.22 | 0.00 | 0.00 | 0.00 | 364.78 |
| 07/16/2021 | 06/27/2021 | 07/10/2021 | 4.75 | 0.00 | 47.50 | 0.00 | $47.50 | 0.00 | 3.64 | 0.00 | 0.00 | 0.00 | 43.86 |
| 07/30/2021 | 07/11/2021 | 07/24/2021 | 14.75 | 0.00 | 147.50 | 0.00 | $147.50 | 0.00 | 11.28 | 0.00 | 0.00 | 0.00 | 136.22 |
| 08/13/2021 | 07/25/2021 | 08/07/2021 | 35.25 | 0.00 | 681.20 | 152.45 | $528.75 | 4.61 | 40.44 | 0.00 | 0.00 | 0.00 | 636.15 |
| 08/27/2021 | 08/08/2021 | 08/21/2021 | 3.75 | 0.00 | 56.25 | 0.00 | $56.25 | 0.00 | 4.31 | 0.00 | 0.00 | 0.00 | 51.94 |
| 09/10/2021 | 08/22/2021 | 09/04/2021 | 14.00 | 0.00 | 210.00 | 0.00 | $210.00 | 0.00 | 16.07 | 0.00 | 0.00 | 0.00 | 193.93 |
| Totals For: | PANTELAS–HEMMERS JON/ | | 192.50 | 0.00 | 2,342.45 | 152.45 | $2,190.00 | 4.61 | 167.54 | 0.00 | 0.00 | 0.00 | 2,170.30 |
| | | | | | | | | | | | | | |
| Report Totals: | | | 192.50 | 0.00 | 2,342.45 | 152.45 | $2,190.00 | 4.61 | 167.54 | 0.00 | 0.00 | 0.00 | 2,170.30 |

Total Number of Employees:      1



Case 21-14486-abl    Doc 47    Entered 09/29/21 16:23:54    Page 48 of 49



## ZZ INFINITY CAPITAL MANAGEMENT
### Pay Code Detail Report
Pay Dates from 09/14/2020 to 09/14/2021 | All Pay Codes | Employee P31721

| Pay Code | Pay Description | Employee ID | Employee Name | Pay Date | Check# | Voucher# | Amount Paid | Hours |
|---|---|---|---|---|---|---|---|---|
| REG | REGULAR | P31721 | OLIVER A HEMMERS | 09/25/2020 | 1344440 | 006383 | 5,769.23 | 80.00 |
| REG | REGULAR | P31721 | OLIVER A HEMMERS | 10/09/2020 | 1350415 | 006404 | 5,769.23 | 80.00 |
| REG | REGULAR | P31721 | OLIVER A HEMMERS | 10/23/2020 | 1356445 | 006424 | 5,769.23 | 80.00 |
| REG | REGULAR | P31721 | OLIVER A HEMMERS | 11/06/2020 | 1362934 | 006444 | 5,769.23 | 80.00 |
| REG | REGULAR | P31721 | OLIVER A HEMMERS | 11/20/2020 | 1368348 | 006484 | 5,769.23 | 80.00 |
| REG | REGULAR | P31721 | OLIVER A HEMMERS | 12/04/2020 | 1375015 | 006504 | 5,769.23 | 80.00 |
| REG | REGULAR | P31721 | OLIVER A HEMMERS | 12/18/2020 | 1381851 | 006523 | 5,769.23 | 80.00 |
| REG | REGULAR | P31721 | OLIVER A HEMMERS | 12/31/2020 | 1389478 | 006557 | 5,769.23 | 80.00 |
| REG | REGULAR | P31721 | OLIVER A HEMMERS | 01/15/2021 | 1394919 | 006576 | 5,769.23 | 80.00 |
| REG | REGULAR | P31721 | OLIVER A HEMMERS | 01/29/2021 | 1401811 | 006596 | 5,769.23 | 80.00 |
| REG | REGULAR | P31721 | OLIVER A HEMMERS | 02/12/2021 | 1407834 | 006615 | 5,769.23 | 80.00 |
| REG | REGULAR | P31721 | OLIVER A HEMMERS | 02/26/2021 | 1414525 | 006634 | 5,769.23 | 80.00 |
| REG | REGULAR | P31721 | OLIVER A HEMMERS | 03/12/2021 | 1418464 | 006655 | 5,769.23 | 80.00 |
| REG | REGULAR | P31721 | OLIVER A HEMMERS | 03/26/2021 | 1425291 | 006682 | 5,769.23 | 80.00 |
| REG | REGULAR | P31721 | OLIVER A HEMMERS | 04/09/2021 | 1432204 | 006699 | 2,884.61 | 80.00 |
| REG | REGULAR | P31721 | OLIVER A HEMMERS | 04/23/2021 | 1440253 | 006716 | 5,769.23 | 80.00 |
| REG | REGULAR | P31721 | OLIVER A HEMMERS | 05/07/2021 | 1446715 | 006730 | 2,884.61 | 80.00 |
| REG | REGULAR | P31721 | OLIVER A HEMMERS | 05/21/2021 | 1454072 | 006776 | 5,769.23 | 80.00 |
| REG | REGULAR | P31721 | OLIVER A HEMMERS | 06/04/2021 | 1460240 | 006806 | 5,769.23 | 80.00 |
| REG | REGULAR | P31721 | OLIVER A HEMMERS | 06/18/2021 | 1467387 | 006823 | 5,769.23 | 80.00 |
| REG | REGULAR | P31721 | OLIVER A HEMMERS | 07/02/2021 | 1474699 | 006838 | 5,769.23 | 80.00 |
| REG | REGULAR | P31721 | OLIVER A HEMMERS | 07/16/2021 | 1484125 | 006855 | 5,769.23 | 80.00 |
| REG | REGULAR | P31721 | OLIVER A HEMMERS | 07/30/2021 | 1489533 | 006870 | 5,769.23 | 80.00 |
| REG | REGULAR | P31721 | OLIVER A HEMMERS | 08/13/2021 | 1497522 | 006882 | 5,769.23 | 80.00 |
| REG | REGULAR | P31721 | OLIVER A HEMMERS | 08/27/2021 | 1504980 | 006894 | 5,769.23 | 80.00 |
| REG | REGULAR | P31721 | OLIVER A HEMMERS | 09/10/2021 | 1512497 | 006918 | 5,769.23 | 80.00 |

Totals For:   OLIVER A HEMMERS                                                     144,230.74     2,080.00

Totals For Pay Code:   REG                                                         144,230.74     2,080.00

28 Sep 2021 − 10:48

# EXHIBIT 4

1   Bart K. Larsen, Esq.
    Nevada Bar No. 8538
2   Kyle M. Wyant, Esq.
    Nevada Bar No. 14652
3   **SHEA LARSEN**
    1731 Village Center Circle, Suite 150
4   Las Vegas, Nevada 89134
    Telephone: (702) 471-7432
5   Fax: (702) 926-9683
    Email:  blarsen@shea.law
6           kwyant@shea.law

7   *Attorneys for HASelect-Medical Receivables*
    *Litigation Finance Fund International SP*

8                **UNITED STATES BANKRUPTCY COURT**

9                      **DISTRICT OF NEVADA**

10  In re:

11  INFINITY CAPITAL MANAGEMENT, INC.                Case No. 21-14486-abl
                                                     Chapter 7
12                        Debtor.

13  _____

14  HASELECT-MEDICAL RECEIVABLES
    LITIGATION FINANCE FUND
15  INTERNATIONAL SP,

16                        Plaintiff,                 Adversary Case No. 21-01167-abl

17  v.

18  TECUMSEH–INFINITY MEDICAL
    RECEIVABLES FUND, LP,
19
                          Defendant.
20
    _____
21  TECUMSEH–INFINITY MEDICAL
    RECEIVABLES FUND, LP,
22
                          Counter-Plaintiff,
23
    v.
24
    HASELECT-MEDICAL RECEIVABLES
25  LITIGATION FINANCE FUND
    INTERNATIONAL SP; ROBERT E. ATKINSON,
26  CHAPTER 7 TRUSTEE

27                        Counter-Defendants.

28

                          Page 1 of 15

# FIRST AMENDED ADVERSARY COMPLAINT

Plaintiff HASELECT–MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP ("Plaintiff" or "HASelect"), by and through its counsel, Shea Larsen PC, hereby submits its First Amended Adversary Complaint and claims and alleges against Defendant TECUMSEH–INFINITY MEDICAL RECEIVABLES FUND, LP ("Defendant" or "Tecumseh") as follows:

## PARTIES

1.      Plaintiff HASelect is, and was at all relevant times, a segregated portfolio company of HedgeACT International SPC Ltd., a Cayman Islands corporation, with its principal place of business in Illinois.

2.      On information and belief, Defendant Tecumseh is, and was at all relevant times, a Delaware limited partnership.

## JURISDICTION AND VENUE

3.      This Adversary Complaint, and the claims herein, are brought pursuant to Bankruptcy Rule 7001 seeking an order, judgment, and decree from this Court determining the validity, priority, and extent of any lien claim asserted by Defendant against certain property of the Debtor's estate.

4.      This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. §§ 105 and 506.  This is a core proceeding pursuant to 28 U.S.C. § 157. Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## GENERAL ALLEGATIONS

5.      Beginning in February 2019, HASelect made several loans to Debtor Infinity Capital Management, Inc. ("Debtor" or "Infinity") that were document through various written loan agreements and promissory notes through which Infinity pledged all of its personal property to HASelect as collateral for such loans.

6.       HASelect perfected its security interest in all of Infinity's personal property through the filing of a UCC-1 with the Nevada Secretary of State on February 19, 2019.

7.      On or about December 18, 2019, HASelect, which was then doing business under the name HASelect-FTM Medical Receivables Litigation Finance Fund SP, and Infinity entered into a

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

Second Amended & Restated Loan and Security Agreement and Promissory Note (together with all prior and related loan documents, the "MLA").

8.  The MLA superseded and restated all prior loans made by HASelect to Infinity as well as extended further credit to Infinity.

9.  HASelect holds a perfected security interest in all of Infinity's personal property (as defined in § 4.1 of the MLA, the "Collateral"). Specifically, Section 4.1 of the MLA states:

> To secure the payment and performance when due of all of the Borrower's obligations hereunder and under the Note, Borrower hereby grants to Lender a security interest in the Receivables and the Alternative Receivables, and all of its other personal property, including without limitation, all of Borrower's interest in the following, whether now owned or hereafter acquired, and wherever located, but excluding the Permitted Liens: All Goods, Inventory, Equipment, Fixtures, Accounts, General Intangibles, Instruments, Chattel Paper, Documents, Commercial Tort Claims, Investment Property, Letter of Credit Rights, Deposit Accounts, and all money, and all other property now or at any time in the future in Lender's possession (including claims and credit balances), and all proceeds (including proceeds of any insurance policies, proceeds of proceeds and claims against third parties), all products and all books and records related to any of the foregoing (all of the foregoing, together with all other property in which Lender may now or in the future be granted a lien or security interest, is referred to herein, collectively, as the "Collateral").

10.  Infinity used the proceeds of the loans it obtained from HASelect to purchase accounts receivable from medical providers.

11.  Such accounts receivable generally arose from medical treatment provided to individuals who were injured in accidents and had asserted personal injury claims. These accounts receivable are generally secured by liens against these personal injury claims and are typically paid at the time the personal injury claims are settled.

12.  HASelect holds a perfected security interest in all accounts receivable purchased by Infinity as Collateral for the indebtedness owed by Infinity under the MLA.

13.  Beginning in or around June 2020 and continuing for several months thereafter, Infinity sold and assigned of substantial number of accounts receivable included within the Collateral in which HASelect held a perfected security interest (the "HAS Accounts") to Tecumseh without HASelect's knowledge or consent and in violation of Infinity's contractual obligations under the MLA.

14.  The HAS Accounts had been purchased by Infinity from various medical providers

and other sources prior to June 18, 2020 using proceeds advanced to Infinity by HASelect pursuant to the MLA.

15.     HASelect is informed and believes that Tecumseh had actual knowledge of HASelect's perfected security interest in the HAS Accounts prior to purchasing the HAS Accounts from Infinity.

16.     HASelect is informed and believes that Tecumseh subsequently colluded with Infinity to conceal the sale and assignment of the HAS Accounts from HASelect to allow Infinity time to collect proceeds from the HAS Accounts and to transfer such proceeds to Tecumseh. Specifically, Tecumseh requested on various occasions that Infinity conceal information from HASelect concerning the HAS Accounts and other Collateral, and Infinity complied with such requests.

17.     Tecumseh does not dispute that HASelect held a perfected security interest in the HAS Accounts at the time it purchased the HAS Accounts from Infinity.

18.     Tecumseh has wrongfully collected and retained proceeds from the HAS Accounts in an unknown amount believed to exceed $200,000.

19.     HASelect holds a perfected security interest in the HAS Accounts and all proceeds of the HAS Accounts as Collateral for the indebtedness owed by Infinity under the MLA.

20.     Any interest Tecumseh claims in the HAS Accounts is subordinate and subject to HASelect's prior, perfected security interest in the HAS Accounts.

21.     HASelect did not consent to or receive notice of Infinity's sale and assignment of the HAS Accounts to Tecumseh.

22.     The sale and assignment of the HAS Accounts to Tecumseh was done in violation of HASelect's prior, perfected security interest in the HAS Accounts and HASelect's rights under the MLA.

23.     Contrary to its actual dealings with Tecumseh and in violation of its obligations to HASelect under the MLA, Infinity misrepresented to HASelect that certain of the HAS Accounts were purchased by Tecumseh directly from the sellers of such HAS Accounts and that Infinity was

merely acting as a servicer for Tecumseh as to such HAS Accounts. Based on this misrepresentation, HASelect may have unknowingly consented to the release of certain proceeds of the HAS Accounts to Tecumseh. Had it known of the true nature and extent of Infinity's dealings with Tecumseh as described herein, HASelect would not have consented to the release of any such proceeds to Tecumseh.

24. On or about June 18, 2020, Infinity entered into a Sub-Advisory Agreement with Defendant Tecumseh under which Infinity agreed, among other things, to "assist [Tecumseh] in acquiring an interest in medical receivables in connection with personal injury cases in the U.S." and to provide collection services related to such receivables.

25. Tecumseh had actual knowledge of the MLA and of HASelect's security interest in the Collateral as well as Infinity's contractual obligations to HASelect under the MLA prior to the execution of the Sub-Advisory Agreement.

26. Following the execution of the Sub-Advisory Agreement, Infinity continued to purchase accounts receivable in its own name and for its own benefit from the largely same medical providers and other sources from which it purchased accounts receivable prior to the execution of the Sub-Advisory Agreement.

27. Such accounts receivable were purchased by Infinity pursuant to various contracts entered into between Infinity and the sellers of such accounts receivable.

28. Upon Infinity's purchase of such accounts receivable, Infinity received from the sellers a written assignment agreement for each account receivable conveying to Infinity the right to collect payment on the account receivable and granting Infinity a lien against any recovery on any personal injury claim asserted in connection with the account receivable.

29. All accounts receivable purchased by Infinity after the execution of the Sub-Advisory Agreement, regardless of the source of funds used to purchase such accounts receivable, constitute Collateral under the MLA in which HASelect holds a perfected security interest.

30. Following the execution of the Sub-Advisory Agreement, Tecumseh periodically issued purchase orders to Infinity in which it identified accounts receivable it wished to purchase

from Infinity. Pursuant to such purchase orders, Infinity and Tecumseh entered into various assignment and bill of sale agreements by which Infinity sold and assigned to Tecumseh certain accounts receivable purchased by Infinity on or after June 18, 2020 (the "Disputed Accounts").

31.     HASelect holds a perfected security interest in the Disputed Accounts and all proceeds of the Disputed Accounts as Collateral under the MLA.

32.     Any interest Tecumseh claims in the Disputed Accounts is subordinate and subject to HASelect's prior, perfected security interest in the Disputed Accounts.

33.     HASelect did not consent to or receive notice of Infinity's sale and assignment of the Disputed Accounts to Tecumseh.

34.     The sale and assignment of the Disputed Accounts to Tecumseh was done in violation of HASelect's prior, perfected security interest in the Disputed Accounts and HASelect's rights under the MLA.

35.     No contract existed between Tecumseh and any seller (aside from Infinity) or obligor of any Disputed Account at the time of purchase by Infinity.

36.     Tecumseh did not negotiate directly with any seller (aside from Infinity) or obligor of any Disputed Account regarding the purchase of any Disputed Account.

37.     Tecumseh did not communicate directly with any seller (aside from Infinity) or obligor of any Disputed Account regarding the purchase of any Disputed Account.

38.     No business relationship existed between Tecumseh and any seller (aside from Infinity) or obligor of any Disputed Account at the time of purchase by Infinity

39.     Tecumseh did not issue any purchase order directly to any seller (aside from Infinity) or obligator of any Disputed Account.

40.     No seller (aside from Infinity) or obligor of any Disputed Account executed any assignment or other document purporting to transfer to Tecumseh any right in any Disputed Account.

41.     Notwithstanding Infinity's sale and assignment of the Disputed Accounts to Tecumseh, neither Infinity nor Tecumseh provided any notice of such sale and assignment to any third-party seller or obligor responsible for payment of any Disputed Account.

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

42.     Rather, Infinity continued to collect the proceeds of the Disputed Accounts in its own name or under its trade name, Infinity Health Connections, which is a fictious firm name under which Infinity had done business since at least 2016.

43.     Following the execution of the Sub-Advisory Agreement, Infinity and Tecumseh colluded to open a deposit account at Bank of America (the "BOA Account") under Infinity's trade name, Infinity Health Connections.  Infinity deposited proceeds collected on the Disputed Accounts, which were typically received in the form of a check made payable to Infinity Health Connections, to the BOA Account from which such proceeds were transferred to Tecumseh or used by Infinity, either directly or indirectly, to purchase additional accounts receivable that were later sold and assigned to Tecumseh.

44.     HASelect is informed and believes that the Disputed Accounts include approximately 19,000 accounts receivable that Infinity purchased at a cost of more than $10 million.

45.     HASelect is informed and believes that Infinity has, to date, collected more than $1,200,000 in proceeds of the Disputed Accounts.

46.     HASelect is informed and believes that the current value of the uncollected Disputed Accounts exceeds $22 million.

47.     Tecumseh and Infinity colluded to conceal the nature and extent of their business dealings under the Sub-Advisory Agreement from HASelect.  Specifically, Tecumseh requested on various occasions that Infinity conceal information pertaining to the Disputed Accounts and other Collateral from HASelect, and Infinity complied with such requests.

48.     Contrary to its actual dealings with Tecumseh and in violation of the obligations to HASelect under the MLA, Infinity misrepresented to HASelect that the Disputed Accounts had been purchased by Tecumseh directly from the sellers of the Disputed Accounts and that Infinity was merely acting as a servicer for Tecumseh as to the Disputed Accounts.   Based on this misrepresentation, HASelect may have consented to the release of certain proceeds of the Disputed Accounts to Tecumseh.  Had HASelect known of the true nature and extent of Infinity's dealings with Tecumseh as described herein, it would not have consented to any release of such proceeds.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

49.    The HAS Accounts and Disputed Accounts constitute "accounts" as that term is defined under the Uniform Commercial Code as adopted in Nevada (and elsewhere) (the "UCC") and as specifically set forth at NRS 104.9102(1)(b).

50.    The term "security interest" as defined under the UCC and as specifically set forth at NRS 104.91201(ii) includes "any interest of … a buyer of accounts."

51.    The term "debtor" as defined under the UCC and as specifically set forth at NRS 104.9102(1)(bb) includes a "seller of accounts."

52.    The term "collateral" as defined under the UCC and as specifically set forth at NRS 104.9102(1)(l) includes "[a]ccounts … that have been sold".

53.    To perfect any interest it claims in the HAS Accounts or Disputed Accounts, Tecumseh was required, pursuant to NRS 104.9910(1), to file a UCC-1 financing statement.

54.    Tecumseh did not file any UCC-1 financing statement to perfect any interest it claims in the HAS Accounts or the Disputed Accounts.

55.    On September 14, 2021 (the "Petition Date"), Infinity filed a voluntary Chapter 7 bankruptcy petition with this Court, commencing Bankruptcy Case No. 21-14486-abl.

56.    Because Tecumseh did not perfect any interest it claims in the HAS Accounts or the Disputed Accounts through the filing of a UCC-1 financing statement, the HAS Accounts and Disputed Accounts remain property of Infinity's bankruptcy estate pursuant to NRS 104.9318(2), which provides that "[f]or purposes of determining the rights of creditors of, and purchasers for value of an account or chattel paper from, a debtor that has sold an account or chattel paper, while the buyer's security interest is unperfected, the debtor has rights and title to the account or chattel paper identical to those the debtor sold."

57.    As of the Petition Date, Infinity owed total indebtedness in excess of $14 million to HASelect pursuant to the MLA. Moreover, the total indebtedness owed pursuant to the MLA continues to increase as additional interest, default interest, late fees, and other amounts owed pursuant to the MLA accrue.

**FIRST CAUSE OF ACTION**

**(Declaratory Relief)**

58.     HASelect incorporates the allegations set forth in the other sections of this Adversary Complaint as if set forth at length herein.

59.     A dispute exists between HASelect and Tecumseh that is ripe for adjudication as to the priority of their respective claimed interests in the HAS Accounts and the Disputed Accounts.

60.     HASelect is entitled to a declaration that (i) it holds a perfected security interest in the HAS Accounts and the Disputed Accounts pursuant to the MLA, (ii) any interest Tecumseh claims in any of the HAS Accounts or the Disputed Accounts is subordinate and subject to HASelect's prior, perfected security interest in the same, (iii) any interest Tecumseh claims in any of the HAS Accounts or the Disputed Accounts was unperfected as of the Petition Date, and (iv) HASelect is entitled to immediate possession of the HAS Accounts and the Disputed Accounts and all proceeds thereof.

61.     HASelect has been required to engage the services of an attorney to bring this claim and is entitled to recover its reasonable costs, attorney fees, and interest.

**SECOND CAUSE OF ACTION**

**(Injunctive Relief)**

62.     HASelect incorporates the allegations set forth in the other sections of this Adversary Complaint as if set forth at length herein.

63.     HASelect is informed and believes Defendant Tecumseh is in possession of or is exercising control over the HAS Accounts and the Disputed Accounts.

64.     The HAS Accounts and the Disputed Accounts constitute Collateral under the MLA in which HASelect holds a first-priority security interest that is superior to any interest Tecumseh may hold in the HAS Accounts or the Disputed Accounts.

65.     HASelect has a substantial likelihood of success on the merits of its claims against Defendant Tecumseh.

66.     HASelect will suffer irreparable harm in the event Tecumseh is permitted to collect,

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

transfer, or otherwise dispose of the HAS Accounts or the Disputed Accounts prior to the adjudication of HASelect's claims herein.

67.     The threatened harm to HASelect if Defendant Tecumseh is permitted to collect, transfer, or otherwise dispose of the HAS Accounts and or the Disputed Accounts outweighs any potential harm to Tecumseh that may result from the entry of a preliminary injunction prohibiting Tecumseh from collecting, transferring, or otherwise disposing of the HAS Accounts or the Disputed Accounts.

68.     Public policy supports granting injunctive relief to protect the rights of a secured creditor with a prior, perfected security interest, such as HASelect, over the rights of an unsecured creditor, such as Tecumseh.

69.     HASelect is entitled to entry of a preliminary injunction prohibiting Tecumseh from collecting, transferring, or otherwise disposing of the HAS Accounts and or the Disputed Accounts.

70.     HASelect has been required to engage the services of an attorney to bring this claim and is entitled to recover its reasonable costs, attorney fees, and interest.

## THIRD CAUSE OF ACTION

### (Conversion)

71.     HASelect incorporates the allegations set forth in the other sections of this Adversary Complaint as if set forth at length herein.

72.     HASelect holds a perfected, first-priority security interest in the HAS Accounts and all proceeds thereof.

73.     Beginning in or around June 2020, Tecumseh knowingly purchased the HAS Accounts from Infinity in violation of HASelect's perfected, first-priority security interest therein and in violation of HASelect's rights under the MLA.

74.     Tecumseh does not dispute that HASelect held a perfected security interest in the HAS Accounts at the time Tecumseh purchased the HAS Accounts from Infinity.

75.     Tecumseh colluded with Infinity to conceal from HASelect the nature and extent of Tecumseh's dealings with Infinity, including Tecumseh's purchase of the HAS Accounts from

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

Infinity.

76.     Tecumseh knowingly collected and retained proceeds of the HAS Accounts in an unknown amount believed to exceed $200,000.

77.     Tecumseh's collection and retention of proceeds of the HAS Accounts was wrongful and inconsistent with HASelect's rights and interests in such proceeds.

78.     HASelect holds a perfected, first-priority security interest in the Disputed Accounts and all proceeds thereof.

79.     Beginning sometime after June 18, 2020, Tecumseh purchased the Disputed Accounts from Infinity in violation of HASelect's perfected, first-priority security interest therein and in violation of HASelects rights under the MLA.

80.     Tecumseh colluded with Infinity to conceal from HASelect the nature and extent of Tecumseh's dealings with Infinity, including Tecumseh's purchase of the Disputed Accounts from Infinity.

81.     Tecumseh knowingly collected and retained proceeds of the Disputed Accounts in an unknown amount believed to exceed $1,200,000.

82.     Tecumseh's collection and retention of proceeds of the Disputed Accounts was wrongful and inconsistent with HASelect's rights and interests in such proceeds

83.     Tecumseh's wrongful actions have caused HASelect to suffer damages in an amount in excess of $75,000.

84.     HASelect has been required to engage the services of an attorney to bring this claim and is entitled to recover its reasonable costs, attorney fees, and interest.

## FOURTH CAUSE OF ACTION

### (Unjust Enrichment)

85.     HASelect incorporates the allegations set forth in the other sections of this Adversary Complaint as if set forth at length herein.

86.     HASelect holds a perfected, first-priority security interest in the HAS Accounts and all proceeds thereof.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

87.     Beginning in or around June 2020, Tecumseh knowingly purchased the HAS Accounts from Infinity in violation of HASelect's perfected, first-priority security interest therein and in violation of HASelects rights under the MLA.

88.     Tecumseh does not dispute that HASelect held a perfected security interest in the HAS Accounts at the time Tecumseh purchased the HAS Accounts from Infinity.

89.     Tecumseh colluded with Infinity to conceal from HASelect the nature and extent of Tecumseh's dealings with Infinity, including Tecumseh's purchase of the HAS Accounts from Infinity.

90.     Tecumseh knowingly collected proceeds of the HAS Accounts in an unknown amount believed to exceed $200,000 and retained and appreciated the benefit thereof.

91.     Tecumseh's collection and retention of proceeds of the HAS Accounts was wrongful and inconsistent with HASelect's rights and interests in such proceeds, and it would be inequitable to allow Tecumseh to retain the benefit of such proceeds.

92.     HASelect holds a perfected, first-priority security interest in the Disputed Accounts and all proceeds thereof.

93.     Beginning sometime after June 18, 2020, Tecumseh purchased the Disputed Accounts from Infinity in violation of HASelect's perfected, first-priority security interest therein and in violation of HASelects rights under the MLA.

94.     Tecumseh colluded with Infinity to conceal from HASelect the nature and extent of Tecumseh's dealings with Infinity, including Tecumseh's purchase of the Disputed Accounts from Infinity.

95.     Tecumseh knowingly collected proceeds of the Disputed Accounts in an unknown amount believed to exceed $1,200,000 and retained and appreciated the benefit thereof.

96.     Tecumseh's collection and retention of proceeds of the Disputed Accounts was wrongful and inconsistent with HASelect's rights and interests in such proceeds, and it would be inequitable to allow Tecumseh to retain the benefit of such proceeds.

97.     Tecumseh's wrongful actions have caused HASelect to suffer damages in excess of

$75,000.

98.     HASelect has been required to engage the services of an attorney to bring this claim and is entitled to recover its reasonable costs, attorney fees, and interest.

### REQUEST FOR RELIEF

WHEREFORE, HASelect respectfully requests that the Court grant the following relief:

1.     Entry of a declaratory judgment determining that (i) HASelect holds a perfected security interest in the HAS Accounts and the Disputed Accounts pursuant to the MLA, (ii) any interest Tecumseh claims in the HAS Accounts or the Disputed Accounts is subordinate and subject to HASelect's prior, perfected security interest, (iii) any interest Tecumseh claims in the HAS Accounts or the Disputed Accounts was unperfected as of the Petition Date, and (iv) HASelect is entitled to immediate possession of the HAS Accounts and the Disputed Accounts and all proceeds thereof;

2.     Entry of a preliminary injunction prohibiting Tecumseh from collecting, transferring, or otherwise disposing of the Disputed Accounts;

3.     Entry of judgment awarding HASelect its damages suffered as a result of the foregoing allegations;

4.     Entry of judgment awarding HASelect its reasonable attorney fees and costs incurred in bringing this action; and

5.     Entry of orders providing such other and further relief as the Court deems just and proper.

Dated this 10th day of December 2021.

**SHEA LARSEN**


/s/ *Bart K. Larsen, Esq.*
Bart K. Larsen, Esq.
Nevada Bar No. 8538
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134

*Attorneys for HASelect-Medical Receivables*
*Litigation Finance Fund International SP*

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1

## CERTIFICATE OF SERVICE

2   1.   On December 10, 2021, I served the following document(s): **FIRST AMENDED**
3        **ADVERSARY COMPLAINT**

4   2.   I served the above document(s) by the following means to the persons as listed
         below:

5        ☒    a.    ECF System:

6   CLARISSE L. CRISOSTOMO on behalf of Counter-Defendant ROBERT E. ATKINSON
7   clarisse@nv-lawfirm.com, bknotices@nv-lawfirm.com

8   GERALD M GORDON on behalf of Counter-Claimant TECUMSEH-INFINITY
    MEDICAL RECEIVABLES FUND, LP
9   ggordon@gtg.legal, bknotices@gtg.legal

10  MICHAEL D. NAPOLI on behalf of Defendant TECUMSEH-INFINITY MEDICAL
    RECEIVABLES FUND, LP
11  michael.napoli@akerman.com,
    cindy.ferguson@akerman.com;catherine.kretzschmar@akerman.com;laura.taveras@akerm
    an.com;masterdocketlit@akerman.com

12

13  ARIEL E. STERN on behalf of Defendant TECUMSEH-INFINITY MEDICAL
    RECEIVABLES FUND, LP
14  ariel.stern@akerman.com, akermanlas@akerman.com

15       ☐    b.    United States mail, postage fully prepaid:

16       ☐    c.    Personal Service:

17  I personally delivered the document(s) to the persons at these addresses:

18            ☐    For a party represented by an attorney, delivery was made by
    handing the document(s) at the attorney's office with a clerk or other person in
19  charge, or if no one is in charge by leaving the document(s) in a conspicuous place
    in the office.

20            ☐    For a party, delivery was made by handling the document(s)
21  to the party or by leaving the document(s) at the person's dwelling house or usual
    place of abode with someone of suitable age and discretion residing there.

22

23       ☐    d.    By direct email (as opposed to through the ECF System):
    Based upon the written agreement of the parties to accept service by email or a
24  court order, I caused the document(s) to be sent to the persons at the email
    addresses listed below. I did not receive, within a reasonable time after the
25  transmission, any electronic message or other indication that the transmission was
    unsuccessful.

26       ☐    e.    By fax transmission:

27  Based upon the written agreement of the parties to accept service by fax
    transmission or a court order, I faxed the document(s) to the persons at the fax
28  numbers listed below. No error was reported by the fax machine that I used. A copy

of the record of the fax transmission is attached.

☐      f.      By messenger:

I served the document(s) by placing them in an envelope or package addressed to the persons at the addresses listed below and providing them to a messenger for service.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 10, 2021.

By: /s/ *Bart K. Larsen, Esq,*

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

# **EXHIBIT 5**

ARIEL E. STERN, ESQ.
Nevada Bar No. 8276
**AKERMAN LLP**
1635 Village Center Circle, Suite 200
Las Vegas, Nevada 89134
Telephone:   (702) 634-5000
Facsimile:    (702) 380-8572
Email: ariel.stern@akerman.com

MICHAEL D. NAPOLI, ESQ.
*PRO HAC VICE*
**AKERMAN LLP**
2001 Ross Avenue, Suite 3600
Dallas, Texas 75201
Telephone: (214) 720-4360
Facsimile:  (214) 720-8116
Email: michael.napoli@akerman.com

Attorneys for Defendant/ Counterclaim Plaintiff
TECUMSEH – INFINITY MEDICAL
RECEIVABLES FUND, L.P.

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No. 21-14486-abl |
| | Chapter 7 |
| INFINITY CAPITAL MANAGEMENT, INC, *dba* INFINITY HEATH CONNECTIONS | |
| Debtor. | |
| HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP, | Adversary Case No. 21-01167-abl |
| Plaintiff, | |
| v. | |
| TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP, | |
| Defendant/Counterclaim Plaintiff | **TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP'S ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM** |
| v. | |
| HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP, and ROBERT E. ATKINSON, CHAPTER 7 TRUSTEE, | Hearing Date (Scheduling Conf.): Feb. 22, 2022 |
| | Hearing Time: 10:00 a.m. |
| | Estimated Time: 30 mins. |
| Counterclaim Defendants. | |

AKERMAN LLP
1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

60961134;2

Defendant, Tecumseh–Infinity Medical Receivables Fund LP, by and through undersigned counsel, files its Answer, Affirmative Defenses and Counterclaim.

## ANSWER

1.     Defendant is without sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 1 of the Adversary Complaint (ECF No. 1) (the "Complaint").

2.     Defendant admits the allegation contained in paragraph 2 of the Complaint.

3.     Defendant denies that any property implicated by Complaint is property of Debtor's estate. Defendant admits any remaining allegations contained in Paragraph 3 of the Complaint.

4.     Defendant denies the allegations contained in paragraph 4 of the Complaint.

5.     The documents are not attached to the Complaint and otherwise speak for themselves.  The Defendant is without knowledge and therefore denies any remaining allegations set forth in paragraph 5 of the Complaint.

6.     The UCC-1 is not attached to the Complaint and speaks for itself.  The Defendant is without knowledge and therefore denies any remaining allegations set forth in paragraph 6 of the Complaint.

7.     The documents are not attached to the Complaint and speak for themselves.  The Defendant is without knowledge and therefore denies any remaining allegations set forth in paragraph 7 of the Complaint.

8.     The Defendant is without knowledge and therefore denies the allegations set forth in paragraph 8 of the Complaint.

9.     The Defendant is without knowledge and therefore denies the allegations set forth in paragraph 9 of the Complaint.

10.     The Defendant is without knowledge and therefore denies the allegations set forth in paragraph 10 of the Complaint.

AKERMAN LLP
1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

60961134;2

AKERMAN LLP

1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

11.     The Defendant is without knowledge and therefore denies the allegations set forth in paragraph 11 of the Complaint.

12.     The Defendant is without knowledge and therefore denies the allegations set forth in paragraph 12 of the Complaint.

13.     The Defendant admits the allegations set forth in paragraph 13 of the Complaint.

14.     Defendant admits that it had knowledge of the MLA, but denies the remaining allegations set forth in paragraph 14 of the Complaint.

15.      The Defendant is without knowledge as to the allegations in paragraph 15 of the Complaint and therefore denies same.

16.     The Defendant denies the allegations set forth in paragraph 16 of the Complaint.

17.     The Defendant denies the allegations set forth in paragraph 17 of the Complaint.

18.     The Defendant is without knowledge and therefore denies the allegations set forth in paragraph 18 of the Complaint.

19.     The Defendant admits the allegations set forth in paragraph 19 of the Complaint.

20.     The Defendant denies the allegations set forth in paragraph 20 of the Complaint.

21.     The Defendant denies the allegations set forth in paragraph 21 of the Complaint.

22.     Plaintiff improperly alleges a legal conclusion which is denied.   Any remaining allegations in paragraph 22 of the Complaint are denied.

23.     Plaintiff improperly alleges a legal conclusion which is denied.   Any remaining allegations in paragraph 23 of the Complaint are denied.

24.      Plaintiff improperly alleges a legal conclusion which is denied. Defendant denies all remaining allegations in paragraph 24 of the Complaint.

60961134;2

25.    Plaintiff improperly alleges a legal conclusion which is denied. Defendant denies all remaining allegations in paragraph 25 of the Complaint.

26.    Plaintiff improperly alleges a legal conclusion which is denied. Defendant denies all remaining allegations in paragraph 26 of the Complaint.

27.    The Defendant denies the allegations set forth in paragraph 27 of the Complaint

28.    The Defendant admits that it did not file any UCC-1 financing statement, but denies the remaining allegations set forth in paragraph 28 of the Complaint, as filing an UCC-1 is not required for perfection.

29.    The Defendant admits the allegations set forth in paragraph 29 of the Complaint.

30.    The Defendant denies the allegations set forth in paragraph 30 of the Complaint.

31.    Plaintiff improperly alleges a legal conclusion which is denied. Defendant denies all remaining allegations in paragraph 31 of the Complaint.

32.    The Defendant denies the allegations set forth in paragraph 32 of the Complaint.

33.    Plaintiff improperly alleges a legal conclusion which is denied. Defendant denies all remaining allegations in paragraph 33 of the Complaint.

34.    The Defendant is without knowledge and therefore denies the allegations set forth in paragraph 34 of the Complaint.

35.    The responses set forth above are realleged and reaverred as if fully set forth herein.

36.    The Defendant denies the allegations set forth in paragraph 36 of the Complaint.

37.    The Defendant denies the allegations set forth in paragraph 37 of the Complaint.

AKERMAN LLP
1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

60961134;2

38. The Defendant denies the allegations set forth in paragraph 38 of the Complaint.

39. The responses set forth above are realleged and reaverred.

40. The Defendant is without knowledge and therefore denies the allegations set forth in paragraph 40 of the Complaint.

41. The Defendant denies the allegations set forth in paragraph 41 of the Complaint.

42. The Defendant denies the allegations set forth in paragraph 42 of the Complaint.

43. The Defendant denies the allegations set forth in paragraph 43 of the Complaint.

44. The Defendant denies the allegations set forth in paragraph 44 of the Complaint.

45. The Defendant denies the allegations set forth in paragraph 45 of the Complaint.

46. The Defendant denies the allegations set forth in paragraph 46 of the Complaint.

47. The Defendant denies the allegations set forth in paragraph 47 of the Complaint.

48. Each and every allegation not specifically admitted herein is hereby denied.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Federal Rule of Civil Procedure 19, made applicable to these proceedings by Federal Rule of Bankruptcy Procedure 7019, defines a "required party" as a person in whose "absence, the court cannot accord complete relief among existing parties" or a person whose own interests would be adversely affected if he were not joined. Fed. R. Civ. P. 19(a)(1). Plaintiff fails to name Robert E. Atkinson, the duly appointed chapter

AKERMAN LLP

1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

60961134;2

7 trustee, as a party. Given that a dispute exists as to whether the Disputed Accounts are property of the chapter 7 bankruptcy estate, the chapter 7 trustee is an indispensable party in whose absence the bankruptcy court cannot accord complete relief.

## SECOND AFFIRMATIVE DEFENSE

The Court lacks subject matter jurisdiction over the Disputed Assets which are not property of the chapter 7 bankruptcy estate.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff fails to state a claim for declaratory relief because it has a legal remedy, *to wit,* foreclosure of its alleged security interest in the Disputed Accounts. In a legal foreclosure action, the Court must determine the priority of liens.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff fails to state a claim for declaratory relief because such relief will not be useful and will be futile because the Court lacks jurisdiction over the Disputed Assets, and Plaintiff must bring a legal foreclosure action under the Uniform Commercial Code to determine the priorities of the parties in the Disputed Accounts.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff fails to state a claim for declaratory relief because the UCC-1 purporting to evidence perfection of Plaintiff's claimed interest in the Disputed Accounts is not attached to the Complaint.

## SIXTH AFFIRMATIVE DEFENSE

Debtor possesses bare legal title of the Disputed Accounts as a purchase money resulting trust existed by operation of law pre-petition under South Carolina, by which the Disputed Assets were held in trust by Debtor for the benefit of Tecumseh, as provider of the purchase monies. South Carolina law recognizes purchase money resulting trusts arise to effectuate the intent of the parties where one party pays for property, in whole or in part, that for a different reason is titled in the name of another. *Donnan v. Mariner*, 529 S.E.2d 754, 758 (S.C. App. 2000).  Resulting trusts arise by

AKERMAN LLP
1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

operation of law and may be proved by parol evidence. *Campbell v. Campbell*, 386 S.E.2d 305, 306 (S.C. App. 1989). A resulting trust may arise in personalty. *McDowell v. S.C. Dept. of Soc. Services*, 370 S.E.2d 878 (S.C. App. 1987).

### SEVENTH AFFIRMATIVE DEFENSE

The Plaintiff was aware of the nature of the Defendant's business relationship with the Debtor and authorized payments to Tecumseh from the Debtor on account of certain receivables purchased by Tecumseh under the Sub-Advisor Agreement. Debtor and the Defendant relied upon such representations and Plaintiff's change in position—asserting that the Defendant does not own the medical receivables and that it was not authorized to receive payment on the Disputed Accounts (including the Overlap Receivables) —is detrimental to the Defendant.

### EIGHTH AFFIRMATIVE DEFENSE

The Plaintiff was aware of the nature of the Defendant's business relationship with the Debtor and authorized payments to Tecumseh on account of certain receivables purchased by Tecumseh under the Sub-Advisor Agreement. Through this conduct, the Plaintiff has waived any rights it might have to such payments.

### NINTH AFFIRMATIVE DEFENSE

The Plaintiff would be unjustly enriched—at the expense of the Defendant— should the Court declare the Disputed Accounts to be property of Chapter 7 bankruptcy estate and subject to the Plaintiff's lien.

### <u>COUNTERCLAIM</u>

Defendant/Cross Plaintiff, Tecumseh–Infinity Medical Receivables Fund, LP ("Tecumseh"), by and through undersigned counsel, asserts its counterclaim against Plaintiff/Cross Defendant, HASelect-Medical Receivables Litigation Finance Fund International SP ("HASelect") and Robert E. Atkinson, chapter 7 trustee ("Trustee") for the bankruptcy estate of Infinity Capital Management, Inc. ("Debtor") and alleges:

AKERMAN LLP
1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

60961134;2

AKERMAN LLP

1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

## GENERAL ALLEGATIONS

1. Tecumseh is engaged in the business of purchasing certain receivables from medical providers.

2. The receivables arise from medical treatment provided to individuals injured in accidents and subsequently asserting personal injury claims (the "Plaintiff(s)").

3. Underinsured or indigent plaintiffs often assign their right to recover the cost of their medical care to a treating medical provider, securing such assignment with the proceeds of the plaintiff's personal injury claims (the "Settlement Proceeds").

4. At all times relevant hereto, Debtor held itself out as an expert in the personal injury medical receivables field.

5. On June 18, 2020, Tecumseh entered into a Sub-Advisory Agreement (as amended) ( "Sub-Advisor Agreement") with Debtor.

6. The Sub-Advisor Agreement is governed by and interpreted under the laws of the state of South Carolina.

7. The Sub-Advisor Agreement called for Debtor to identify, underwrite and negotiate the purchase of receivables by Tecumseh from medical providers, subject to Tecumseh's approval.

8. Upon such approval, Tecumseh would make necessary arrangements to remit payment for the receivables directly to the medical providers.

9. Pursuant to the terms of the Sub-Advisor Agreement, in connection with each receivable approved for purchase by Tecumseh, Debtor was to obtain a lien from Plaintiffs in favor of Tecumseh and against the Settlement Proceeds, in an amount totaling the retail cost of all receivables provided to each Plaintiff.

10. Pursuant to the terms of the Sub-Advisor Agreement, in connection with each receivable approved for purchase by Tecumseh, Debtor was also to obtain a contract which involved an assignment of interest in a receivable between Tecumseh

60961134;2

and the medical service provider to evidence the sale of the receivable to Tecumseh by the medical service provider.

11. Through and including September 2021, Tecumseh approved and purchased receivables totaling approximately $26.7 million dollars (face amount) under the terms of its Sub-Advisor Agreement with Debtor (collectively, the "Tecumseh Receivables").

12. The purchase monies for all of the Tecumseh Receivables were paid by Tecumseh.

13. Debtor was responsible for servicing the Tecumseh Receivables on Tecumseh's behalf, and all collections and recoveries from the Tecumseh Receivables were deposited into Tecumseh's bank account.

14. At all times relevant hereto, Tecumseh owned the legal and equitable interests in the Tecumseh Receivables. Debtor did not hold or claim an ownership interest in the Tecumseh Receivables, and Debtor treated the Tecumseh Receivables as property belonging to and owned by Tecumseh.

## FIRST CLAIM FOR RELIEF
## (DECLARATORY RELIEF AGAINST TRUSTEE AND HASELECT)

15. Tecumseh realleges and reavers the allegations set forth in paragraphs 1 through 14 above.

16. Pursuant to the terms of the Sub-Advisor Agreement, Debtor was to (i) obtain a contract involving an assignment of interest in a receivable between Tecumseh and the medical service provider to evidence the sale of the receivable to Tecumseh by the medical service provider; and (ii) obtain an assignment of the lien against the Settlement Proceeds.

17. The Tecumseh Receivables purchased by Tecumseh under the Sub-Advisor Agreement have a face value of approximately $26.7 million dollars.

18. The purchase monies for the Tecumseh Receivables were paid by Tecumseh.

AKERMAN LLP
1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

60961134;2

AKERMAN LLP
1635 Village Center Circle, Suite 200
Las Vegas, Nevada 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

19.    Debtor was responsible for servicing the Tecumseh Receivables on Tecumseh's behalf, and    all collections and recoveries from the Tecumseh Receivables were deposited into Tecumseh's bank account.

20.    Debtor did not hold or claim an ownership interest in  the Tecumseh Receivables, and Debtor treated the Tecumseh Receivables as property belonging to and owned by Tecumseh.

21.    To the extent necessary, Tecumseh's interest in the Tecumseh Receivables is perfected under the Uniform Commercial Code.

22.    This is an action for entry of a declaratory judgment determining that the Tecumseh Receivables are owned legally and equitably by Tecumseh and, as such, the Tecumseh Receivables are not property of Debtor's bankruptcy estate.

23.    Through its Complaint, HASelect claims a security interest in the Tecumseh Receivables and seeks entry of a declaratory judgment against Tecumseh finding that its claimed interest in the Tecumseh Receivables is superior to the interests of Tecumseh and that it is entitled to possession of the Tecumseh Receivables.

24.    HASelect improperly concludes that the Tecumseh Receivables are property of the chapter 7 estate and that, as such, the Court has jurisdiction over the Tecumseh Receivables.

25.    The parties are in doubt as to their rights and interests in the Tecumseh Receivables, and there is a genuine dispute as to whether the Tecumseh Receivables belong to the chapter 7 bankruptcy estate or Tecumseh.

26.    By the terms and provisions of 28 U.S.C. §§ 2201, 2202 and Fed. R. Bankr. P. 7001(9) and 11 U.S.C. § 105, this Court is vested with the power to declare the rights and liabilities of the parties and to grant such other future relief as may be necessary.

**WHEREFORE**, the Counter-Plaintiff, Tecumseh, demands judgment in its favor and against Counter Defendants, HASelect and the Trustee:

60961134;2

AKERMAN LLP

1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

i.     Declaring Tecumseh to be the legal and equitable owner of the Tecumseh Receivables, and finding that the Tecumseh Receivables are not property of Debtor's Chapter 7 bankruptcy estate and, thus, not subject to HASelect's all asset lien;

ii.     Declaring that HASelect's claimed lien does not extend to or encumber the Tecumseh Receivables;

iii.     Awarding Tecumseh its attorney's fees and costs; and

iv.     Granting Tecumseh such further and additional relief as may be just and equitable

### SECOND CLAIM FOR RELIEF
### (DECLARATORY RELIEF AGAINST TRUSTEE AND HASELECT)

27.     Tecumseh realleges and reavers the allegations set forth in paragraphs 1 through 26 above.

28.     Pleading strictly in the alternative, this an action for entry of a declaratory judgment determining that: (i) a resulting trust arose pre-petition in favor of Tecumseh as to any Tecumseh Receivables titled in the name of Debtor, so that Debtor therefore possesses only bare legal title to same; and, as such, (ii) the Tecumseh Receivables are not property of Debtor's Chapter 7 bankruptcy estate.

29.     Tecumseh paid for the Tecumseh Receivables it purchased from medical providers, and Tecumseh was contractually entitled to a direct assignment of all rights, title and interests in the purchased receivables from the medical provider.

30.     Debtor never intended to acquire any ownership interest – legally or equitably – in the Tecumseh Receivables. A portion of the Tecumseh Receivables may be legally titled in the name of Debtor, despite the furnishing of the purchase monies by Tecumseh and Debtor's intent not to take any form of ownership in the Tecumseh Receivables.

31.     Section 541(d) of the Bankruptcy Code provides,

Property in which the debtor holds, as of the commencement of the case, **only legal title and not an equitable interest**, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as

to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d) (emphasis added).

32.     Determining Debtor's rights and interests in any Tecumseh Receivables titled in the name of Debtor requires the application of the law of the State of South Carolina. *Butner v. United States*, 440 U.S. 48, 55 (1979) (property interests are created and defined by state law).

33.     South Carolina recognizes purchase money resulting trusts arise to effectuate the intent of the parties where one party pays for property, in whole or in part, that for a different reason is titled in the name of another. *Donnan v. Mariner*, 529 S.E.2d 754, 758 (S.C. App. 2000).

34.     Resulting trusts arise by operation of law and may be proved by parol evidence. *Campbell v. Campbell*, 386 S.E.2d 305, 306 (S.C. App. 1989).

35.     A resulting trust may arise in personalty. *McDowell v. S.C. Dept. of Soc. Services,* 370 S.E.2d 878 (S.C. App. 1987).

36.     By operation of law, Debtor holds any Tecumseh Receivables in a resulting trust for the sole benefit of Tecumseh, the purchase money resulting trust beneficiary.

37.     The Tecumseh Receivables do not belong to Debtor's bankruptcy estate.

38.     Through its Complaint, HASelect claims a security interest in the Tecumseh Receivables and seeks entry of a declaratory judgment against Tecumseh finding that its claimed interest in the Tecumseh Receivables is superior to the interests of Tecumseh and that it is entitled to possession of the Tecumseh Receivables.

39.     HASelect improperly concludes that the Tecumseh Receivables are property of the chapter 7 estate and that, as such, the Court has jurisdiction over the Tecumseh Receivables.

60961134;2

40.     The parties are in doubt as to their rights and interests in the Tecumseh Receivables, and there is a genuine dispute as to whether the Tecumseh Receivables belong to the chapter 7 bankruptcy estate or to Tecumseh by virtue of the resulting trust.

41.     By the terms and provisions of 28 U.S.C. §§ 2201, 2202 and Fed. R. Bankr. P. 7001(9) and 11 U.S.C. § 105, this Court is vested with the power to declare the rights and liabilities of the parties and to grant such other future relief as may be necessary.

**WHEREFORE**, Counter-Plaintiff Tecumseh demands judgment in its favor and against Counter Defendants HASelect and the Trustee:

i.      Declaring that a resulting trust arose pre-petition in favor of Tecumseh as to any Tecumseh Receivables titled in the name of Debtor so that Debtor therefore possesses only bare legal title to same and, as such, any such Tecumseh Receivables are not property of Debtor's Chapter 7 bankruptcy estate;

ii.     Declaring that HASelect's claimed lien does not extend to or encumber the Tecumseh Receivables;

iii.    Awarding Tecumseh its attorneys' fees and costs; and

iv.     Granting Tecumseh such further and additional relief as may be just and equitable.

### THIRD CLAIM FOR RELIEF
### (DECLARATORY RELIEF AGAINST TRUSTEE AND HASELECT)

42.     Tecumseh realleges and reavers the allegations set forth in paragraphs 1 through 14 above.

43.     To the extent necessary, Tecumseh's interest in the Tecumseh Receivables is perfected under the Uniform Commercial Code.

44.     Pleading strictly in the alternative, this an action for entry of a declaratory judgment determining that the Trustee's strong arm powers under 11

AKERMAN LLP
1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

60961134;2

U.S.C. § 544 cannot make the corpus of a valid resulting trust — i.e. the Tecumseh Receivables — property of the chapter 7 bankruptcy estate.

45. The strong arm rights and powers are conferred on the Trustee by federal law. *See* 11 U.S.C. § 544.

46. The extent of the Trustee's rights as a judicial lien creditor, however, are measured by the substantive non-bankruptcy law of the jurisdiction governing the property in question. *See Robertson v. Peters (In re Weisman)* 5 F.3d 417, 420 (9th Cir. 1993) (Whether the trustee qualifies under section 544(a)(3) "is a question of federal law; state law determines whether the trustee's status will defeat the rights of persons against whom the trustee asserts its power.")

47. South Carolina recognizes purchase money resulting trusts arise to effectuate the intent of the parties where one party pays for property, in whole or in part, that for a different reason is titled in the name of another. *Donnan v. Mariner*, 529 S.E.2d 754, 758 (S.C. App. 2000). Resulting trusts arise by operation of law and may be proved by parol evidence. *Campbell v. Campbell*, 386 S.E.2d 305, 306 (S.C. App. 1989). A resulting trust may arise in personalty. *McDowell v. S.C. Dept. of Soc. Services,* 370 S.E.2d 878 (S.C. App. 1987).

48. The strong arm power of 11 U.S.C. § 544 can "not make the corpus of a valid resulting trust property of the bankruptcy debtor." *In re Torrez*, 63 B.R. 751, 755 (B.A.P. 9th Cir. 1986), *aff'd,* 827 F.2d 1299 (9th Cir. 1987) ("[u]nder California law a resulting trust is implied by operation of law whenever a party pays the purchase price for a parcel of land and places the title to that land in the name of another").

49. By operation of law, Debtor holds any Tecumseh Receivables in a resulting trust for the benefit of Tecumseh, the purchase money resulting trust beneficiary, and Debtor's bankruptcy estate has no interest in the Tecumseh Receivables.

50. Both HASelect and the Trustee have claimed the estate could possess an interest superior to that of Tecumseh pursuant to his strong-arm powers under 11

AKERMAN LLP
1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

U.S.C. § 544. *See* Trustee's Opposition (Main Case, ECF No. 117) and Objection to Motion of Party In Interest Tecumseh – Infinity Medical Receivables Fund, LP to (1) Abandon Property; and (2) Lift the Automatic Stay (Main Case, ECF No. 118).

51.  The parties are in doubt as to their rights and interests in the Tecumseh Receivables, and there is a genuine dispute as to whether the Tecumseh Receivables are subject to the Trustee's strong arm powers under 11 U.S.C. § 544.

52.  By the terms and provisions of 28 U.S.C. §§ 2201, 2202 and Fed. R. Bankr. P. 7001(9) and 11 U.S.C. § 105, this Court is vested with the power to declare the rights and liabilities of the parties and to grant such other future relief as may be necessary.

**WHEREFORE**, Counter-Plaintiff Tecumseh demands judgment in its favor and against Counter Defendants HASelect and the Trustee:

i.  Declaring that  the 11 U.S.C. § 544 does not operate to make the Tecumseh Receivables property of the Chapter 7 bankruptcy estate;

ii.  Awarding Tecumseh its attorney's fees and costs; and

iii.  Granting Tecumseh such further and additional relief as may be just and equitable.


Dated:  November 19, 2021            Respectfully submitted,


            */s/ Michael Napoli, Esq*
            ARIEL E. STERN, ESQ.
            Nevada Bar No. 8276
            1635 Village Center Circle, Suite 200
            Las Vegas, Nevada 89134

            MICHAEL D. NAPOLI, ESQ.
            *PRO HAC VICE*
            2001 Ross Avenue, Suite 3600
            Dallas, Texas 75201

            *Attorneys for Defendant/ Counterclaim Plaintiff*
            *TECUMSEH – INFINITY MEDICAL*
            *RECEIVABLES FUND, L.P.*

AKERMAN LLP
1635 VILLAGE CENTER CIRCLE, SUITE 200
LAS VEGAS, NEVADA 89134
TEL.: (702) 634-5000 – FAX: (702) 380-8572

60961134;2

**EXHIBIT 6**

1  CLARISSE L. CRISOSTOMO, ESQ., Bar No. 15526
   Email: clarisse@nv-lawfirm.com
2  **ATKINSON LAW ASSOCIATES LTD.**
3  376 E. Warm Springs Rd Suite 130
   Las Vegas, NV 89119
4  Telephone:  (702) 614-0600
   *Attorney for Robert E. Atkinson, Chapter 7 Trustee*
5

6                    **UNITED STATES BANKRUPTCY COURT**
                       **FOR THE DISTRICT OF NEVADA**
7

8  | In re: | Case No. 21-14486-abl |
   |        | Chapter 7 |
9  INFINITY CAPITAL MANAGEMENT, INC.
   *dba* INFINITY HEALTH CONNECTIONS,
10                   Debtor.

11 HASELECT–MEDICAL RECEIVABLES          Adv. No. 21-01167-abl
   LITIGATION FINANCE FUND
12 INTERNATIONAL SP,
13                   Plaintiff,          **AMENDED ANSWER**
                                          **AND COUNTERCLAIM**
14 v.

15 TECUMSEH–INFINITY MEDICAL
   RECEIVABLES FUND, LP,
16                   Defendant,

17 TECUMSEH–INFINITY MEDICAL
   RECEIVABLES FUND, LP,
18
                   Counter-Claimant,
19
   v.
20
   HASELECT-MEDICAL RECEIVABLES
21 LITIGATION FINANCE FUND
   INTERNATIONAL SP; ROBERT E. ATKINSON,
22 CHAPTER 7 TRUSTEE,
23                 Counter-Defendants.

24 ROBERT E. ATKINSON, CHAPTER 7 TRUSTEE,
25                 Counter-Claimant,
26 v.
27 TECUMSEH–INFINITY MEDICAL
   RECEIVABLES FUND, LP,
28                 Counter-Defendant.

Counter-Defendant ROBERT E. ATKINSON, CHAPTER 7 TRUSTEE ("***Trustee***"), by and through counsel, hereby answers the claims asserted by Counter-Claimant TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP ("***Tecumseh***") in its counterclaim (the "***Tecumseh Counterclaim***"), as follows:

## GENERAL ALLEGATIONS

1.      The Trustee is without sufficient information or knowledge to either admit or deny the allegation set forth therein, and denies on that basis.

2.      The Trustee is without sufficient information or knowledge to either admit or deny the allegation set forth therein, and denies on that basis.

3.      The Trustee is without sufficient information or knowledge to either admit or deny the allegation set forth therein, and denies on that basis.

4.      The Trustee is without sufficient information or knowledge to either admit or deny the allegation set forth therein, and denies on that basis.

5.      The Trustee is without sufficient information or knowledge to either admit or deny the allegation set forth therein, and denies on that basis.

6.      The Trustee is without sufficient information or knowledge to either admit or deny the allegation set forth therein, and denies on that basis.

7.      The Trustee is without sufficient information or knowledge to either admit or deny the allegation set forth therein, and denies on that basis.

8.      Deny.

9.      Deny.

10.     The Trustee is without sufficient information or knowledge to either admit or deny the allegation set forth therein, and denies on that basis.

11.     The Trustee is without sufficient information or knowledge to either admit or deny the allegation set forth therein, and denies on that basis.

12.     The Trustee is without sufficient information or knowledge to either admit or deny the allegation set forth therein, and denies on that basis.

13.     The Trustee is without sufficient information or knowledge to either admit or deny the allegation set forth therein, and denies on that basis.

14.     Deny.

**FIRST CLAIM FOR RELIEF**

15.    The Trustee incorporates and repeats his responses to paragraphs 1 through 14 above as though set forth fully herein.

16.    The Trustee is without sufficient information or knowledge to either admit or deny the allegation set forth therein, and denies on that basis.

17.    The Trustee is without sufficient information or knowledge to either admit or deny the allegation set forth therein, and denies on that basis.

18.    The Trustee is without sufficient information or knowledge to either admit or deny the allegation set forth therein, and denies on that basis.

19.    The Trustee is without sufficient information or knowledge to either admit or deny the allegation set forth therein, and denies on that basis.

20.    Deny.

21.    Deny.

22.    Counter-Claimant's counterclaim speaks for itself.  To any extent this allegation seeks a legal conclusion, the Trustee denies.

23.    Plaintiff's complaint speaks for itself.

24.    Plaintiff's complaint speaks for itself.

25.    Admit that there is a dispute; deny that the Trustee is in doubt.

26.    Admit.

The Trustee denies that Tecumseh is entitled to any relief relating to the disputed receivables at issue, and expressly denies each and every assertion in the 'wherefore' clause found below Paragraph 26 of the Tecumseh Counterclaim.

**SECOND CLAIM FOR RELIEF**

27.    The Trustee incorporates and repeats his responses to paragraphs 1 through 26 above as though set forth fully herein.

28.    This response is a legal argument, and requires no response.  To any extent a response is required, the Trustee denies.

29.    The Trustee is without sufficient information or knowledge to either admit or deny the allegation set forth therein and, as such, denies those allegations.

30.    Deny.

31.    The Bankruptcy Code speaks for itself.

32.     This response is a legal argument, and requires no response.  To any extent a response is required, the Trustee denies.

33.     This response is a legal argument, and requires no response.  To any extent a response is required, the Trustee denies.

34.     This response is a legal argument, and requires no response.  To any extent a response is required, the Trustee denies.

35.     This response is a legal argument, and requires no response.  To any extent a response is required, the Trustee denies.

36.     Deny.

37.     Deny.

38.     Plaintiff's complaint speaks for itself.

39.     Deny as to the word "improper"; otherwise, Plaintiff's complaint speaks for itself.

40.     Admit that there is a dispute; deny that the Trustee is in doubt.

41.     Admit.

The Trustee denies that Tecumseh is entitled to any relief relating to the disputed receivables at issue, and expressly denies each and every assertion in the 'wherefore' clause found below Paragraph 41 of the Tecumseh Counterclaim.

**THIRD CLAIM FOR RELIEF**

42.     The Trustee incorporates and repeats his responses to paragraphs 1 through 41 above as though set forth fully herein.

43.     Deny.

44.     This response is a legal argument, and requires no response.  To any extent a response is required, the Trustee denies.

45.     Admit.

46.     This response is a legal argument, and requires no response.

47.     This response is a legal argument, and requires no response.  To any extent a response is required, the Trustee denies

48.     This response is a legal argument, and requires no response.  To any extent a response is required, the Trustee denies.

49.     Deny.

50.    Admit.

51.    Admit that there is a dispute; deny that the Trustee is in doubt.

52.    Admit.

The Trustee denies that Tecumseh is entitled to any relief relating to the disputed receivables at issue, and expressly denies each and every assertion in the 'wherefore' clause found below Paragraph 52 of the Tecumseh Counterclaim.

## AFFIRMATIVE DEFENSES

A.     The first cause of action of the Tecumseh Counterclaim fails to state a claim for relief because it improperly, incompletely, or incorrectly pled the cause of action.

B.     The second cause of action of the Tecumseh Counterclaim fails to state a claim for relief because it improperly, incompletely, or incorrectly pled the cause of action.

C.     The third cause of action of the Tecumseh Counterclaim fails to state a claim for relief because it improperly, incompletely, or incorrectly pled the cause of action.

D.     The second and third causes of action of the Tecumseh Counterclaim fails to state a claim because there was no mutual agreement between Debtor and Tecumseh to form a trust relationship, and therefore a resultant trust could not have formed under applicable law.

E.     All causes of action of the Tecumseh Counterclaim fails to state a claim because Tecumseh cannot meet applicable evidentiary standards to prove their causes of action, *e.g*., clear and convincing evidence.

F.     One or more of Tecumseh's causes of actions fails to state a claim because some or all of the disputed receivables were not actually or properly transferred to Tecumseh, and were still owned by Debtor on the Petition Date.

G.     Tecumseh's claims are barred by Tecumseh's own negligence and/or failure to exercise for its own protection the proper care and precautions which prudent persons under the same and similar circumstances would have exercised.

H.     Tecumseh's claims are barred by Tecumseh's own unclean hands, including but not limited to failure to perfect their interest, lack of due diligence, and/or failure to accept the assignment/sale when preferred by Debtor.

I.     Tecumseh's claims are barred because of Tecumseh's conduct (including omissions or failure to act) constitutes a waiver, including but not limited to failure to perfect

their interest, lack of due diligence, and/or failure to accept the assignment/sale when proferred by Debtor.

J.      Tecumseh's damages are zero because all of the allegedly transferred receivables were fully secured by HASelect's perfected security interest.

K.      One or more of Tecumseh's causes of actions fails to state a claim because the Sub-Advisor Agreement is not the operative contract relating to the transfer of assets. Instead, the operative contracts were one or more contracts styled as "Assignment and Bill of Sale", each of which was governed by Nevada law, and some or all of which were improperly executed in a manner that failed to actually convey title.

L.      One or more of Tecumseh's causes of actions fails to state a claim because Debtor contributed money to purchase the disputed receivables, and/or or held an ownership interest in the disputed receivables for a period of time prior to any transfer that allegedly occurred.

M.      One or more of Tecumseh's causes of actions fails to state a claim because Tecumseh never actually accepted any of the alleged assignments and sale.

The Trustee reserves the right to assert additional affirmative defenses that are deemed appropriate because of the discovery of new information.

# COUNTERCLAIM
## AGAINST TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP

Counter-Claimant Robert E. Atkinson, Chapter 7 Trustee, by and through counsel, hereby asserts his counterclaim against Counter-Defendant Tecumseh-Infinity Medical Receivables Fund, LP, and alleges:

### JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

2.      This is action is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (C), and (K).

3.      If this adversary proceeding is determined to be noncore, or if this adversary proceeding is a core proceeding under 28 U.S.C. § 157(b) but may not, as a constitutional matter, be adjudicated as such, the Trustee consents to the entry of final orders or judgments by the bankruptcy judge.

4.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1408(1) and 1409(a).

**PARTIES**

5.    Counter-Claimant ROBERT E. ATKINSON ("***Trustee***") is the chapter 7 trustee of the bankruptcy estate in the underlying bankruptcy case.

6.    Counter-Defendant TECUMSEH–INFINITY MEDICAL RECEIVABLES FUND, LP ("***Tecumseh***") is a Delaware limited partnership.

**GENERAL ALLEGATIONS**

7.    On September 15, 2021, debtor INFINITY CAPITAL MANAGEMENT, INC. ("***Debtor***") filed for chapter 7 bankruptcy in the District of Nevada, creating the underlying bankruptcy case.

8.    Pre-petition, Debtor had a variety of accounts receivable, generally arising from Debtor's purchase of medical liens against personal injury claims, i.e., from medical treatment provided to individuals who were injured in accidents and had asserted personal injury claims against tortfeasors.  The medical liens were typically established at the law firm retained by the injured party to prosecute the personal injury claim.

9.    Pre-petition, Debtor assigned and sold, or attempted to assign and sell, some of its accounts receivable to Tecumseh.

10.    Some or all of the accounts receivable sold to Tecumseh were not properly sold and assigned to Tecumseh, and title to those accounts receivable remained the property of Debtor on the Petition Date.

11.    This counterclaim is brought to seek relief in the event that Tecumseh is able to prove, under applicable evidentiary standards, that a significant portion of the accounts receivable were in fact properly sold and assigned to Tecumseh prior to the Petition Date (the "***Transferred Accounts Receivable***").

12.    The Transferred Accounts Receivable, if they exist, were transferred by Debtor to Tecumseh in one or more batches.

13.    For each such batch, the instrument of conveyance was styled as "Assignment and Bill of Sale".

14.    Each of the Assignment and Bill of Sale documents is, on its own terms, governed by Nevada law.

-7-

15.     Tecumseh has alleged that the assignment and sale was made pursuant to a Sub-Advisory Agreement, which is governed by South Carolina law.

16.     For each of the Transferred Accounts Receivable, Debtor did not change or modify the medical lien at the law firm of the injured party.

17.     For all of the Transferred Accounts Receivable, the medical lien remained in Debtor's name in the records of the law firm of the injured party.

18.     For each of the Transferred Accounts Receivable, either Debtor or Tecumseh had the right to receive payment thereon ("***Rights to Payment***").

### FIRST CAUSE OF ACTION

[*AVOIDANCE OF UNPERFECTED LIEN*]
[11 U.S.C. §§ 544, 551; NRS § 104 [1]]

19.     The Trustee repeats and re-alleges the allegations set forth in paragraphs 1 through 18 above, and thereby incorporates the same as if set forth fully herein.

20.     Nevada's implementation of Article 9 the Uniform Commercial Code is codified at NRS § 104.9101 *et seq.* ("***Nevada UCC Article 9***").

21.     The Transferred Accounts Receivable and/or the Rights to Payment are 'accounts', as that term is defined in NRS § 104.9102(2), and other applicable law (as applicable, "***Accounts***").

22.     Pursuant to NRS § 104.9109(1)(c), the Nevada UCC Article 9 governs the Debtor's assignment and sale of the Accounts.

23.     Because Nevada UCC Article 9 applies to assignment and sale of accounts, the perfection requirements of Article 9 governs such transactions.

24.     The Debtor was located solely in Nevada.  Pursuant to NRS § 104.9301(1) and other applicable law, the laws of Nevada therefore govern perfection of an interest in the Accounts.

25.     Pursuant to NRS § 104.9310(1) and other applicable law, Tecumseh was required to file a financing statement to perfect its interests in the Accounts.

---

[1] To any extent that Tecumseh proves that South Carolina is the applicable state law for the assignment and sale of the receivables, then the phrase "and other applicable law" found in this counterclaim shall include (but not be limited to) the corresponding statutes found in South Carolina's codification of the Uniform Commercial Code (S.C. Code Ann § 36-1-101 *et seq.*).

26.     By not filing a financing statement with the Nevada Secretary of State (or in any other State) prior to the Petition Date, Tecumseh failed to perfect interests in the Accounts.  Therefore, its interest in the Accounts was unperfected on the Petition Date.

27.     Pursuant to NRS § 104.9317 and other applicable law, the unperfected interests of Tecumseh in the Accounts is subordinate to the rights of a judicial lien creditor.

28.     Pursuant to 11 U.S.C. § 544(a)(1), the Trustee has the rights and powers of a judicial lien creditor.

29.     Pursuant to the strong-arm powers of 11 U.S.C. § 544(a), the unperfected interests of Tecumseh in the Accounts is subordinate to the rights of the Trustee, and the Trustee can avoid the transfer of any of the Accounts to Tecumseh.

30.     Under applicable State and Federal bankruptcy law, when an outright buyer of accounts receivable failed to perfect its interest in a debtor's accounts by filing a financing statement, the buyer cannot prevail over the bankruptcy trustee, as lien creditor.  *See, e.g.*, Valley Bank of Nevada v. City of Henderson, 528 F. Supp. 907 (D. Nev. 1981).

31.     In addition, pursuant to 11 U.S.C. § 551, the Debtor may preserve this avoided transfer of the Accounts for the benefit of the estate.

WHEREFORE, the Trustee prays for judgment, in favor of the Trustee and against Tecumseh, as follows:

- Finding that the unperfected interests of Tecumseh in the Accounts is subordinate to the rights of the Trustee under 11 U.S.C. § 544;

- Avoiding the transfer of any of Debtor's property to Tecumseh that ever occurred, including but not limited to the Accounts; and

- Preserving this avoided transfer for the benefit of the estate, i.e., that the Accounts are property of the bankruptcy estate.

# # # # #

DATED: January 6, 2022                    **ATKINSON LAW ASSOCIATES LTD.**

By: _____/s/ Clarisse L. Crisostomo_____
CLARISSE L. CRISOSTOMO, ESQ.
Nevada Bar No. 15526
*Attorney for Robert E. Atkinson, Chapter 7*
*Trustee*

**EXHIBIT 7**



Honorable August B. Landis
United States Bankruptcy Judge

Entered on Docket
February 11, 2022

CLARISSE L. CRISOSTOMO, ESQ., Bar No. 15526
Email: clarisse@nv-lawfirm.com
**ATKINSON LAW ASSOCIATES LTD.**
376 E Warm Springs Rd, Suite 130
Las Vegas, NV 89119
Telephone:  (702) 614-0600
*Attorney for Robert E. Atkinson, Trustee*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

In re:

INFINITY CAPITAL MANAGEMENT, INC.
*dba* INFINITY HEALTH CONNECTIONS,

        Debtor.

Case No. 21-14486-abl
Chapter 7

**ORDER APPROVING SALE**

Hearing Date:  February 8, 2022
Hearing Time:  1:30 p.m.

A sale/auction hearing came on before the Court on February 8, 2022 at 1:30 p.m. ("***Sale Hearing***").  Appearances at the Sale Hearing were as noted in the record.

The chapter 7 trustee ("***Trustee***") had sought approval of the sale of certain assets to buyer HASelect-Medical Receivables Litigation Finance Fund International SP ("***HASelect***") for $100,000.00 and on the other terms and conditions of the Asset Purchase agreement ("***APA***") attached as Exhibit 1 to the Trustee's motion to approve sale [DE #145] ("***Sale Motion***"), subject to overbid at auction pursuant to certain bid procedures ("***Procedures***").

The specific assets being sold hereunder are:

1) Whatever interest the Bankruptcy Estate has in the Tecumseh Receivables (inclusive of the monies from the TIF Checks, and the monies from the TIF+HAS Checks), if any, and subject to the rights, title, and interests that Tecumseh-Infinity Medical Receivables Fund, LP ("***Tecumseh***") may have in this property, if any.

2) All claims and causes of action that could be brought by the Trustee or the Bankruptcy Estate against any third party relating in any way to the Tecumseh Receivables, pursuant to (i) chapter five of title 11 of the United States Code, or (ii) all applicable or relevant state or federal laws (collectively, the "***Claims***"). For avoidance of douber, the Claims include, but are not limited to, all causes of action that could be brought by the Trustee pursuant to Sections 542, 543, 544, 545, 547, 548, 549, 550, 551, 552, and 553 of the United States Bankruptcy Code for any matter relating in any way to the Tecumseh Receivables.

3) All books and records related to the foregoing that the Bankruptcy Estate currently has in its possession, in whatever form and wherever located.

(collectively, the "***Assets***").[1]

The Sale Hearing was held pursuant to prior Court order entitled ORDER GRANTING IN PART, AND DENYING IN PART, THE TRUSTEE'S MOTION TO: (I) APPROVE SALE OF CERTAIN ASSETS; (II) SET SALE/AUCTION PROCEDURES; AND (III) SET AUCTION HEARING DATE [DE #175] ("***Sale Procedures Order***").

At the Sale Hearing, the Trustee informed the Court: (i) that a new servicer for the Tecumseh Receivables was now in place[2]; and (ii) that no overbidders had pre-qualified to bid

---

[1] The term "***Tecumseh Receivables***" is as defined in Tecumseh – Infinity Medical Receivable Fund, LP's Objection to Joint Motion to Approve Abandonment of Collateral [ECF No. 82] and as identified in Exhibit A and, to the extent marked as assigned to Tecumseh, Exhibit B to the Meyer Declaration [ECF No. 59], as well as any records relating exclusively thereto or any proceeds thereof. The term "Tecumseh Receivables" shall also include any modification or substitution of that Exhibit A and Exhibit B allowed by the Court pursuant to Tecumseh's Motion to Allow Amendment of Declaration [DE #177]. The term "***TIF Checks***" shall include all funds received from checks from certain of the Tecumseh Receivables, and as deposited by the Trustee in a segregated estate account (ending x3146), currently in the amount of $115,842.90. The term "***TIF + HAS Checks***" shall include all funds received from checks from certain other receivables that include Tecumseh Receivables, and as deposited by the Trustee in a segregated estate account (ending x3154), currently in the amount of $23,900.00.

[2] The accounts are being serviced by TPL Claims Management, LLC ("***Servicer***").

pursuant to the Procedures approved in the Sale Procedures Order. The Trustee observed that therefore no auction need be held, and that the APA could simply be approved by the Court. The Trustee also renewed his request to have HASelect be deemed a good-faith purchaser and be afforded the protections of 11 U.S.C. § 363(m) as part of any approved sale.

The Court determined that, in the absence of any qualified bidder other than HASelect, no auction was necessary and that approval of the APA was in the best interests of the estate. The Court expressly found that HASelect is a good-faith purchaser of the Assets, and therefore entitled to the protections of Section 363(m). All other findings of fact and conclusions of law orally stated by the Court at the February 8, 2022 hearing are incorporated herein pursuant to Fed. R. Civ. P. 52, as made applicable to these proceedings via Fed. R. Bankr. P. 9014(c) and 7052. For the reasons stated by the Court on the record at the hearing,

**IT IS HEREBY ORDERED:**

1. The APA (attached hereto as **Exhibit 1**) is approved on a final basis, and the sale of the Assets to HASelect for $100,000.00 is approved. HASelect shall promptly remit the entire purchase price to the Trustee.

2. For avoidance of doubt, the following term contained in Section 1.04 of the APA is expressly incorporated in this order:

- Upon Court approval of the Sale, all books and records of the Debtor pertaining to the Tecumseh Receivables, wherever located and in any form, shall be turned over to HASelect, and HASelect shall be empowered to enforce said turnover against any party.

3. For avoidance of doubt, the following sale terms previously approved in the Sale Procedures Order are restated and incorporated herein:

- The sale of the Assets is free and clear of all liens, claims, and encumbrances of any third party other than HASelect and Tecumseh. The Assets are sold subject to whatever rights, title, interests, and encumbrances HASelect and Tecumseh may have in the Tecumseh Receivables. Both HASelect's and Tecumseh's interests in the Assets that existed as of the Petition Date shall remain unaffected by the sale.

- HASelect shall take the Assets in an "as-is" condition, and HASelect shall be subject to and bound by the terms found in paragraph 13 of the Sale Motion.  Such terms are incorporated herein by reference.

4.      The Trustee is authorized and instructed to remit the following funds to the Servicer:

- $115,842.90 in funds from the TIF Checks, as currently held in estate bank account ending x3146;

- $23,900.00 in funds from the TIF + HAS Checks, as currently held in estate bank account ending x3154; and

- Any checks or funds relating to the Tecumseh Receivables that may be received by the Trustee in the future, from any source.

Such funds are no longer property of the estate, to any extent that they ever were.

5.      HASelect is hereby afforded the protections found in 11 U.S.C. § 363(m).

6.      Entry of this Order on the docket of the bankruptcy case shall be sufficient evidence of the transfer of title of the Assets to HASelect. The Trustee is also authorized and empowered to execute a bill of sale or any other document consistent with this Order that may be reasonably appropriate to evidence its consummation.

7.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).

**IT IS SO ORDERED.**

# # # # #

Respectfully submitted by:

____/s/ Clarisse Crisostomo_____
CLARISSE L. CRISOSTOMO, ESQ.
Nevada Bar No. 15526
*Attorney for Robert E. Atkinson, Trustee*

## <u>CERTIFICATION re: RULE 9021</u>

In accordance with LR 9021, counsel submitting this document certifies that the order accurately reflects the court's ruling and that (check one):

☐ The court has waived the requirements set forth in LR 9021(b)(1).

☐ No other party appeared at the hearing or filed an objection to the motion.

☒ I have delivered a copy of this proposed order to all counsel who appeared at the hearing, and any unrepresented parties who appeared at the hearing, and each has approved or disapproved the order, or failed to respond, as indicated below:

Gabrielle A. Hamm, Esq. (*counsel for Tecumseh*) – APPROVED
Bart Larsen, Esq. (*counsel for HASelect*) – APPROVED

☐ I certify that this is a case under Chapter 7 or 13, that I have served a copy of this order with the motion pursuant to LR 9014(g), and that no party has objected to the form or content of the order.

# # # # #

# EXHIBIT 1

# to

# ORDER

# ASSET PURCHASE AGREEMENT

This asset purchase agreement ("***Agreement***"), is made by and between seller THE BANKRUPTCY ESTATE OF INFINITY CAPITAL MANAGEMENT, INC. *dba* INFINITY HEALTH CONNECTIONS, by and through chapter 7 trustee Robert E. Atkinson ("***Bankruptcy Estate***" or "***Seller***") arising from Nevada chapter 7 bankruptcy case no. 21-14486-abl (the "***Bankruptcy Case***"), and buyer HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP, a segregated portfolio company of HedgeACT International SPC Ltd., a Cayman Islands corporation ("***HASelect***"). Together, HASelect and Seller may be referred to hereafter individually as a "***Party***" or collectively as the "***Parties***".

## RECITALS

WHEREAS, Seller is a bankruptcy estate formed by the filing of the Bankruptcy Case on September 14, 2021 ("***Petition Date***"); and

WHEREAS, Robert E. Atkinson ("***Trustee***") is the appointed chapter 7 trustee for the Bankruptcy Estate; and

WHEREAS, pre-petition, debtor Infinity Capital Management Inc. ("***Debtor***") was engaged in the business of purchasing receivables from medical providers; and

WHEREAS, HASelect is a secured creditor of the Debtor and holds a perfected security interest in substantially all personal property owned by the Debtor; and

WHEREAS, on October 15, 2021, an order was entered in the Bankruptcy Case [ECF No. 97] abandoning the Debtor's interest in certain of Debtor's collateral, which excluded the following portfolio:

- The Tecumseh Receivables as defined in Tecumseh – Infinity Medical Receivable Fund, LP's Objection to Joint Motion to Approve Abandonment of Collateral [ECF No. 82] and as identified in Exhibit A and, to the extent marked as assigned to Tecumseh, Exhibit B to the Meyer Declaration [ECF No. 59], as well as any records relating exclusively thereto or any proceeds thereof

(hereinafter, the "***Tecumseh Receivables***"); and

WHEREAS, on October 19, 2021, HASelect commenced an adversary proceeding against Tecumseh in the District of Nevada (adversary case no. 21-01167) (the "***AP Case***") seeking declaratory and injunctive relief regarding the Tecumseh Receivables; and

WHEREAS, the Trustee received from the Debtor's principal, and on October 26, 2021 were deposited into segregated estate bank accounts:

- A total of $75,402.85 in checks from certain of the Tecumseh Receivables (the "***TIF Checks***")
- A total of $13,400.00 in checks from certain other receivables that include Tecumseh Receivables (the "***TIF+HAS Checks***");

and

Doc ID: 4c38b2ce62a53868d9b4859730e6170ce02193fb

WHEREAS, Seller has agreed to sell the following assets to HASelect (collectively, the "*Assets*"), on the terms and conditions herein:

1) Whatever interest the Bankruptcy Estate has in the Tecumseh Receivables (inclusive of the $75,402.85 in monies from the TIF Checks, and the $13,400.00 in monies from the TIF+HAS Checks), if any, and subject to the rights, title, and interests that Tecumseh-Infinity Medical Receivables Fund, LP ("*Tecumseh*") may have in this property, if any.

2) All claims and causes of action that could be brought by the Trustee or the Bankruptcy Estate against any third party relating in any way to the Tecumseh Receivables, pursuant to (i) chapter five of title 11 of the United States Code, or (ii) all applicable or relevant state or federal laws (collectively, the "*Claims*"). For avoidance of doubt, the Claims include, but are not limited to, all causes of action that could be brought by the Trustee pursuant to Sections 542, 543, 544, 545, 547, 548, 549, 550, 551, 552, and 553 of the United States Bankruptcy Code for any matter relating in any way to the Tecumseh Receivables.

3) All books and records related to the foregoing that the Bankruptcy Estate currently has in its possession, in whatever form and wherever located.

NOW, THEREFORE, the Parties, intending to be legally bound, do hereby agree as follows:

## ARTICLE I. SALE AND PURCHASE

Section 1.01 **Bankruptcy Court Approval Required**. The Parties acknowledge and agree that this Agreement, inclusive of the sale contemplated herein, is contingent upon Bankruptcy Court approval and may be terminated without cause by any Party at any time prior to the hearing on the Sale Motion. The Trustee shall prepare and file a motion to obtain approval of this sale, inclusive of auction procedures (the "*Sale Motion*"), and shall seek to have the Sale Motion heard on shortened time.

Section 1.02 **Purchase and Sale**. Subject to overbid at auction and all other terms and conditions of this Agreement, Seller hereby sells, assigns, and transfers the Assets to HASelect, as follows:

a. **Purchase Price**. The purchase price for the Assets ("*Purchase Price*") is $100,000.00.

- The Purchase Price shall be new money to the estate, unsecured, and shall be available for the Trustee to use for payment of allowed administrative expenses and general unsecured claims in the Bankruptcy Case.

- The Purchase Price shall be subject to overbid, in accordance with the terms of this Agreement and any procedures that may be established by the Court.

- The Purchase Price shall be remitted to the Trustee in good funds prior to the hearing on the Motion to Sell or at such other time as the Trustee and HASelect may agree. The Trustee shall hold the funds in trust in a segregated estate account, pending final approval of the Sale.

- If HASelect is not the winning bidder at the Sale, then the Trustee shall promptly remit the Purchase Price back to HASelect.

Doc ID: 4c38b2ce62a53868d9b4859730e6170ce02193fb

b. **Auction**. The sale contemplated herein (the "*Sale*") shall be confirmed by the Bankruptcy Court via an auction, to be held at a date and time set by the Bankruptcy Court (the "*Auction*"). At the Auction, the Bankruptcy Court will call for overbids, in an auction format, pursuant to any procedures that may be set by the Court. An authorized representative of HASelect should attend the Auction and be prepared to overbid.

c. **Credit Bid**. Contingent upon any auction procedures that may be entered by the Court, HASelect shall be permitted to credit bid on the amounts of any of its bids in excess of the Purchase Price, up to the total amount owed shown on a proof of claim filed by HASelect in the Bankruptcy Case.

- For avoidance of doubt, if HASelect enters a bid of $150,000 and that is the winning bid, then that amount shall consist of the $100,000 Purchase Price previously remitted to the Trustee, plus a $50,000 credit bid.

- If HASelect is the winning bidder at the Auction, HASelect shall amend its proof of claim to adjust it for any portion of the winning bid that is a credit bid.

- If, at the Auction, HASelect bids more than its available credit bid, then any portion of its winning bid in excess of its available credit bid shall require the payment of new funds to the Bankruptcy Estate.

Section 1.03 **Transfer of Ownership Only Upon Court Approval of Sale**. The Sale contemplated herein shall consummate only after the Auction is held, and a court order approving the Sale to HASelect is entered on the docket of the Bankruptcy Case.

Section 1.04 **Modified Section 363(f) Sale; No Warranties**. HASelect has had an opportunity to investigate the Tecumseh Receivables and the other Assets, and agrees to purchase the Assets subject to the conditions below.

- The Assets will be sold subject to HASelect's lien, **and also** whatever rights, title, and interests that Tecumseh has in the Tecumseh Receivables, if any. Both HASelect's and Tecumseh's interests in the Assets that existed as of the Petition Date shall remain unaffected by the Sale.

- Other than HASelect and Tecumseh, the Trustee is unaware of any interest of any other third party in the Assets. As such, the Trustee agrees to sell the Assets pursuant to Section 363(f) of the Bankruptcy Code excluding these two parties, i.e., the Sale of the Assets shall be made free and clear of the liens, claims, and encumbrances of any third party other than HASelect and Tecumseh.

- HASelect waives all further due diligence in the Assets.

- HASelect is in possession of certain books and records of the Debtor relating to the Tecumseh Receivables, including computer records and paper records. The Trustee only has a list of the Tecumseh Receivables, as found in Court records. Upon Court approval of the Sale, all books and records of the Debtor pertaining to the Tecumseh Receivables, wherever located and in any form, shall be turned over to HASelect, and HASelect shall be empowered to enforce said turnover against any party.

- Seller makes no representations or warranties to HASelect whatsoever, express or

Doc ID: 4c38b2ce62a53868d9b4859730e6170ce02193fb

implied, regarding the Assets, including but not limited to the condition, value, title, or collectability of the Tecumseh Receivables.

- HASelect expressly understands and agrees that:

    (i) the Assets being sold include whatever interest the Bankruptcy Estate has in the Tecumseh Receivables (inclusive of the funds from the TIF Checks and TIF+HAS Checks), if any, and that litigation is required to determine what interest the Bankruptcy Estate had in such Assets as of the Petition Date; and

    (ii) the Bankruptcy Estate may not have any right, title, or interest in the Tecumseh Receivables.

- HASelect, not the Bankruptcy Estate or the Trustee, shall be responsible for and shall bear all fees, costs, and expenses to obtain clear title on the Assets, to service and monetize the Assets, and to prosecute the Claims purchased herein (which shall be prosecuted in HASelect's name, as successor-in-interest to the Claims).

- Upon Court approval of the Sale, the Assets shall no longer be property of the Bankruptcy Estate and neither the Trustee nor the Bankruptcy Estate shall have any obligation whatsoever regarding the Assets. **For avoidance of doubt, litigation of the dispute in the AP Case as to whether the Assets are property of the Bankruptcy Estate is not resolved by the Sale**. HASelect's claims and causes of action relating to the Tecumseh Receivables in the AP Case, along with any related counterclaims of Tecumseh regarding title to the Assets on the Petition Date, shall survive the Sale. After the Sale is consummated, neither the Trustee nor the Bankruptcy Estate shall have any obligation to prosecute or defend any dispute (in the AP Case or otherwise) regarding title to the Assets on the Petition Date.

- HASelect expressly understands and agrees that the Bankruptcy Case has not been designated an operating chapter 7 case, and that the Tecumseh Receivables have not been serviced by the Debtor or the Bankruptcy Estate since the Petition Date, and hereby waives any and all claims against the Estate and the Trustee relating to this non-servicing and any diminishment of the Assets that may have occurred prior to the Sale, if any.

## ARTICLE II. GENERAL PROVISIONS

Section 2.01 **Limitation of Liability**. Neither Party will be liable to the other for losses or damages (including special or consequential damages such as lost profits or loss of use) arising from any cause of action related to this Agreement, whether in contract, tort, or otherwise.

Section 2.02 **Assignment and Succession**. This Agreement is binding on and enforceable by each Party's successors and assignees. If HASelect is the winning bidder at the Auction, then after the Sale is consummated it may freely assign its rights and interests in and to the Assets to a third party, without further court order required.

Section 2.03 **Governing Law**. Any disputes between the Parties relating to or arising from this Agreement, of any kind or nature, shall be determined in the Bankruptcy Court, District of

Doc ID: 4c38b2ce62a53868d9b4859730e6170ce02193fb

Nevada, and the parties do consent to personal jurisdiction of such court.

Section 2.04 **Severability**. If any court determines that any provision of this agreement is invalid or unenforceable, any invalidity or unenforceability will affect only that provision and will not make any other provision of this agreement invalid or unenforceable.

Section 2.05 **Full Integration**. The Parties actively negotiated the terms of this Agreement. This Agreement sets forth the entire agreement of the Parties as to the Receivables and the Sale. It replaces and supersedes any and all oral agreements or statements made between the Parties relating to the Assets and the Sale, as well as any prior writings. There are no side agreements or other agreements or contracts, oral or otherwise, between the Parties relating to the subject matter of this Agreement. HASelect has relied solely on its own investigation and not on any oral or written information provided by Seller or its attorneys. Neither Party have relied upon any statements other than those specifically contained in this Agreement.

Section 2.06 **Authority**. The signatory below for each Party has the authority to bind that Party. Both Parties have had the full opportunity to have their own legal counsel review the terms and conditions of this Agreement.

Section 2.07 **Modification**. This Agreement may be modified only by a writing signed by all Parties. After Bankruptcy Court approval of this Agreement, if cannot be modified without Bankruptcy Court approval of such modification.

Section 2.08 **Counterparts**. This Agreement may be executed in a number of counterparts, each of which shall be deemed an original and all of which together shall constitute the same document. Delivery by facsimile or email of an executed counterpart shall have the same force and effect as a delivery in person of that document.

Section 2.09 **Further Assurances**. Each Party shall use all reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable to carry out the intent and purposes of this Agreement.

\* \* \* \* \*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**THE BANKRUPTCY ESTATE OF INFINITY CAPITAL MANAGEMENT, INC. dba INFINITY HEALTH CONNECTIONS**

Robert E. Atkinson, *in his capacity as chapter 7 Trustee of the Bankruptcy Estate of INFINITY CAPITAL MANAGEMENT, INC. dba INFINITY HEALTH CONNECTIONS, a Nevada corporation, Nevada Bankruptcy Case No. 21-14486-abl*

Doc ID: 4c38b2ce62a53868d9b4859730e6170ce02193fb

**HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE
FUND INTERNATIONAL SP**

By: _____

Printed Name: Michael E Griffin

Its: Director _____

Doc ID: 4c38b2ce62a53868d9b4859730e6170ce02193fb

# **<u>EXHIBIT 8</u>**



_____
Honorable August B. Landis
United States Bankruptcy Judge

Entered on Docket
May 23, 2022

CLARISSE L. CRISOSTOMO, ESQ., Bar No. 15526
Email: clarisse@nv-lawfirm.com
**ATKINSON LAW ASSOCIATES LTD.**
376 E Warm Springs Rd Suite 130
Las Vegas, NV 89119
Telephone:  (702) 614-0600
*Attorney for Robert E. Atkinson, Trustee*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>INFINITY CAPITAL MANAGEMENT, INC. *dba* INFINITY HEALTH CONNECTIONS,<br><br>Debtor. | Case No. 21-14486-abl<br>Chapter 7 |
| HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP,<br><br>Plaintiff,<br>v.<br><br>TECUMSEH–INFINITY MEDICAL RECEIVABLES FUND, LP,<br><br>Defendant. | Adv. No. 21-01167-abl<br><br>**ORDER GRANTING MOTION TO SUBSTITUTE PARTY AND RE-CAPTION CASE**<br><br>Hearing Date:    April 6, 2022<br>Hearing Time:    9:30 a.m.<br><br>Oral Ruling Date:    April 28, 2022<br>Oral Ruling Time:    3:00 p.m. |

-1-

TECUMSEH–INFINITY MEDICAL
RECEIVABLES FUND, LP,

                Counter-Claimant,

v.

HASELECT-MEDICAL RECEIVABLES
LITIGATION FINANCE FUND
INTERNATIONAL SP; ROBERT E. ATKINSON,
CHAPTER 7 TRUSTEE,

                Counter-Defendants.

ROBERT E. ATKINSON, CHAPTER 7 TRUSTEE,

                Counter-Claimant,

v.

TECUMSEH–INFINITY MEDICAL
RECEIVABLES FUND, LP,

                Counter-Defendant.

       The Trustee's motion entitled MOTION TO SUBSTITUTE PARTY AND RECAPTION CASE [Adv. ECF #45] (the "***Motion***"), came on for hearing before the Court on April 6, 2022.  An oral ruling on this matter was held on April 28, 2022 ("***Oral Ruling***"). Appearances at the hearings were as noted on the record.

       All findings of fact and conclusions of law orally stated by the Court at the Oral Ruling are incorporated herein pursuant to Fed. R. Civ. P. 52, as made applicable to these proceedings via Fed. R. Bankr. P. 9014(c) and 7052.  For the reasons stated by the Court on the record at the Oral Ruling,

///

///

///

///

///

///

-2-

**IT IS HEREBY ORDERED:**

1.    The Motion, and all of the relief sought therein, is granted in full.

2.    The Trustee is hereby removed as a Counter-Defendant for Tecumseh's counterclaim against the Trustee, and HASelect is hereby substituted for the Trustee as the Counter-Claimant to prosecute the counterclaim against Tecumseh.

3.    The Clerk of the Court shall modify the case docket as follows:

    a.    For Tecumseh's counterclaim against the Trustee and HASelect (filed in Adv. ECF #12), the party ROBERT E. ATKINSON, CHAPTER 7 TRUSTEE shall be entirely removed as Counter-Defendant. Only HASelect shall defend this counterclaim.

    b.    For the Trustee's counterclaim (filed in Adv. ECF #28), HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL LP (represented by Bart Larsen, Esq. of the law firm Shea Larsen) shall be substituted in as Counter-Claimant, in the place and stead of ROBERT E. ATKINSON, CHAPTER 7 TRUSTEE.

///
///
///
///
///
///
///
///
///
///
///
///
///

4.      For all filings made after the entry of any order approving this motion, the caption to this adversary case shall be:

|  |  |
|---|---|
| In re: | Case No. 21-14486-abl<br>Chapter 7 |
| INFINITY CAPITAL MANAGEMENT, INC.<br>*dba* INFINITY HEALTH CONNECTIONS, | |
|              Debtor. | |
| HASELECT-MEDICAL RECEIVABLES<br>LITIGATION FINANCE FUND<br>INTERNATIONAL SP, | Adv. No. 21-01167-abl |
|              Plaintiff,<br>v. | **[Pleading Title]** |
| TECUMSEH–INFINITY MEDICAL<br>RECEIVABLES FUND, LP, | |
|              Defendant, | |
| TECUMSEH–INFINITY MEDICAL<br>RECEIVABLES FUND, LP, | |
|              Counter-Claimant,<br>v. | |
| HASELECT-MEDICAL RECEIVABLES<br>LITIGATION FINANCE FUND<br>INTERNATIONAL SP, | |
|              Counter-<br>Defendant. | |
| HASELECT-MEDICAL RECEIVABLES<br>LITIGATION FINANCE FUND<br>INTERNATIONAL SP, | |
|              Counter-Claimant,<br>v. | |
| TECUMSEH–INFINITY MEDICAL<br>RECEIVABLES FUND, LP, | |
|              Counter-Defendant. | |

**IT IS SO ORDERED.**

# # #

-4-

1

Respectfully submitted by:

2

    /s/ Clarisse L. Crisostomo

3

CLARISSE L. CRISOSTOMO, ESQ.
Nevada Bar No. 15526

4

5

6

### CERTIFICATION re: RULE 9021

7

8

In accordance with LR 9021, counsel submitting this document certifies that the order accurately reflects the court's ruling and that (check one):

9

10

☐ The court has waived the requirements set forth in LR 9021(b)(1).

11

☐ No party appeared at the hearing or filed an objection to the motion.

12

☒ I have delivered a copy of this proposed order to all counsel who appeared at the hearing, and any unrepresented parties who appeared at the hearing, and each has approved or disapproved the order, or failed to respond, as indicated below:

13

14

15

Bart Larsen, Esq. (*counsel for HASelect*) – APPROVED
Gabrielle Hamm, Esq. (*counsel for Tecumseh*) - APPROVED

16

☐ I certify that this is a case under Chapter 7 or 13, that I have served a copy of this order with the motion pursuant to LR 9014(g), and that no party has objected to the form or content of the order.

17

18

###

19

20

21

22

23

24

25

26

27

28

-5-

# EXHIBIT 9

| | |
|---|---|
| **From:** | Dr. Oliver Hemmers |
| **To:** | Mike Belotz |
| **Cc:** | Chad Meyer; endre@ftm-investments.com; Brenda Dalzell; bill@ftm-investments.com; Anne@infinitycapital.com |
| **Subject:** | Re: Thinking outside the box |
| **Date:** | Saturday, July 11, 2020 8:10:59 PM |

I like the creative thinking.

Dr. Oliver Hemmers
Please excuse typos - sent from my phone.


On Jul 11, 2020, at 6:53 PM, Mike Belotz <mbelotz@tecumsehalts.com> wrote:


Oliver,


Just to clarify you would have to  give up title to the receivables in exchange for extinguishment of your note with HA so you would need to be happy with the valuation too.  Once HA has them they would give them to TB in exchange for their LP interest.  And finally TB gives them to Tecumseh-Infinity for a new LP interest.  In reality this should all happen almost simultaneously.  It's probably a long shot but it will certainly save everyone time and money in litigation and we get to an end result we all will be happy with.


Best,

MB

---

**From:** Dr. Oliver Hemmers <Oliver@infinitycapital.com>
**Sent:** Saturday, July 11, 2020 9:34 PM
**To:** Mike Belotz <mbelotz@tecumsehalts.com>; Chad Meyer <cmeyer@tecumsehalts.com>; endre@ftm-investments.com; 'Brenda Dalzell' <dalzellbb@mithril.ca>; bill@ftm-investments.com; Anne@infinitycapital.com
**Subject:** RE: Thinking outside the box


No they cannot.

Oliver

---

**From:** Mike Belotz <mbelotz@tecumsehalts.com>
**Sent:** Saturday, July 11, 2020 10:08 AM
**To:** Chad Meyer <cmeyer@tecumsehalts.com>; endre@ftm-investments.com; 'Brenda Dalzell' <dalzellbb@mithril.ca>; bill@ftm-investments.com; Anne@infinitycapital.com; 'Oliver Hemmers' <oliver@infinitycapital.com>
**Subject:** RE: Thinking outside the box

Chad,

Your flow is correct.  And since this is a negotiation between TB and HA they don't necessarily need an outside valuation.  Three Bell can demand all of the Infinity receivables.

MB

**From:** Chad Meyer <cmeyer@tecumsehalts.com>
**Sent:** Saturday, July 11, 2020 1:05 PM
**To:** Mike Belotz <mbelotz@tecumsehalts.com>; endre@ftm-investments.com; 'Brenda Dalzell' <dalzellbb@mithril.ca>; bill@ftm-investments.com; Anne@infinitycapital.com; 'Oliver Hemmers' <oliver@infinitycapital.com>
**Subject:** Re: Thinking outside the box

Hey Mike,

I didn't see your comment before sending mine. Your solution solves the problem of the current Three Bell HA investors. Obviously, one detail to solve is how do you value the receivables? And I suppose the mechanism to do this is that Infinity would be paying off their loan in-kind, with those receivables flowing to the investors, and then flowing to our fund, right?

Chad

**From:** Mike Belotz <mbelotz@tecumsehalts.com>
**Date:** Saturday, July 11, 2020 at 11:30 AM
**To:** "endre@ftm-investments.com" <endre@ftm-investments.com>, 'Brenda Dalzell' <dalzellbb@mithril.ca>, "bill@ftm-investments.com" <bill@ftm-investments.com>, Chadwick Meyer <cmeyer@tecumsehalts.com>, "Anne@infinitycapital.com" <Anne@infinitycapital.com>, 'Oliver Hemmers' <oliver@infinitycapital.com>
**Subject:** RE: Thinking outside the box

Endre,

Interesting idea.  I don't know how much TB has in the HA fund but one idea we can pursue that may work out for everyone is that TB redeems and gets paid off in kind with receivables.  They then give Tecumseh-Infinity those receivables instead of a cash investment.  That way TB doesn't lose anything and the receivables stay with Infinity. Obviously there will be a number of details to pull it off but conceptually it can work.

Best,

MB

**From:** endre@ftm-investments.com <endre@ftm-investments.com>
**Sent:** Saturday, July 11, 2020 10:13 AM
**To:** 'Brenda Dalzell' <dalzellbb@mithril.ca>; bill@ftm-investments.com; Mike Belotz
<mbelotz@tecumsehalts.com>; Chad Meyer <cmeyer@tecumsehalts.com>;
Anne@infinitycapital.com; 'Oliver Hemmers' <oliver@infinitycapital.com>
**Subject:** Thinking outside the box

Hi Everyone,

As you may know I tend to think outside the box when looking for solutions.  It's not
intentional just how my brain seems to be wired.

The issue we face at the moment is that the Griffins don't seem to have any intention
to find an amicable resolution with Infinity. I guess
for then its fine if the receivables are sold at 10 or 20 cents on the dollar. Mainly
because I believe that Mike is purposely driving towards
this so that his other receivables company PFD can be standing on the courthouse
steps and buy all these at a deep discount.

It's obviously not moral or ethical but hell neither are they.

If they managed to achieve this then investors in the HASelect-FTM fund (which has
been renamed) would potentially lose 70 to 80% of their
money. To me that's totally unacceptable for many reasons. Especially because there is
absolutely no reason for this to happen. Infinity have
returned 3.2 million to HA since the start of the fund.

So, after an unrelated conversation with Simon yesterday I had an idea.  I'm not sure if
we could sell it but if we could it would solve 99.9% of all
our issues.

If left to their own devices GAM will destroy the fund, waste stupid money on lawsuits
and use the poor investors' money to virtually guarantee
that they lose 80% of so of their investment. Anne reiterated this on Thursday when
she said that if Infinity were not the ones collecting then
many attorneys would offer stupidly low settlements as there is no ongoing
relationship to protect

But if we could convince TBC to purchase the receivables in their entirety via a very
large investment into the TI fund.  Then 2 things would happen
1) They would get out of the HASelect Fund without a loss.
2) They would be invested in a far superior product with moral ethical people.

Back in February they wanted to have a call to discuss investing up to 2.5 mil a month
into the fund but with Simons departure that fell apart.

The byproduct of this investment and receivables purchase is that it would remove the
Griffins from Infinity and they would not need to deal with
them and most of the legal issues would also go.

Honestly, I am not sure if we can make this happen but to me it is the only real way TBC
can ensure they will not lose money by having the
receivables sold at a fire sale. I fully realize we can stop this possible sale or slow it
down, but the simplest and best way would be to replace the HA
receivables with them being purchased by TI.

It would also be a massive boost to the fund as these are aged receivables and would
settle fast and then allow for further reinvestment. And there

is no acquisition fee on these as it's all been done.

Anyway, I wanted to share my idea with all of you and hope that we can work towards making it a reality.

Kind regards
Endre

# **EXHIBIT 10**

| From: | Dr. Oliver Hemmers |
|---|---|
| To: | Simon Clark |
| Cc: | Chad Meyer; Mike Belotz; licsu@verizon.net; Anne@infinitycapital.com; endre@ftm-investments.com; bill@ftm-investments.com; Brenda Dalzell |
| Subject: | Re: TECUMSEH – INFINITY MEDICAL RECEIVABLES FUND, LP | Commitment |
| Date: | Friday, September 4, 2020 6:33:39 PM |

Wonderful! And perfect timing.

Dr. Oliver Hemmers
Please excuse typos - sent from my phone.


> On Sep 4, 2020, at 5:58 PM, Simon Clark <s.h.clark@me.com> wrote:
>
> That is such great news; congrats to....”us”!!
>
> Simon H. Clark
>
>
> 805-722-8599
>
>
>
>
>
> On Sep 4, 2020, at 17:51, Chad Meyer <cmeyer@tecumsehalts.com> wrote:
>
>
> Happy Friday evening Team,
>
> We talked a few weeks ago about putting aside an expensive bottle of Champagne to break out if and when we were fortunate enough to have the first Three Bell client subscribe to one of our funds. Well, the notice you see below means the Champagne should now find its way out of that bottle! I'm absolutely thrilled to announce that Joel Wood, a very good friend, in fact groomsman of one of the Three Bell partners, and, of course, a Three Bell client, has invested $100,000 in our Tecumseh – Infinity Fund!
>
> And, possibly even more significantly, we also received a small investment this afternoon from Bethany Ratliff, who runs the office at Three Bell. I know from my experience at HedgeACT, and Simon knows even better than I, that she is the single point person for papering all client investments. So the fact that she is now personally invested in our fund,

and will certainly mention that fact to clients, is absolutely phenomenal.

So it's a night to rejoice – congratulations to all of us! As long as we keep working hard to make this fund as successful as we know it can be, this should be the beginning of a wonderful long-term relationship with Three Bell!

Cheers,
Chad


**Chadwick Meyer**
***Tecumseh* Alternatives, LLC**
(312) 543-2204
cmeyer@TecumsehAlts.com
www.TecumsehAlts.com

# EXHIBIT 11

| From: | Simon Clark |
|---|---|
| To: | Pantelas Anne; Hemmers Dr.Oliver |
| Cc: | bill@ftm-investments.com; Dobozy Endre S |
| Subject: | Three Bell Capital. |
| Date: | Monday, December 30, 2019 8:21:04 AM |

Good morning to you both, I hope Christmas was a lot of fun.

As I think I mentioned whilst in Las Vegas, my client Three Bell Capital, and by far HedgeAct's largest customer is now pointing about $1.2-$1.5mm per month towards us just for the FTM product.

They have intimated they might like to do a "meet the manager" call with you both, and Endre/Bill, largely for their clients. This won't happen until February most likely, but would you be comfortable giving a 15 minute presentation by CC and then answering questions??

Just let me know in due course.

Happy New Year if we do not speak.

Simon H. Clark
President
HedgeACT International Ltd.


805-722-8599

# EXHIBIT 12

| | |
|---|---|
| **From:** | oliver@infinitycapital.com |
| **To:** | "Will Martin" |
| **Cc:** | Anne@infinitycapital.com; "Patterson Eric" |
| **Subject:** | RE: Performance Analysis and Numbers |
| **Date:** | Sunday, June 27, 2021 9:42:53 PM |

Yes, you will get your principle plus a couple of million in interest. Much more than Infinity made.

Oliver

**From:** Will Martin <will@three-bell.com>
**Sent:** Sunday, June 27, 2021 9:37 PM
**To:** oliver@infinitycapital.com
**Cc:** Anne@infinitycapital.com; Patterson Eric <eric@three-bell.com>
**Subject:** Re: Performance Analysis and Numbers

Thanks for this Oliver.

So the middle case is that we only get our money back and it takes 12-24 months to do so?

Will

On Sun, Jun 27, 2021 at 8:26 PM <oliver@infinitycapital.com> wrote:

> Hello Eric, hello Will,
>
> Please find attached our take on the performance of the current HAS assets considering the 2020 impact of COVID-19. We are still analyzing some numbers, but we wanted to get you at least this much of information. The projected collections of the remaining A/R face several potential outcomes depending on three assumptions. First, the worst case if COVID continues or any new virus causes additional shutdowns, second if we are on our way out of the crisis and things are getting back to before COVID levels and a best-case scenario. In a worst case we do not expect to collect more than $10.5 Million on the existing A/R, a post-COVID expectation is about $13.8 Million, and a best case would be about $15 Million. Anne and I will not be available on Monday, but we will be back in the office on Tuesday if you want a call and discuss.
>
> Kind Regards,
> Anne Pantelas and Oliver Hemmers

--
**Will Martin, CFA**
**Chief Investment Strategist at Three Bell Capital**
**A** 4 Main Street, Los Altos, CA 94022
**C** 650.417.8335   **P** 650.843.9836
**E** will@three-bell.com
**W** Three-Bell.com

# EXHIBIT 13

| | |
|---|---|
| **From:** | Anne@infinitycapital.com |
| **To:** | "Jon Porter" |
| **Cc:** | oliver@infinitycapital.com; "Eric Patterson"; "Will Martin" |
| **Subject:** | RE: Any updates on the HAS negotiations? |
| **Date:** | Friday, July 16, 2021 11:28:19 AM |

Understood!

Thank you Jon, I will bear what you say in mind.

Have a great weekend and talk soon.

Anne

---

**From:** Jon Porter <jon@three-bell.com>
**Sent:** Friday, July 16, 2021 9:20 AM
**To:** Anne@infinitycapital.com
**Cc:** oliver@infinitycapital.com; Eric Patterson <eric@three-bell.com>; Will Martin <will@three-bell.com>
**Subject:** Re: Any updates on the HAS negotiations?

We were in the same camp.  We had what felt like two productive calls with the HedgeAct attorney, and then we got a message that the solutions we had been discussing (some permutation of an in kind transfer to a third party and corresponding forgiveness of the loan) were not feasible because they somehow only benefitted Three Bell clients.

We are still more than willing to resurrect those discussions, but I'm honestly not sure what else we can suggest that would work for them.  Again, I'm open to ideas.  At this point, unless we come back to HedgeAct with something other than what we have already discussed, we will hit a wall.

Happy Friday,

Jon

**Jon Porter** CPWA
CEO
Three Bell Capital LLC
Office 650.887.7203
Mobile 650.862.4757
Email Jon@three-bell.com

Silicon Valley  |  New York  |  San Francisco  |  Los Angeles  |  Charlotte  |  Dallas

On Jul 16, 2021, at 8:08 AM, Anne@infinitycapital.com wrote:

Thank you Jon

We will discuss with counsel to review consequences (if any) and we will let you know.

We were hopeful that as a team we could see a path forward that is in the bets interests of all parties. Oliver is on a trip with the kids for the next 10 days but I will set up meetings so we can have more knowledge on repercussions for each path that may be taken and we will keep you advised.

Best wishes

Anne

Anne Pantelas
President | Infinity Capital Management
(877) 746-3497 | Toll Free
(702) 228-3499 | Office
(702) 383-5079 | Fax

<image001.jpg>

**From:** Jon Porter <jon@three-bell.com>
**Sent:** Thursday, July 15, 2021 9:36 PM
**To:** oliver@infinitycapital.com
**Cc:** Eric Patterson <eric@three-bell.com>; Will Martin <will@three-bell.com>; Anne@infinitycapital.com
**Subject:** Re: Any updates on the HAS negotiations?

Hi Oliver,

None since our last conversation.  Hedge Act appears to be willing to cease discussions and pursue their own path.

The only recourse we have at this point is to highlight past breaches of fiduciary duty in the hopes that our knowledge of the same elicits some level of cooperation going forward.

The best such example of a breach would be the emails that purportedly exist between hedge act and Infinity wherein you warned of the danger of breach.

Your counsel indicated he was unwilling to share those, which I understand, but without them, we don't have much leverage.

Open to ideas here…

Jon

**Jon Porter** CPWA
CEO
Three Bell Capital LLC
Office 650.887.7203
Mobile 650.862.4757
Email Jon@three-bell.com

Silicon Valley  |  New York  |  San Francisco   |  Los Angeles  |  Charlotte |  Dallas

On Jul 15, 2021, at 11:59 AM, oliver@infinitycapital.com wrote:

Hi Jon,

Any updates this week?

Kind Regards, Oliver

**Dr. Oliver A Hemmers**
Partner/EVP | Infinity Health Connections
(877) 746-3497 | Toll Free
(702) 228-3499 | Office
(702) 383-5079 | Fax
www.infinityhealth.com

# EXHIBIT 14

| From: | Dr. Oliver Hemmers |
|-------|--------------------|
| **To:** | Will Martin |
| **Cc:** | Infinity Capital; Larry Oldham |
| **Subject:** | Re: Three Bell, Tecumseh, Infinity, HedgeAct Asset transfer Deal |
| **Date:** | Thursday, June 17, 2021 7:15:55 AM |

Thanks

Dr. Oliver Hemmers
Please excuse typos - sent from my phone.


On Jun 17, 2021, at 6:03 AM, Will Martin <will@three-bell.com> wrote:


Good morning,

That sounds good. I'll check in with Jon and Eric and get back to you with a time that works.

Thanks,

On Wed, Jun 16, 2021 at 11:24 PM <oliver@infinitycapital.com> wrote:

> Hello Will,
>
>
> Today, Simon presented the essence of your discussions and what options you like to pursue. We would like to schedule a conference call tomorrow with you and if possible, others from Three Bell with Anne, Larry and myself. For this call we will not include Tecumseh nor Simon. We would be available at or after noon PST and we can send you an invite with our conference line.
>
>
> Kind Regards, Oliver
>
>
> **From:** Will Martin <will@three-bell.com>
> **Sent:** Wednesday, June 16, 2021 3:38 PM
> **To:** Dr. Oliver Hemmers <oliver@infinitycapital.com>; Infinity Capital <anne@infinitycapital.com>; Larry Oldham <larryoldham@lcopc.com>
> **Subject:** Re: Three Bell, Tecumseh, Infinity, HedgeAct Asset transfer Deal
>
>
> Hi Guys

Any update on this?  We never heard back from you about the call today.

Is it looking good for a transaction?

Thx

On Wed, Jun 16, 2021 at 10:54 AM Will Martin <will@three-bell.com> wrote:

> HI Oliver,
>
> The only call that I am aware of from yesterday was with Simon and Tecumseh?  Please keep us posted on what you need from us.
>
> Thanks!
>
> Will
>
> On Wed, Jun 16, 2021 at 10:52 AM <oliver@infinitycapital.com> wrote:
>
>> Hello Will,
>>
>> It is my understanding that you had a call yesterday with someone and this person wanted to loop in the Tecumseh-FTM-Infinity group regarding the details on the scheduled call today. Now, after that call it would be good if we all could reconnect including Larry and pencil out a path forward. I will let you know as soon as I hear more.
>>
>> Kind Regards, Oliver

**From:** Will Martin <will@three-bell.com>
**Sent:** Wednesday, June 16, 2021 10:38 AM
**To:** Larry Oldham <larryoldham@lcopc.com>
**Cc:** oliver@infinitycapital.com; Infinity Capital
<Anne@infinitycapital.com>
**Subject:** Re: Three Bell, Tecumseh, Infinity, HedgeAct Asset transfer Deal

Hello,

Is there a cc today?  If so, can someone please
send us an invite?

Thanks,
WIll

On Tue, Jun 15, 2021 at 6:16 PM Larry Oldham
<larryoldham@lcopc.com> wrote:

> Gentlemen:
>
> It is my understanding that there is a conference call scheduled for
> tomorrow at noon Las Vegas time wherein you will be discussing this
> matter.  As you are aware, I have been talking with attorneys for HAS
> and I need to let them know what traction, if any, a proposed resolution
> has.  I would like to participate in tomorrow's conference call so I can
> get a feel for where things stand.  Are there any other attorneys who will
> be on that call?
>
> _____
> Larry C. Oldham
> Larry C. Oldham, P.C.
> 416 Pirkle Ferry Road
> Suite K-500
> Cumming, Georgia  30040
> (770) 889-8557 (o)
> (770) 317-7544 (c)
> (770) 888-4988 (f)

www.lcopc.com
larryoldham@lcopc.com

_____

The information contained in this transmission is confidential and intended only for the use of the individual or entity named above. This information may also be legally privileged. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this transmission is strictly prohibited. If you have received this transmission in error, please notify us immediately by responding to this message or telephone and delete the original and all copies thereof immediately without reading it.  Thank you.

---

**From:** oliver@infinitycapital.com <oliver@infinitycapital.com>
**Sent:** Thursday, June 10, 2021 6:16 PM
**To:** 'Will Martin' <will@three-bell.com>
**Cc:** Larry Oldham <larryoldham@lcopc.com>; 'Infinity Capital' <Anne@infinitycapital.com>
**Subject:** RE: Three Bell, Tecumseh, Infinity, HedgeAct Asset transfer Deal

Good to hear. Thank you. Hawaii sounds great.

---

**From:** Will Martin <will@three-bell.com>
**Sent:** Thursday, June 10, 2021 3:03 PM
**To:** Dr. Oliver Hemmers <oliver@infinitycapital.com>
**Cc:** Larry Oldham <larryoldham@lcopc.com>; Infinity Capital <Anne@infinitycapital.com>
**Subject:** Re: Three Bell, Tecumseh, Infinity, HedgeAct Asset transfer Deal

Thanks so much for the info Oliver.  I have passed this along to Jon and Eric.  Just as an FYI, Jon is on his way to Hawaii now, so we will get back as soon as we are able.

Thanks!

Will

On Thu, Jun 10, 2021 at 2:24 PM <oliver@infinitycapital.com> wrote:

Hello Will,

I just got off the phone with our corporate attorney, Larry Oldham, who has been working with us regarding HedgeAct for over a year now and who wrote the response to John Hourihane that I forwarded to you last Monday. Larry spoke to John Hourihane and found out that there is strong interest from HedgeAct's side to pursue the proposal made of asset and loan transfers. Larry would like to talk to you about how he could be of help to get this going before we end up in a legal battle that would be costly and just delay everything considering time is of the essence. Anne and/or I would be happy to be on the call if needed/wanted, as well. I included contact info for Larry and Will below.

Kind Regards, Oliver

**Will Martin, CFA**

**Chief Investment Strategist at Three Bell Capital**

**A** 4 Main Street, Los Altos, CA 94022

**C** 650.417.8335   **P** 650.843.9836

**E** will@three-bell.com

**W** Three-Bell.com

Larry C. Oldham
Larry C. Oldham, P.C.
416 Pirkle Ferry Road
Suite K-500
Cumming, Georgia  30040
(770) 889-8557 (o)
(770) 317-7544 (c)
(770) 888-4988 (f)

www.lcopc.com
larryoldham@lcopc.com

--

**Will Martin, CFA**

**Chief Investment Strategist at Three Bell Capital**

**A** 4 Main Street, Los Altos, CA 94022

**C** 650.417.8335   **P** 650.843.9836

**E** will@three-bell.com

**W** Three-Bell.com

--

**Will Martin, CFA**

**Chief Investment Strategist at Three Bell Capital**

**A** 4 Main Street, Los Altos, CA 94022

**C** 650.417.8335   **P** 650.843.9836

**E** will@three-bell.com

**W** Three-Bell.com

--

**Will Martin, CFA**

**Chief Investment Strategist at Three Bell Capital**

**A** 4 Main Street, Los Altos, CA 94022

**C** 650.417.8335   **P** 650.843.9836

**E** will@three-bell.com

**W** Three-Bell.com

--

**Will Martin, CFA**

**Chief Investment Strategist at Three Bell Capital**

**A** 4 Main Street, Los Altos, CA 94022

**C** 650.417.8335   **P** 650.843.9836

**E** will@three-bell.com

**W** Three-Bell.com

--
**Will Martin, CFA**
**Chief Investment Strategist at Three Bell Capital**
**A** 4 Main Street, Los Altos, CA 94022
**C** 650.417.8335   **P** 650.843.9836
**E** will@three-bell.com
**W** Three-Bell.com

# EXHIBIT 15

**From:** oliver@infinitycapital.com
**To:** "Jon Porter"
**Cc:** Anne@infinitycapital.com
**Subject:** RE: Call
**Date:** Wednesday, September 1, 2021 10:24:33 AM

Hi Jon,

That works. Please call my cell at 702-525-8767

Kind Regards, Oliver

**From:** Jon Porter <jon@three-bell.com>
**Sent:** Wednesday, September 1, 2021 10:16 AM
**To:** Dr. Oliver Hemmers <oliver@infinitycapital.com>
**Cc:** Anne@infinitycapital.com
**Subject:** Re: Call

Are you free in 15 minutes?



**Jon Porter, CPWA®**

CEO at **THREE BELL CAPITAL**

Silicon Valley I San Francisco I Los Angeles I New York I Charlotte I Dallas

(650) 887-7203   jon@three-bell.com



On Wed, Sep 1, 2021 at 12:00 PM Dr. Oliver Hemmers <oliver@infinitycapital.com> wrote:

> Hi Jon,
>
> What time is good for a call today?
>
> Kind Regards, Oliver

# EXHIBIT 16

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (12/15)

# UNITED STATES BANKRUPTCY COURT

District of **Nevada**

In re **Infinity Capital Management, Inc.**
_____
Debtor

*(Complete if issued in an adversary proceeding)*

**HASelect-Medical Receivables Litigation Finance Fund International SP**
_____
Plaintiff

v.

**Tecumseh-Infinity Medical Receivables Fund, LP**
_____
Defendant

Case No. **21-14486-abl**

Chapter **7**

Adv. Proc. No. **21-01167-abl**

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: **FTM Investments, LLC c/o William Dalzell - 26 Colleton River Dr., Henderson, NV 89052**
*(Name of person to whom the subpoena is directed)*

☑ *Production*: **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: **See Exhibit A attached hereto**

| PLACE | DATE AND TIME |
|---|---|
| Shea Larsen, 1731 Village Center Circle, Suite 150, Las Vegas, NV 89134 | 11/30/2022 by 5:00 p.m. |

### **Production to blarsen@shea.law is also permitted and preferred**

☐ *Inspection of Premises*: **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| PLACE | DATE AND TIME |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: **11/9/2022**

CLERK OF COURT

OR

_____
Signature of Clerk or Deputy Clerk

**/s/ Bart K. Larsen, Esq.**
_____
Attorney's signature

The name, address, email address, and telephone number of the attorney representing *(name of party)* HASelect-Medical Receivables Litigation Finance Fund International SP , who issues or requests this subpoena, are:

**Bart K. Larsen, Esq. 1731 Village Center Circle, Suite 150, Las Vegas, Nevada 89134, blarsen@shea.law**

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (Page 2)

## PROOF OF SERVICE
### (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because:  _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of  $ _____ .

 My fees are $ _____ for travel and $_____ for services, for a total of $_____  .

        I declare under penalty of perjury that this information is true and correct.

Date:  _____

_____
                                    *Server's signature*

_____
                                    *Printed name and title*

_____
                                    *Server's address*

Additional information concerning attempted service, etc.:

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
        (i) is a party or a party's officer; or
        (ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
    (A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    (B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

    *(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

    *(2) Command to Produce Materials or Permit Inspection.*
    *(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    *(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
        (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
        (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

    *(3) Quashing or Modifying a Subpoena.*
    *(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
        (i) fails to allow a reasonable time to comply;
        (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
        (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
        (iv) subjects a person to undue burden.
    *(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify a subpoena if it requires:
        (i) disclosing a trade secret or other confidential research, development, or commercial information; or

        (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    *(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
        (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
        (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

    *(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    *(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    *(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    *(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    *(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

    *(2) Claiming Privilege or Protection.*
    *(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
        (i) expressly make the claim; and
        (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    *(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

# EXHIBIT A

### DEFINITIONS

1.     "**506 Investor Group**" refers to 506 Investor Group, LLC, including its employees, directors, officers, agents, servants, subsidiaries, parent company, affiliated companies, and other persons acting or purporting to act on its behalf, including its Representatives, as well as anyone known or believed to be a member of or affiliated with 506 Investor Group.

2.     "**Bankruptcy Case**" shall mean the following case: *In re Infinity Capital Management, Inc.*, United States Bankruptcy Court for the District of Nevada, Case No. 21-14486-abl, including all related adversary proceedings.

3.     "**Communication**" means any oral or written statement, dialogue, colloquy, discussion, or conversation, and includes any transfer of thoughts or ideas or data or information, between persons or locations by means of any Documents or by any other means, including but not limited to electronic or similar means.

4.     "**Control**" means in your possession, custody, or control or under your direction, and includes in the possession, custody, or control of those under the direction of you or your employees, subordinates, counsel, accountant, consultant, expert, parent or affiliated corporation, and any person purporting to act on your behalf.

5.     "**Document**" means any written or graphic matter and other means of preserving thought or expression and all tangible things from which information can be processed or transcribed, including the originals and all non-identical copies, whether different from the original by reason of any notation made on such copy or otherwise, including, but not limited to, correspondence, emails, memoranda, notes, messages, letters, telegrams, teletype, telefax, bulletins, meetings or other communications, inter-office and intra-office telephone calls, diaries, chronological data, minutes, books, reports, studies, summaries, pamphlets, bulletins, printed matter, charts, ledgers, invoices, worksheets, receipts, returns, computer printouts, prospectuses, financial statements, schedules, affidavits, contracts, canceled checks, statements, transcripts,

statistics, surveys, magazine or newspaper articles, releases (and any and all drafts, alterations or modifications, changes and amendments of any of the foregoing), graphic or aural records or representations of any kind (including without limitation, photographs, microfiche, microfilm, videotape, records and motion pictures) and electronic, mechanical or electric records or representations of any kind (including without limitation, tapes, cassettes, discs and records) as well as all Electronically Stored Information ("**ESI**"), which refers to any type of information that is created, used, or stored in digital form and accessible by digital means, including but not limited to, all data, digital documents, email, electronic documents, and metadata of the same (and is further defined below).  For the avoidance of doubt, Document includes but is not limited to all Communications.

6.      "**HASelect**" shall refer to HASelect-Medical Receivables Litigation Finance Fund International SP, including its employees, directors, officers, agents, servants, subsidiaries, parent company, affiliated company, and other persons acting or purporting to act on its behalf, including its Representatives.

7.      "**Infinity**" or "**Debtor**" shall refer to Debtor Infinity Capital Management, Inc., including its employees, directors, officers, agents, servants, subsidiaries, parent company, affiliated company, and other persons acting or purporting to act on its behalf, including its Representatives.  <u>For the avoidance of doubt, any request for Communications between You and Infinity includes Communications between You and Oliver Hemmers or Anne Pantelas (or any combination thereof)</u>.

8.      "**Person**" refers to any natural individual, governmental entity, or business entity, including a corporation, partnership, association, limited liability company, or other entity or combination thereof, and all corporations, divisions, or entities affiliated with, owned, or controlled directly or indirectly or owning or controlling directly or indirectly any such entities as well as directors, officers, managers, employees, agents, attorneys, affiliates, or other representatives thereof, or third parties retained by any of the above.

9.      "**PFD**" refers to PFD Management, LLC, including its employees, directors,

officers, agents, servants, subsidiaries, parent company, affiliated companies, and other persons acting or purporting to act on its behalf, including its Representatives.

10.     "**Representative**" means any and all agents, employees, servants, officers, directors, attorneys, or other persons acting or purporting to act on behalf of the person in question.

11.     "**Tecumseh**" shall refer to Tecumseh-Infinity Medical Receivables Fund, LP, including its employees, directors, officers, members, agents, servants, subsidiaries, parent company, affiliated company, and other persons acting or purporting to act on its behalf, including its Representatives.  <u>For the avoidance of doubt, any request for Communications between You and Tecumseh includes Communications between You and Chadwick Meyer, Mike Belotz, or Simon Clark (or any combination thereof)</u>.

12.     "**Three Bell**" shall refer to Three Bell Capital, LLC, including its employees, directors, officers, members, agents, servants, subsidiaries, parent company, affiliated company, and other persons acting or purporting to act on its behalf, including its Representatives.

13.     "**You**" or "**FTM**" shall refer to FTM Investments, LLC and any affiliated entities known to be owned or controlled by Endre Debozy and William Dalzell, including all employees, directors, officers, agents, servants, subsidiaries, parent company, affiliated company, and other persons acting or purporting to act on behalf of such entities, including Representatives.

14.     The terms "**related to**", "**relate to**", or "**relating to**" shall mean directly or indirectly, refer to, reflect, describe, pertain to, arise out of or in connection with, or in any way legally, logically, or factually be connected with the matter discussed.

## INSTRUCTIONS

1.     When producing the Documents, please keep all Documents segregated by the file in which the Documents are contained and indicate the name of the file in which the Documents are contained, and the name of the Documents being produced.

2.     When producing the required Documents, please produce all other Documents that are clipped, stapled, or otherwise attached to any requested Document.

3.     In the event such file(s) or Document(s) has (have) been removed, either for the

3

purpose of this action or for some other purpose, please state the name and address of the person who removed the file, the title of the file and each subfile, if any, maintained within the file, and the present location of the file.

4.      Each draft, final Document, original, reproduction, and each signed and unsigned Document and every additional copy of such Document where such copy contains any commentary, note, notation or other change whatsoever that does not appear on the original or on the copy of the one Document produced shall be deemed and considered to constitute a separate Document.

5.      If any Document encompassed by the attached requests for production of Documents is deemed by you to be privileged, furnish all non-privileged Documents and provide a log outlining all Documents claimed as privileged which includes: (a) the type of privilege claimed for each Document; (b) a brief description of the Document; (c) the author of the Document sufficient to identify it; (d) the recipient (if any); (e) the date of the Document.

6.      When appropriate, the singular form of a word should be interpreted in the plural as may be necessary to bring within the scope hereof any Documents which might otherwise be construed to be outside the scope hereof.

7.      In addition to Documents currently in your possession, custody, or control, you are to produce all Documents within the scope of these requests that are not currently in your possession, custody, or control but can be obtained through reasonable effort.

8.      This request calls for the production of all electronic Documents and electronically stored information (ESI) responsive to the requests below, including but not limited to e-mails and any related attachments, electronic files, or other data compilations that relate to the categories of Documents requested below.  Your search for these electronically stored Documents shall include all of your computer hard drives, floppy discs, compact discs, backup and archival tapes, removable media such as zip drives, password protected and encrypted files, databases, electronic calendars, personal digital assistants, iPhones, smart phones, tablets, iPads, proprietary software, and inactive or unused computer disc storage areas.

9.      The words "and" and "or" as used herein shall be construed either disjunctively or conjunctively as required by the context to bring within the scope of these Requested Documents any answer that might be deemed outside their scope by another construction.

10.      Unless otherwise stated, the following Document requests relate to the time period of January 1, 2018 through the date of your response.

## DOCUMENT PRODUCTION REQUESTS

1.      All Documents relating to any Communication between You and Infinity relating to HASelect.

1.      All Documents relating to any Communication between You and Infinity relating to Tecumseh.

2.      All Documents relating to any Communication between You and relating to the Bankruptcy Case.

3.      All Documents relating to any Communication between You and Infinity relating to the sale, purchase, sourcing, servicing, collection, or valuation of accounts receivable.

4.      All Documents relating to any Communication between You and Infinity relating to Three Bell.

5.      All Documents relating to any Communication between You and Tecumseh relating to HASelect.

6.       All Documents relating to any Communication between You and Tecumseh relating to Infinity.

7.      All Documents relating to any Communication between You and Tecumseh relating to the Bankruptcy Case.

8.      All Documents relating to any Communication between You and Tecumseh relating to the sale, purchase, sourcing, servicing, collection, or valuation of accounts receivable.

9.      All Documents relating to any Communication between You and Three Bell relating to HASelect.

10.      All Documents relating to any Communication between You and Three Bell

relating to Infinity.

11.     All Documents relating to any Communication between You and Three Bell relating to Tecumseh.

12.     All Documents relating to any Communication between You and Three Bell relating to the Bankruptcy Case.

13.     All Documents relating to any Communication between You and Three Bell relating to the sale, purchase, sourcing, servicing, collection, or valuation of accounts receivable.

14.     All Documents relating to any Communication between You and any Person, including but not limited to 506 Investor Group and PFD, regarding HASelect's relationship to Infinity or You or Three Bell.

15.     All Documents relating to any Communication between You and any Person, including but not limited to 506 Investor Group and PFD, regarding Tecumseh's relationship to Infinity or You or Three Bell.

16.     All Documents relating to any agreement between You and Infinity relating to the sale, purchase, sourcing, servicing, collection, or valuation of accounts receivable.

17.     All Documents relating to any agreement between You and Tecumseh relating to the sale, purchase, sourcing, servicing, collection, or valuation of accounts receivable.

18.     All Documents relating to any agreement between You and Three Bell relating to the sale, purchase, sourcing, servicing, collection, or valuation of accounts receivable.

19.     All Documents relating to any agreement between You and Infinity relating to loans or repayment of the same, including, but not limited to, all Documents evidencing any transfers of loans or monies to Infinity or repayment by Infinity of the same.

20.     All Documents, including but not limited to Communications, relating to any agreement or contract between You and HASelect.

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (12/15)

# UNITED STATES BANKRUPTCY COURT

District of __Nevada__

In re __Infinity Capital Management, Inc.__
_____
Debtor

_(Complete if issued in an adversary proceeding)_

__HASelect-Medical Receivables Litigation Finance Fund International SP__
_____
Plaintiff

v.

__Tecumseh-Infinity Medical Receivables Fund, LP__
_____
Defendant

Case No. __21-14486-abl__

Chapter __7__

Adv. Proc. No. __21-01167-abl__

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: __William Dalzell - 26 Colleton River Dr., Henderson, NV 89052__

_(Name of person to whom the subpoena is directed)_

☑ _Production_: **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: __See Exhibit A attached hereto__

| PLACE | DATE AND TIME |
|---|---|
| Shea Larsen, 1731 Village Center Circle, Suite 150, Las Vegas, NV 89134 | 11/30/2022 by 5:00 p.m. |

**\*\*Production to blarsen@shea.law is also permitted and preferred\*\***

☐ _Inspection of Premises_: **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| PLACE | DATE AND TIME |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: __11/9/2022__

CLERK OF COURT

OR

_____
_Signature of Clerk or Deputy Clerk_

__/s/ Bart K. Larsen, Esq.__
_____
_Attorney's signature_

The name, address, email address, and telephone number of the attorney representing _(name of party)_ HASelect-Medical Receivables Litigation Finance Fund International SP , who issues or requests this subpoena, are:

__Bart K. Larsen, Esq. 1731 Village Center Circle, Suite 150, Las Vegas, Nevada 89134, blarsen@shea.law__

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (Page 2)

## PROOF OF SERVICE
### (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .

       I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
                                      *Server's signature*

_____
                                  *Printed name and title*

_____
                                    *Server's address*

Additional information concerning attempted service, etc.:

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (Page 3)

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

   (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

   (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

      (i) is a party or a party's officer; or

      (ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:

   (A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

   (B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

   *(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

   *(2) Command to Produce Materials or Permit Inspection.*

   *(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

   *(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

      (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

      (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

   *(3) Quashing or Modifying a Subpoena.*

   *(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

      (i) fails to allow a reasonable time to comply;

      (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

      (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

      (iv) subjects a person to undue burden.

   *(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      (i) disclosing a trade secret or other confidential research, development, or commercial information; or

      (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

   *(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

      (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

      (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

   *(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

   *(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

   *(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

   *(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

   *(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

   *(2) Claiming Privilege or Protection.*

   *(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

      (i) expressly make the claim; and

      (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

   *(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

# EXHIBIT A

## DEFINITIONS

1.        "**506 Investor Group**" refers to 506 Investor Group, LLC, including its employees, directors, officers, agents, servants, subsidiaries, parent company, affiliated companies, and other persons acting or purporting to act on its behalf, including its Representatives, as well as anyone known or believed to be a member of or affiliated with 506 Investor Group.

2.        "**Bankruptcy Case**" shall mean the following case: *In re Infinity Capital Management, Inc.*, United States Bankruptcy Court for the District of Nevada, Case No. 21-14486-abl, including all related adversary proceedings.

3.        "**Communication**" means any oral or written statement, dialogue, colloquy, discussion, or conversation, and includes any transfer of thoughts or ideas or data or information, between persons or locations by means of any Documents or by any other means, including but not limited to electronic or similar means.

4.        "**Control**" means in your possession, custody, or control or under your direction, and includes in the possession, custody, or control of those under the direction of you or your employees, subordinates, counsel, accountant, consultant, expert, parent or affiliated corporation, and any person purporting to act on your behalf.

5.        "**Document**" means any written or graphic matter and other means of preserving thought or expression and all tangible things from which information can be processed or transcribed, including the originals and all non-identical copies, whether different from the original by reason of any notation made on such copy or otherwise, including, but not limited to, correspondence, emails, memoranda, notes, messages, letters, telegrams, teletype, telefax, bulletins, meetings or other communications, inter-office and intra-office telephone calls, diaries, chronological data, minutes, books, reports, studies, summaries, pamphlets, bulletins, printed matter, charts, ledgers, invoices, worksheets, receipts, returns, computer printouts, prospectuses, financial statements, schedules, affidavits, contracts, canceled checks, statements, transcripts,

1

statistics, surveys, magazine or newspaper articles, releases (and any and all drafts, alterations or modifications, changes and amendments of any of the foregoing), graphic or aural records or representations of any kind (including without limitation, photographs, microfiche, microfilm, videotape, records and motion pictures) and electronic, mechanical or electric records or representations of any kind (including without limitation, tapes, cassettes, discs and records) as well as all Electronically Stored Information ("**ESI**"), which refers to any type of information that is created, used, or stored in digital form and accessible by digital means, including but not limited to, all data, digital documents, email, electronic documents, and metadata of the same (and is further defined below).  For the avoidance of doubt, Document includes but is not limited to all Communications.

6. "**FTM**" shall refer to FTM Investments, LLC and any affiliated entities known to be owned or controlled by Endre Debozy and William Dalzell, including all employees, directors, officers, agents, servants, subsidiaries, parent company, affiliated company, and other persons acting or purporting to act on behalf of such entities, including Representatives.

7. "**HASelect**" shall refer to HASelect-Medical Receivables Litigation Finance Fund International SP, including its employees, directors, officers, agents, servants, subsidiaries, parent company, affiliated company, and other persons acting or purporting to act on its behalf, including its Representatives.

8. "**Infinity**" or "**Debtor**" shall refer to Debtor Infinity Capital Management, Inc., including its employees, directors, officers, agents, servants, subsidiaries, parent company, affiliated company, and other persons acting or purporting to act on its behalf, including its Representatives.  <u>For the avoidance of doubt, any request for Communications between You and Infinity includes Communications between You and Oliver Hemmers or Anne Pantelas (or any combination thereof)</u>.

9. "**Person**" refers to any natural individual, governmental entity, or business entity, including a corporation, partnership, association, limited liability company, or other entity or combination thereof, and all corporations, divisions, or entities affiliated with, owned, or

controlled directly or indirectly or owning or controlling directly or indirectly any such entities as well as directors, officers, managers, employees, agents, attorneys, affiliates, or other representatives thereof, or third parties retained by any of the above.

10.     "**PFD**" refers to PFD Management, LLC, including its employees, directors, officers, agents, servants, subsidiaries, parent company, affiliated companies, and other persons acting or purporting to act on its behalf, including its Representatives.

11.     "**Representative**" means any and all agents, employees, servants, officers, directors, attorneys, or other persons acting or purporting to act on behalf of the person in question.

12.     "**Tecumseh**" shall refer to Tecumseh-Infinity Medical Receivables Fund, LP, including its employees, directors, officers, members, agents, servants, subsidiaries, parent company, affiliated company, and other persons acting or purporting to act on its behalf, including its Representatives.  <u>For the avoidance of doubt, any request for Communications between You and Tecumseh includes Communications between You and Chadwick Meyer, Mike Belotz, or Simon Clark (or any combination thereof)</u>.

13.     "**Three Bell**" shall refer to Three Bell Capital, LLC, including its employees, directors, officers, members, agents, servants, subsidiaries, parent company, affiliated company, and other persons acting or purporting to act on its behalf, including its Representatives.

14.     "**You**" or "**Dalzell**" shall refer to William Dalzell, including all agents, servants, and other persons acting or purporting to act on behalf of You.

15.     The terms "**related to**", "**relate to**", or "**relating to**" shall mean directly or indirectly, refer to, reflect, describe, pertain to, arise out of or in connection with, or in any way legally, logically, or factually be connected with the matter discussed.

<u>**INSTRUCTIONS**</u>

1.     When producing the Documents, please keep all Documents segregated by the file in which the Documents are contained and indicate the name of the file in which the Documents are contained, and the name of the Documents being produced.

2.     When producing the required Documents, please produce all other Documents that

are clipped, stapled, or otherwise attached to any requested Document.

3.      In the event such file(s) or Document(s) has (have) been removed, either for the purpose of this action or for some other purpose, please state the name and address of the person who removed the file, the title of the file and each subfile, if any, maintained within the file, and the present location of the file.

4.      Each draft, final Document, original, reproduction, and each signed and unsigned Document and every additional copy of such Document where such copy contains any commentary, note, notation or other change whatsoever that does not appear on the original or on the copy of the one Document produced shall be deemed and considered to constitute a separate Document.

5.      If any Document encompassed by the attached requests for production of Documents is deemed by you to be privileged, furnish all non-privileged Documents and provide a log outlining all Documents claimed as privileged which includes: (a) the type of privilege claimed for each Document; (b) a brief description of the Document; (c) the author of the Document sufficient to identify it; (d) the recipient (if any); (e) the date of the Document.

6.      When appropriate, the singular form of a word should be interpreted in the plural as may be necessary to bring within the scope hereof any Documents which might otherwise be construed to be outside the scope hereof.

7.      In addition to Documents currently in your possession, custody, or control, you are to produce all Documents within the scope of these requests that are not currently in your possession, custody, or control but can be obtained through reasonable effort.

8.      This request calls for the production of all electronic Documents and electronically stored information (ESI) responsive to the requests below, including but not limited to e-mails and any related attachments, electronic files, or other data compilations that relate to the categories of Documents requested below.  Your search for these electronically stored Documents shall include all of your computer hard drives, floppy discs, compact discs, backup and archival tapes, removable media such as zip drives, password protected and encrypted files, databases, electronic

calendars, personal digital assistants, iPhones, smart phones, tablets, iPads, proprietary software, and inactive or unused computer disc storage areas.

9.      The words "and" and "or" as used herein shall be construed either disjunctively or conjunctively as required by the context to bring within the scope of these Requested Documents any answer that might be deemed outside their scope by another construction.

10.     Unless otherwise stated, the following Document requests relate to the time period of January 1, 2018 through the date of your response.

## DOCUMENT PRODUCTION REQUESTS

1.      All Documents relating to any Communication between You and Infinity relating to HASelect.

1.      All Documents relating to any Communication between You and Infinity relating to Tecumseh.

2.      All Documents relating to any Communication between You and Infinity relating to FTM.

3.      All Documents relating to any Communication between You and relating to the Bankruptcy Case.

4.      All Documents relating to any Communication between You and Infinity relating to the sale, purchase, sourcing, servicing, collection, or valuation of accounts receivable.

5.      All Documents relating to any Communication between You and Infinity relating to Three Bell.

6.      All Documents relating to any Communication between You and Tecumseh relating to HASelect.

7.       All Documents relating to any Communication between You and Tecumseh relating to Infinity.

8.      All Documents relating to any Communication between You and Tecumseh relating to FTM.

9.      All Documents relating to any Communication between You and Tecumseh

relating to the Bankruptcy Case.

10.    All Documents relating to any Communication between You and Tecumseh relating to the sale, purchase, sourcing, servicing, collection, or valuation of accounts receivable.

11.    All Documents relating to any Communication between You and Three Bell relating to HASelect.

12.    All Documents relating to any Communication between You and Three Bell relating to FTM.

13.    All Documents relating to any Communication between You and Three Bell relating to Infinity.

14.     All Documents relating to any Communication between You and Three Bell relating to Tecumseh.

15.    All Documents relating to any Communication between You and Three Bell relating to the Bankruptcy Case.

16.    All Documents relating to any Communication between You and Three Bell relating to the sale, purchase, sourcing, servicing, collection, or valuation of accounts receivable.

17.    All Documents relating to any Communication between You and any Person, including but not limited to 506 Investor Group and PFD, regarding HASelect's relationship to Infinity or FTM or Three Bell.

18.    All Documents relating to any Communication between You and any Person, including but not limited to 506 Investor Group and PFD, regarding Tecumseh's relationship to Infinity or FTM or Three Bell.

19.    All Documents relating to any agreement between FTM and Infinity relating to the sale, purchase, sourcing, servicing, collection, or valuation of accounts receivable.

20.    All Documents relating to any agreement between FTM and Tecumseh relating to the sale, purchase, sourcing, servicing, collection, or valuation of accounts receivable.

21.    All Documents relating to any agreement between FTM and Three Bell relating to the sale, purchase, sourcing, servicing, collection, or valuation of accounts receivable.

22.     All Documents relating to any agreement between FTM and Infinity relating to loans or repayment of the same, including, but not limited to, all Documents evidencing any transfers of loans or monies to Infinity or repayment by Infinity of the same.

23.     All Documents, including but not limited to Communications, relating to any agreement or contract between FTM and HASelect.

**EXHIBIT 17**

Bart K. Larsen, Esq.
Nevada Bar No. 8538
Kyle M. Wyant, Esq.
Nevada Bar No. 14652
**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Telephone: (702) 471-7432
Fax: (702) 926-9683
Email:  blarsen@shea.law
           kwyant@shea.law

*Attorneys for HASelect-Medical Receivables
Litigation Finance Fund International SP*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>INFINITY CAPITAL MANAGEMENT, INC.<br><br>Debtor. | Case No. 21-14486-abl<br>Chapter 7 |
| HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP,<br><br>Plaintiff,<br><br>v.<br><br>ANNE PANTELAS; OLIVER HEMMERS; and INFINITY HEALTH SOLUTIONS, LLC,<br><br>Defendants. | Adversary Case No.: |

**ADVERSARY COMPLAINT**

Plaintiff HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP ("Plaintiff" or "HASelect"), by and through its attorneys of the law firm of Shea Larsen PC, hereby complains and alleges against Defendants ANNE PANTELAS ("Pantelas"), OLIVER HEMMERS ("Hemmers"), and INFINITY HEALTH SOLUTIONS LLC ("IHS" and collectively with Pantelas and Hemmers, "Defendants") as follows:

///

///

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

## **PARTIES**

1.     Plaintiff HASelect is, and was at all relevant times, a segregated portfolio company of HedgeACT International SPC Ltd., a Cayman Islands corporation, with its principal place of business in Illinois.

2.     On information and belief, Defendant Pantelas is, and was at all relevant times, a resident domiciled in the state of Nevada.

3.     On information and belief, Defendant Hemmers is, and was at all relevant times, a resident domiciled in the state of Nevada.

4.     On information and belief, Defendant IHS is, and was at all relevant times, a Nevada limited liability company.

## **JURISDICTION AND VENUE**

5.     This Adversary Complaint, and the claims herein, are brought pursuant to Bankruptcy Rule 7001 seeking an order, judgment, and decree from this Court to recovery money and property that is the collateral of HASelect.

6.     This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. §§ 105 and 506.  This is a core proceeding pursuant to 28 U.S.C. § 157. Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  If this adversary proceeding is determined to be noncore, or if this adversary proceeding is a core proceeding under 28 U.S.C. § 157(b) but may not, as a constitutional matter, be adjudicated as such, Plaintiff consents to the entry of final orders or judgments by the bankruptcy judge.

## **GENERAL ALLEGATIONS**

**A.     HASelect Loaned Money to Infinity and Obtained a Security Interest in Infinity's Personal Property.**

7.     Beginning in February 2019, HASelect made several advances under a loan to Infinity Capital Management, Inc. ("Infinity"), which were documented through various written loan agreements and promissory notes through which Infinity pledged all of its personal property to HASelect as collateral.

8.     HASelect perfected its security interest in all of Infinity's personal property through

the filing of a UCC-1 with the Nevada Secretary of State on February 19, 2019.

9. On or about December 18, 2019, HASelect, which was then doing business under the name HASelect-FTM Medical Receivables Litigation Finance Fund SP, and Infinity entered into a Second Amended & Restated Loan and Security Agreement and Promissory Note (together with all related loan documents, the "MLA").

10. The MLA superseded and restated all prior loans made by HASelect to Infinity as well as extended further credit to Infinity.

11. HASelect holds a perfected security interest in all of Infinity's personal property (as defined in § 4.1 of the MLA, the "Collateral"). Specifically, Section 4.1 of the MLA states:

> To secure the payment and performance when due of all of the Borrower's obligations hereunder and under the Note, Borrower hereby grants to Lender a security interest in the Receivables and the Alternative Receivables, and all of its other personal property, including without limitation, all of Borrower's interest in the following, whether now owned or hereafter acquired, and wherever located, but excluding the Permitted Liens: All Goods, Inventory, Equipment, Fixtures, Accounts, General Intangibles, Instruments, Chattel Paper, Documents, Commercial Tort Claims, Investment Property, Letter of Credit Rights, Deposit Accounts, and all money, and all other property now or at any time in the future in Lender's possession (including claims and credit balances), and all proceeds (including proceeds of any insurance policies, proceeds of proceeds and claims against third parties), all products and all books and records related to any of the foregoing (all of the foregoing, together with all other property in which Lender may now or in the future be granted a lien or security interest, is referred to herein, collectively, as the "Collateral").

12. In entering into the MLA and requesting funds thereunder, Infinity agreed to use the proceeds of the loans it obtained from HASelect to purchase accounts receivable from medical providers.

13. Such accounts receivable generally arose from medical treatment provided to individuals who were injured in accidents and had asserted personal injury claims. These accounts receivable are generally secured by liens against such personal injury claims and are typically paid at the time the personal injury claims are settled.

14. HASelect holds a perfected security interest in all accounts receivable purchased by Infinity as Collateral for the indebtedness owed by Infinity under the MLA.

15. Infinity materially breached its obligations under the MLA by, among other things, failing to repay all amounts due and owing thereunder.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**B.** **After the Filing of Infinity's Chapter 7 Bankruptcy Case, the Collateral Was Abandoned to HASelect.**

16.     On September 14, 2021 (the "Petition Date"), Infinity filed a voluntary Chapter 7 bankruptcy petition with this Court, commencing Bankruptcy Case No. 21-14486-abl (the "Bankruptcy Case").

17.     On October 15, 2021, the Bankruptcy Court entered an Order in the Bankruptcy Case [ECF No. 96] granting HASelect's Motion for Relief from the Automatic Stay [ECF No. 17] permitting HASelect to immediately take possession and control of the Collateral, wherever it may be located, and to otherwise enforce its security interest and rights in the Collateral consistent with its rights under the MLA and applicable law (the "Relief Order").

18.     The only items excluded by way of the Relief Order were (i) information believed to be in Infinity's possession as of the Petition Date relating to certain accounts receivables owned by HealthPlus Imaging of Texas, LLC ("HealthPlus Imaging") that had been offered for sale to Infinity and (ii) certain accounts receivable over which Tecumseh – Infinity Medical Receivable Fund, LP's ("Tecumseh") claimed ownership.

19.     The Relief Order specifically required Infinity and its officers, directors, and agents to assist HASelect in locating and taking possession of the Collateral and directed them to turn over the Collateral to HASelect.

20.     On October 15, 2021, the Bankruptcy Court also entered an Order in the Bankruptcy Case [ECF No. 97] granting HASelect and the Chapter 7 Trustee's Joint Motion to Approve Abandonment of the Collateral to HASelect [ECF No. 12], requiring Infinity and its officers, directors, and agents to promptly deliver or make available to HASelect any and all Collateral that remains in their possession or control, including all copies of physical documents and electronically stored information constituting Collateral, as well as future Collateral (the "Abandonment Order"). The Abandonment Order contains the same exclusions as the Relief Order.

21.     The Relief Order and the Abandonment Order require that anyone in possession of any of the Collateral turn over the same to HASelect, including any Collateral in the possession of Infinity's officers, directors, and agents.

22. The Relief Order and the Abandonment Order additionally provide HASelect the right to receive payment relating to the Collateral.

23. In entering the Relief Order and the Abandonment Order, the Bankruptcy Court retained jurisdiction to interpret and enforce the provisions of such Orders.

**C.   HASelect Is Entitled to Collect an Outstanding Shareholder Loan Owed by Pantelas.**

24. As defined in the MLA, Collateral includes all rights to payment held by Infinity, which includes all outstanding loans made by Infinity to third parties.

25. HASelect is informed and believes, and thereon alleges, that Infinity, prior to the Petition Date, regularly made loans to Pantelas in her individual capacity as a shareholder of Infinity the ("Shareholder Loans") before Infinity ceased business operations on or about the Petition Date.

26. HASelect is informed and believes, and thereon alleges, Pantelas was indebted to Infinity as of the Petition Date in the amount of as much as $380,000 relating to the Shareholder Loans.

27. By virtue of the Relief Order and Abandonment Order, HASelect is entitled to collect the outstanding balance of the Shareholder Loans from Pantelas.

28. Pantelas has failed or refuses to pay HASelect the indebtedness due and owing in connection with the Shareholder Loans.

**D.   Hemmers and Pantelas Misappropriated the Proceeds of HASelect's Loans to Infinity.**

29. In entering into the MLA and requesting funds thereunder, Hemmers and Pantelas represented that the proceeds advanced by HASelect under the MLA would be used for the purchase of accounts receivable by Infinity.

30. HASelect is informed and believes, and thereon alleges, Hemmers and Pantelas, intentionally misrepresented and overstated the purchase cost and value of accounts receivable purchased by Infinity in requesting advances under the MLA with the intent to induce HASelect to release additional loan proceeds to Infinity.

31. HASelect reasonably relied on such representations by Hemmers and Pantelas in

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

advancing funds to Infinity under the MLA.

32.     HASelect is informed and believes, and thereon alleges, Hemmers and Pantelas caused Infinity to use proceeds advanced by HASelect to pay bonuses and make loans to Hemmers and Pantelas instead of using such funds to pay for the purchase of accounts receivable as represented to HASelect.

33.     HASelect is informed and believes, and thereon alleges, Hemmers and Pantelas, contrary to their representations to HASelect, misappropriated more than $3 million in proceeds advanced to Infinity by HASelect and used such funds to pay debts owed by Infinity to Coastal Investments, PLC, which is a related entity organized by Hemmers and Pantelas in the Cook Islands ("Coastal").

34.     HASelect is informed and believes, and thereon alleges, Hemmers and Pantelas were the majority owners of Coastal at the time such payments were received by Coastal and, thus, personally benefited from such payments.

**E.     Hemmers and Pantelas Misappropriated HASelect's Collateral.**

35.     Pursuant to the MLA, Infinity was required to deposit all proceeds collected on accounts receivable to a dedicated deposit account at First Savings Bank (the "FSB Account") over which HASelect held control of disbursements and from which payments due under the MLA were remitted to HASelect.

36.     All such proceeds are included within the Collateral and are subject to HASelect's perfected security interest under the MLA.

37.     In or around July 2021, Hemmers and Pantelas intentionally caused Infinity to cease deposits of proceeds collected on accounts receivable to the FSB Account and to, instead, deposit such proceeds in one or more separate Infinity deposit accounts at Nevada State Bank (the "NSB Account").

38.     HASelect is informed and believes, and thereon alleges, Pantelas and Hemmers intentionally caused Infinity to divert $100,000 or more in proceeds collected from accounts receivable in which HASelect held a perfected security interest to the NSB Account in violation of

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

the MLA during July, August, and September 2021.

39.     HASelect is informed and believes, and thereon alleges, Pantelas and Hemmers intentionally caused Infinity to use such diverted proceeds to pay personal expenses of Pantelas and Hemmers and to pay other amounts to Pantelas and Hemmers instead of remitting payment to HASelect as required under the MLA.

**F.     Hemmers and Pantelas Transferred Infinity's Business Records and Personal Property to Their New Company, Defendant IHS.**

40.     As of the Petition Date, Hemmers and Pantelas were the sole officers, directors, and shareholders of Infinity.

41.     On or about September 2, 2020, Hemmers and Pantelas formed Defendant IHS as a Nevada limited liability company.

42.     HASelect is informed and believes, and thereon alleges, Hemmers and Pantelas are the sole managers of IHS and collectively own 100% of the membership interests in IHS.

43.     HASelect is informed and believes, and thereon alleges, IHS did not engage in any material business transaction with any third party prior to the Petition Date.

44.     HASelect is informed and believes, and thereon alleges, that shortly before the Petition Date, Hemmers and Pantelas copied and transferred to IHS substantially all of Infinity's electronic business records, including records relating to Infinity's accounts receivable, Infinity's contracts with third parties, Infinity's employees, Infinity's software and computer systems, Infinity's websites and data portals, and Infinity's business operations among other things.

45.     On September 2, 2021, Infinity employee Robert Land sent an email to Hemmers with the subject line "Cloud Migration Update" in which he advised Hemmers that he had copied Infinity's electronic records to a new server, was able to run Infinity's proprietary case manager software on the new server, and had attempted to install Infinity's websites on the new server but was unable to do so.

46.     On September 10, 2021, Infinity employee Robert Land sent an email to Hemmers with the subject line "RX Portal on Solutions is working" in which he advised Hemmers that Infinity's websites and customer portals were functional through IHS's new website

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

www.infinityhealth.solutions and that he had not yet made "the changes we discussed yesterday [to] the company and domain name."

47.     One day before the Petition Date, Infinity employee Robert Land sent an email to Hemmers with the subject line "Name Replacements" in which advised that he was updating Infinity's electronic records to add IHS's name in place of Infinity.  Specifically, Land advised "'Infinity Health' will be changed to 'Infinity Health Solutions'" and "'Infinity Capital' will be changed to 'Infinity Health Solutions'".  Hemmers responded to this email within a few minutes instructing Land to also change "the old name Infinity Health Connections" to "Infinity Health Solutions".

48.     On the Petition Date, Infinity employee Robert Land sent an email to Hemmers with the subject line "Move Status" in which he discussed the status of his efforts to copy and transfer Infinity's electronic records to IHS.  Among other things, Land represented that Infinity's "[d]atabase has been copied and set up", the "Infinity Health folder has been copied from [Infinity's server]", and "PI and RX Portals with FileManager are working (infinityhealth.com changed to infinityhealth.solutions where appropriate)".

49.     All Infinity records copied and transferred to IHS are included within and remain part of the Collateral and are subject to HASelect's perfected security interest under the MLA.

50.     HASelect is informed and believes, and thereon alleges, that on or about the Petition Date, Hemmers and Pantelas caused certain equipment owned by Infinity and included within the Collateral, including laptop computers, iPads, hard drives, and telephone equipment, to be moved from Infinity's business office to their personal residence for use by IHS.

51.     HASelect is informed and believes, and thereon alleges, that on or about the Petition Date, Hemmers and Pantelas caused other personal property owned by Infinity and included within the Collateral, including software, websites, data portals, and other general intangibles, to be transferred to IHS for use in its business operations.

**G.      Hemmers and Pantelas Are Attempting to Continue Infinity's Business Operations through IHS.**

52.     HASelect is informed and believes, and thereon alleges, that on or about the Petition

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

Date, Hemmers and Pantelas caused IHS to hire substantially all of the employees of Infinity in substantially the same roles and positions in which they served while employed by Infinity.

53.     Approximately a week after the Petition Date, Hemmers emailed an "updated company roster" to several former employees of Infinity in which those employees were identified as employees of IHS.  This "updated company roster" also included contact information for Infinity's prior lawyer and accountant as well as contact information for individuals associated with several companies that had previously done business with Infinity, including Tecumseh.

54.     HASelect is informed and believes, and thereon alleges, that on or about the Petition Date, Hemmers and Pantelas caused all new incoming emails sent to emails address used in connection with Infinity's business operations, including various email addresses ending in @infinitycapital.com and @infinityhealth.com, to be automatically forwarded to similar email addresses ending in @infinityhealth.solutions to be used in connection with IHS's business operations.

55.     On October 6, 2021, Hemmers sent an email to Infinity employee Robert Land with the subject line "Corrections to Statement" in which Hemmers asked Land to update the form billing statement used by Infinity to replace Infinity's name and contact information with IHS's name and contact information.  Hemmers attached to this email an Infinity billing statement on which he had crossed out Infinity's name and contact information and handwritten IHS's name and contact information.

56.     On October 8, 2021, Infinity employee Robert Land sent an email to Hemmers with the subject line "Modified Template Files" in which he advised that he had modified more than 20 document templates previously used by Infinity to include the new logo, address, and phone numbers for IHS.

57.     HASelect is informed and believes, and thereon alleges, that on or about the Petition Date, Hemmers and Pantelas caused numerous vendor accounts used by Infinity to be transferred to IHS, including vendor accounts established with AdvanStaffHR, Adobe, GoDaddy, Equiinet, Slack, Tailormade Servers, and others.

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

58. HASelect is informed and believes, and thereon alleges, that on or about the Petition Date, Hemmers and Pantelas and other IHS employees began contacting third parties that had previously done business with Infinity to request that those third parties enter into new contracts with IHS.

59. HASelect is informed and believes, and thereon alleges, that shortly after the Petition Date, Hemmers and Pantelas caused IHS to begin entering into new written contracts with third parties that had previously entered into written contracts with Infinity, including new contracts with Peachtree Orthopedic, Perimeter Orthopedics, ColdCo Therapies, ExpressCHEX, Georgia Spine and Orthopedics, Paid Care Center of Georgia, and others. The contracts entered into by IHS with such third parties are substantially similar to the contracts previously entered into between such third parties and Infinity.

60. HASelect is informed and believes, and thereon alleges, that from and after the Petition Date, Hemmers and Pantelas (and other IHS employees) have continued to communicate with and accept payment from various third parties responsible for payment of accounts receivable included in HASelect's Collateral that are subject to the Relief Order and Abandonment Order in interference of HASelect's rights and its efforts to service and collect such accounts receivable.

61. From approximately June 2020 through the Petition Date, Infinity sold a substantial number of accounts receivable to Tecumseh for which Infinity provided collection services following the sale.

62. HASelect is informed and believes, and thereon alleges, that following the Petition Date, Hemmers and Pantelas used IHS to continue providing substantially the same collection services as previously provided by Infinity to Tecumseh.

63. As part of such collection services, Hemmers, Pantelas, and IHS employees exchanged dozens of emails with Tecumseh regarding the status of accounts receivable as well as numerous emails with third parties regarding the acceptance of discounted payments in satisfaction of accounts receivable Infinity sold to Tecumseh.

64. HASelect is informed and believes, and thereon alleges, that following the Petition

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

Date, Hemmers and Pantelas used IHS to continue selling accounts receivable to Tecumseh as evidenced by a payment from Tecumseh to IHS on October 12, 2021 in the amount of $56,590.89.

65.     That same day, Tecumseh principal, Mike Belotz, emailed Hemmers and Pantelas at their new @infinityhealth.solutions email addresses advising that Tecumseh was "going to have to suspend all purchases of receivables from you until the matter of the bankruptcy is resolved."

66.     Prior to the Petition Date, Infinity operated a pharmacy card program through its website[1] pursuant to a contract it had entered into with ExpressCHEX, LLC through which Infinity originated and purchased accounts receivable relating to purchases of prescription medication.

67.     Shortly after the Petition Date, Hemmers and Pantelas caused IHS to enter into a substantially similar contract with ExpressCHEX, LLC and to begin operating the same pharmacy card program developed by Infinity through IHS's website.[2]

68.     HASelect is informed and believes, and thereon alleges, that following the Petition Date, Hemmers and Pantelas added IHS's name, logo, and contact information to marketing materials developed by Infinity and used such materials, as modified, to solicit business for IHS.

69.     HASelect is informed and believes, and thereon alleges, Hemmers and Pantelas, in causing Infinity to file its chapter 7 case, intended to avoid repayment of debts owed to HASelect under the MLA while simultaneously converting valuable assets of Infinity (and HASelect's Collateral) and using such assets to effectively transfer Infinity's business operations to IHS.

70.     HASelect is informed and believes, and thereon alleges, Hemmers and Pantelas formed IHS for the specific purpose of continuing the business operations of Infinity under a different name in order to hinder, delay, or defraud creditors of Infinity.

71.     HASelect is informed and believes, and thereon alleges, IHS is a mere continuation or successor of Infinity, and utilizes the same employees, equipment, electronic records, documents, customer lists, marketing materials, and business model.

---

[1] Available at https://web.archive.org/web/20210225070654/https://infinityhealth.com/pharmacy-card/ (last visited February 24, 2022).

[2] Available at https://infinityhealthrx.com (last visited February 24, 2022).

**H.    Hemmers and Pantelas Have Attempted to Conceal IHS's Continuation of Infinity's Business Operations.**

72.    HASelect is informed and believes, and thereon alleges, Hemmers and Pantelas, in attempting to conceal their wrongful conduct in transferring Infinity's electronic records and business operations to IHS, deleted emails and other electronic documents from computers surrendered to HASelect pursuant to the Relief Order and the Abandonment Order.

73.    For example, the "Deleted Items" folders in the Infinity email accounts of Hemmers and Pantelas (and most other Infinity employees) were empty when Infinity's computers were abandoned to HASelect, indicating that emails were permanently deleted from those email accounts on or around the Petition Date.

74.    Additionally, the above-referenced emails exchanged between Hemmers and Robert Land on and around the Petition Date as well as many other similar emails, were deleted from Hemmers' Infinity email account prior to the abandonment of Infinity's computers to HASelect.

75.    HASelect is informed and believes, and thereon alleges, that, in a further attempt to conceal their wrongful conduct through IHS, Hemmers and Pantelas made several false statements while testifying under oath at Infinity's § 341 meeting of creditors on October 27, 2021.

76.    For example, when asked if IHS had entered into any contract with any party, Hemmers and Pantelas both answered "no". In fact, as of October 27, 2021, IHS had already entered into several contracts (all signed by Pantelas as manager of IHS) with parties that had previously done business with Infinity, including a contract with Peachtree Orthopedic Clinic, P.A. dated October 1, 2021, a contract with ExpressCHEX, LLC dated October 6, 2021, a contract with Georgia Spine and Orthopedics dated October 11, 2021, and several others.

77.    Similarly, when asked if they had any connection to a company named Buena Vista (a fictitious firm named used by ExpressCHEX, LLC in its dealings with Infinity), both Hemmers and Pantelas answered "no" with the exception of Infinity's pre-petition relationship with Buena Vista. Hemmers and Pantelas failed to disclose that IHS had entered into a new contract with ExpressCHEX, LLC (again doing business as Buena Vista Medical Services) on October 6, 2021 and had purchased accounts receivable from ExpressCHEX, LLC after the Petition Date.

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

78. When asked if they were involved in or had any connection to any "medical lien business" other than Infinity, both Hemmers and Pantelas answered "no". In fact, as of October 27, 2021, IHS had entered into several contracts with medical providers relating to the purchase of accounts receivable secured by liens against personal injury claims, had sold a substantial number of such accounts receivable to Tecumseh, and had provided collection services to Tecumseh with respect to accounts receivable sold to Tecumseh by Infinity.

79. When asked if IHS used any of the same software systems that were used by Infinity, Hemmers answered "no". In fact, as of October 27, 2021, IHS was using the same proprietary case manager software, websites, and customer portals that had been developed and used by Infinity.

80. When asked if IHS was in possession of any electronic records relating to Infinity, Hemmers and Pantelas testified that the only such records in IHS's possession were "backups" stored on a single hard drive that was removed from Infinity's office around the Petition Date and had not been connected to any computer system used by IHS. In fact, as of October 27, 2021, substantially all of the electronic records stored on Infinity's data servers had been copied to new servers set up by Hemmers and Pantelas for use by IHS.

81. When asked if they were involved in the management of any portfolio of accounts receivable, both Hemmers and Pantelas testified they were not. In fact, as of October 27, 2021, IHS was providing collection services, including negotiating discounted payment amounts, relating to accounts receivable Infinity had sold to Tecumseh.

82. When asked if IHS's employees were communicating with parties that had previously done business with Infinity, both Hemmers and Pantelas answered "no". In fact, as of October 27, 2021, IHS's employees, including Hemmers and Pantelas, were actively communicating with several parties that had previously done business with Infinity.

## FIRST CAUSE OF ACTION

### (Declaratory Relief)

83. HASelect incorporates the allegations set forth in the other sections of this Adversary Complaint as if set forth at length herein.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

84. A dispute exists between HASelect and Defendants that is ripe for adjudication as to the priority of their respective claimed interests in the Disputed Accounts.

85. HASelect is entitled to a declaration that (i) Defendants have no right to possession of the Collateral or copies or reproductions thereof, (ii) Defendants must immediately cease and refrain from any and all use of HASelect's Collateral, and (iii) Defendants must immediately surrender all Collateral in their possession to HASelect in accordance with the Relief Order and the Abandonment Order.

86. It was necessary for HASelect to engage the services of an attorney to bring this claim. As such, HASelect is entitled to recover its reasonable costs and attorney fees.

## SECOND CAUSE OF ACTION

### (Conversion)

87. HASelect incorporates the allegations set forth in the other sections of this Adversary Complaint as if set forth at length herein.

88. HASelect is informed and believes Defendants are in possession of and exercising control over HASelect's Collateral, including, but not limited to equipment, business records, software, and other general intangibles owned by Infinity that Defendants are using to continue Infinity's business operations through IHS.

89. HASelect holds a perfected security interest in such Collateral and is entitled to immediate possession of the same pursuant to the Relief Order and the Abandonment Order.

90. HASelect has not authorized or granted Defendants permission to use HASelect's Collateral. As such, Defendants' use of the Collateral is wrongful.

91. Defendants' wrongful use of HASelect's Collateral in exclusion or defiance of HASelect's rights and interests in the Collateral.

92. HASelect is informed and believes that the value of the Collateral misappropriated by Defendants exceeds $75,000. As such, Defendants' actions have caused HASelect to suffer damages in excess of $75,000.

93. It was necessary for HASelect to engage the services of an attorney to bring this

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

claim.  As such, HASelect is entitled to recover its reasonable costs and attorney fees.

### THIRD CAUSE OF ACTION

### (Unjust Enrichment)

94.    HASelect incorporates the allegations set forth in the other sections of this Adversary Complaint as if set forth at length herein.

95.    HASelect holds a perfected security interest in the Collateral and is entitled to immediate possession of the same pursuant to the Relief Order and the Abandonment Order.

96.    Notwithstanding the Abandonment Order and demands by HASelect for the surrender of all Collateral, Defendants continue to retain and use HASelect's Collateral for their own benefit as described herein.

97.    It is against equity and good conscience to permit Defendants to retain or use for their benefit HASelect's Collateral.

98.    Defendants' actions have caused HASelect to suffer damages in excess of $75,000.

99.    It was necessary for HASelect to engage the services of an attorney to bring this claim.  As such, HASelect is entitled to recover its reasonable costs and attorney fees.

### FOURTH CAUSE OF ACTION

### (Claim and Delivery)

100.    HASelect incorporates the allegations set forth in the other sections of this Adversary Complaint as if set forth at length herein.

101.    The Relief Order and the Abandonment Order, as well as the MLA, require that all Collateral be turned over to HASelect.

102.    HASelect holds a perfected security interest in the Collateral and is entitled to immediate possession of the same pursuant to the Abandonment Order.

103.    Despite HASelect's demands, Defendants refuse to surrender possession of all of the Collateral to HASelect.

104.    Defendants have offered no justification or explanation for their refusal to surrender the Collateral to HASelect.  Rather, Defendants have attempted to conceal their ongoing possession

and use of the Collateral.

105.    The Collateral has not been taken for a tax, assessment, or fine pursuant to any statute, or seized under an execution or an attachment against the property of HASelect.

106.    HASelect is entitled to preliminary and permanent writs of possession compelling Defendants to immediately cease use and surrender possession of the Collateral.

107.    Defendants' actions have caused HASelect to suffer damages in excess of $75,000.

108.    It was necessary for HASelect to engage the services of an attorney to bring this claim.  As such, HASelect is entitled to recover its reasonable costs and attorney fees.

## FIFTH CLAIM FOR RELIEF

### (Breach of Contract)

109.    HASelect incorporates the allegations set forth in the other sections of this Adversary Complaint as if set forth at length herein.

110.    A valid and enforceable contract existed between Pantelas and Infinity with respect to the Shareholder Loan.

111.    By way of the MLA and the orders entered in the Bankruptcy Case, HASelect has succeeded in Infinity's rights to repayment of amounts owed by Pantelas in connection with the Shareholder Loan.

112.    HASelect is informed and believes that Infinity fully performed its obligations to Pantelas or was excused from performance as a result of Pantelas' material breach.

113.    Pantelas breached the agreement by failing to repay the amounts due and owing in connection with the Shareholder Loan.

114.    Pantelas' actions have caused HASelect to suffer damages in excess of $75,000.

115.    It was necessary for HASelect to engage the services of an attorney to bring this claim.  As such, HASelect is entitled to recover its reasonable costs and attorney fees.

## SIXTH CLAIM FOR RELIEF

### (Fraudulent Misrepresentation)

116.    HASelect incorporates the allegations set forth in the other sections of this Adversary

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

Complaint as if set forth at length herein.

117. Defendants Hemmers and Pantelas made intentional false representations in their capacities as individuals and as agents of Infinity concerning Infinity's use of loan proceeds received from HASelect as well as the cost and value of accounts receivable pledged as collateral under the MLA.

118. Specifically, in requesting advances under the MLA, Hemmers and Pantelas (i) intentionally and repeatedly inflated the cost of accounts receivable purchased by Infinity by 20% or more, (ii) intentionally misrepresented that the value of such accounts receivable was equal to the gross billed amounts of such accounts receivable even though Hemmers and Pantelas knew their true value to be far less than the gross billed amounts, and (iii) intentionally misrepresented the purposes for which Infinity intended to use funds advanced by HASelect under the MLA.

119. For example, in or around December 2019, Hemmers and Pantelas requested that HASelect advance funds in the amount of $3,400,000 to Infinity and misrepresented that such funds would be used by Infinity solely to purchase accounts receivable pursuant to a contract entered into between Infinity and HealthPlus Imaging. In making this request, Hemmers and Pantelas represented to HASelect that the value of the accounts receivable to be purchased by Infinity was at least $6,800,000. At the time the request was made, Hemmers and Pantelas knew the actual purchase price due and payable under Infinity's contract with HealthPlus Imaging was only $2,500,000 and that the actual value of such accounts receivable was far less than $6,800,000. Hemmers and Pantelas intentionally misrepresented the cost and value of such accounts receivable to HASelect with the fraudulent intent to induce HASelect to advance additional funds to Infinity above and beyond the amount HASelect would have advanced based on the true cost and true value of such accounts receivable.

120. Moreover, upon receipt of the loan funds requested from HASelect for the purchase of accounts receivable from HealthPlus Imaging, Hemmers and Pantelas caused Infinity to pay only $1,750,000 of the $2,500,000 purchase price to HealthPlus Imaging. Hemmers and Pantelas then used the remaining proceeds advanced by HASelect to pay bonuses to themselves, to fund loans

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

made by Infinity to Pantelas, and to pay unsecured debts owed by Infinity to third parties, including Coastal.

121.    HASelect justifiably relied on Hemmers and Pantelas' misrepresentations and was unaware of Hemmers and Pantelas' misrepresentations concerning the cost and value of accounts receivable purchased by Infinity or their intent to use loan funds for purposes other than purchasing accounts receivable.

122.    Hemmers and Pantelas' actions have caused HASelect to suffer damages in excess of $75,000.

123.    Based on the fraudulent actions of Defendant Pantelas and Defendant Hemmers fraudulent actions, punitive damages are also appropriate.

124.    It was necessary for HASelect to engage the services of an attorney to bring this claim.  As such, HASelect is entitled to recover its reasonable costs and attorney fees.

## SEVENTH CLAIM FOR RELIEF

### (Permanent Injunction)

125.    HASelect incorporates the allegations set forth in the other sections of this Adversary Complaint as if set forth at length herein.

126.    Based on the foregoing, HASelect is reasonably likely to succeed on the merits of its claims that Defendants have wrongfully taken and misappropriated HASelect's Collateral.

127.    In the event Defendants are not prohibited from further using or transferring the Collateral, HASelect will face irreparable harm including, but not limited to, HASelect's continued dispossession of the Collateral and Defendants continued use of the Collateral to continue Infinity's business operations through IHS.

128.    Defendants have no right to possession or use of the Collateral.

129.    HASelect's relative hardship in not having the Collateral returned substantially outweighs Defendants' hardship in being required to turnover the Collateral, which this Court has already ordered be returned to HASelect.

130.    The public's interest also weighs in favor of granting an injunction because the public

has an interest in ensuring that court orders are respected.

131.    It was necessary for HASelect to engage the services of an attorney to bring this claim.  As such, HASelect is entitled to recover its reasonable costs and attorney fees.

### REQUEST FOR RELIEF

WHEREFORE, HASelect respectfully requests that the Court grant the following relief:

1.    Entry of a declaratory judgment determining that (i) Defendants have no right to possession of the Collateral or copies or reproductions thereof, (ii) Defendants must immediately cease and refrain from any and all use of HASelect's Collateral, and (iii) Defendants must immediately surrender all Collateral in their possession to HASelect in accordance with the Relief Order and the Abandonment Order

2.    Entry of a preliminary and permanent injunction prohibiting Defendants from using or otherwise disposing of HASelect's Collateral;

3.    Entry of judgment awarding HASelect its damages suffered as a result of the foregoing allegations, as well as punitive damages;

4.    Entry of judgment awarding HASelect its reasonable attorney fees and costs incurred in bringing this action; and

5.    Entry of orders providing such other and further relief as the Court deems just and proper.

DATED this ___ day of June 2022.

**SHEA LARSEN**

/s/ *Bart K. Larsen, Esq.*
Bart K. Larsen, Esq.
Nevada Bar No. 8538
Kyle M. Wyant, Esq.
Nevada Bar No. 14652
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134

*Attorneys for HASelect-Medical Receivables*
*Litigation Finance Fund International SP*

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**EXHIBIT 18**

| | |
|---|---|
| **From:** | Bart Larsen |
| **To:** | Boennighausen, Mark V. |
| **Cc:** | Zonne, Melissa; Lawal, Monica; Smith, Marla L.; Ortiz, Dinah X. |
| **Subject:** | RE: In re: Infinity Capital Management, Inc. - Subpoenas to Three Bell |
| **Date:** | Wednesday, December 21, 2022 3:46:00 PM |

To be clear, we are willing to reduce the scope of the document requests to exclude communications with Tecumseh as discussed below, which should address your client's objection that we haven't taken adequate steps to obtain communications in Tecumseh's possession, and to reimburse your client's reasonable costs in searching for responsive documents.  I don't understand what undue burden remains that would support a motion to quash.  If I'm missing something, please let me know.

I appreciate your efforts yesterday to find a solution.  As always, I'm happy to make time for a call to try to work this out.

Thanks.

Bart K. Larsen, Esq.
SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Office: (702) 471-7432
Direct: (702) 255-0098
Mobile: (702) 321-6528
Email: blarsen@shea.law

This message was sent from Shea Larsen PC and is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

**From:** Boennighausen, Mark V. <MBoennighausen@thoits.com>
**Sent:** Wednesday, December 21, 2022 11:00 AM
**To:** Bart Larsen <blarsen@shea.law>
**Cc:** Zonne, Melissa <MZonne@thoits.com>; Lawal, Monica <MLawal@thoits.com>; Smith, Marla L. <MSmith@thoits.com>; Ortiz, Dinah X. <DOrtiz@thoits.com>
**Subject:** RE: In re: Infinity Capital Management, Inc. - Subpoenas to Three Bell

Bart,

After consulting with our client, we will be filing our motion.  We believe that the law fully supports that as a non-party Three Bell should not be burdened with any of this since especially in light of the fact that your client has not sought the information you claim your client needs from the actual party, Tecumseh,  regarding the equitable counterclaim at issue.

Mark

---

**From:** Bart Larsen [mailto:blarsen@shea.law]
**Sent:** Wednesday, December 21, 2022 10:50 AM
**To:** Boennighausen, Mark V. <MBoennighausen@thoits.com>
**Cc:** Zonne, Melissa <MZonne@thoits.com>; Lawal, Monica <MLawal@thoits.com>; Smith, Marla L. <MSmith@thoits.com>; Ortiz, Dinah X. <DOrtiz@thoits.com>
**Subject:** RE: In re: Infinity Capital Management, Inc. - Subpoenas to Three Bell

I believe HASelect would be willing to reimburse reasonable costs for searching for responsive documents.  I'll confirm and get back to you.

Thanks.

Bart K. Larsen, Esq.
SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Office: (702) 471-7432
Direct: (702) 255-0098
Mobile: (702) 321-6528
Email: blarsen@shea.law

This message was sent from Shea Larsen PC and is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

---

**From:** Boennighausen, Mark V. <MBoennighausen@thoits.com>
**Sent:** Tuesday, December 20, 2022 6:22 PM
**To:** Bart Larsen <blarsen@shea.law>
**Cc:** Zonne, Melissa <MZonne@thoits.com>; Lawal, Monica <MLawal@thoits.com>; Smith, Marla L. <MSmith@thoits.com>; Ortiz, Dinah X. <DOrtiz@thoits.com>
**Subject:** Re: In re: Infinity Capital Management, Inc. - Subpoenas to Three Bell

Bart,

Thank you for confirming your clients is withdrawing the deposition subpoena.

Based on these two categories even limited by the new time frame and providing additional information regarding subject matter I still do not see any relevance about how any communications from Three Bell an investment advisory firm is relevant to a purported

equitable counterclaim brought by Tecumseh.   It seems that your discovery needs to be focused on Tecumseh and its conduct rather than bothering a non-party such as Three Bell.  For example I am informed that your client has yet to take the deposition of any Tecumseh witness which would seem to be a prerequisite to bothering a non-party about these documents and never moved to compel communications concerning Three Bell it sought in written discovery.

In any event, please advise  whether your client will pay for the cost of searching for any such e-mails over the requested  a two year period.  I do not have an estimate of the cost of such a search but would expect it not to exceed $10,000.

In the meantime I will forward your e-mail to Three Bell and revert.

Best regards,

Mark

---

**From:** Bart Larsen <blarsen@shea.law>
**Sent:** Tuesday, December 20, 2022 5:31 PM
**To:** Boennighausen, Mark V.
**Cc:** Zonne, Melissa; Lawal, Monica; Smith, Marla L.; Ortiz, Dinah X.
**Subject:** RE: In re: Infinity Capital Management, Inc. - Subpoenas to Three Bell

My willingness to withdraw the deposition subpoena and reduce the scope of the document subpoena is not an acknowledgement that the subpoenas are unnecessary or in any way improper and should not be construed as such.  Rather, as I have said several times, I am attempting to address your client's objections to the subpoenas and to avoid any undue expense or burden to your client in responding – just as I would for any other non-party to whom we might issue a subpoena.  Further, the document requests in the subpoena are, in fact, limited to a specific period of time.  Instruction No. 10 on page 5 of Exhibit A to the document subpoena states that the requests relate to the period of time of January 1, 2019 through the date of the response.

With respect to the requests for communications between Three Bell Capital and FTM and/or Infinity, I will further limit the relevant time period to January 1, 2020 through December 31, 2021.  As to the scope of those communications, we seek the production of emails exchanged during that time frame between Three Bell Capital (Jon Porter, Will Martin, and/or Eric

Patterson) and FTM (Endre Debozy [endre@ftm-investments.com] and/or Bill Dalzell [bill@ftm-investments.com]) and/or Infinity (Oliver Hemmers [oliver@infinitycapital.com, oliver@infinityhealth.com, oliver@infinityhealth.solutions, oliver.hemmers@gmail.com, ohemmers@hotmail.com, and ohemmers@icloud.com] and/or Anne Pantelas [anne@infinitycapital.com, anne@infinityhealth.com, and anne@infinityhealth.solutions]) regarding the following subject matter:

1. Any purchase, collection, sale, assignment, transfer or other disposition of accounts receivable owned or serviced by Infinity;
2. The status, value, handling, or disposition of accounts receivable owned or serviced by Infinity or any other personal property pledged by Infinity as collateral for any indebtedness owed to HASelect;
3. Any actual or contemplated transfer by Infinity to Tecumseh of accounts receivable owned or serviced by Infinity or any other personal property pledged by Infinity as collateral for any indebtedness owed to HASelect;
4. Any transactions taking place between Infinity and Tecumseh or the nature of Infinity's business relationship with Tecumseh;
5. Any transactions taking place between FTM and Tecumseh or the nature of FTM's business relationship with Tecumseh;
6. Infinity's bankruptcy filing; or
7. Any request by FTM, Infinity, or Tecumseh that Three Bell Capital seek a redemption of its investment in HASelect or take other action against HASelect.

I believe I have explained the relevancy of such communications to the pending litigation in my earlier emails.  Regardless, if you have any question as to the relevancy or scope of any of the forgoing categories of communications or other concerns, please let me know.  As stated in my email this morning, to the extent that any such communications were copied to Tecumseh, those communication can be excluded from any production by Three Bell Capital. Please consider the deposition subpoena withdrawn.

Thanks.

Bart K. Larsen, Esq.
SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Office: (702) 471-7432
Direct: (702) 255-0098
Mobile: (702) 321-6528
Email: blarsen@shea.law

This message was sent from Shea Larsen PC and is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

**From:** Boennighausen, Mark V. <MBoennighausen@thoits.com>
**Sent:** Tuesday, December 20, 2022 11:47 AM
**To:** Bart Larsen <blarsen@shea.law>
**Cc:** Zonne, Melissa <MZonne@thoits.com>; Lawal, Monica <MLawal@thoits.com>; Smith, Marla L. <MSmith@thoits.com>; Ortiz, Dinah X. <DOrtiz@thoits.com>
**Subject:** RE: In re: Infinity Capital Management, Inc. - Subpoenas to Three Bell

Bart,

Unfortunately, your e-mail simply confirms the harassing nature of the subpoenas.  Why serve a deposition subpoenas and incredibly broad document subpoenas against a non-party if it is not necessary?  I also note both subpoenas use of the term "relating" is overbroad on its face and there is no  limitation on time or scope and thus the  subpoenas fail to describe with any reasonable particularity the documents sought.  See e.g. Terry v. Wasatch Advantage Group,2020 WL 12991347 (ED CA) (in discovery directed against a party use of the term "relating" and "concerning" without limitation of time overbroad on its face).

So I understand you and your client's position, please describe with reasonable particularity the documents your client seeks regarding Infinity and FTM both with regard to subject matter time period and both sender and  recipient.  Part of the burden on Three Bell is incurring the expense of looking for documents and understanding what could potentially be responsive.  For example, are you just looking for communications to Infinity and FTM regarding a subject matter from Three Bell and if so who at Three Bell. In any event, I still fail to see how any communications from an Investment Advisor could have any relevance to a dispute about the priority of a security interest in a bankruptcy proceeding.  Your vague references to equitable claims makes no sense given that Three Bell is making no such claim and has no interest in the bankruptcy proceeding.

Finally, in the event we cannot reach agreement and  so we may frame our motion to quash/protective order properly please confirm your client is withdrawing the deposition subpoena and other document requests directed to Three Bell.

Thanks.

Mark

**From:** Bart Larsen [mailto:blarsen@shea.law]
**Sent:** Tuesday, December 20, 2022 11:17 AM
**To:** Boennighausen, Mark V. <MBoennighausen@thoits.com>
**Cc:** Zonne, Melissa <MZonne@thoits.com>; Lawal, Monica <MLawal@thoits.com>; Smith, Marla L. <MSmith@thoits.com>
**Subject:** RE: In re: Infinity Capital Management, Inc. - Subpoenas to Three Bell

Again, it is not our intent to harass your client or to cause it to incur unnecessary legal fees. I have explained the relevancy of the document requests in the email below, and I am attempting to address your client's concerns with respect to the scope of the requests.

I am willing to withdraw the deposition subpoena as it makes little sense to go forward without the relevant documents. With respect to the document subpoena, I am willing to withdraw the requests for your client's communications with Tecumseh as that seems to be your client's primary point of objection. That leaves only the requests for your client's communications with FTM and Infinity. Would your client be willing to produce responsive communications with FTM and Infinity on which Tecumseh was not copied or, alternatively, confirm that it is not in possession of any such communications?

As always, I'm happy to make time for a call to discuss the matter further.

Thanks.

Bart K. Larsen, Esq.
SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Office: (702) 471-7432
Direct: (702) 255-0098
Mobile: (702) 321-6528
Email: blarsen@shea.law

This message was sent from Shea Larsen PC and is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

**From:** Boennighausen, Mark V. <MBoennighausen@thoits.com>
**Sent:** Monday, December 19, 2022 7:11 PM

**To:** Bart Larsen <blarsen@shea.law>
**Cc:** Zonne, Melissa <MZonne@thoits.com>; Lawal, Monica <MLawal@thoits.com>; Smith, Marla L. <MSmith@thoits.com>
**Subject:** Re: In re: Infinity Capital Management, Inc. - Subpoenas to Three Bell

Mr. Larsen:

As stated in my prior e-mail, Three Bell will be moving to quash and seek sanctions against you and your client.  Nothing in this e-mail changes our analysis.  Your client earlier this year made it clear it meant to use Rule 45 discovery to harass Three Bell.  I have discussed your discovery against Three Bell with counsel for Tecumseh.  And they confirmed that you did not move to compel document discovery against their client on these issues and have yet to take a deposition of a Tecumseh witness, yet you and your client seek these documents from a non-party, Three Bell, as well as to depose a Three Bell witness.   Counsel for Tecumseh is also perplexed as to your legal theory that would make any of these documents relevant to any claim in that action.  Your client  failing to incur the expense in seeking this discovery against Tecumseh, the party in your litigation whose claim you say makes it relevant, does not justify burdening Three Bell. In fact, it is one of the reasons we believe sanctions is appropriate against you and your client.

As mentioned previously, if your client has retained counsel in the Northern District of California, please provide it.  We expect to get our motion to quash on file this week.

Best regards,

Mark Boennighausen

---

**From:** Bart Larsen <blarsen@shea.law>
**Sent:** Monday, December 19, 2022 6:00 PM
**To:** Zonne, Melissa
**Cc:** Boennighausen, Mark V.
**Subject:** RE: In re: Infinity Capital Management, Inc. - Subpoenas to Three Bell

Melissa:

Thank you for your email below.  I believe you may have misunderstood some of the comments I made during our call last week.  You are correct that HASelect has not asserted equitable claims against Tecumseh in its adversary complaint.  Rather, I meant to convey to

you that Tecumseh has asserted counterclaims against HASelect and the chapter 7 trustee, alleging that Tecumseh is the equitable owner of the disputed accounts at issue and that Infinity held those accounts in trust for Tecumseh's benefit.  A copy of Tecumseh's counterclaim [ECF No. 12] is attached.

As set forth in the opposition brief I sent last week, HASelect has raised the affirmative defense of unclean hands and has argued that Tecumseh is not entitled to the equitable relief it seeks due to, among other things, its inequitable conduct towards HASelect, including its discussion with FTM and Infinity of potentially soliciting Three Bell Capital to demand a redemption of its investment in HASelect to force HASelect to settle litigation pending against Tecumseh and FTM in Illinois and to facilitate Tecumseh's acquisition from Infinity of the remaining accounts included in the collateral for HASelect's loan to Infinity.  Any communications Tecumseh, FTM, or Infinity exchanged with third parties, including Three Bell Capital, concerning such solicitations are relevant to the adversary proceeding and are well within the scope of permissible discovery under FRCP 26.

Additionally, the chapter 7 trustee asserted a counterclaim against Tecumseh, seeking to avoid any interest Tecumseh may hold in such accounts.  A copy of the chapter 7 trustee's counterclaim [ECF No. 32] is also attached.  Subsequent to the filing of the chapter 7 trustee's counterclaim, HASelect purchased the estate's interests in the disputed accounts from the chapter 7 trustee through a 363 sale approved by the bankruptcy court.  A copy of the order approving that sale [ECF No. 184] is attached.  Thereafter, HASelect was substituted to the chapter 7 trustee's position in the adversary proceeding.  A copy of the order approving that substitution [ECF No. 81] is attached.  Consequently, HASelect now sits in the position of the chapter 7 trustee in terms of defending Tecumseh's counterclaims against the chapter 7 trustee and in pursuing the chapter 7 trustee's counterclaims against Tecumseh.  Accordingly, any communications Tecumseh, FTM, or Infinity exchanged with third parties, including Three Bell Capital, concerning the nature of Tecumseh's dealings with Infinity and its interests, if any, in the disputed accounts that are the subject of the adversary proceeding are relevant to this case and well within the scope of permissible discovery under FRCP 26.

HASelect has attempted in good faith to obtain the documents requested through the subpoena to Three Bell Capital from other sources.  As I mentioned last week, we have been unable to serve discovery on FTM as it is a Vanatu company with no presence in the United States.  We attempted to serve a subpoena on one of the principals of FTM during a recent visit to Las Vegas but were unsuccessful, and I am told he has left the United States and will not return for several months.  The records we have been able to obtain to date from Infinity are far from complete as Infinity's former principals have retained and concealed records that should have been turned over to HASelect more than a year ago as described in the attached adversary complaint HASelect recently filed against Infinity's former principals.  HASelect has also requested through discovery in the adversary proceeding that Tecumseh produce its

communications with Three Bell Capital.  Tecumseh, however, has refused to do so.  I am aware of no rule or case law that requires that HASelect engage in costly and time-consuming motion practice against Tecumseh to avoid issuing discovery on third parties such as Three Bell Capital.

In short, there is nothing improper in HASelect's issuance of the recent subpoenas to Three Bell Capital.  We have attempted to address your client's objections to the prior subpoenas by seeking documents from other sources and by narrowing the scope of the document requests, and I am open to discussing further narrowing the scope of those requests to minimize any inconvenience to your client.  It should not be difficult to identify and produce communications your client exchanged with a small handful of individuals over a relatively short period of time.  To the extent we can reach an agreement as to the production of such communications, I expect that the deposition subpoena could be withdrawn.

Finally, I do not agree with your conclusion that affidavit of service I sent last week confirms that Mr. Porter was not personally served with the subpoenas at his residence.  In fact, the affidavit, which is signed under penalty of perjury, expressly states that the subpoenas were left with Mr. Porter.  Regardless, I would much prefer to reach an amicable resolution.  If your client is willing to discuss a reasonable resolution of this matter, please let me know.  I can be available for a call any time tomorrow afternoon or any time on Wednesday or Thursday of this week.

Thanks.

Bart K. Larsen, Esq.
SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Office: (702) 471-7432
Direct: (702) 255-0098
Mobile: (702) 321-6528
Email: blarsen@shea.law

This message was sent from Shea Larsen PC and is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

**From:** Zonne, Melissa <MZonne@thoits.com>
**Sent:** Thursday, December 15, 2022 12:07 PM
**To:** Bart Larsen <blarsen@shea.law>
**Cc:** Boennighausen, Mark V. <MBoennighausen@thoits.com>

**Subject:** RE: In re: Infinity Capital Management, Inc. - Subpoenas to Three Bell

Hi Bart,
Thank you for sending the affidavit and speaking with me yesterday. Mr. Porter was out of town on 12/1/22, and in my view, the affidavit appears to confirm that he was not personally served the subpoenas beyond leaving the documents at his address.  As you previously conceded this is not proper service.

As previously discussed, I suggest your client leave Three Bell alone instead of continuing to seek discovery against a non-party, which is at best a collateral issue in the adversary proceeding being litigated by your client. For example,  you mentioned purported "equitable claims" against Tecumseh render this information relevant. But a review of the First Amended Complaint filed by your client reveals no such "equitable claims."  Indeed, what that complaint shows is a vanilla bankruptcy dispute as to priority over assets of the debtor  with regard to your client and Tecumseh. Nevertheless, to reiterate my client's position, even if the information sought was relevant, it should be obtained in party discovery rather than from a third party. You represented that no motion to compel has been filed against Tecumseh for these documents, but that at this point, there is no time for a motion given the trial date.  We fail to understand how there can be no time for a motion to compel against Tecumseh but sufficient time to burden a non-party to seek information which a party to the litigation possesses.  Your asserted lack of confidence that Tecumseh would fully comply with a discovery order if obtained is an issue to take up with the trial judge in Nevada, not a grounds to seek duplicative discovery against a non-party in California.  Simply put, there is no basis for your client to seek discovery from Three Bell.

Regards,
Melissa

**Melissa Zonne**
**Thoits Law** | 400 Main St, #250, Los Altos, CA 94022
650.327.4200 | www.thoits.com  |  MZonne@thoits.com

**Confidentiality Notice**.  The information contained in this e-mail and any accompanying attachments, all of which may be confidential or privileged, is intended only for use by the person or entity to whom it is addressed.  If you are not the intended recipient, any unauthorized use, disclosure or copying of this e-mail and its contents is strictly prohibited and may be unlawful.  If you are not the intended recipient, please immediately notify the sender by return e-mail and delete the original message and all copies from your system.  Thank you.

**From:** Bart Larsen [mailto:blarsen@shea.law]
**Sent:** Wednesday, December 14, 2022 10:22 AM
**To:** Zonne, Melissa <MZonne@thoits.com>

**Cc:** Boennighausen, Mark V. <MBoennighausen@thoits.com>
**Subject:** RE: In re: Infinity Capital Management, Inc. - Subpoenas to Three Bell

Thank you for taking time to talk this morning.  Attached is the affidavit of service I mentioned that came in after I emailed you last week.  Please let me know if you client's position as to service has changed.

If your client maintains that service was ineffective, I assume you will have no issue with my office attempting to serve the subpoena at the personal residences of your client's officers as you are unable to accept service and your client's business office, which is also the location of its resident agent, is inaccessible.

Bart K. Larsen, Esq.
SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Office: (702) 471-7432
Direct: (702) 255-0098
Mobile: (702) 321-6528
Email: blarsen@shea.law

This message was sent from Shea Larsen PC and is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

**From:** Zonne, Melissa <MZonne@thoits.com>
**Sent:** Tuesday, December 13, 2022 9:44 AM
**To:** Bart Larsen <blarsen@shea.law>
**Cc:** Boennighausen, Mark V. <MBoennighausen@thoits.com>; ggordon@gtg.legal
**Subject:** RE: In re: Infinity Capital Management, Inc. - Subpoenas to Three Bell

Yes, should I plan on calling your direct line?

**Melissa Zonne**
**Thoits Law** | 400 Main St, #250, Los Altos, CA 94022
650.327.4200 | www.thoits.com | MZonne@thoits.com

**Confidentiality Notice.**  The information contained in this e-mail and any accompanying attachments, all of which may be confidential or privileged, is intended only for use by the person or entity to whom it is addressed.  If you are not the intended recipient, any unauthorized use, disclosure or copying of this e-mail and its contents is strictly prohibited and may be unlawful.  If you are not the intended recipient, please immediately notify the sender by return e-mail and delete the original message and all copies from your system.  Thank you.

**From:** Bart Larsen [mailto:blarsen@shea.law]
**Sent:** Tuesday, December 13, 2022 9:34 AM
**To:** Zonne, Melissa <MZonne@thoits.com>
**Cc:** Boennighausen, Mark V. <MBoennighausen@thoits.com>; ggordon@gtg.legal
**Subject:** RE: In re: Infinity Capital Management, Inc. - Subpoenas to Three Bell

Would tomorrow at 10:00 am work?

Thanks.

Bart K. Larsen, Esq.
SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Office: (702) 471-7432
Direct: (702) 255-0098
Mobile: (702) 321-6528
Email: blarsen@shea.law

This message was sent from Shea Larsen PC and is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

**From:** Zonne, Melissa <MZonne@thoits.com>
**Sent:** Monday, December 12, 2022 3:02 PM
**To:** Bart Larsen <blarsen@shea.law>
**Cc:** Boennighausen, Mark V. <MBoennighausen@thoits.com>; ggordon@gtg.legal
**Subject:** RE: In re: Infinity Capital Management, Inc. - Subpoenas to Three Bell

Hi Bart,
Yes – I'm tied up today and tomorrow but I'm completely open Wednesday if any time that day works for you?

**Melissa Zonne**
**Thoits Law** | 400 Main St, #250, Los Altos, CA 94022
650.327.4200 | www.thoits.com | MZonne@thoits.com

**Confidentiality Notice.**  The information contained in this e-mail and any accompanying attachments, all of which may be confidential or privileged, is intended only for use by the person or entity to whom it is addressed.  If you are not the intended

recipient, any unauthorized use, disclosure or copying of this e-mail and its contents is strictly prohibited and may be unlawful.  If you are not the intended recipient, please immediately notify the sender by return e-mail and delete the original message and all copies from your system.  Thank you.

---

**From:** Bart Larsen [mailto:blarsen@shea.law]
**Sent:** Monday, December 12, 2022 3:01 PM
**To:** Zonne, Melissa <MZonne@thoits.com>
**Cc:** Boennighausen, Mark V. <MBoennighausen@thoits.com>; ggordon@gtg.legal
**Subject:** RE: In re: Infinity Capital Management, Inc. - Subpoenas to Three Bell

Just following up.  Please let me know if you have time for a call this week.

Thanks.

Bart K. Larsen, Esq.
SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Office: (702) 471-7432
Direct: (702) 255-0098
Mobile: (702) 321-6528
Email: blarsen@shea.law

This message was sent from Shea Larsen PC and is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

---

**From:** Bart Larsen
**Sent:** Thursday, December 8, 2022 11:52 AM
**To:** Zonne, Melissa <MZonne@thoits.com>; ggordon@gtg.legal
**Cc:** Boennighausen, Mark V. <MBoennighausen@thoits.com>
**Subject:** RE: In re: Infinity Capital Management, Inc. - Subpoenas to Three Bell

Melissa:

Thank you for your letter.  If you have time for a call later today or tomorrow morning, please let me know.  I would be happy to discuss the matter with you to attempt to resolve your client's objections.  As for the points raised in your letter, please consider the following.

First, I was not aware that the subpoena had been left unattended at Mr. Porter's personal

residence and agree that would not constitute proper service.  Second, the attempted service of the subpoena at Mr. Porter's personal residence was not intended in any way as harassment.  Our process server attempted to serve the subpoena at Three Bell Capital's business office at 4 Main Street, Suite 230, Los Altos, California, which is also the address designated with the California Secretary of State for Mr. Porter as Three Bell Capital's resident agent, five times between November 7 and November 15 but found the office closed on each attempt (see attached records regarding attempted service).  Mr. Porter's personal address was provided as an alternative location for service only after we learned service could not be completed at Three Bell Capital's business office.

Finally, the scope of this subpoena has been reduced substantially from the prior subpoena issued to Three Bell Capital earlier this year and focuses largely on communications Three Bell Capital exchanged with Infinity, Tecumseh, and FTM.  Those communications are relevant to the claims and defenses at issue in the adversary case between HASelect and Tecumseh.  In July 2020, Infinity, Tecumseh, and FTM discussed a plan to force HASelect to settle its claims by convincing Three Bell Capital to seek a redemption of its investment in HASelect that could have resulted in HASelect's liquidation and in Tecumseh acquiring the remaining collateral for HASelect's loan to Infinity (see attached email dated 7.11.20).  Such conduct and related communications with Three Bell Capital are relevant to the claims at issue in the adversary case for the reasons explained in the attached opposition filed by HASelect in response to a motion for partial summary judgment filed by Tecumseh that remains pending before the court.  We have previously attempted to obtain these communications through discovery directed at Infinity with limited success and Tecumseh, which has refused to produce any such communications.

I look forward to hearing from you.

Bart K. Larsen, Esq.
SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Office: (702) 471-7432
Direct: (702) 255-0098
Mobile: (702) 321-6528
Email: blarsen@shea.law

This message was sent from Shea Larsen PC and is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

**From:** Zonne, Melissa <MZonne@thoits.com>

**Sent:** Wednesday, December 7, 2022 3:44 PM
**To:** Bart Larsen <blarsen@shea.law>; ggordon@gtg.legal
**Cc:** Boennighausen, Mark V. <MBoennighausen@thoits.com>
**Subject:** In re: Infinity Capital Management, Inc. - Subpoenas to Three Bell

Counsel:

Please find the attached correspondence.

**Melissa Zonne**

**Thoits Law** | 400 Main St, #250, Los Altos, CA 94022

650.327.4200 | www.thoits.com | MZonne@thoits.com

**Confidentiality Notice**.  The information contained in this e-mail and any accompanying attachments, all of which may be confidential or privileged, is intended only for use by the person or entity to whom it is addressed.  If you are not the intended recipient, any unauthorized use, disclosure or copying of this e-mail and its contents is strictly prohibited and may be unlawful.  If you are not the intended recipient, please immediately notify the sender by return e-mail and delete the original message and all copies from your system.  Thank you.

**EXHIBIT 19**

Bart K. Larsen, Esq.
Nevada Bar No. 8538
Kyle M. Wyant, Esq.
Nevada Bar No. 14652
**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Telephone: (702) 471-7432
Fax: (702) 926-9683
Email:  blarsen@shea.law
        kwyant@shea.law

*Attorneys for HASelect-Medical Receivables
Litigation Finance Fund International SP*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>INFINITY CAPITAL MANAGEMENT, INC.<br><br>Debtor. | Case No. 21-14486-abl<br>Chapter 7 |
| HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP,<br><br>Plaintiff,<br><br>v.<br><br>TECUMSEH–INFINITY MEDICAL RECEIVABLES FUND, LP,<br><br>Defendant. | Adversary Case No. 21-01167-abl<br><br>**PLAINTIFF HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP'S OPPOSITION TO TECUMSEH–INFINITY MEDICAL RECEIVABLE FUND, LP'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CERTAIN DISPUTED RECEIVABLES** |
| TECUMSEH–INFINITY MEDICAL RECEIVABLES FUND, LP,<br><br>Counter-Claimant,<br><br>v.<br><br>HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP,<br><br>Counter-Defendant. | Hearing Date:  October 25, 2022<br>Hearing Time: 1:30 p.m. |

| | |
|---|---|
| 1 | HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP, |
| 2 | |
| 3 | Counter-Claimant, |
| 4 | v. |
| 5 | TECUMSEH–INFINITY MEDICAL RECEIVABLES FUND, LP, |
| 6 | |
| 7 | Counter-Defendant. |

8       HASelect-Medical Receivables Litigation Finance Fund International SP ("HASelect") by

9 and through counsel, respectfully submits this Opposition to Tecumseh-Infinity Medical

10 Receivables Fund, LP's ("Tecumseh") *Motion for Partial Summary Judgment as to Direct Purchase*

11 *Receivables* [ECF No. 90] (the "Motion"). This Opposition is made pursuant to Fed. R. Civ. P. 56

12 and Federal Rules of Bankruptcy Procedure 7056 and Rule 7056 of the Local Rules of Bankruptcy

13 Practice and Procedure of the United States Bankruptcy Court for the District of Nevada,[1] and is

14 made and based upon the following memorandum of points and authorities as well as the exhibits

15 submitted herewith and on file with the Court and referenced herein:

### I.     PRELIMINARY STATEMENT

17       As this Court previously found in granting HASelect's Motion for Partial Summary

18 Judgment with respect to receivables contained in the 1-A through 1-E, 1-G, and 1-H Accounts [ECF

19 Nos. 84 and 88],[2] HASelect holds a perfected security interest in all of Infinity Capital

20 Management's ("Debtor" or "Infinity") personal property and proceeds thereof (the "Collateral").

21 In an attempt to avoid this security interest, and because Tecumseh indisputably did not perfect its

22 claimed security interest in any account receivable it supposedly acquired from Infinity, Tecumseh

---

[1] Unless otherwise stated, all "Chapter" and "Section" references are to Title 11 of the U.S. Code (the "Bankruptcy Code"), all "Bankruptcy Rule" references are to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and all references to "Local Rules" are to the Local Rules of Bankruptcy Practice for the U.S. District Court for the District of Nevada (the "Local Rules").

[2] As to the 1-F, 1-I and 1-J Accounts, the Court denied HASelect's Motion for Partial Summary Judgment based on genuine issues of material fact but expressly stated that HASelect could again move for summary judgment on these account batches at a later date—which HASelect intends to do.

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

has created an argument that the Direct Purchase Receivables[3] are not property of Infinity's estate because either (1) Tecumseh purchased them directly with its own funds or, alternatively, (2) Infinity purchased them and held them in the form of a resulting trust for Tecumseh's benefit using Tecumseh's funds held in Infinity and Tecumseh's shared Bank of America account ending in 8995 (the "BOA Account"). Ignoring the fact that Tecumseh's own arguments conflict with its burden to put forth clear and convincing and unambiguous intent to create the rarely granted remedy of a resulting trust,[4] Tecumseh's Motion must be denied for numerous other reasons.

First, Tecumseh's Motion is fundamentally and factually flawed, precluding any award of summary judgment. For example, the Motion makes bold misstatements regarding the funds used to purchase the Direct Purchase Receivables, including, but not limited to, the statement that "[a]ll of the funds in that [BOA Account] belonged to Tecumseh and the Infinity had no interest in the funds."[5] Additionally, Tecumseh boldly misstates that "none of the dollars that Tecumseh used to purchase the receivables flowed through any of Infinity's accounts,"[6] which is provably false. As shown from the unredacted BOA Account statements submitted herewith as well as Tecumseh's own accounting records and Infinity's bank account statements, the BOA Account contained collection proceeds from HASelect's Collateral, including, but not limited to, funds from receivables associated with the 1-A through 1-E, 1-G and 1-H Accounts that the Court has already found are subject to HASelect's security interest, which has priority over any claim by Tecumseh in the same. Additionally, the BOA Account contained commingled funds transferred from Infinity's operating account at NSB ending in 6375 (the "Operating Account"). The funds from the Operating Account came from Infinity's 8480 Account, which contained commingled funds received from both HASelect and Tecumseh. Put differently, Infinity and Tecumseh indisputably rolled proceeds from HASelect's Collateral, as well as commingled proceeds of HASelect's loan to Infinity from the

---

[3] Defined in the Motion as accounts purchased from and after October 29, 2020, which are the subject of the Motion. *See* Motion, 6:17.

[4] *Secure Leverage Grp., Inc. v. Bodenstein (In re Peregrine Fin. Grp., Inc.)*, No. 12 B 27488, 2014 Bankr. LEXIS 2328, at *9 (Bankr.N.D. Ill. May 27, 2014)

[5] *See* Motion, 12:1-2.

[6] *See* Motion, 12:2-4.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

Operating Account and 8480 Account into the BOA Account and used those funds to purchase the Direct Purchase Receivables.

Second, the Motion should be denied because Tecumseh has not and cannot establish through clear and convincing evidence that the rare remedy of a resulting trust should be imposed here over the Direct Purchase Receivables. Nothing in any of the documents between Tecumseh and Infinity reference a trust relationship. Infinity's bankruptcy schedules also fail to list any of the receivables being held in trust by Infinity for Tecumseh. Moreover, as the Court previously found in ruling in favor of HASelect's Motion for Partial Summary Judgment, the relationship between Tecumseh and Infinity is not that of a trustee-beneficiary but rather that of a buyer-seller relationship. Additionally, the relationship between Infinity and the medical providers associated with the Direct Purchase Receivables is not that of a buyer and seller but rather a lender and borrower. Indeed, the transactions between Infinity and the medical providers through whom most of the Direct Purchase Receivables were funded took the form of loans in which Infinity received a contractual right to repayment instead of any outright claim to ownership of the accounts receivable at issue, which cannot satisfy the purchase requirement for a resulting trust to exist.

Lastly, the Motion must be denied because Tecumseh seeks equitable relief from this Court despite coming to it with unclean hands. It is indisputable that Tecumseh's principals were directly and materially involved in the origination of HASelect's loan to Infinity and related security interest in all of Infinity's Collateral. Despite being armed with the knowledge of Infinity's indebtedness to HASelect and HASelect's security interest, including the electronic stamps used to identify accounts receivable as HASelect's Collateral, Tecumseh's principals knowingly persuaded Infinity to sell it millions of dollars in accounts receivable included in HASelect's Collateral. As evidenced by the communications submitted herewith, Tecumseh further conspired with Infinity to remove these electronic stamps and attempted to negate HASelect's security interest. Further, Tecumseh conspired with Infinity to continue to profit from their business relationship by transferring Infinity's Collateral to newly created Infinity Health Solutions, which is simply a continuation of Infinity under a different name. Tecumseh's unclean hands in these regards preclude it from seeking an equitable

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

remedy such as a resulting trust. For any of these reasons, the Motion must be denied.

## II.    STATEMENT OF FACTS

**A.    HASelect Loaned $16 Million to Infinity and Obtained a Perfected Security Interest in All of Infinity's Personal Property.**

1.    Beginning in February 2019, HASelect made a series of loans to Infinity that were documented through various written loan agreements and promissory notes through which Infinity pledged substantially all of its personal property, including all existing and after acquired accounts receivable, to HASelect as collateral for such loans.[7]

2.    HASelect perfected its security interest in all of Infinity's personal property through the filing of a UCC-1 with the Nevada Secretary of State on February 19, 2019.[8]

3.    On or about December 18, 2019, HASelect, which was then doing business under the name HASelect-FTM Medical Receivables Litigation Finance Fund SP, and Infinity entered into a Second Amended & Restated Loan and Security Agreement and Promissory Note (together with all prior and related loan documents, the "MLA"), which amended and superseded all prior written loan agreements and promissory notes entered into between HASelect and Infinity.[9]

4.    Accordingly, HASelect holds a perfected security interest in all of Infinity's personal property (as defined in § 4.1 of the MLA, the "Collateral"). Specifically, Section 4.1 of the MLA describes the Collateral as follows:

> To secure the payment and performance when due of all of the Borrower's obligations hereunder and under the Note, Borrower hereby grants to Lender a security interest in the Receivables and the Alternative Receivables, and all of its other personal property, including without limitation, all of Borrower's interest in the following, whether now owned or hereafter acquired, and wherever located, but excluding the Permitted Liens: All Goods, Inventory, Equipment, Fixtures, Accounts, General Intangibles, Instruments, Chattel Paper, Documents, Commercial Tort Claims, Investment Property, Letter of Credit Rights, Deposit Accounts, and all money, and all other property now or at any time in the future in Lender's possession (including claims and credit balances), and all proceeds (including proceeds of any insurance policies, proceeds of proceeds and claims against third parties), all products and all books and records related to any of the foregoing (all of the foregoing, together with all other property in which Lender may now or in the future be granted

---

[7] *See* Declaration of Michael Griffin (the "Griffin Declaration"), ¶ 5.

[8] *Id.* at ¶ 6.  A copy of this UCC-1 filing is submitted herewith as Exhibit 2.

[9] *See* Griffin Declaration, ¶ 7.  A copy of the MLA is submitted herewith as Exhibit 1.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

a lien or security interest, is referred to herein, collectively, as the "Collateral").[10]

5.      Pursuant to the MLA, Infinity agreed to use the loan proceeds it received from HASelect to purchase accounts receivable from medical providers.[11]

6.      Such accounts receivable generally arose from medical treatment or prescription medication provided to individuals who were injured in accidents and had asserted personal injury claims against third parties and were typically paid at the time the personal injury claims were settled. Infinity represented to HASelect that these accounts receivable were secured by liens against these personal injury claims.[12]

7.      Infinity purchased these accounts receivable pursuant to contracts it entered into directly with various medical providers.[13]  In addition to the contracts Infinity entered into with the sellers of these accounts receivable, Infinity also received direct assignments of liens against the individual personal injury claimants' rights to recovery.[14]

8.      To ensure that HASelect received a perfected, first-priority security interest in all accounts receivable purchased by Infinity (as well as all other Collateral), HASelect required that Infinity use approximately $2.2 million in loan proceeds advanced by HASelect to repay and retire prior secured debts owed to Law Finance Group, LLC ("LFG"), which had similarly advanced funds to Infinity for the purchase of accounts receivable.[15]

9.      HASelect also required that Infinity apply an electronic stamp to certain documents associated with its accounts receivable to identify the accounts receivable as HASelect's Collateral.[16]

10.     From February 2019 through April 2020, HASelect advanced loan proceeds totaling

---

[10] *See* MLA (Exhibit 1), § 4.1.

[11] *See* MLA (Exhibit 1), § 3.2.

[12] *See* Griffin Declaration at ¶ 11.

[13] *See* Infinity's Amended Schedule G filed in the chapter 7 case at ECF No. 91.

[14] *See* Excerpts from Transcript of November 9, 2021 Rule 2004 Examination of Anne Pantelas (the "Pantelas Transcript") submitted herewith as Exhibit 4, pp. 66-67 ("Q: Was there any version of this form that you're aware of that was used in the last two years by Infinity in which, you know, Infinity was not identified as the party receiving the assignment?  A: No, no."); Exhibit 7 to Pantelas Transcript (Assignment of Benefits/Medical Lien and Security Agreement).

[15] *See* Pantelas Transcript (Exhibit 4), pp. 82-83.

[16] *See* Hemmers Transcript (Exhibit 3), pp. 108-110; Exhibit 18 to Hemmers Transcript (February 26, 2019 email chain discussing electronic stamping of documents as HASelect collateral).

approximately $16 million to Infinity, which was obligated under the MLA to use such proceeds to purchase accounts receivable.[17]

**B.     HASelect Engaged FTM Limited to Protect Its Interests under the MLA.**

11.     To ensure loan proceeds were used appropriately, HASelect engaged FTM Limited under a sub-advisory agreement dated February 7, 2019 (the "FTM Agreement")[18] to provide sub-advisory and fiduciary services to HASelect that included the investigation and verification of accounts receivable to be purchased by Infinity and the approval of draw requests submitted by Infinity on which HASelect relied in advancing funds to Infinity under the Loan.[19]

12.     FTM Limited is a Vanatu limited liability company.  The principals of FTM Limited are Endre Debozy and William Dalzell.  Debozy and Dalzell introduced HASelect to Infinity in late 2018 and strongly encouraged HASelect to enter into a lending relationship with Infinity.  In doing so, Debozy and Dalzell did not disclose to HASelect that they had a nearly 20-year history of soliciting investment capital and financing for Infinity – very little of which was ever repaid.[20]

13.     In or around 2000, Infinity's principals, Oliver Hemmers and Anne Pantelas, began working with Debozy and Dalzell to solicit investment capital for Infinity.  Debozy and Dalzell guided Hemmers and Pantelas in establishing Coastal Investments, PLC ("Coastal") as a Cook Islands public limited company owned by Hemmers, Pantelas, and Infinity.  Debozy and Dalzell then solicited potential investors to make loans to Coastal that would, in turn, be loaned by Coastal to Infinity to be used to purchase accounts receivable.[21]

14.     Over the next few years, Debozy and Dalzell convinced dozens of investors to loan

---

[17] *See* Griffin Declaration, ¶ 13.

[18] FTM Limited later assigned its rights and interests under the FTM Agreement to a related entity, Alternative Investment Specialists Limited.

[19] *See* Griffin Declaration, ¶ 14.  Under the FTM Agreement, FTM Limited agreed that its services would be exclusive to GAM and HASelect and agreed it would not use, disclose, or distribute any confidential information received from GAM or HASelect.  FTM Limited also agreed that it would act professionally and in best interests of GAM and HASelect at all times and that its principals would act in accordance with the FTM Agreement. *See* Verified Complaint filed in Circuit Court of Cook County, Illinois (case no. 2020CH044270 submitted herewith as Exhibit 5, ¶¶ 22-41.

[20] *See* Griffin Declaration, ¶ 16.

[21] A summary of Infinity's relationship with Debozy and Dalzell that was prepared by Infinity's principal, Oliver Hemmers, and included in the business records surrendered to HASelect after Infinity's bankruptcy filing is submitted herewith as Exhibit 6.

SHEA LARSEN

1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

several million dollars to Coastal under short term promissory notes. Coastal then loans those funds to Infinity under dozens of separate short term promissory notes. By early 2019, Infinity owed approximately $12 million to Coastal under such notes. Infinity was unable to repay the notes as they matured and struggled to even pay interest on the notes as it came due.[22]

15.    Yet, in spending several months from late 2018 through February 2019 discussing a potential lending relationship and later negotiating the terms of the MLA, Debozy, Dalzell, Hemmers, and Pantelas failed to disclose to HASelect the $12 million Infinity owed on Coastal notes or the $2.2 million in secured debt Infinity owed to LFG. HASelect did not learn of these issues until shortly before the Loan was set to close. When confronted with this information, Debozy, Dalzell, Hemmers, and Pantelas misrepresented the debts owed to Coastal as debts owed to FTM Limited or a related entity, concealing Coastal's existence and ownership from HASelect, and misrepresented the amounts of the indebtedness owed under both the Coastal notes and LFG loan as $8.8 million and $1.9 million, respectively – approximately $3.5 million less than Infinity actually owed.[23]

16.    After reconsidering the matter, HASelect advised Infinity it would go forward with entering into the MLA only if (i) FTM Limited agreed to subordinate all indebtedness owed under the Coastal notes to the HASelect Loan, which Debozy and Dalzell agreed to do, and (ii) the indebtedness owed to LFG was repaid immediately and LFG released its security interest in Infinity's assets. Ultimately, HASelect and Infinity agreed that HASelect would advance additional Loan proceeds to refinance the LFG loan as referenced above.[24]

**C.    FTM Limited Colluded with Infinity to Misappropriate Loan Proceeds.**

17.    HASelect began advancing Loan funds to Infinity under the MLA on March 5, 2019. All advances made under the MLA were wired to an Infinity deposit account at Nevada State Bank ending in 8480 (the "8480 Account"). From March 2019 through April 2020, wired nearly $16 million

---

[22] Also, an accounting of the outstanding balances due under the Coastal notes that was emailed to Oliver Hemmers by an advisor to Coastal on February 11, 2019 is submitted herewith as Exhibit 7.

[23] See Griffin Declaration, ¶ 17; Emails submitted herewith as Exhibit 8. Similarly, Debozy, Dalzell, Hemmers, and Pantelas failed to disclose to HASelect that Infinity had been in default of its obligations under the LFG loan since February 2018. See LFG notice of default submitted herewith as Exhibit 9. Likewise, Infinity did not disclose its ownership interest in Coastal in its bankruptcy schedules. See Case No. 21-14486, ECF Nos. 47 and 112.

[24] See Griffin Declaration, ¶ 19; Emails submitted herewith as Exhibit 10.

in Loan proceeds to the 8480 Account, which were the only material deposits to or funds held in the 8480 Account during that period.[25]  In making such advances, HASelect relied on Debozy and Dalzell's representations that FTM Limited had investigated and verified Infinity's use of funds to be advanced for the purchase of accounts receivable.[26]

18.   Within a few weeks of receiving the first advance, Infinity began using Loan proceeds to pay down the Coastal notes.  Between April 2019 and June 2020, Infinity wired over $2.5 million in proceeds from the Loan directly to Coastal without HASelect's knowledge.[27]  Debozy and Dalzell, however, undoubtedly knew that Loan proceeds were being used to pay down the Coastal notes as they and their investors were the end recipients of such payments.  Yet, Debozy and Dalzell said absolutely nothing to HASelect regarding such payments.[28]

**D.   Simon Clark Negotiated and Administered the Loan for HASelect.**

19.   In communicating with FTM Limited and Infinity and in negotiating and entering into the MLA, HASelect was represented by Simon Clark, who was then employed by Griffin Asset Management, LLC ("<u>GAM</u>")[29] and was responsible for GAM's offshore division, which included HASelect.  Following the execution of the MLA, Clark remained responsible for the administration of the Loan and for protecting HASelect's rights and interests under the MLA.  Instead of fulfilling these obligations, however, Clark ignored Infinity's misappropriation Loan proceeds and later assisted Tecumseh and FTM in soliciting Infinity to terminate its relationship with HASelect.[30]

20.   In seeking advances under the MLA, Infinity routinely misrepresented both the cost and value of the accounts receivable it intended to purchase.  For example, in December 2019, Infinity, requested that HASelect advance Loan funds in the amount of $3.2 million to Infinity[31] for the

---

[25] *See* 8480 Account records submitted herewith as <u>Exhibit 11</u>.

[26] *See* Griffin Declaration, ¶ 19.

[27] *See* 8480 Account records submitted herewith as <u>Exhibit 11</u>.

[28] *See* Griffin Declaration, ¶ 28.

[29] HASelect is an investment fund that was sponsored by an affiliated entity, and Griffin Asset Management, LLC serves as its investment manager.

[30] *See* Griffin Declaration, ¶¶ 20 and 28.

[31] A copy of this draw request is submitted herewith as <u>Exhibit 12</u>.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

purchase certain preexisting accounts receivable from HealthPlus Imaging ("HealthPlus").[32]  The actual purchase price for these accounts receivable was only $2.5 million, not $3.2 million as Infinity represented.[33]  Even worse, upon receiving the full $3.2 million it requested, Infinity paid only $1.75 million of the purchase price to HealthPlus and used the remaining Loan proceeds to pay down the Coastal notes and for other improper purposes.[34]  When questioned about these facts during his 2004 examination in Infinity's chapter 7 case, Hemmers admitted these facts to be true and claimed that Clark and FTM Limited were fully aware of Infinity's practice of inflating the cost and value of accounts receivable to HASelect in seeking draws under the MLA and of Infinity's habitual misuse of Loan proceeds for purposes other than those approved by HASelect.[35]

### E. Tecumseh Partnered with Debozy and Dalzell to Solicitate Infinity to Terminate Its Relationship with HASelect.

21.    Clark continued to serve as HASelect's primary point of contact for Infinity and FTM until he resigned his position with GAM in February 2020 to join another former GAM employee, Chad Meyer, along with Debozy, Dalzell, Hemmers, and Pantelas in establishing Tecumseh to replace HASelect in its role as lender to Infinity.[36]

22.    Meyer was terminated from his position with GAM in May 2019.  Unbeknownst to HASelect or GAM at the time, Meyer, Clark, and another individual they met through GAM, Michael Belotz, formed Tecumseh Alternatives, LLC in August of 2019[37] as an investment advisory

---

[32] In seeking this advance, Infinity represented that all preconditions to the advance, as set forth in § 3.2 of the MLA, had been satisfied, including the precondition that the value of the accounts receivable to be purchased be at least 200% of amount advanced.  In other words, in requesting this advance, Infinity represented to HASelect that the value of the accounts receivable to be purchased under the HealthPlus agreement was at least $6.4 million.  Infinity's internal emails show that Hemmers and Pantelas undoubtedly knew as of October 2019 that Infinity was likely to collect less than $5 million on these accounts receivable.  See Emails submitted herewith as Exhibit 13.

[33] See Exhibit 38 submitted herewith.

[34] See 8480 Account records submitted herewith as Exhibit 11.

[35] See Hemmers Transcript (Exhibit 3), pp. 39-42, 67-74.

[36] See Griffin Declaration, ¶ 21.  On August 12, 2022, filed a verified complaint against Clark in the U.S. District Court for the Northern District of Illinois (case no. 1:22-cv-04269) (the "Chicago Federal Court Action") asserting claims for breach of fiduciary duty and fraud based on Clark's conduct in connection with the negotiation of the MLA and the administration of the Loan.  A copy of this verified complaint is submitted herewith as Exhibit 14.

[37] In an ADV Form filed by Tecumseh Alternatives, LLC on April 4, 2022, Tecumseh claims that Clark has been a principal of Tecumseh Alternatives, LLC since August 2019 – roughly six months before he resigned his position with GAM.  See Exhibit 39 (page 26 of 28) submitted herewith.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

firm modeled after and designed to compete with GAM. Shortly thereafter, Tecumseh Alternatives LLC formed Tecumseh and, upon Clark's resignation, began working with Debozy and Dalzell to solicit Infinity to terminate its relationship with HASelect and to enter into a new financing arrangement with Tecumseh.[38]

23.     Meyer, Debozy, and Dalzell wrongfully used confidential and trade secret information gained through their relationships with GAM and HASelect and routinely misrepresented facts and disparaged GAM's principals in their attempts to solicit Infinity.[39]

24.     Meyer, Debozy, and Dalzell represented in email communications to Infinity that HASelect was charging "exorbitant interest" under the Loan, had "stifled Infinity with interest rates, origination fees and absurd demands", and was preventing Infinity being successful through its "greed" and "shortsightedness" despite being the same individuals who negotiated and encouraged both HASelect and Infinity to enter into the MLA.[40]

25.     In other emails to Infinity, Meyer personally attached and repeatedly disparaged GAM's principal, Michael Griffin, and promised that Infinity's new agreement with Tecumseh would not include any "sneaky 'Griffin-type' gotchas".[41]

26.     Similarly, Dalzell repeatedly disparaged GAM's chief financial officer, Debbie Griffin, and instructed that Infinity not send records requested by Griffin relating to HASelect's Collateral or the Coastal notes and to instead falsely claim that such records could not be sent to Griffin because HASelect was not "HIPPA compliant".[42] Debozy also slandered and disparaged Michael Griffin represented to Infinity that he and Dalzell could avoid breaching their fiduciary obligations as subadvisors to HASelect by simply forming a new entity to partner with Tecumseh.[43]

---

[38] *See* Griffin Declaration, ¶ 22.

[39] *See* Emails submitted herewith as Exhibit 15.

[40] *See* Emails submitted herewith as Exhibit 15

[41] *See* Emails submitted herewith as Exhibit 15

[42] Presumably, Dalzell meant to refer to the Health Insurance Portability and Accountability Act of 1996, which is commonly referenced as HIPAA. HASelect was fully HIPAA compliant at the time this Dalzell's email was sent. *See* emails submitted herewith as Exhibit 16.

[43] *See* Emails submitted herewith as Exhibit 15.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

27.     Hemmers eventually questioned Tecumseh representations regarding the supposed benefits of a new relationship with Tecumseh in an email stating, "This model is either completely fucked up or you come up with an explanation how and why it is a benefit for Infinity to take money from Tecumseh." Debozy and Dalzell responded by misrepresenting the terms of the Loan in comparison to the supposed benefits of Tecumseh's plan and using confidential information gained through their fiduciary relationship with HASelect to persuade Hemmers to move forward.[44]

28.     While at the same time assisting Tecumseh in soliciting Infinity (and concealing such activities from HASelect), Debozy and Dalzell continued to assist Infinity in obtaining additional Loan advances from HASelect under the MLA. From March through May 2020, Infinity requested and received Loan advances totaling approximately $1.45 million. HASelect advanced such funds in reliance upon Debozy and Dalzell's representations that FTM Limited had verified the information provided by Infinity concerning the accounts receivable to be purchased with such funds.[45]

29.     As of June 2020, over $744,000 in Loan proceeds remained on deposit in the 8480 Account. Infinity used $170,000 of this amount to pay amounts owed under the Coastal notes and transferred the remaining funds to its operating account to pay Infinity's operating expenses during the initial months of its new funding relationship with Tecumseh and purchase additional accounts receivable that Infinity would later sell and assign to Tecumseh.[46] Tecumseh and FTM were undoubtedly aware of, if not complicit in, and clearly benefited from this misappropriation of HASelect's Loan proceeds.

**F.     Tecumseh and FTM's Wrongful Conduct Continued Long After the Execution of the Sub-Advisory Agreement.**

30.     On or about June 18, 2020, Infinity and Tecumseh concluded their negotiations and entered into the Sub-Advisory Agreement.[47] Although they are not mentioned in the Sub-Advisory

---

[44] *See* Emails submitted herewith as Exhibit 17.

[45] *See* 8480 Account records submitted herewith as Exhibit 11; Griffin Declaration, ¶ 19.

[46] *See* 8480 Account records submitted herewith as Exhibit 11.

[47] A copy of the Sub-Advisory Agreement is submitted with the Motion as Exhibit B.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

Agreement, Tecumseh's early marketing materials represented to potential investors that Debozy and Dalzell would serve as members of Tecumseh's "management team" alongside Meyer and Belotz.[48] While the precise roles that Debozy and Dalzell accepted with Tecumseh remain unclear, HASelect believes they formed a new entity to serve as a subadvisor to Tecumseh.[49]

31. After signing the Sub-Advisory Agreement, Infinity, FTM, and Tecumseh began preparing to transfer accounts receivable in which HASelect held a perfected first-priority security interest to Tecumseh by, among other things, removing the electronic stamps that identified such accounts receivable as HASelect's Collateral.[50]

32. Infinity then sold a substantial portion of its accounts receivable in which HASelect held a perfected, first-priority security interest to Tecumseh without HASelect's knowledge or consent and in violation of Infinity's contractual obligations under the MLA.[51]

33. After learning of Tecumseh and FTM's solicitation of Infinity, GAM and HASelect filed a complaint against Meyer, Tecumseh, FTM Limited, and Alternative Investment Specialists Limited (another entity controlled by Debozy and Dalzell) in the Circuit Court of Cook County, Illinois (case no. 2020CH04427) (the "Chicago State Court Action") in which they asserted claims for trade secrets violations, breach of contract, breach of fiduciary duty, tortious interference, and civil conspiracy.[52]

34. In an attempt to compel GAM and HASelect to drop the Chicago State Court Action and eliminate HASelect's involvement in Infinity's business operations, Tecumseh, FTM, and

---

[48] *See* Emails submitted herewith as Exhibit 18.

[49] A private placement memorandum ("PPM") prepared by Tecumseh in June 2020 indicates that Debozy and Dalzell would serve as subadvisors to Tecumseh through a Hong Kong limited company, Forget the Market, Ltd. *See* Email with excerpt of PPM submitted herewith as Exhibit 19. Tecumseh's Statement of Facts [ECF No. 92] indicates that a different entity, FTM Investments, Inc., was engaged to provide subadvisor services to Tecumseh. *See* ECF No. 92, p. 4.

[50] *See* Hemmers Transcript (Exhibit 3), pp. 61, 110-112; Exhibit 25 to Hemmers Transcript (June 23, 2020 emails from Oliver Hemmers to Endre Debozy confirming removal of electronic stamps).

[51] *See* Hemmers Transcript (Exhibit 3), pp. 110-114 ("Q: And it may have not been clear earlier, but I believe I asked you if any accounts in which HASelect held a security interest were sold to any other party, and I thought you had told me no. So just -- A: Under the blanket UCC[?] Q: Yes, under the blanket UCC. A: Yeah. In that case the Tecumseh receivables were the only ones that fall in that category."); *see also* Griffin Declaration, ¶ 15.

[52] A copy of this complaint is submitted herewith as Exhibit 5. GAM and HASelect later voluntarily dismissed their claims against FTM Limited.

Infinity concocted a plan in July 2020 to attempt to persuade Three Bell Capital, which is a registered investment advisor whose clients invested in HASelect to whom Clark and Meyer were introduced through their employment with GAM, to demand a redemption of its investment in HASelect, which they believed would force the liquidation of HASelect and create an opportunity for Tecumseh to acquire all remaining Infinity accounts receivable in which HASelect held a perfected, first-priority security interest. From July 2020 through July 2021, Tecumseh and Infinity frequently contacted Three Bell Capital in an attempt to implement this plan.[53]

35. Tecumseh also conspired with Infinity to exploit the bankruptcy process through Infinity's chapter 7 filing. Tecumseh, FTM, and Infinity clearly planned to continue to profit from their business relationship while leaving Infinity's debts to HASelect unpaid by transferring Infinity's business records and intangible assets to Infinity Health Solutions, LLC through which Infinity's principals, after misappropriating more than $100,000 in proceeds collected from accounts receivable included in HASelect's Collateral to finance their new company in the weeks prior to Infinity's chapter 7 filing[54], continued to service and collect disputed Tecumseh Receivables and to acquire new accounts for Tecumseh after Infinity's bankruptcy filing just as Infinity had done previously.[55]

### G. Infinity Commingled Loan Proceeds with Funds Received from Tecumseh.

36. As referenced above, all Loan proceeds advanced to Infinity under the MLA were wired to the 8480 Account and were the only material amounts deposited to or held in the 8480 Account from March 2019 through May 2020.

37. As of June 2020, over $744,000 in Loan proceeds remained on deposit in the 8480 Account. Infinity used $170,000 of this amount to pay amounts owed under the Coastal notes and

---

[53] *See* Emails submitted herewith as Exhibit 20.

[54] *See* Transcript of October 27, 2021 Meeting of Creditors attached hereto as Exhibit 21, pp. 7-9.

[55] *See* Infinity Health Solutions, LLC bank account statement for account ending in 5736 for September 29, 2021 filed in Adversary Proceeding 22-01109-abl as ECF No. 4-15; *see also* October 12, 2021 email from Tecumseh's principal Mike Belotz stating that Tecumseh is "going to have to suspend all purchases of receivables from [Infinity Health Solutions]…" filed in Adversary Proceeding 22-01109-abl as ECF No. 4-16. Additionally, in responding to a separate adversary complaint filed by HASelect, Hemmers and Pantelas admit that they used Infinity Health Solutions, LLC to continue providing precisely the same servicing and collection services to Tecumseh that Infinity provided prior to its bankruptcy filing. *See* Adversary Case No. 22-01109, ECF No. 21, ¶¶ 61-62.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

transferred the remaining funds, approximately $575,000, to its operating account to pay Infinity's operating expenses during the initial months of its new funding relationship with Tecumseh and to purchase additional accounts receivable that Infinity would later sell and assign to Tecumseh.[56]

38.     On June 26, 2020, Tecumseh made its first deposit into the 8480 Account in the amount of $294,465.70.[57] At the end of June 2020, the 8480 Account held $425,269.66, well above what Tecumseh transferred to the 8480 Account, evidencing the commingled nature of Tecumseh's funds with HASelect's Loan proceeds. Tecumseh continued to deposit funds in the 8480 Account in payment of accounts receivable purchased from Infinity through at least September 2020.[58]

39.     Infinity routinely transferred funds deposited to the 8480 Account to its operating account at Nevada State Bank and ending in 6735 (the "Operating Account"). For example, on June 8, 2020 and June 16, 2020, Infinity wired $244,000 and $200,000, respectively, from the 8480 Account to the Operating Account.[59]

40.     Infinity used funds transferred to the Operating Account to pay operating expenses[60] and to purchase or fund additional accounts receivable.[61]

41.     Additionally, Infinity began transferring funds from its Operating Account (which included the commingled funds received from HASelect and Tecumseh transferred from the 8480 Account), to the BOA Account shortly after it was opened. For example, on August 1, 2020, the BOA Account contained only $269.72 but ended with a balance of $3,084.80 based on a deposit in the amount of $2,815.08 made from Infinity's Operating Account.[62]

42.     This trend continued as numerous transfers from Infinity's Operating Account made

---

[56] *See* 8480 Account records submitted herewith as Exhibit 11; Griffin Declaration, ¶ 19.

[57] *See* 8480 Account records submitted herewith as Exhibit 11.

[58] *See* 8480 Account records submitted herewith as Exhibit 11.

[59] *See* Operating Account records submitted herewith as Exhibit 22.

[60] For example, the Operating Account bank statement for June 2020 reflects payments to National Payment Corp., which is a payroll/direct deposit company. *See generally* nationalpayment.com.

[61] *See* Operating Account statement submitted herewith as Exhibit 22 reflecting a payment on June 9, 2020 of $53,739.72 to medical provider Preva Advanced SurgiCare.

[62] *Compare* Operating Account bank statement for August 2020 (reflecting a transfer of $2,815.08 on August 12, 2020), submitted herewith as Exhibit 22, *with* BOA Account bank statement for August 2020 (reflecting a deposit of $2,815.08 on August 13, 2020), submitted herewith as Exhibit 23.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1    their way into the BOA Account. On September 21, 25, and 28, 2020, Infinity wired $5,430.16,

2    $36,042.51, and $11,617.59, respectively, from its Operating Account to the BOA Account.[63]

3         43.     Additionally, proceeds from the 1-A through 1-E, 1-G, and 1-H Accounts (over which

4    the Court has already granted summary judgment in favor of HASelect),[64] as well as other amounts

5    from the 1-F, 1-I, and 1-J accounts in which HASelect claims a perfected security interest were

6    frequently deposited to the BOA Account and commingled with funds used by Infinity to purchase

7    and fund the Direct Purchase Receivables.[65]

8         44.     The following non-exhaustive analysis shows that for each month from October 2020

9    through September 2021, proceeds of accounts the Court has already determined rightfully belong to

10   HASelect (or other proceeds in dispute that remain unresolved) were rolled into the BOA Account and

11   commingled with the funds therein:

12        -  On October 9, 2020, $10,545.42 was deposited into the BOA Account with Payment Info
13           listed as "September 2020 Collections." The Operating Account reflects a transfer of
            $10,545.42 on October 8, 2020;[66]
14

15        -  On November 23, 2020, a total of $4,583.27 was deposited into the BOA Account
           through pre-encoded deposits, which is the exact total amount for all amounts collected
16           on November 23, 2020 with respect to the 1-D, 1-F, and 1-I Accounts as reflected by the
           Spreadsheet;[67]

17        -  On December 9, 2020 and December 16, 2020, $752.28 and $5,500.00, respectively, was
18           deposited into the BOA Account through pre-encoded deposits. The December 9, 2020
          amount of $752.28 reflets the exact amount of all amounts collected on this date
19           contained in the Spreadsheet with respect to the 1-D Accounts, and the $5,500 reflects a
          payment collected on December 16, 2020 associated with a 1-A Account;[68]
20

21        -  On January 28, 2021, a total of $38,077.88 was deposited into the BOA Account through
          six pre-encoded deposits. The Spreadsheet reflects a total of $38,077.88 collected on

22

23    [63] *See id.*

24    [64] *See* ECF Nos. 84 and 88 on file herein.

25    [65] *Compare* BOA Account statements, submitted herewith as Exhibit 23, *with* Tecumseh's Spreadsheet entitled
     "Collections (Inc. to June 2021 – Aug 2021.xlsx)" (the "Spreadsheet"), submitted herewith as Exhibit 24, which shows
     the corresponding BillID with the 1-A through 1-J Accounts and the amount collected. The Spreadsheet only continues
26    through June 2021.

   [66] *Id.*
27
   [67] *Id.*

28    [68] *Id.*

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

January 28, 2021 from the 1-D, 1-E, 1-F, and 1-H Accounts.[69]  Moreover, the BillIDs contained in the Spreadsheet correlate with the BillIDs and amounts contained in the purchase orders previously submitted to this Court;[70]

- On February 16, 2021, a pre-encoded deposit in the amount of $9,236.43 was deposited into the BOA Account which correlates to the Spreadsheet, reflecting an amount of $9,236.43 collected on February 16, 2021 from a 1-B Account;[71]

- On March 4, 2021, and March 12, 2021, pre-encoded deposits in the amount of $550.24 and $769.30, respectively, were deposited into the BOA Account, which correlates to the Spreadsheet for all 1-D Accounts collected on March 4, 2021 (totaling $550.24) as well as a 1-D Account collected on March 12, 2021;[72]

- On April 12, 2021 and April 22, 2021, pre-encoded deposits totaling the amount of $5,238.12 and $1,856.63, respectively, were deposited into the BOA Account, which correlates to the Spreadsheet for the 1-A, 1-B, and 1-D Accounts collected on April 12, 2021 and the 1-D, 1-F, and 1-J Accounts collected on April 22, 2021;[73]

- On May 5, 2021 and May 19, 2021, pre-encoded deposits of $219.21 and $9,459.90, respectively, were deposited into the BOA Account, which correlates to the Spreadsheet for all of the accounts collected on May 5, 2021 in the amount of $219.21 from the 1-D Accounts and a $9,459.50 collection on May 19, 2021 from a 1-F Account;[74]

- On June 8, 2021 and June 10, 2021, pre-encoded deposits totaling $16,848.58 and $13,569.69, respectively, were deposited into the BOA Account, which correlates to the Spreadsheet for amounts collected on accounts including the 1-D Accounts on June 8, 2021 in the amount of $16,848.58, and the 1-D, 1-H, 1-I, and 1-J Accounts on June 10, 2021 in the total amount of $13,569.69;[75]

- On July 19, 2021, a pre-encoded deposit of $2,129.68 was deposited into the BOA Account, which corresponds to a check and letter dated July 15, 2021 from the Richard Harris Law Firm regarding a certain patient assigned to BillID number including, but not limited to, 24546, which is included in the 1-H Accounts;[76]

- On August 2, 2021 and August 23, 2021, pre-encoded deposits of $5,250 and $32,380.00

---

[69] *Id.*

[70] *See generally* ECF No. 75-1 on file herein.

[71] *Compare* BOA Account bank statements, submitted herewith as <u>Exhibit 23</u>, *with* Tecumseh's Spreadsheet, submitted herewith as <u>Exhibit 24</u>, which shows the corresponding BillID with the 1-A through 1-J Accounts and the amount collected.

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] *Compare* BOA Account bank statements, submitted herewith as <u>Exhibit 23</u>, *with* check 120046 and corresponding letter dated July 15, 2021, submitted herewith as <u>Exhibit 35</u>.  *See also* ECF No. 75-1 on file herein.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

were deposited into the BOA Account, which corresponds to checks involving certain patients assigned to BillID numbers including, but not limited to, 19958, 15585 and 26889, respectively, which are included in the 1-D and 1-J Accounts;[77]

- On September 1, 2021, a pre-encoded deposit of $599.22 was deposited into the BOA Account, which corresponds to check and letter dated August 30, 2021 from the Mountain Vista Law Group involving a patient assigned to BillID number 25461, which is included in the 1-H Accounts.[78]

45.    Based on a collections report prepared by FTM and sent to Tecumseh and Infinity on August 17, 2021, it appears that Infinity collected at least $500,000 in proceeds from the Tecumseh Receivables that it deposited to the BOA Account (sometimes directly and sometimes through transfers from other Infinity bank accounts) and later used to purchase additional Tecumseh Receivables.[79]

46.    Tecumseh's Motion entirely ignores the deposit of such funds to the BOA Account – a large portion, if not all, of which were clearly proceeds of HASelect's Collateral and remained subject to HASelect's perfected security interest.  In fact, in the BOA Account statements provided as exhibits to the Motion, Tecumseh obtusely redacts these deposits as if they never occurred.[80] Similarly, Tecumeh makes no effort to explain how such proceeds were allocated or used by Infinity to purchase or fund additional Tecumseh Receivables or to trace the use of its own investors' funds it claims were deposited to the BOA Account and used by Infinity to purchase or fund the Direct Purchase Receivables.[81]

**H.    Infinity Controlled and Made All Payments from the BOA Account, Not Tecumseh.**

47.    The BOA account was opened under the fictitious firm name "Infinity Health Connections", which is a fictitious firm name registered to and used by Infinity since at least 2016.[82]

---

[77] *Compare* BOA Account bank statements, submitted herewith as Exhibit 23, *with* checks 14056 and 1237, submitted herewith as Exhibit 35.  *See also* ECF No. 75-1 on file herein.

[78] *Compare* BOA Account bank statements, submitted herewith as Exhibit 23, *with* checks 2021 and corresponding letter dated August 30, 2021, submitted herewith as Exhibit 35.  *See also* ECF No. 75-1 on file herein.

[79] *See* Email and accounting records submitted herewith as Exhibit 24.

[80] Unredacted (except for account numbers) copies of the BOA Account statements are submitted herewith as Exhibit 23.

[81] *See generally,* the Motion.

[82] *See* Exhibit 25 submitted herewith.

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

All parties responsible for payment of the Tecumseh Receivables were instructed to send payment to Infinity under the fictitious firm name "Infinity Health Connection". No such party was ever instructed to send payment to Tecumseh or even advised of Tecumseh's existence. Infinity's principals, Oliver Hemmers and Anne Pantelas, were signatories on the BOA Account and made all payments from the BOA account.[83]

**I. All Tecumseh Receivables Were Purchased or Funded by Infinity, Not Tecumseh.**

48. All Tecumseh Receivables were purchased or funded by Infinity pursuant to written contracts between Infinity and medical service providers, which in most cases existed long before the execution of the Sub-Advisory Agreement and in all cases govern Infinity's rights in the Tecumseh Receivables. Infinity purchased or funded the Tecumseh Receivables pursuant to approximately 100 separate such contracts. Infinity's rights under such contracts are included in the Collateral in which HASelect holds a perfected security interest in connection with the MLA. Tecumseh is not a party to and holds no rights under any such contract.[84]

49. Except with respect to those Tecumseh Receivables for which Infinity and Tecumseh entered into an Assignment and Bill of Sale, not a single document exists that evidences the purchase of any Tecumseh Receivable (including the so-called Direct Purchase Receivables) by Tecumseh. Similarly, no document exists that evidences any sale or assignment of any Tecumseh Receivable to Tecumseh by any medical provider.[85]

50. In reviewing business records obtained from Infinity after its bankruptcy filing, HASelect has discovered that a majority of the Direct Purchase Receivables originated from transactions between Infinity and medical providers that were effectively loans rather than outright

---

[83] *See* Exhibit 25 submitted herewith. Additionally, Debtor often treated the funds in the BOA Account as its own. In at least one instance, Debtor borrowed funds from the BOA Account to pay its own operating expenses without informing Tecumseh. On March 10, 2021, Debtor transferred $25,000 from the BOA Account to its own operating account at Nevada State Bank, which at the time was overdrawn by $720.81. Debtor was obligated to fund its payroll the following day. On March 11, 2021, after satisfying its payroll obligations and obtaining a loan from a third party, Debtor returned the $25,000 to the BOA account. *See* BOA Account records submitted herewith as Exhibit 23; Operating Account records submitted herewith as Exhibit 22.

[84] *See* Tecumseh's excerpts of responses to requests for production of documents submitted herewith as Exhibit 26, p. 47, responses to requests nos. 94-99. *See also* Tecumseh's responses to interrogatories submitted herewith as Exhibit 27, p. 9, response to interrogatory no. 3.

[85] *Id.*

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

purchases of an account receivable.

51.     While such transactions involved an advance of funds by Infinity and were typically designated by Infinity as a purchase of an account receivable, Infinity did not actually acquire ownership of or the right to collect the account receivable in question.  Rather, the medical provider retained ownership of and all rights to collect the account receivable and generally bore the risk of non-payment of the account receivable.  Neither the individual obligated as to payment of the account receivable nor that individual's attorney was informed of any transaction involving Infinity, nor were they instructed to pay any amount to Infinity, nor did they grant Infinity any lien against any personal injury claim.  Rather, all such individuals and their attorneys were instructed only to pay the medical provider, and all such lien rights were given to and retained by the medical provider.

52.     For example, on September 20, 2019, Infinity entered into an agreement with Cueva Diagnostics, LLC d/b/a Stat Diagnostics ("Stat Diagnostics") under which Infinity agreed to pay $600 for each account receivable arising from a magnetic resonance imaging scan ("MRI") performed by Stat Diagnostics that Stat Diagnostics offered to Infinity and Infinity elected to "purchase".[86]  Infinity's payment, however, did not give Infinity the right to collect such account receivable.  Rather, all collection rights remained with Stat Diagnostics.[87]  In fact, Infinity was expressly prohibited from making any contact with Stat Diagnostic's patient or the patient's attorney and did not receive any assignment of any lien or other interest in any personal injury claim from such patient or attorney.[88]  In consideration for Infinity's payment, Stat Diagnostics agreed that it would refund Infinity's $600 payment and pay an additional fixed fee to Infinity of $180 to $480 at the time of collection depending on the length of time that passed between Infinity's funding of the account receivable and collection.[89]  Stat Diagnostics had the right to refund Infinity's $600 payment along with the applicable fixed fee at any time regardless of collection.[90]  Stat Diagnostics retained

[86] *See* Contract dated September 20, 2019 between Infinity and Stat Diagnostics (the "Stat Diagnostics Contract") submitted herewith as Exhibit 28.

[87] *See* Stat Diagnostics Contract, § 6.

[88] *See* Stat Diagnostics Contract, § 6(c)

[89] *See* Stat Diagnostics Contract, § 6.

[90] *See* Stat Diagnostics Contract, § 9.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1    the rights to all amounts collected in excess of Infinity's $600 payment and the applicable fixed

2    fee.[91]  Infinity received only limited records relating to the accounts receivable it funded.[92]  Stat

3    Diagnostics was required to indemnify Infinity for all losses arising out of any breach of any

4    representation or warranty by Stat Diagnostic or its negligence.[93]  Finally, Infinity was precluded

5    from assigning any right under this contact to any other person without Stat Diagnostic's prior

6    written consent.[94]

7        53.    After entering into the Stat Diagnostics Contract, Infinity periodically sent payments

8    to Stat Diagnostics (first from the Operating Account and later the BOA Account) along with

9    correspondence identifying the accounts receivables to be funded through such payments.[95]  The

10   Direct Purchase Receivables include accounts receivable funded by Debtor under the Stat

11   Diagnostics Contract with a face value of $5,796,689.[96]

12       54.    On June 2, 2020, Infinity entered into an agreement with Preva Advanced Surgicare

13   – The Woodlands, LLC ("Preva") under which Infinity agreed to pay 22% of the face value of

14   accounts receivable arising from medical services provided by Preva that Preva offered to Infinity

15   and Infinity elected to "purchase".[97]  Infinity's payment, however, did not give Infinity the right to

16   collect such accounts receivable, nor did Infinity receive any assignment of any lien or other interest

17   in any personal injury claim from Preva's patients or their attorneys.[98]  All collection and lien rights

18   remained with Preva.[99]  In consideration for Infinity's payment, Preva agreed it would refund

19   Infinity's 22% payment and pay an additional fixed fee to Infinity of 10% to 15% at the time of

20   collection depending on the length of time that passed between Infinity's funding of the account

21   [91] *See* Stat Diagnostics Contract, § 8.

22   [92] *See* Stat Diagnostics Contract, § 10.

23   [93] *See* Stat Diagnostics Contract, § 11.

24   [94] *See* Stat Diagnostics Contract, § 23.

     [95] Examples of such payments are submitted herewith as Exhibit 29.

25   [96] *See* Accounting attached here to as Exhibit 30.

26   [97] *See* Contract dated June 2, 2020 between Infinity and Preva (the "Preva Contract") submitted herewith as Exhibit 31,
     § 4.

27   [98] *See* Preva Contact, § 5.

28   [99] *See* Preva Contact, § 5.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

receivable and collection.[100]  For any accounts receivable that remained uncollected 18 months after Infinity's Payment to Preva, Preva was obligated to pay Infinity double the amount of its 22% payment.[101]  Preva had the right to refund Infinity's 22% payment along with the applicable fixed fee at any time regardless of collection.[102]  Preva also retained the rights all amounts collected in excess of Infinity's 22% payment and the applicable fixed fee.[103]  Infinity received only limited records relating to the accounts receivable it funded.[104]  Preva was required to indemnify Infinity for all losses arising out of any breach of any representation or warranty by Preva or its negligence.[105]  Finally, Infinity was precluded from assigning any right under this contact to any other person without Preva's prior written consent.[106]

55.     After entering into the Preva Contract, Infinity periodically sent payments to Preva (first from the Operating Account and later the BOA Account) along with correspondence identifying the accounts receivables to be funded through such payments.[107]  The Direct Purchase Receivables include accounts receivable funded by Debtor under it the Preva Contract with a face value of $1,022,473.[108]

56.     On January 6, 2021, Infinity entered into an agreement with Viking Pain Management, LLC ("Viking") under which Infinity agreed to pay either $1,800 or $300 for each account receivable arising from medical services provided by Viking (depending on the type of service) that Viking offered to Infinity and Infinity elected to "purchase".[109]  Infinity's payment, however, did not give Infinity the right to collect such accounts receivable, nor did Infinity receive

[100] *See* Preva Contact, § 5.

[101] *See* Preva Contact, § 5 D.

[102] *See* Preva Contact, § 8.

[103] *See* Preva Contact, § 7.

[104] *See* Preva Contract, § 9.

[105] *See* Preva Contract, § 12.

[106] *See* Preva Contact, § 22.

[107] Examples of such payments are submitted herewith as Exhibit 32.

[108] *See* Accounting attached here to as Exhibit 30.

[109] *See* Agreement dated January 6, 2021 between Infinity and Viking (the "Viking Contract") submitted herewith as Exhibit 33, §§ 5-6.

any assignment of any lien or other interest in any personal injury claim from Viking's patients or their attorneys. All collection and lien rights remained with Viking.[110] In consideration for Infinity's payment, Viking agreed that it would refund Infinity's $1,800 or $300 payment and pay an additional fixed fee to Infinity of $700 or $300, respectively, at the time of collection.[111] Viking retained the rights to all amounts collected in excess of Infinity's payment and the applicable fixed fee.[112] In the event that Viking's collections were insufficient to refund the full amount of Infinity's payment and the applicable fixed fee, Viking was expressly obligated to pay such amounts to Infinity from other sources subject to certain limitations.[113] Infinity received only limited records relating to the accounts receivable it funded.[114] Viking was required to indemnify Infinity for all losses arising out of any breach of any representation or warranty by Viking or its negligence.[115]Finally, Infinity was precluded from assigning any right under this contact to any other person without Viking's prior written consent.[116]

57. After entering into the Viking Contract, Infinity periodically sent payments to Viking along with correspondence identifying the accounts receivables to be funded through such payments.[117] The Direct Purchase Receivables include accounts receivable funded by Debtor under the Viking Contract with a face value of $5,743,993.[118]

58. Together, the Direct Purchase Receivables funded by Infinity pursuant to its contracts with Stat Diagnostics, Preva, and Viking account for $12,563,155 (roughly 63.3%) of the total Direct Purchase Receivables of $19,846,625 by face value.[119]

---

[110] *See* Viking Contract, § 7.

[111] *See* Viking Contact, § 7 A.

[112] *See* Viking Contact, § 7.

[113] *See* Viking Contract, § 7 C and D.

[114] *See* Viking Contract, § 8.

[115] *See* Viking Contract, § 11.

[116] *See* Viking Contact, § 21.

[117] An example of such a payment is submitted herewith as Exhibit 30.

[118] *See* Accounting attached here to as Exhibit 32.

[119] *See* Accounting attached here to as Exhibit 32.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

59.     Neither the Stat Diagnostics Contract, the Preva Contract, nor the Viking Contract make any mention of Tecumseh, a resulting trust, or any trust relationship whatsoever.[120]

## III.     ARGUMENTS

### A.     Summary Judgment Is Not Appropriate and Must Be Denied.

Summary judgment may only be granted when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (incorporated herein by Bankruptcy Rule 7056). A moving party meets its initial burden under Rule 56 only when it presents sufficient evidence to support a verdict at trial on all the elements of the claims sought to be summarily adjudicated. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-250 (1986). Only then does the burden shift to the non-moving party to put forth evidence showing a genuine issue of material fact. *See id.*

A court "must view the evidence and inferences therefrom in the light most favorable to the nonmoving party," which here is HASelect. *Twentieth Century-Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1328 (9th Cir. 1983). Courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment because the court's function at summary judgment is not to weight the evidence or credibility but rather to simply determine whether there is a genuine issue for trial. *Zetwick v. Cnty. Of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citing *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014)). "Similarly, the district court must recognize that, where evidence is genuinely disputed on a particular issue—such as by conflicting testimony—that 'issue is inappropriate for resolution on summary judgment.'" *Zetwick*, 850 F.3d at 441.

Here, the Motion must be denied because Tecumseh cannot establish it is entitled to a resulting trust over the Direct Purchased Receivables or that it purchased the same directly. Moreover, Tecumseh cannot obtain the equitable relief it seeks—a resulting trust—because it comes to this Court with unclean hands. Lastly, no resulting trust exists between Infinity and Tecumseh based on the evidence currently before this Court, as well as this Court's previous findings. At a

---

[120] *See generally* the Stat Diagnostics Contract, the Preva Contract, and the Viking Contract, submitted herewith as Exhibits 28, 31, and 33, respectively.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

minimum, genuine issues of material fact exist regarding the resulting trust issue and as such, summary judgment cannot be granted.

**B.      It Was Infinity, Not Tecumseh, that Purchased and Funded the Direct Purchase Receivables.**

Despite Tecumseh's unsupported assertions to the contrary, it was Infinity that purchased or funded all Tecumseh Receivables, including the Direct Purchase Receivables, not Tecumseh. Consequently, HASelect's perfected security interest attached to all Tecumseh Receivables.  The fact that Tecumseh provided funds to Infinity is irrelevant as the use of such funds granted Tecumseh nothing more than an unperfected security interest in the disputed Tecumseh Receivables.

All Tecumseh Receivables were purchased or funded by Infinity pursuant to written contracts between Infinity and medical service providers, which in most cases existed prior to the execution of the Sub-Advisory Agreement and in all cases govern Infinity's rights in the Tecumseh Receivables.  Infinity's rights under such contracts are included in HASelect's Collateral and subject to HASelect's perfected security interest.[121]  Tecumseh is not a party to and holds no rights under any such contract.[122]  Tecumseh further admits it never communicated or entered into any contractual relationship with any medical provide whose services gave rise to any Tecumseh Receivable or any personal injury claimant or attorney obligated as to payment of any Tecumseh Receivable and received no assignment of any lien from any such claimant or attorney.[123]

Except with respect to those Tecumseh Receivables for which Debtor and Tecumseh entered into an Assignment and Bill of Sale, which this Court has already awarded to HASelect[124], not a single document exists to evidence the sale or assignment of any account receivable to Tecumseh by Infinity, any medical provider, or any other person.[125]  The lack of any document supporting

---

[121] *See* MLA, § 4.1.

[122] *See* Tecumseh's responses to requests for production of documents submitted herewith as Exhibit 26, p. 47, response to request no. 95.  *See also* Tecumseh's responses to interrogatories submitted herewith as Exhibit 27, p. 9, response to interrogatory no. 3.

[123] *See* Tecumseh's responses to requests for production of documents submitted herewith as Exhibit 26, p. 47, responses to request nos. 94 and 96-99.

[124] *See* ECF No. 88.

[125] *See* Tecumseh's responses to requests for production of documents submitted herewith as Exhibit 26, p. 47, responses to request nos. 94-99.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1  Tecumeh's claim to have purchased the Direct Purchase Receivables directly from medical providers

2  is entirely consistent with Tecumseh's lack of involvement in the actual process by which Infinity

3  purchased and funded the Direct Purchase Receivables.

4  Further, Tecumseh has failed to establish that any particular Direct Purchase Receivable (let

5  alone all Direct Purchase Receivables) was purchased or funded by Infinity using funds received

6  from Tecumseh's investors.  In fact, the statements on which the Motion relies to claim sole

7  ownership over the Direct Purchase Receivables are clearly untrue.[126]  For example, the Motion

8  claims that "all dollars collected on the [Direct Purchase Receivables] were paid directly to

9  Tecumseh…."[127]  However, as shown by the checks included herewith, all of the checks were made

10  out and paid to Infinity, not Tecumseh.[128]  Further, the Motion is entirely incorrect in claiming that

11  all of the funds in the BOA Account belonged to Tecumseh and nothing flowed through any of

12  Infinity's bank accounts.[129]  As shown above, commingled funds from Infinity's Operating Account

13  were routinely transferred to the BOA Account.  Moreover, as much as $500,000 in proceeds of

14  HASelect's collateral were deposited to the BOA Account.[130]  Such proceeds remained subject to

15  HASelect's perfected security interest under the MLA and clearly did not belong to Tecumseh.[131]

16  Those proceeds were then used by Infinity to purchase and fund additional Direct Purchase

17  Receivables.  The Motion makes no attempt whatsoever to address these facts.  Instead, Tecumseh

18  simply redacts these deposits from the BOA Account statements on which the Motion is based.

19  As the moving party, it is Tecumseh that bears the burden of proof.  Tecumseh has plainly

20  failed to meet that burden here.  As such, the Motion must be denied.  At a minimum, the documents

21  and evidence submitted herewith directly contradict the evidence contained in the motion show that

22

23  [126] Tecumseh also relies heavily on 'Reports' that it provided to its investors to substantiate its ownership in the accounts receivable at issue in this adversary. However, as the Court recently ruled, these self-serving statements made

24  by Tecumseh to its investors are patently false.

25  [127] Motion, 11:18-20.

26  [128] *See* Checks attached hereto as <u>Exhibit 36</u>.

27  [129] Motion, 12:1-4.

28  [130] *Compare* Operating Account bank statements, submitted herewith as <u>Exhibit 22</u>, *with* BOA Account bank statements, submitted herewith as <u>Exhibit 23</u>, *and* Tecumseh's Spreadsheet, submitted herewith as <u>Exhibit 24</u>.

[131] *See* MLA, § 4.1.  *See also* NRS 104.9315; 810 ILCS 5/9-315.

there is a genuine issue of material fact regarding Infinity's ownership over the Direct Purchase Receivables.

### C. No Resulting Trust Exists Over the Direct Purchase Receivables.

As Tecumseh is well aware, it come forward with clear and convincing evidence showing that not only it provided the funds on the date of purchase of the Direct Purchase Receivables, but also that it and Infinity had the intent to create such a resulting trust relationship. *See, e.g.*, *Anderson v. Monroe (In re Hester)*, No. 18-03903, 2019 Bankr. LEXIS 2371, *8 (D.S.C. Bankr. July 26, 2019); *see also Glover v. Glover*, 234 S.E.2d 477 (S.C. 1977) ("In order to establish a resulting trust [under South Carolina law], it was necessary that respondent show by ***definite, clear, unequivocal, and convincing evidence*** that she paid…the purchase money at the time of the transaction.") (emphasis supplied); Restatement (Third) of Trusts, § 9, Comment f(1) ("[T]he party alleging the purchase-money resulting trust has the burden of proving by clear and convincing evidence that the claimant…paid or furnished the purchase price…thereof."). "If the evidence produced can be construed in any reasonable way other than to create a resulting trust, the trust theory fails." *In re Peregrine Fin. Grp., Inc.*, 2014 Bankr. LEXIS 2328 at *9. Here, Tecumseh cannot establish either that it paid for the Direct Purchase Receivables or that Tecumseh and Infinity intended to create a resulting trust. As such, the Motion must fail.

#### 1. Tecumseh Cannot Establish that Its Funds Were Used by Infinity to Purchase or Fund the Direct Purchase Receivables.

Tecumseh's argument for the rarely granted remedy of a resulting trust must fail because the Direct Purchase Receivables were purchased with commingled funds received from HASelect and Tecumseh and with proceeds of HASelect's Collateral. Funds from Infinity's Operating Account, which included both Loan proceeds advanced by HASelect and proceeds collection on Tecumseh Receivables in which HASelect holds a superior perfected security interest, were plainly transferred to the BOA Account.[132] For example, on June 8, 2020 and June 16, 2020, Infinity transfered $244,000 and $200,000, respectively, from the 8480 Account to its Operating Account.[133] Such

---

[132] *Compare* Operating Account bank statement, submitted herewith as Exhibit 22, *with* BOA Account bank statement, submitted herewith as Exhibit 23.

[133] *Compare* 8480 Account bank statements, submitted herewith as Exhibit 11, *with* Operating Account bank

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1    funds were clearly Loan proceeds advanced to Infinity by HASelect as Tecumseh did not wire any

2    funds to the 8480 Account until June 26, 2020.[134]  Infinity thereafter used such funds to finance is

3    business operations under its new funding arrangement with Tecumseh, which did not provide

4    sufficient cash flow to support Infinity business operations, if at all, until several months later, and

5    to purchase additional accounts receivable that Infinity would later sell and assign to Tecumseh as

6    Tecumseh Receivables.

7         Additionally, collections from the Tecumseh Receivables, which were made payable and

8    delivered to Infinity, were often deposited to Infinity's Operating Account and later transferred to

9    the BOA Account as outlined above.  Even where such collections were deposited directly to the

10   BOA Account, such collections were proceeds of HASelect's Collateral and remained subject to

11   HASelect's perfected security interest under the MLA as discussed above.  This Court has already

12   determined that HASelect holds superior interests in the 1-A through 1-E, 1-G, and 1-H Accounts,

13   and that no resulting trust existed with respect to these account batches.[135]  The BOA Account and

14   Tecumseh's own records reflect that proceeds of HASelect's Collateral were regularly deposited to

15   the BOA Account and later used to purchase additional Direct Purchase Receivables.[136]

16        Tecumseh has made no effort to trace to the source any of the funds deposited in the BOA

17   Account or how such funds were used by Infinity in purchasing and funding the Direct Purchase

18   Receivables as is required of a party seeking to impose a resulting trust.  *See Old Republic Nat'l title*

19   *Ins. Co. v. Tyler (In re Dameron)*, 155 F.3d 718, 723 (4th Cir. 1998) ("[A] party claiming entitlement

20   to a trust must be able to trace its assets into the fund or property that is the subject of the trust.");

21   *Hatoff v. Lemons & Assocs., Inc.*, 67 B.R. 198, 213 (Bankr. D. Nev. 1986) ("A party who wishes to

22   exempt trust property from the estate must not only prove the existence of a trust relationship but

23   must also specifically identify the trust property in either its original or substituted form.").

24

25   statements, submitted herewith as Exhibit 22.

26   [134] *Compare* 8480 Account bank statements, submitted herewith as Exhibit 11, *with* Operating Account bank statements,
     submitted herewith as Exhibit 22.

27   [135] See ECF Nos. 84 and 88.  Priority rights over the 1-F, 1-I, and 1-J Accounts remain unresolved.

28   [136] *See* ¶¶ 36-46 above.

1    Tecumseh has not and cannot trace the use of any funds deposited to the BOA Account by Infinity.[137]

2         As the moving party, it is Tecumseh that bears the burden of proof. Tecumseh has plainly

3    failed to meet that burden here. As such, the Motion must be denied. At a minimum, as a genuine

4    issue of material fact exists regarding the sources and uses of the funds used by Infinity to purchase

5    or fund the Direct Purchase Receivables.

6                    **2.    There Was No Intent to Create a Resulting Trust.**

7         In an interesting departure from its prior arguments in this matter, Tecumseh's primary

8    argument under the Motion is that there was no trust relationship between it and Infinity (and

9    therefore no intent to create any trust relationship) because Tecumseh purchased the Direct Purchase

10   Receivables in its own name directly from the medical providers. As shown above, Tecumseh is

11   plainly wrong in claiming to have been a party to any transaction of any kind with any of the medical

12   providers at issue. However, by arguing that Infinity never took ownership of the Direct Purchase

13   Receivables, Tecumseh completely undercuts any argument either it or Infinity intended to create a

14   resulting trust.

15        Moreover, the Court has already entertained Tecumseh's arguments for a resulting trust and

16   found them wanting.[138] There is no reference to any trust relationship between Tecumseh and

17   Infinity in the Sub-Advisory Agreement or any other document before this Court.[139] The failure to

18   include such language by sophisticated commercial parties should be fatal. *In re Landamerica Fin.*

19   *Grp., Inc.*, No. 08-35994, 2009 Bankr. LEXIS 4133, *44 (E.D. Va. May 7, 2009). Infinity's

20   bankruptcy schedules make no mention whatsoever of any account receivable it held in trust for

21   Tecumseh or to which it held only bare legal title.[140] Likewise, in filing its motions in Infinity's

22   chapter 7 case to reject the Sub-Advisory Agreement and to compel the Trustee to abandon the

23   estate's interests in the Disputed Accounts, Tecumseh make no mention whatsoever of any account

24

---

25   [137] Tecumseh similarly cannot attempt to trace funds in its reply brief because to do so would be against binding case
     law. *See, e.g.*, *Vasquez v. Rackauckas*, 734 F.3d 1025, 1054 (9th Cir. 2013) ("[W]e do not consider issues raised for
26   the first time in reply briefs.").

     [138] *See* ECF Nos. 84 and 88.

27   [139] *See* Exhibit B attached to the Motion.

28   [140] *See* Bankruptcy Case No. 21-14486-abl, ECF No. 112.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1  receivable held in trust by Infinity or to which Infinity held only bare legal title.[141]

2    The commingling addressed above further shows that there was no intent to create a resulting

3  trust.  *See Obuchowski v. Entis (In re Robert)*, No. 05-12461, 2007 Bankr. LEXIS 2852, *33 (Vt.

4  Bankr. Aug. 17, 2007) (finding that as a matter of law, there was no intent to create a resulting trust

5  when the operative agreement contained no provision that the funds provided to debtor would be

6  held in trust or kept separate from debtor's assets).  Moreover, none of the various contacts between

7  Infinity and the medical providers whose services gave rise to the Direct Purchased Receivables to

8  which Tecumseh admits it was not a party made any reference whatsoever to Tecumseh or any trust

9  in its favor.[142]  Rather, the majority of those contracts expressly precluded Infinity from assigning

10  its interests to any other person with the medical providers prior written consent.[143]

11    Additionally, Tecumseh has admitted through the amended declaration of Chad Meyer filed

12  in Infinity's chapter 7 case on March 22, 2022 that it purchased a significant portion of what it now

13  claims to be the Direct Purchase Receivables from Infinity – specifically, accounts receivable with

14  a face value of $64,621.43 identified in "Exhibit D-10" thereto and accounts receivable with a face

15  value of $584,935.85 identified in "Exhibit D-11" thereto.[144]  Clearly, there can be no resulting trust

16  where Tecumseh admits it purchased so-called Direct Purchase Receivables directly from Infinity.

17    Finally, as the Court has already found, the initial series of transactions under the Sub-

18  Advisory Agreement were clearly not intended to create a resulting trust relationship.  Rather, those

19  consisted of Tecumseh purchasing accounts receivable from Infinity after Infinity had already paid

20  for and acquired the same.[145]  The Sub-Advisory Agreement was never amended to address any

21  change in the nature of the parties' relationship.  Thus, the original actions of the parties show that

22  there was no intent to create a resulting trust or trust relationship.  Tecumseh has plainly failed to

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

23

24  [141] *See* Bankruptcy Case No. 21-14486-abl, ECF Nos. 57 and 61.

[142] *See generally* the Stat Diagnostics Contract, the Preva Contract, and the Viking Contract, submitted herewith as

25  Exhibits 28, 31, and 33, respectively.

[143] *Id.*

26  [144] *See* Bankruptcy Case No. 21-14486-abl, ECF Nos. 200, 201-13, and 201-14 ("[Tecumseh] purchased the remaining

27  Tecumseh Receivables from the Debtor. Attached as Exhibits D-1 to D-11 are purchase orders reflecting the purchase of Tecumseh Receivables from the Debtor.").

28  [145] *See* ECF Nos. 84 and 88.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1   establish by clear and convincing evidence that any resulting trust was intended under the Sub-

2   Advisory Agreement. Moreover, Tecumseh has certainly not met its burden of proof in seeking

3   summary judgment. *JPMorgan Chase Bank, N.A. v. KB Home*, 632 F.Supp.2d 1013, 1020 (D. Nev.

4   2009) ("[t]he parties' intentions regarding a contractual provision present a question of fact.").

5   Accordingly, Summary judgment cannot be granted in Tecumseh's favor.

6                    **3.    The Nature of Infinity's Transactions with Medical Providers
                            Precludes Any Finding of a Resulting Trust Over the Majority of the
7                            Direct Purchase Receivables.**

8           It is beyond reasonable dispute that a transfer of title through a purchase must occur in order

9   to support the remedy of a resulting trust. Where there is no purchase, there can be no resulting

10  trust. The purchase requirement is referenced in both the cases cited herein and in Tecumseh's

11  Motion. *See, e.g.*, *In re Hester*, 2019 Bankr. LEXIS at * 8 (referencing a "date of purchase");

12  Restatement (Third) of Trusts § 9 (discussing a "purchase price" being paid); *In re Macdonald*, 622

13  B.R. 837, 856 (Bankr. D.S.C. 2020) (stating that the actual intention of the parties ***at the time of***

14  ***purchase*** is the critical determination) (emphasis supplied). Unless a purchase results in an actual

15  transfer of title, no resulting trust can arise. *See In re Welch*, No. 12-05082-8, 2012 Bankr. LEXIS

16  4747, *12-14 (Bankr. E.D.N.C. Oct. 10, 2012). In *In re Welch*, the court acknowledged that where

17  legal title has not changed hand, no resulting trust can arise. *Id.* (collecting cases where a resulting

18  trust cannot arise because no legal title was transferred). Here, the nature of the transactions with

19  the medical providers associated with the majority of the Direct Purchase Receivables were not

20  outright purchases of these accounts receivable. Rather, these transactions were effectively made

21  by Infinity loans to these medical providers.[146]

22          To determine the nature of a transaction, courts look to the "substance of the relationship"

23  and "not simply the label attached to the transaction." *S&H Packing & Sales Co. v. Tanimura*

24  *Distrib.*, 883 F.3d 797, 804-08 (9th Cir. 2018). One of the largest factors in determining whether a

25  transaction constitutes a loan or a sale of an account receivable turns on who bears the risk of

26  nonpayment. *See id.* (stating that the root of the factors turns on the transfer of risk). Other factors

27  ──────────────

28  [146] A right to repayment is a general intangible, which is expressly covered by HASelect's perfected security interest.
    *See* MLA, § 4.1.

include whether the buyer has a right of recourse against the seller, whether the seller continues to service and collect the accounts, whether there was an independent investigation by the buyer of the account debtor, whether the seller has the right to excess collections, and whether the seller has the absolute power to alter the terms of the underlying asset. *CapCall, LLC v. Foster (In re Shoot the Moon, LLC)*, 635 B.R. 797, 812-13 (Bankr. D. Mont. 2021). All such factors support a finding that the transactions between Infinity and Stat Diagnostics, Preva, and Viking were loans, not purchases of accounts receivable.

As set forth in paragraphs 47 through 58 above, approximately 63% of Direct Purchase Receivables were funded by Infinity under its contracts with just three medical providers – Stat Diagnostics, Preva, and Viking. Notwithstanding the fact that each of those contracts was designated a "purchase and sale agreement", the terms of those contracts undoubtedly reflect loan transactions, not sales of accounts receivable. The rights to settle, compromise, and collect the accounts receivable, the potential benefits of collection above the amounts owed to Infinity and, in most cases, the risk of loss stayed with the medical providers.[147]

Moreover, the contracts require that the medical providers deposit collected in an account held in the medical provider's name for which Infinity has "read only access,"[148] similar to Infinity's obligation to do the same for HASelect under the MLA. Thus, the fact that the medical providers continue to service the accounts post-funding by Infinity shows that the relationship with these medical providers is more akin to a loan, not a purchase. Further, the medical providers continued to have the exclusive right to service the accounts receivable as Infinity was not allowed to directly contact an attorney of an individual associated with an account receivable held by these medical providers.[149] If Infinity indeed purchased these accounts receivable from the medical providers, then Infinity would be free to contact the relevant individuals regarding repayment and collection on these accounts. In the event of any default by the medical provider, Infinity was required to give notice

---

[147] *See generally* the Stat Diagnostics Contract, the Preva Contract, and the Viking Contract, submitted herewith as Exhibits 28, 31, and 33, respectively.

[148] *Id.*

[149] *See* Stat Diagnostics Contract, ¶ 12(c), submitted herewith as Exhibit 28; *see also* Preva Contract, ¶ 11(c), submitted herewith as Exhibit 31; Viking Contract, ¶ 10(c), submitted herewith as Exhibit 34.

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

and an opportunity to cure, which would not be required in an actual sale of an account receivable.[150]
As there was no purchase of the Direct Purchase Receivables funded by Infinity through these three
medical providers, a resulting trust relationship is precluded as a matter of law. *See In re Welch*,
2012 Bankr. LEXIS 4747 at *12-14.

### 4. Tecumseh's Unclean Hands Precludes It from Establishing a Resulting Trust.

Although the foregoing establishes that no resulting trust exists over the Direct Purchase
Receivables, Tecumseh would be unable to obtain such a remedy based on its own inequitable
conduct.[151] "The unclean hands doctrine generally 'bars a party from receiving equitable relief
because of that party's own inequitable conduct.'" *Las Vegas Fetish & Fantasy Halloween Ball,
Inc. v. Ahern Rentals, Inc.*, 124 Nev. 272, 182 P.3d 764 (2008) (quoting *Food Lion, Inc. v. S.L.
Nusbaum Ins. Agency, Inc.*, 202 F.3d 223, 228 (4th Cir. 2000)). "The imposition of a resulting trust
is an equitable remedy." *In re Foam Systems Co.*, 92 B.R. 406, 409 (9th Cir. 1988). If a party seeking
an equitable remedy comes to court with unclean hands, the court will not aid the party who engaged
in inequitable conduct but rather "will leave them where it finds them." *See, e.g.*, *Goldman v.
Dardashti (In re Melamed)*, 634 B.R. 361, 372 (C.D. Cal. 2021).

Here, Tecumseh has unclean hands with respect to the Direct Purchase Receivables as a result
of its wrongful conduct described herein with respect to both the administration of the MLA and the
solicitation of Infinity to terminate its relationship with HASelect in favor of a new funding
arrangement with Tecumseh. Two of Tecumseh's principals, Meyer and Clark, are former
employees of GAM that used confidential and proprietary knowledge they gained through their
employment with GAM both in soliciting Infinity and in soliciting investors to whom they were
introduced through GAM to fund Tecumseh. Moreover, Clark was directly and materially involved
in the origination and administration of HASelect's Loan to Infinity and reportedly knew of
Infinity's habitual misconduct in overstating the cost and value of accounts receivable presented to

---

[150] *See* Stat Diagnostics Contract, ¶ 14(a), submitted herewith as <u>Exhibit 28</u>; *see also* Preva Contract, ¶ 13(a), submitted herewith as <u>Exhibit 31</u>; Viking Contract, ¶ 12(a), submitted herewith as <u>Exhibit 34</u>.

[151] This was asserted as an affirmative defense to Tecumseh's claims for a resulting trust. *See* ECF No. 25.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1    HASelect for financing through draw requests and the resulting misappropriation of Loan proceeds

2    by Infinity but took no action to protect HASelect's from such misconduct.  Likewise, the principals

3    of FTM Limited, Dobozy and Dalzell, were clearly complicit in such misrepresentations and

4    personally benefited from Infinity's misappropriation of loan proceeds through Infinity's use of such

5    proceeds to pay amounts owed under the Coastal notes.

6        Despite Meyer and Clark's knowledge that HASelect's Collateral included all of Infinity's

7    accounts receivable, they still solicited Infinity to sell Tecumseh millions of dollars of such accounts

8    receivable, which further harmed HASelect by reducing the Collateral available to satisfy the

9    indebtedness owed under the MLA.  Tecumseh further conspired with Infinity to continue to profit

10   from their business relationship by transferring Infinity's business records and intangible assets to

11   Infinity Health Solutions, LLC through which Infinity's principals continued to service and collect

12   the disputed Tecumseh Receivables and to acquire new accounts receivable for Tecumseh after

13   Infinity's bankruptcy filing just as Infinity had done previously.  Such conduct plainly evidences a

14   fraudulent intent to assist Infinity in attempting to avoid repayment of its obligations to HASelect

15   by stripping Infinity of its assets and transferring the same to Infinity Health Solutions where such

16   assets could continue to be used for Tecumseh's benefit.   As such, there is a question of fact as to

17   whether a resulting trust is precluded by the fraudulent actions of Tecumseh and Infinity.[152]

18       Finally, there is clear evidence Tecumseh intended to harm HASelect through its collusion

19   with FTM and Infinity to persuade Three Bell Capital to demand a redemption of its investment in

20   HASelect, which they believed would force the liquidation of HASelect and create an opportunity

21   for Tecumseh to acquire all remaining Infinity accounts receivable included in HASelect's

22   Collateral.  This Court should not sanction or reward Tecumseh's wrongful conduct but should leave

23   Tecumseh as it found it – without the extreme and undeserved equitable remedy of a resulting trust.

24   Because the "application of the unclean hands doctrine raises primarily a question of fact," the

25   Motion must be denied. *See, e.g.*, *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 173

26   (9th Cir. 1989).

27

28   [152] *See* Motion, 18:5-16.

**D.    The Motion Must be Denied to Allow HASelect to Conduct Further Discovery under FRCP 56(d).**

Although the foregoing is sufficient to deny the Motion, in the event that the Court is inclined to grant the Motion, HASelect requests that it be allowed to conduct discovery pursuant to FRCP 56(d), incorporated herein by Bankruptcy Rule 7056.  FRCP 56(d) allows a party, through affidavit or declaration, to request more time to marshal necessary facts and provide the reasons for the additional discovery time.  Here, as set forth by the declaration of Bart K. Larsen, Esq. submitted herewith, HASelect requests additional time to, among other things, fully investigate and determine what payments applied to what receivables, review the binders that are referenced in the Motion to be submitted to the Court under seal, depose Infinity and Tecumseh's FRCP 30(b)(6) designees to determine the intent of the parties and all discussions regarding any trust relationship.  These areas of discovery are directly material to the issues of fact raised in the Motion.

## IV.    <u>CONCLUSION</u>

Based on the foregoing, HASelect respectfully requests that the Court deny Tecumseh's Motion in its entirety.

Dated this 30th day of September 2022.

**SHEA LARSEN**

/s/ *Bart K. Larsen, Esq.*
BART K. LARSEN, ESQ.
Nevada Bar No. 8538
KYLE M. WYANT, ESQ.
Nevada Bar No. 14652
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134

*Attorneys for HASelect-Medical Receivable*
*Litigation Finance Fund International SP*

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**CERTIFICATE OF SERVICE**

1. On September 30, 2022, I served the following document(s): **PLAINTIFF HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP'S OPPOSITION TO TECUMSEH-INFINITY MEDICAL RECEIVABLE FUND, LP'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CERTAIN DISPUTED RECEIVABLES**.

2. I served the above document(s) by the following means to the persons as listed below:

☒    a.    ECF System:

CLARISSE L. CRISOSTOMO on behalf of ROBERT E. ATKINSON
clarisse@nv-lawfirm.com, bknotices@nv-lawfirm.com

GERALD M GORDON on behalf of TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP
ggordon@gtg.legal, bknotices@gtg.legal

MICHAEL D. NAPOLI on behalf of TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP
michael.napoli@akerman.com,
cindy.ferguson@akerman.com;catherine.kretzschmar@akerman.com;laura.taveras
@akerman.com;masterdocketlit@akerman.com;teresa.barrera@akerman.com

ARIEL E. STERN on behalf of TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP
ariel.stern@akerman.com, akermanlas@akerman.com

□    b.    United States mail, postage fully prepaid:

□    c.    Personal Service:

I personally delivered the document(s) to the persons at these addresses:

    □    For a party represented by an attorney, delivery was made by handing the document(s) at the attorney's office with a clerk or other person in charge, or if no one is in charge by leaving the document(s) in a conspicuous place in the office.

    □    For a party, delivery was made by handling the document(s) to the party or by leaving the document(s) at the person's dwelling house or usual place of abode with someone of suitable age and discretion residing there.

□    d.    By direct email (as opposed to through the ECF System):
Based upon the written agreement of the parties to accept service by email or a court order, I caused the document(s) to be sent to the persons at the email addresses listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

□    e.    By fax transmission:

Based upon the written agreement of the parties to accept service by fax

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

transmission or a court order, I faxed the document(s) to the persons at the fax numbers listed below. No error was reported by the fax machine that I used. A copy of the record of the fax transmission is attached.

☐     f.     By messenger:

I served the document(s) by placing them in an envelope or package addressed to the persons at the addresses listed below and providing them to a messenger for service.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 30, 2022.

By: /s/ *Bart K. Larsen, Esq.*

**EXHIBIT 20**

1 | Bart K. Larsen, Esq.
Nevada Bar No. 8538

2 | Kyle M. Wyant, Esq.
Nevada Bar No. 14652

3 | **SHEA LARSEN**
1731 Village Center Circle, Suite 150

4 | Las Vegas, Nevada 89134
Telephone: (702) 471-7432

5 | Fax: (702) 926-9683
Email:  blarsen@shea.law

6 |         kwyant@shea.law

7 | *Attorneys for HASelect-Medical Receivables*
*Litigation Finance Fund International SP*

8

9 | **UNITED STATES BANKRUPTCY COURT**

10 | **DISTRICT OF NEVADA**

11 | In re:

12 | INFINITY CAPITAL MANAGEMENT, INC. | Case No. 21-14486-abl
Chapter 7

13 |         Debtor.

14 |

15 | HASELECT-MEDICAL RECEIVABLES | Adversary Case No. 21-01167-abl
LITIGATION FINANCE FUND
INTERNATIONAL SP,

16 |

17 |         Plaintiff, | **DECLARATION OF MICHAEL GRIFFIN IN SUPPORT OF PLAINTIFF HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP'S OPPOSITION TO TECUMSEH–INFINITY MEDICAL RECEIVABLE FUND, LP'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO DIRECT PURCHASE RECEIVABLES**

18 | v.

19 | TECUMSEH–INFINITY MEDICAL
RECEIVABLES FUND, LP,

20 |         Defendant.

21 |

22 | TECUMSEH–INFINITY MEDICAL
RECEIVABLES FUND, LP,

23 |         Counter-Plaintiff, | Hearing Date: October 25, 2022
Hearing Time: 1:30 p.m.

24 |

25 | v.

26 | HASELECT-MEDICAL RECEIVABLES
LITIGATION FINANCE FUND

27 | INTERNATIONAL SP; ROBERT E. ATKINSON,
CHAPTER 7 TRUSTEE

28 |         Counter-Defendants.

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

| 1 | |
|---|---|

HASELECT-MEDICAL RECEIVABLES
LITIGATION FINANCE FUND
INTERNATIONAL SP,

             Counter-Claimant,

v.

TECUMSEH–INFINITY MEDICAL
RECEIVABLES FUND, LP,

             Counter-Defendant.

I, Michael Griffin, hereby declare as follows:

1.      I am over the age of twenty-one (21) years old and am mentally competent.  I have personal knowledge of the matters set forth herein except as to those matters stated on information and belief, which I believe to be true, and if called upon as a witness to testify to these facts, I could and would competently and truthfully do so.

2.      I am the majority member and manager of Griffin Asset Management LLC ("GAM").  GAM serves as asset manager to HASelect-Medical Receivables Litigation Finance Fund International SP ("HASelect").  HASelect is an investment fund that was sponsored by an affiliated entity, and GAM serves as its investment manager.

3.      I make this Declaration in support of HASelect's Opposition to Tecumseh-Infinity Medical Receivables Fund, LP's ("Tecumseh") *Motion for Partial Summary Judgment as to Direct Purchase Receivables* [ECF No. 90].

4.      I make this declaration based upon my own personal knowledge of the facts stated herein as well as my review of the certain books and records of GAM and HASelect related to the Debtor Infinity Capital Management, Inc. ("Debtor" or "Infinity"), including the exhibits attached to the Motion.  I am familiar with the business operations and document retention practices of both GAM and HASelect.  I am informed and believe that the business records I have reviewed in connection with the preparation of this Declaration, including the exhibits attached to the Motion, were made at or near the time of the events they document by, or from information transmitted by, a person with knowledge of such events, all in the course of regularly conducted business activities.

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

5.      Beginning in February 2019, HASelect made several loans to Infinity that were documented through various loan agreements and promissory notes through which Infinity pledged substantially all of its assets to HASelect as collateral for such loans.

6.      HASelect perfected its security interest in Infinity's assets through the filing of a UCC-1 with the Nevada Secretary of State on February 19, 2019.

7.      On or about December 18, 2019, HASelect, which was then doing business under the name HASelect-FTM Medical Receivables Litigation Finance Fund SP, and Infinity entered into a Second Amended & Restated Loan and Security Agreement and Promissory Note (the "MLA").

8.      The MLA superseded and restated all prior loans made by HASelect to Infinity as well as extended further credit to Infinity.

9.      Pursuant to the MLA, HASelect continues to hold a perfected security interest in all of Infinity's assets as collateral for all indebtedness owed by Infinity in connection with the MLA.

10.      As of September 14, 2021, Infinity owed total indebtedness in excess of $16 million to HASelect pursuant to the MLA.

11.      The MLA loan proceeds were to be used by Infinity to purchase accounts receivables from medical providers.  These accounts receivables generally arose from medical treatment provided to individuals who were injured in accidents and had asserted personal injury claims.  These accounts receivables are generally secured by liens against these personal injury claims and are typically paid at the time the personal injury claims are settled.

12.      To ensure that HASelect received a perfected, first-priority security interest in such accounts receivable (as well as all other Collateral), HASelect required that Infinity use part of loan proceeds advanced by HASelect to repay and retire a prior secured debt owed to Law Finance Group, LLC ("LFG"), which had similarly advanced funds to Infinity for the purchase of accounts receivable.

13.      HASelect also required that Infinity apply an electronic stamp to certain documents associated with its accounts receivable to identify the accounts receivable as HASelect's Collateral.

14.      To ensure loan proceeds were used appropriately by Infinity, HASelect engaged FTM Limited under a sub-advisory agreement dated February 7, 2019 (the "FTM Agreement") to provide

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

sub-advisory and fiduciary services to HASelect that included the investigation and verification of accounts receivable to be purchased by Infinity and the review and approval of draw requests submitted by Infinity on which HASelect relied in advancing funds to Infinity under the Loan.

15.     Under the FTM Agreement, FTM Limited agreed that its services would be exclusive to GAM and HASelect and agreed it would not use, disclose, or distribute any confidential information received from GAM or HASelect.  FTM Limited also agreed that it would act professionally and in best interests of GAM and HASelect at all times and that its principals would act in accordance with the FTM Agreement.

16.     FTM Limited is a Vanatu limited liability company and that the principals of FTM Limited are Endre Debozy and William Dalzell.  Debozy and Dalzell introduced HASelect to Infinity in late 2018 and strongly encouraged HASelect to enter into a lending relationship with Infinity.  In doing so, Debozy and Dalzell did not disclose to HASelect that they had a nearly 20-year history of soliciting investment capital and financing for Infinity or that Infinity owed approximately $12 million in connect with promissory notes given to Coastal Investments, PLC ("Coastal"),  a Cook Islands public limited company owned by Hemmers, Pantelas, and Infinity that Debozy and Dalzell helped create and for which they had solicited and received investments from dozens of third parties.

17.     As a result, despite several months spent discussing and negotiating the MLA, HASelect did not learn of the debts owed by Infinity in connection with the Coastal notes or the secured LFG loan referenced above until February 2019 shortly before the Loan was set to close. When confronted with this information, Debozy, Dalzell, Hemmers, and Pantelas misrepresented the debts owed to Coastal as debts owed to FTM Limited or a related entity, concealing Coastal's existence and ownership from HASelect, and misrepresented the amounts of the indebtedness owed under both the Coastal notes and LFG loan as $8.8 million and $1.9 million, respectively – approximately $3.5 million less than Infinity actually owed.

18.     After reconsidering the matter, HASelect advised Infinity it would go forward with entering into the MLA only if (i) FTM Limited agreed to subordinate all indebtedness owed under the Coastal notes to the HASelect Loan, which Debozy and Dalzell agreed to do, and (ii) the indebtedness

owed to LFG was repaid immediately and LFG released its security interest in Infinity's assets. Ultimately, HASelect and Infinity agreed that HASelect would advance additional Loan proceeds to refinance the LFG loan as referenced above.

19.    HASelect began advancing Loan funds to Infinity under the MLA on March 5, 2019. All advances made under the MLA were wired to an Infinity deposit account at Nevada State Bank ending in 8480 (the "8480 Account"). From March 2019 through April 2020, wired nearly $16 million in Loan proceeds to the 8480 Account. In making such advances, HASelect relied on Debozy and Dalzell's representations that FTM Limited had investigated and verified Infinity's use of funds to be advanced for the purchase of accounts receivable.

20.    In communicating with FTM Limited and Infinity and in negotiating and entering into the MLA, HASelect was represented by Simon Clark, who was then employed by GAM and was responsible for GAM's offshore division, which included HASelect. Following the execution of the MLA, Clark remained responsible for the administration of the Loan and for protecting HASelect's rights and interests under the MLA.

21.    Clark continued to serve as HASelect's primary point of contact for Infinity and FTM until he resigned his position with GAM in February 2020 to join another former GAM employee, Chad Meyer, along with Debozy, Dalzell, Hemmers, and Pantelas in establishing Tecumseh to replace HASelect in its role as lender to Infinity.

22.    Meyer was terminated from his position with GAM in May 2019. Unbeknownst to HASelect or GAM at the time, Meyer, Clark, and another individual they met through GAM, Michael Belotz, formed Tecumseh Alternatives, LLC in August of 2019 as an investment advisory firm modeled after and designed to compete with GAM. Shortly thereafter, Tecumseh Alternatives LLC formed Tecumseh and, upon Clark's resignation, began working with Debozy and Dalzell to solicit Infinity to terminate its relationship with HASelect and to enter into a new financing arrangement with Tecumseh.

23.    While at the same time assisting Tecumseh in soliciting Infinity (and concealing such activities from HASelect), Debozy and Dalzell continued to assist Infinity in obtaining additional

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

Loan advances from HASelect under the MLA.  From March through May 2020, Infinity requested and received Loan advances totaling approximately $1.45 million.  HASelect advanced such funds in reliance upon Debozy and Dalzell's representations that FTM Limited had verified the information provided by Infinity concerning the accounts receivable to be purchased with such funds.

24.    During the course of their employment with GAM, Meyer and Clark had access to GAM's confidential and proprietary business information concerning GAM's relationships with investors and potential investors.  Such information was not publicly known and was highly valuable to GAM.

25.    While soliciting Infinity to terminate its relationship with HASelect in favor of a new funding relationship with Tecumseh, Meyer and Clark used confidential and proprietary information received through their prior employment with GAM to solicit and obtain investment capital from several parties to whom they had been introduced through their employment with GAM.

26.    HASelect learned in May 2020 of a potential business relationship between Tecumseh and Infinity and later that Tecumseh and Infinity had entered into a sub-advisory agreement under which Tecumseh provided funding to Infinity.  However, prior to Infinity's bankruptcy filing, HASelect had only limited information available to it concerning Infinity's dealings with Tecumseh.

27.    After the filing of Infinity's chapter 7 petition, HASelect discovered that Infinity had sold and assigned accounts receivable included within HASelect's Collateral to Tecumseh.  HASelect did not have contemporaneous knowledge of or consent to any sale or transfer of its Collateral, including the accounts receivable at issue in this action, by Infinity to Tecumseh.

28.    After the filing of Infinity's chapter 7 petition, HASelect also discovered that Infinity routinely misrepresented the cost and value of the accounts receivable that it purchased through draw requests made to HASelect in order to obtain excess Loan proceeds.   HASelect also learned that Infinity had misappropriated several million dollars in Loan proceeds, including over $2.5 million used by Infinity to pay debts allegedly owed under the Coastal notes and $150,000 Infinity

1  loaned to Anne Pantelas.  Despite the duties they owed to HASelect, neither Debozy, Dalzell, nor

2  Clark made any effort to inform HASelect of Infinity's misconduct.

3          29.      I declare under penalty of perjury of the laws of the United States that the foregoing

4  is true and correct.

5          DATED this 30th day of September 2022.

6

7                                                    /s/ *Michael Griffin*
                                                      MICHAEL GRIFFIN

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**CERTIFICATE OF SERVICE**

1. On September 30, 2022, I served the following document(s): **DECLARATION OF MICHAEL GRIFFIN IN SUPPORT OF PLAINTIFF HASELECT-MEDICAL RECEIVABLES LITIGATION FINANCE FUND INTERNATIONAL SP'S OPPOSITION TO TECUMSEH-INFINITY MEDICAL RECEIVABLE FUND, LP'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO DIRECT PURCHASE RECEIVABLES**.

2. I served the above document(s) by the following means to the persons as listed below:

    ☒    a.    ECF System:

CLARISSE L. CRISOSTOMO on behalf of ROBERT E. ATKINSON
clarisse@nv-lawfirm.com, bknotices@nv-lawfirm.com

GERALD M GORDON on behalf of TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP
ggordon@gtg.legal, bknotices@gtg.legal

GABRIELLE A. HAMM on behalf of TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP
ghamm@Gtg.legal, bknotices@gtg.legal

MICHAEL D. NAPOLI on behalf of TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP
michael.napoli@akerman.com,
cindy.ferguson@akerman.com;catherine.kretzschmar@akerman.com;laura.taveras@akerman.com;masterdocketlit@akerman.com;teresa.barrera@akerman.com

ARIEL E. STERN on behalf of TECUMSEH-INFINITY MEDICAL RECEIVABLES FUND, LP
ariel.stern@akerman.com, akermanlas@akerman.com

    ☐    b.    United States mail, postage fully prepaid:

    ☐    c.    Personal Service:

I personally delivered the document(s) to the persons at these addresses:

    ☐    For a party represented by an attorney, delivery was made by handing the document(s) at the attorney's office with a clerk or other person in charge, or if no one is in charge by leaving the document(s) in a conspicuous place in the office.

    ☐    For a party, delivery was made by handling the document(s) to the party or by leaving the document(s) at the person's dwelling house or usual place of abode with someone of suitable age and discretion residing there.

    ☐    d.    By direct email (as opposed to through the ECF System):

Based upon the written agreement of the parties to accept service by email or a court order, I caused the document(s) to be sent to the persons at the email addresses listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1    ☐    e.    By fax transmission:

2    Based upon the written agreement of the parties to accept service by fax transmission or a
     court order, I faxed the document(s) to the persons at the fax numbers listed below. No
3    error was reported by the fax machine that I used. A copy of the record of the fax
     transmission is attached.
4
     ☐    f.    By messenger:
5
6    I served the document(s) by placing them in an envelope or package addressed to the
     persons at the addresses listed below and providing them to a messenger for service.

7    I declare under penalty of perjury that the foregoing is true and correct.

8    Dated: September 30, 2022.

                           By: /s/ *Bart K. Larsen, Esq,*
9